ORAL ARGUMENT NOT YET SCHEDULED

No. 15-1177

================================================

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PHH CORPORATION, PHH MORTGAGE CORPORATION, PHH HOME LOANS, LLC, ATRIUM INSURANCE CORPORATION, AND ATRIUM REINSURANCE CORPORATION,

*Petitioners,*

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU,

*Respondent.*

_____

On Petition for Review Of An Order
Of The Consumer Financial Protection Bureau

_____

## OPENING BRIEF FOR PETITIONERS

_____

Mitchel H. Kider
David M. Souders
Sandra B. Vipond
Michael S. Trabon
WEINER BRODSKY KIDER PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C.  20036
(202) 628-2000

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000

Theodore B. Olson
  *Counsel of Record*
Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Petitioners*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**(A)    Parties**

The parties that appeared before the Consumer Financial Protection Bureau ("CFPB") are PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation.  These parties appear before this Court as Petitioners.  The CFPB appears as Respondent.

There are currently no *amici* and no intervenors.

**(B)    Ruling Under Review**

The ruling under review is the final agency action of the CFPB, captioned *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) (JA __–__), and Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 (June 4, 2015) (JA __–__).

**(C)    Related Cases**

This matter has not previously been before this Court.  Counsel is aware of no related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Petitioner PHH Corporation is a publicly traded company (NYSE: PHH). It has no parent company and no publicly held corporation owns 10% or more of its stock. Petitioners Atrium Insurance Corporation, Atrium Reinsurance Corporation, and PHH Mortgage Corporation are wholly-owned subsidiaries of PHH Corporation, and no other company or publicly held corporation owns 10% or more of their stock. Petitioner PHH Home Loans, LLC is owned in part by subsidiaries of PHH Corporation and in part by affiliates of Realogy Holdings Corporation, a publicly traded company (NYSE: RLGY).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION................................................................2

STATEMENT OF ISSUES ......................................................................3

CONSTITUTIONAL PROVISIONS, STATUTES,  AND REGULATIONS
AT ISSUE ..........................................................................................4

STATEMENT OF THE CASE..................................................................4

    A.    Mortgage Insurance And Reinsurance.......................................4

    B.    The Real Estate Settlement Procedures Act ..............................6

    C.    Petitioners' Affiliated Mortgage Reinsurance
        Relationship ...................................................................10

    D.    Proceedings Before The CFPB ...........................................12

        1.    The ALJ 's Decisions ..................................................13

        2.    The Director's Decision................................................15

STANDARD OF REVIEW ....................................................................17

SUMMARY OF ARGUMENT ................................................................18

STANDING ......................................................................................23

ARGUMENT ....................................................................................23

    I.    The Director's Liability Determination Is Unlawful .........................23

    A.    The Director's Decision Violates Fundamental Principles
        Of Fair Notice ...............................................................24

        1.    The Director's New Interpretation Of Section
            8(c)(2) Contradicts Nearly Two Decades Of
            Consistent Agency Guidance.........................................25

**TABLE OF CONTENTS**
**(continued)**

**Page**

2. The Director's New Interpretation Of Section 8(a) Contradicts The Previously Settled Interpretation Of That Provision .......................................... 31

B. The Director's New Interpretations Of RESPA Are Contrary To Law ...................................................... 32

1. The Director's New Interpretation Of Section 8(c)(2) Contravenes The Plain Statutory Text And Guts Its Purpose ............................................... 33

2. The Director's New Interpretation Of Section 8(a) Contravenes The Plain Statutory Text And Structure ...................................................... 37

3. Even If Sections 8(a) Or 8(c)(2) Were Ambiguous, Those Provisions Must Be Interpreted In Petitioners' Favor ............................................ 39

4. The Director Erred In Concluding That Administrative Enforcement Actions Under RESPA Are Not Subject To Any Limitations Period ....................................................... 43

C. The CFPB Violates The Constitutional Separation Of Powers ...................................................... 45

II. The Order's Sanctions Are Unlawful ................................ 51

A. The Injunctive Provisions Exceed The CFPB's Statutory Authority And Are Otherwise Invalid ...................... 52

B. The Disgorgement Order Exceeds The CFPB's Statutory Authority And Is Otherwise Invalid ...................... 56

III. The Decision And Order Should Be Vacated ................... 61

CONCLUSION ............................................................ 62

iv

# TABLE OF AUTHORITIES

**Page(s)**

\* Authorities upon which we chiefly rely are marked with an asterisk.

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...................................................................61

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................62

*Am. Library Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005) ...................................................................57

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*,
   721 F.3d 666 (D.C. Cir. 2013) ...................................................................50

*BP Am. Prod. Co. v. Burton*,
   549 U.S. 84 (2006) ............................................................................... 43, 44

*Capell v. Pulte Mortg. L.L.C.*,
   Civ. A. No. 07-1901, 2007 WL 3342389 (E.D. Pa. Nov. 7, 2007).....................37

*\*Carter v. Welles-Bowen Realty, Inc.*,
   736 F.3d 722 (6th Cir. 2013)................................... 24, 25, 33, 40, 41, 42

*CFPB v. Morgan Drexen, Inc.*,
   60 F. Supp. 3d 1082 (C.D. Cal. 2014)................................................49

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................... 17, 41

*Christopher v. SmithKline Beecham Corp.*,
   132 S. Ct. 2156 (2012) ........................................................................ 2, 25, 30

*Clark v. Martinez*,
   543 U.S. 371 (2005) ...................................................................................40

*Crandon v. United States*,
   494 U.S. 152 (1990) ...................................................................................42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
  482 U.S. 437 (1987) ...................................................................57

*Culpepper v. Irwin Mortg. Corp.*,
  253 F.3d 1324 (11th Cir. 2001) .................................................. 9, 36

*Duka v. SEC*,
  No. 15-CIV-357, 2015 WL 4940083 (S.D.N.Y. Aug. 12, 2015)........51

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................. 18, 42

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ...............................................................24

*Franks v. Bowman Transp., Co.*, 424 U.S. 747 (1976) ..........................37

*\*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ...................................................... 46, 47, 49, 50

*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ...................................................................51

*\*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ............................................. 17, 25, 30

*Geraci v. Homestead Bank*,
  347 F.3d 749 (9th Cir. 2003) .......................................................35

*Glover v. Standard Fed. Bank*,
  283 F.3d 953 (8th Cir. 2002) .................................................. 26, 35

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,
  Local No. 70 of Alameda Cnty.*,
  415 U.S. 423 (1974) ...................................................................52

*Gray Fin. Grp. v. SEC*,
  15-CV-492, Dkt. 56 (N.D. Ga. Aug. 4, 2015)...............................51

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hardin v. City Title & Escrow Co.*,
  797 F.2d 1037 (D.C. Cir. 1986) ................................................................ 34, 36

*Hateley v. SEC*,
  8 F.3d 653 (9th Cir. 1993) ....................................................................... 61

*Heimmermann v. First Union Mortg. Corp.*,
  305 F.3d 1257 (11th Cir. 2002) ............................................................... 36

*Hill v. SEC*,
  No. 1:15-CV-1801, 2015 WL 4307088 (N.D. Ga. June 8, 2015) ....................... 51

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935) .............................................................................. 47

*In re Aiken Cnty.*,
  645 F.3d 428 (D.C. Cir. 2011) ................................................................. 47

*INS v. St. Cyr*,
  533 U.S. 289 (2001) .............................................................................. 41

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*,
  389 U.S. 64 (1967) ................................................................................ 54

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
  131 S. Ct. 1325 (2011) .......................................................................... 40

*Landry v. Fed. Deposit Ins. Corp.*,
  204 F.3d 1125 (D.C. Cir. 2000) ............................................................... 51

*\*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) .......................................................................... 17, 33, 40

*Menichino v. Citibank, N.A.*,
  No. 12-0058, 2013 WL 3802451 (W.D. Pa. July 19, 2013) ............................ 37

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...................................................................... 47, 48, 50

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Mullinax v. Radian Guar. Inc.*,
  199 F. Supp. 2d 311 (M.D.N.C. 2002).....................................................31, 38, 39

*Munoz v. PHH Corp.*,
  No. 08-cv-759, 2013 WL 2146925 (E.D. Cal. May 15, 2013) .....................27, 42

*Myers v. United States*,
  272 U.S. 52 (1926) .........................................................................................46

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1364 (D.C. Cir. 2007) ......................................................................61

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) .........................................................................................41

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) .........................................................................................25

*NLRB v. Express Publ'g Co.*,
  312 U.S. 426 (1941) ....................................................................................53, 54

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013) ........................................................................46

*Office of Personnel Mgmt. v. Richmond*,
  496 U.S. 414 (1990) .........................................................................................49

*Palmer v. Homecomings Fin., LLC*,
  677 F. Supp. 2d 233 (D.D.C. 2010) ................................................................38

*Pedraza v. United Guar. Corp.*,
  No. 99-239, Dkt. 172 (S.D. Ga. June 25, 2001)..............................................27

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ..........................................................................18, 33, 42

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir. 2001) ........................................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Price v. Landsafe Credit, Inc.*,
No. CIV.A.CV205-156, 2006 WL 3791391 (S.D. Ga. Dec. 22, 2006) ..............35

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ......................................................................................57

*Reich v. Sea Sprite Boat Co.*,
50 F.3d 413 (7th Cir. 1995) ..........................................................................52

*Reyes v. Premier Home Funding, Inc.*,
640 F. Supp. 2d 1147 (N.D. Cal. 2009) ..........................................................27

*Satellite Broad. Co. v. FCC*,
824 F.2d 1 (D.C. Cir. 1987) .................................................................... 24, 32

*Schuetz v. Banc One Mortg. Corp.*,
292 F.3d 1004 (9th Cir. 2002) .................................................................. 8, 27

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ....................................................................59

*SEC v. Savoy Indus., Inc.*,
665 F.2d 1310 (D.C. Cir. 1981) ....................................................................55

*SEC v. Teo*,
746 F.3d 90 (3d Cir. 2014) ...........................................................................60

*SEC v. Wash. Inv. Network*,
475 F.3d 392 (D.C. Cir. 2007) ......................................................................53

*SEC v. Whittemore*,
659 F.3d 1 (D.C. Cir. 2011) .................................................................... 59, 60

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) ......................................................................23

*Snow v. First Am. Title Ins. Co.*,
332 F.3d 356 (5th Cir. 2003) .......................................................... 15, 31, 37, 38

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ........................................................48

*United States v. Bajakajian*,
524 U.S. 321 (1998) ........................................................................39

*United States v. Bass*,
404 U.S. 336 (1971) ........................................................................41

*United States v. Masters*,
924 F.2d 1362 (7th Cir. 1991) ..........................................................60

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ........................................................55

*United States v. Santos*,
553 U.S. 507 (2008) ........................................................................40

*United States v. Thompson/Ctr. Arms Co.*,
504 U.S. 505 (1992) ................................................................... 40, 41

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................................................50

*Whitman v. United States*,
135 S. Ct. 352 (2014) ......................................................................41

**Constitutional Provisions**

U.S. Const. art. I, § 7, cl. 1 ..............................................................48

U.S. Const. art. I, § 8, cl. 1 ..............................................................48

U.S. Const. art. I, § 9, cl. 7 ..............................................................48

U.S. Const. art. II, § 2, cl. 2 ............................................................51

U.S. Const. art. II, § 3 ....................................................................46

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**Statutes**

5 U.S.C. § 706(2) ................................................................................61

12 U.S.C. § 1454(a)(2) .........................................................................4

12 U.S.C. § 1717(b) ..............................................................................4

12 U.S.C. § 2601 .................................................................................36

*12 U.S.C. § 2607(a) ..............................................6, 19, 20, 26, 37, 53, 56

12 U.S.C. § 2607(b) ..............................................................................6

*12 U.S.C. § 2607(c) .....................................................6, 7, 19, 33, 37

*12 U.S.C. § 2607(d) .....................................................6, 39, 44, 45, 57, 58

*12 U.S.C. § 2614 .............................................13, 16, 20, 31, 37, 43, 59

12 U.S.C. § 5481(12)(M) .....................................................................10

12 U.S.C. § 5491(a) .............................................................................51

12 U.S.C. § 5491(c) ......................................................................45, 46

12 U.S.C. § 5497(a) ..................................................................45, 46, 48

12 U.S.C. § 5563(a) ......................................................................10, 45

12 U.S.C. § 5563(b) .............................................................3, 23, 52, 54

12 U.S.C. § 5565(a)(2)(D) ...................................................................57

12 U.S.C. § 5581(b)(7)(B) ..................................................................58

28 U.S.C. § 2415(a) ......................................................................43, 44

**Rules**

*12 C.F.R. § 1024.14(g) ................................................10, 26, 29, 34, 55

# TABLE OF AUTHORITIES
## (continued)

Page(s)

12 C.F.R. pt. 1024 ........................................................................................10

24 C.F.R. § 3500.14(g) .......................................................... 7, 26, 34

Fed. R. Civ. P. 65(d)(1)..............................................................................52

**Other Authorities**

Amy Friedman, Standard & Poor's, *Lender Captives Benefit Both
   Lenders and Mortgage Insurers, for a Price* (2007)..............................5

Brief for the United States as Amicus Curiae, *Freeman v. Quicken Loans,
   Inc.*, 132 S. Ct. 2034 (2012) (No. 10-1042) ........................................35

Clarification of Statement of Policy Regarding Lender Payments to
   Mortgage Brokers, and Guidance Concerning Unearned Fees Under
   Section 8(b), 66 Fed. Reg. 53,052 (Oct. 18, 2001) ...............................9

Consent Order, *In re Fidelity Mortg. Corp.*, No. 2014-CFPB-0001 (Jan.
   16, 2014).................................................................................................35

Consent Order, I*n re Lighthouse Title, Inc.*, No. 2014-CFPB-0015 (Sept.
   30, 2014).................................................................................................35

Consolidated Delegations of Authority for Housing, 54 Fed. Reg. 22,033
   (May 22, 1989) ........................................................................................7

Consumer Financial Protection Bureau, *The CFPB Strategic Plan,
   Budget, and Performance Plan and Report* (2015), *available at*
   http://files.consumerfinance.gov/f/201502_cfpb_report_ strategic-plan-
   budget-and-performance-plan_FY2014-2016.pdf ................................48

Fannie Mae, *Qualified Mortgage Insurer Approval Requirements* (2003),
   *available at* https://www.fanniemae.com/content/eligibility_
   information/mortgage-insurers-approval-requirements.pdf..................5

Freddie Mac, *Private Mortgage Insurer Eligibility Requirements* (2015),
   *available at* http://www.freddiemac.com/singlefamily/pdf/PMIERs.pdf..............5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

H.R. Rep. No. 105-769 (1998) (Conf. Rep.) ............................................9

Home Warranty Companies' Payments to Real Estate Brokers and
    Agents,
    75 Fed. Reg. 36,271 (June 25, 2010)......................................9

Identification of Enforceable Rules and Orders,
    76 Fed. Reg. 43,569 (July 21, 2011) ............................... 10, 29

James H. Pannabecker & David Stemler, *The RESPA Manual: A
Complete Guide to the Real Estate Settlement Procedures Act* (2013) ..............27

Lender Payments to Mortgage Brokers,
    64 Fed. Reg. 10,080 (Mar. 1, 1999) ......................................9

Mark P. Goodman & Daniel J. Fetterman, *Defending Corporations and
Individuals in Government Investigations* (2014)................................46

Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance
    Activities Through Reciprocal Insurer, 1999 WL 413838 (Mar. 11,
    1999)..........................................................................10

Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29,264
    (June 7, 1996) ...........................................................8

*The Federalist No. 47* (Clinton Rossiter ed., 1961)..............................45

*The Federalist No. 58* (James Madison) (Clinton Rossiter ed., 1961) ...................49

*The Federalist No. 70* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ............49

Title Insurance Practices in Florida, 61 Fed. Reg. 49,398 (Sept. 19, 1996)..............8

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| Atrium | Petitioners Atrium Insurance Corporation and Atrium Reinsurance Corporation |
| CFPA | Consumer Financial Protection Act |
| CFPB | Consumer Financial Protection Bureau |
| Confirmation Letter | Letter from J. Kennedy, Assoc. Gen. Counsel for Fin. & Regulatory Compliance, HUD, to J. Maher, Am. Land Title Ass'n (Aug. 12, 2004) (JA __) |
| Dec. | *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) (JA __ – __) |
| HUD | United States Department of Housing and Urban Development |
| HUD Letter | Letter from N. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to S. Samuels, Countrywide Funding Corp. (Aug. 6. 1997) ) (JA __ – __) |
| Order | *In the Matter of PHH Corporation*, Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 (June 4, 2015) (JA __ – __) |
| PHH | Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC |
| RESPA | Real Estate Settlement Procedures Act of 1974 |

## INTRODUCTION

In this enforcement proceeding against Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC (collectively, "PHH"), and Atrium Insurance Corporation and Atrium Reinsurance Corporation (collectively, "Atrium"), the Consumer Financial Protection Bureau ("CFPB") declared *per se* illegal a legitimate business arrangement—affiliated mortgage reinsurance—that federal agencies had explicitly approved for nearly two decades.  Not content with upending the settled interpretation of the Real Estate Settlement Procedures Act ("RESPA"), the Director sought to apply his newly-minted standard retroactively to punish Petitioners for conduct they engaged in years ago.  In another dramatic departure from precedent, the Director concluded that each mortgage reinsurance payment—rather than each mortgage settled, as the Administrative Law Judge ("ALJ") had previously determined—constituted a separate statutory violation, and applied that new standard retroactively as well.

Consequently, the Director increased *by a multiple of 18* the "disgorgement" recommended by the ALJ—from $6 million to $109 million.  The Director also imposed sweeping injunctions that forbid Petitioners from "violating Section 8" of RESPA, ban conduct expressly permitted under RESPA or not covered by RESPA at all, and require Petitioners to record the receipt of *any* "thing of value" received by *any* of them from *any* real estate settlement service provider to which *any*

Petitioner has referred borrowers since July 21, 2008, and for the next fifteen years.

Neither the liability determination nor the sanctions imposed can survive judicial review.  The Director's acknowledged "reject[ion]," Dec. 17 (JA __), of well-established RESPA precedent is "precisely the kind of 'unfair surprise' against which [the Supreme Court's] cases have long warned." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (citation omitted).  Even if his interpretation were otherwise permissible, which it is not, it cannot under any circumstances be applied to conduct dating back to and before 2013—the last time Petitioners received any mortgage reinsurance premiums.   The Director's autocratic approach is the all-too-predictable result of his unprecedented lack of democratic accountability, which violates the constitutional separation of powers. The sanctions imposed are also invalid because the injunctive provisions are vague, overbroad, and outside the CFPB's authority.

This Court previously stayed the Director's action pending appeal, finding that Petitioners met the stringent requirements for such relief.  This Court should now vacate the Director's action.

## STATEMENT OF JURISDICTION

The CFPB action on review, *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 ("Dec.") (JA __–__), and

Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 ("Order") (JA __–__), was issued on June 4, 2015 ("Decision and Order"). Petitioners filed a timely petition for review on June 19, 2015. This Court has jurisdiction pursuant to 12 U.S.C. § 5563(b)(4).

## STATEMENT OF ISSUES

1.     Whether the Decision and Order impermissibly apply new interpretations of RESPA retroactively to punish past conduct that was expressly permitted by agency guidance and regulations.

2.     Whether the Decision's interpretation of RESPA's Section 8 is contrary to the statute, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

3.     Whether the unprecedented structure of the CFPB, conferring legislative, executive, *and* judicial power on the democratically unaccountable Director, violates the separation of powers.

4.     Whether the injunctions and $109 million "disgorgement" order are overbroad, vague, unduly burdensome, *ultra vires*, unsupported by evidentiary foundation, or otherwise invalid.

## CONSTITUTIONAL PROVISIONS, STATUTES,
## AND REGULATIONS AT ISSUE

Pertinent constitutional provisions, statutes, regulations, and administrative materials are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Mortgage Insurance And Reinsurance.

Mortgage lenders typically require borrowers who make a down payment of less than 20% to obtain mortgage insurance. Dec. 3 (JA __).[1] Mortgage insurance protects the lender against default. The borrower pays monthly premiums to the mortgage insurer; if the borrower defaults, the insurer covers part of the lender's loss. *Ibid.*

Historically, many insurers have obtained *re*insurance. Whereas mortgage insurance protects lenders, mortgage reinsurance protects the mortgage insurers themselves. Dec. 3 (JA __). Under a typical mortgage-reinsurance arrangement, the mortgage reinsurer assumes some of the risk of insuring the mortgages; in exchange, the mortgage insurer pays, or "cedes" to, the mortgage reinsurer a portion of the monthly premiums paid by the borrower. *Ibid.* Rather than insuring

---

[1]   Fannie Mae and Freddie Mac, which purchase many U.S. mortgages, are required to ensure that higher-risk borrowers secure "credit enhancement." 12 U.S.C. §§ 1454(a)(2), 1717(b)(2)(C), (b)(5)(C). Loan originators thus generally require such borrowers to obtain mortgage insurance. Dec. 3 (JA __).

particular loans, a mortgage reinsurer insures pools of loans originated over a given "book year." *Ibid*. Although given a choice, borrowers typically rely on lenders to recommend a mortgage insurer. *Ibid.*

The only mortgage reinsurers that existed during the relevant period were "affiliated" or so-called "captive" reinsurers, meaning that they provided reinsurance only for loans originated by their related lender. Dec. 13 (JA __). Affiliated reinsurance relationships are common and well-accepted in and outside the mortgage industry. Dkt. 205, at 4 (JA __); Admin. Hr. Tr. 1141–45 (JA __–__).

Affiliated reinsurance emerged in the mortgage lending industry in 1993. Enforcement Ex. 586, at 4 (JA __). By 2007, it was "an integral component of the mortgage insurance industry." Amy Friedman, Standard & Poor's, *Lender Captives Benefit Both Lenders and Mortgage Insurers, for a Price* 1 (2007); *see* Enforcement Ex. 682 (JA __). Affiliated reinsurance ensures that the originator of the mortgage loan continues to have "skin in the game," even after it has sold the mortgage on the secondary mortgage market. Enforcement Ex. 653, at 6 (JA __). Fannie Mae and Freddie Mac have recognized affiliated mortgage reinsurance as a permissible form of risk mitigation. *See* Freddie Mac, *Private Mortgage Insurer Eligibility Requirements* § 707 (2015), *available at* http://www.freddiemac.com/ singlefamily/pdf/PMIERs.pdf; Fannie Mae, *Qualified Mortgage Insurer Approval*

5

*Requirements* § 7(E)(iii), (iv) (2003), *available at* https://www.fanniemae.com/
content/eligibility_information/mortgage-insurers-approval-requirements.pdf.

### B.     The Real Estate Settlement Procedures Act

In 1974, Congress enacted RESPA, 12 U.S.C. § 2601 *et seq.*, which
prohibits kickbacks and certain unearned fees in connection with home mortgage-
related services.  Sections 8(a) and (b) of RESPA generally prohibit two distinct
practices: giving or accepting any "thing of value" "pursuant to any agreement or
understanding" to "refe[r]" business "incident to or part of a real estate settlement
service," 12 U.S.C. § 2607(a), or giving or accepting any portion of a charge for
settlement services "other than for services actually performed," *id.* § 2607(b).
Violation of these prohibitions is a federal crime as well as a basis for civil
liability.  *Id.* § 2607(d)(1)–(2).  Section 8(c), in turn, creates several exemptions
from these prohibitions.  *Id.* § 2607(c).  Section 8(c)(2) provides:  "Nothing in this
section shall be construed as prohibiting . . . (2) the payment to any person of a
bona fide salary or compensation or other payment for goods or facilities actually
furnished or for services actually performed[.]"  *Id.* § 2607(c)(2).

The Department of Housing and Urban Development ("HUD") was
originally charged with enforcing RESPA.  *See* 12 U.S.C. § 2607(d)(4) (2006).
HUD's implementing regulations were known as "Regulation X."  In 1996, HUD
amended Regulation X to provide:

> If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided.

24 C.F.R. § 3500.14(g)(2) (2011). It also clarified that "Section 8 . . . permits" payments covered by Section 8(c)(2). *Id.* § 3500.14(g) (2011).

In 1997, the Federal Housing Commissioner, exercising the Secretary's delegated authority, 54 Fed. Reg. 22,033, 22,035 (May 22, 1989), explained how HUD would apply Section 8 to affiliated-reinsurance programs. *See* Letter from Nicholas P. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to Sandor Samuels, Gen. Counsel, Countrywide Funding Corp. (Aug. 6. 1997) ("HUD Letter") (JA __–__). Countrywide, a residential mortgage lender, had established precisely the type of reinsurance relationship at issue here. *See id.* at 1 (JA __). In response to Countrywide's request for clarification regarding the lawfulness of its programs, HUD issued a letter ruling stating:

> [HUD's] view of captive reinsurance is that the arrangements are permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services "actually furnished or for services performed" and (2) are *bona fide* compensation that does not exceed the value of such services.

*Id.* at 3 (JA __). When this test is satisfied, "such payments would be permissible under [Section] 8(c)." *Ibid.* In crafting that test, HUD relied primarily on Section 8(c)(2) as an "exemption" from Sections 8(a) and (b). *Ibid.*

7

The HUD Letter detailed how its two-part test should be applied. *First*, for "a real service—reinsurance—[to be] performed by the reinsurer," the following criteria must be satisfied: (a) there must be an industry-standard "legally binding contract for reinsurance"; (b) "[t]he reinsurer must post capital and reserves satisfying [relevant state law] and the reinsurance contract . . . must provide for the establishment of adequate reserves"; and (c) "[t]here must be a real transfer of risk." HUD Letter at 6 (JA __). *Second*, in determining "whether the compensation paid for reinsurance does not exceed the value of the reinsurance," the agency would consider "the risk borne by the" affiliated reinsurer, "the likelihood of losses occurring," and "the relative risk exposure." *Id.* at 7 (JA __).[2]

Subsequently, HUD frequently relied upon its two-part test as the governing standard under Section 8. For example, in the yield spread premiums context, there had been "legal uncertainty" about Section 8's application to lender payments to mortgage brokers for services performed. *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1009 (9th Cir. 2002). This uncertainty "generated a considerable amount of litigation." *Ibid.* Thus, in 1998, Congress directed HUD to "clarify its position on lender payments to mortgage brokers," pointedly observing that

---

[2]  The HUD Letter mirrored HUD's earlier interpretations of Section 8(c)(2) in other contexts. *See* Title Insurance Practices in Florida, 61 Fed. Reg. 49,398, 49,399 (Sept. 19, 1996); Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29,264, 29,265 (June 7, 1996).

"Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of subsections (a) or (b) (12 U.S.C. Sec. 2607) in its enactment of RESPA."  H.R. Rep. No. 105-769, at 260 (1998) (Conf. Rep.).  HUD responded by publishing a policy statement reaffirming that Section 8(c)(2) exempts settlement services that satisfy the two-part analysis.  *See* Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080, 10,085–86 (Mar. 1, 1999).

In 2001, HUD published another policy statement, this time in response to *Culpepper v. Irwin Mortgage Corp.*, 253 F.3d 1324 (11th Cir. 2001), again reiterating its interpretation in order to "eliminate any ambiguity."  Clarification of Statement of Policy Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53,052, 53,052, 53,054 (Oct. 18, 2001).

For the rest of its time administering RESPA, HUD continued to confirm both the validity of the HUD Letter and the applicability of its two-part test.  *See* Home Warranty Companies' Payments to Real Estate Brokers and Agents, 75 Fed. Reg. 36,271, 36,272 (June 25, 2010).  In 2004, HUD reiterated that the "1997 guidance" is "useful" in determining the "legality of captive mortgage reinsurance programs."  Letter from John P. Kennedy, Assoc. Gen. Counsel for Fin. & Regulatory Compliance, HUD, to James Maher, Am. Land Title Ass'n (Aug. 12,

2004) ("Confirmation Letter") (JA __).  Other federal agencies relied on it, too.  *See* Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance Activities Through Reciprocal Insurer, 1999 WL 413838, at *2 n.20 (Mar. 11, 1999) ("[The 1997 HUD Letter] will assist you in meeting your responsibility to comply with RESPA.").

On July 21, 2011, HUD's enforcement mandate was transferred to the CFPB by the Consumer Financial Protection Act ("CFPA").  *See* 12 U.S.C. §§ 5563(a)(2), 5481(12)(M).  That same day, the CFPB announced that "the official commentary, guidance, and policy statements issued prior to July 21, 2011, by a transferor agency with exclusive rulemaking authority for the law in question . . . will be applied by the CFPB pending further CFPB action."  Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43,569, 43,570 (July 21, 2011).  Subsequently, the CFPB codified Regulation X in its own regulations, making no substantive change to the provisions relevant here.  *See* 12 C.F.R. pt. 1024; *see also id.* § 1024.14(g)(2).  Until this matter arose, the CFPB took no further substantive administrative action regarding Section 8.

### C.    Petitioners' Affiliated Mortgage Reinsurance Relationship.

During the relevant period, PHH Mortgage Corporation and PHH Home Loans, LLC, originated home mortgage loans.  Dec. 2 (JA __).  PHH generally sold its loans to secondary-market investors, primarily Fannie Mae and Freddie

Mac, but retained the right to service those loans. *Ibid.* PHH also purchased and resold loans originated by other lenders. *Id.* at 3 (JA __). Like other mortgage lenders, PHH required certain borrowers to secure mortgage insurance, if required by the investor. *Ibid.*

In 1994, PHH created Atrium Insurance Company as a wholly-owned subsidiary to provide reinsurance services to mortgage insurers. Dec. 2 (JA __). The subsidiary's functions were transferred to Atrium Reinsurance Corporation in 2010. *Ibid.* Atrium provided reinsurance only for mortgages originated by PHH or underwritten to its guidelines. PHH disclosed those affiliated-reinsurance arrangements in writing to its borrowers, giving them the choice to secure a different mortgage insurer or to request that the policy not be reinsured. Admin. Hr. Tr. 119 (JA __). Borrowers were not assessed any additional fees or premiums if the policy on the loan was reinsured; the rates assessed by mortgage insurers are approved by state insurance regulators and remain the same regardless of any reinsurance arrangements. Dec. 3 (JA __).

PHH used a variety of mortgage-insurance providers, some of which did not enter into reinsurance agreements with Atrium. Enforcement Ex. 653, at 9 (JA __). Four of those insurers did: AIG United Guaranty Mortgage Insurance Company ("UGI"), Genworth Mortgage Insurance Company ("Genworth"), Radian

11

Guaranty, Inc. ("Radian"), and CMG Mortgage Insurance Company ("CMG"). *Ibid*; Enforcement Ex. 153, at 38 (JA __).

Atrium began to assume risk on behalf of UGI, Genworth, Radian, and CMG on January 1, 1997, October 9, 2000, July 26, 2004, and December 1, 2006, respectively. Enforcement Ex. 653 at 12–13 (JA __–__). Atrium paid substantial reinsurance claims filed by several of those entities. Indeed, between 2005 and 2009, the amount of claims that Atrium paid out to UGI and Genworth far exceeded the premiums received from them: projected ultimate loss ratios for these years ranged from 153.5% to 201.7%. Respondents' Compilation of Material in Support of Their Appeal, Dkts. 211-B; 211-C (JA __–__). As of January 1, 2010, all reinsurance agreements involving Atrium were in "run-off" (*i.e.*, Atrium continued to receive premiums from insurers on existing loans but reinsured no new loans). Dkt. 205, at 28–31 (JA __–__). As of May 2013, the last of the agreements had been "commuted" (*i.e.*, Atrium and the insurer agreed to a final payment to terminate their relationship). *Id.* at 28–35 (JA __–__).

### D.    Proceedings Before The CFPB.

On January 19, 2014, the CFPB filed a Notice of Charges against Petitioners, alleging violations of Sections 8(a) and 8(b) of RESPA "relating to their use of captive mortgage reinsurance arrangements." Dkt. 1, at 1 (JA __). The Notice of Charges applied the legal standard articulated in the HUD Letter,

12

contending that "[t]he premiums ceded by the [mortgage insurers] to PHH through Atrium: (a) were not for services actually furnished or performed, or (b) grossly exceeded the value of any such services." *Id.* ¶ 96 (JA __).  The document further charged that the alleged violations "commenced in 1995 (at the latest) and continued until at least May of 2013." *Id.*¶ 103 (JA __).

### 1.    The ALJ 's Decisions

To adjudicate this matter, the CFPB borrowed an Administrative Law Judge ("ALJ") from the Securities and Exchange Commission ("SEC").  *See* Order Assigning Administrative Law Judge, Dkt. 20 ("*Order Assigning ALJ*") (JA __).

On May 22, 2014, the ALJ issued an order resolving the parties' dispositive motions.  *See* Dkt. 152 (JA __).  Expressly relying on HUD's "regulations and interpretive guidance," including the HUD Letter, the ALJ found that "captive reinsurance is permissible under RESPA if the payments to the reinsurer are for reinsurance services actually furnished or for services performed, and are bona fide compensation that does not exceed the value of such services." *Id.* at 5, 6 (JA __).

The ALJ also determined that the CFPB could not pursue any alleged violations that HUD could not have challenged before the CFPB's creation on July 21, 2011.  He therefore barred any claims arising before July 21, 2008, under RESPA's three-year statute of limitations.  Dkt. 152, at 10 (citing 12 U.S.C. § 2614) (JA __).  Consequently, the ALJ analyzed only "book years" that included

13

loans that closed on or after July 21, 2008—namely, the 2009 book year for insurer UGI ("UGI 2009"), the 2008-B book year for Genworth ("Genworth 2008-B"), the 2008 book year for Radian ("Radian 2008"), and the 2008 book year for CMG ("CMG 2008"). *See* Dec. 21 (JA __).

The evidence before the ALJ showed that Petitioners satisfied the standard set forth in the HUD Letter: that Atrium performed actual reinsurance services (*i.e.*, insurance "risk transfer" from the insurers) and received bona fide compensation for those services (*i.e.*, price commensurability). For example, Milliman, an actuarial consulting firm, evaluated "risk transfer and price commensurability with risk" for several of the book years at issue to support that conclusion. Dkt. 205, at 41 (JA __).

On November 25, 2014, the ALJ issued a recommended decision finding that Petitioners violated Sections 8(a) and 8(b) for the book years at issue. Applying the HUD Letter's test, the ALJ concluded that Section 8(c)(2) did not apply because he was not convinced "that Atrium's premiums in their entirety were bona fide." Dkt. 205, at 75 (JA __). The ALJ recommended injunctions and disgorgement of $6,442,399, or all premiums received by Atrium on the Genworth 2008-B and UGI 2009 book. *Id.* at 102 (JA __). Consistent with the ALJ's finding that alleged violations before July 21, 2008 were not actionable, the amount

included only book years containing loans closed after that date. *Id.* at 88–93 (JA __–__).

### 2.    The Director's Decision

Petitioners and Enforcement Counsel cross-appealed the ALJ's recommended decision to Director Richard Cordray. Dec. 2 (JA __). On June 4, 2015, the Director upheld the ALJ's Recommended Decision in part and reversed in part, to dramatically increase the amount of disgorgement to $109 million and impose additional injunctions. *See* Dec. 33–37 (JA __).

The Director expressly "reject[ed]" the HUD Letter and held that Section 8(c)(2) is not a "substantive exemption" from liability and instead becomes relevant only "if there is a question as to whether the parties actually did enter into an agreement to refer settlement service business." Dec. 16–17 (JA __–__). By so disregarding Section 8(c)(2), the Director was able to conclude that Petitioners violated Section 8(a); he declined to address Section 8(b). *Id.* at 14, 17 (JA __, __).

As to the accrual of a violation, the Director again departed drastically from precedent. The ALJ, relying on *Snow v. First American Title Ins. Co.*, 332 F.3d 356 (5th Cir. 2003), had determined that Petitioners violated Section 8 at the moment each reinsured loan closed, *see* Dec. 22 (JA __). The Director disagreed, determining that *each payment* to Atrium by the mortgage insurers amounted to a

15

separate violation. *Ibid.* Moreover, while acknowledging that RESPA "contains a three-year statute of limitations for 'actions brought by the [CFPB],'" the Director concluded that this provision applies *only* to suits brought in court. Dec. 10 (quoting 12 U.S.C. § 2614) (JA __).

Thus, while the Director agreed with the ALJ that the CFPB could not pursue claims before July 21, 2008, Dec. 11–12 (JA __–__), he nonetheless reached back to earlier book years for which any premium payment was made on or after July 21, 2008, even where the relevant loan closed before that date. On the basis of these novel interpretations of RESPA, the Director ordered Petitioners to disgorge $109,188,618. Order at 2 ("Provision V") (JA __).

As additional sanctions, the Director enjoined Petitioners "from violating Section 8" of RESPA, Order at 1 ("Provision I") (JA __); entering into any affiliated reinsurance agreement for the next 15 years, *ibid.* ("Provision II"); and "referring any borrower to any provider of a real estate settlement service if that provider has agreed to purchase or pay for any service" from Petitioners and "the provider's purchase of or payment for that service is triggered by those referrals," *id.* at 2 ("Provision III") (JA __). He also ordered that Petitioners "maintain records of all things of value that [Petitioners] receiv[e] or ha[ve] received from any real estate settlement service provider to which [Petitioners] ha[ve] referred borrowers since July 21, 2008, and for the next 15 years." *Ibid.* ("Provision IV").

Petitioners timely sought review in this Court, as well as a stay.  This Court granted the stay, finding that PHH "satisfied the stringent requirements" for such relief.  Order (Aug. 3, 2015).

## STANDARD OF REVIEW

The question whether an agency has provided fair notice is reviewed *de novo*.  *See*, *e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995) ("The due process clause . . . prevents deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.") (internal quotation marks and ellipsis omitted).

An agency's statutory interpretation is addressed under *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  At *Chevron's* first step, courts apply the "traditional tools of statutory interpretation—text, structure, purpose, and legislative history"—to determine if Congress has spoken directly to the question at issue.  *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001).  These "tools" include the rule of lenity, which requires courts to interpret any ambiguity in statutes with criminal applications against the government.  *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  Furthermore, "the APA requires an agency to provide more substantial justification . . . 'when its prior policy has engendered serious reliance interests.'"  *Perez v.*

17

*Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

## SUMMARY OF ARGUMENT

**I.** The Director's interpretations of RESPA's Sections 8(a) and 8(c)(2) break with nearly two decades of prior authority. Even if those interpretations were permissible readings of the statute, which they are not, they most certainly cannot be applied retroactively to punish conduct undertaken by Petitioners based on explicit agency advice expressly approving that conduct.

**A.** The Due Process Clause prohibits the government from retroactively imposing punishment based on conduct that, at the time it was undertaken, was recognized as lawful. In this case, however, the Director has read Section 8(c)(2)'s express authorization of affiliated-reinsurance arrangements—where reinsurance services are actually provided and the compensation is consistent with the services provided—out of existence, contravening the operative regulations and repeated interpretative guidance from HUD and the CFPB itself. Those novel interpretations cannot be applied retroactively to punish Petitioners for affiliated-reinsurance relationships created when the relevant agencies had expressly authorized them. Principles of fair notice alone require vacating the Decision and Order.

**B.**    In any event, the Director's interpretations of RESPA cannot remotely be squared with the text of the statute and would gut its purpose.

**1.**    Section 8(c)(2) exempts from liability under RESPA any "payment to any person of . . . compensation . . . for services actually performed."  12 U.S.C. § 2607(c)(2).  The Director interpreted this provision as providing a mere gloss on Section 8(a)'s general prohibition against "accept[ing] any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person," *id.* § 2607(a), effectively limiting Section 8(c)(2) to cases where there is some ambiguity whether an "agreement or understanding" has actually been reached.  But Section 8(c) plainly states that it applies *notwithstanding* any other provision of RESPA, and the Director's reading nullifies Congress's obvious intent to protect certain referrals from liability under Sections 8(a) and (b).

**2.**    The Director also erred in interpreting Section 8(a).  According to the Director, that provision gives rise to liability every time a mortgage-reinsurance premium is received for a loan reinsured pursuant to an unlawful referral.  This interpretation, however, ignores the uniform view of the federal courts, which have recognized that Section 8(a) is violated (if at all) at the time the relevant loan closes; at that point, the "referral" and "agreement" have already occurred and the

19

"thing of value" (12 U.S.C. § 2607(a)) has been transferred; any later payments are simply an exchange of a contractual right for an equivalent amount of currency. Moreover, RESPA's statute of limitations runs from "*the* date of *the* occurrence of *the* violation," 12 U.S.C. § 2614 (emphases added), which—consistent with Section 8(a)—does not envision multiple violations occurring whenever a premium is received.

    **3.**    Even if Sections 8(a) or 8(c)(2) were ambiguous, they must be interpreted in favor of Petitioners. Violation of RESPA carries criminal penalties, and the rule of lenity requires all ambiguities in criminal statutes to be construed against the government. Because a single statute can have only one valid interpretation, RESPA must be interpreted the same way in this civil case as well. The Director failed to show that Sections 8(a) or 8(c)(2) unambiguously require *his* interpretation, or even to consider the serious reliance interests at stake.

    **4.**    Compounding the Director's interpretive errors, he concluded that the CFPB can pursue administrative enforcement proceedings based on those provisions without *any* statute of limitations. He did so by claiming that the relevant provision regarding the statute of limitations—requiring "[a]ny action" by the CFPB to be brought within three years of the alleged violations—applies only to judicial cases. Yet the very statute that the CFPB invoked to bring this proceeding (*see* 12 U.S.C. § 2614) refers to "actions" brought by the agency. The

term "action" must be understood to include administrative proceedings, and accordingly the three-year statute of limitations applies.

**C.**    The Decision and Order are invalid for the independent reason that the agency's structure violates the Constitution.  No previous agency has ever given one person—here, the Director—sole decision-making authority, lengthy tenure, independence from the President, and unfettered access to a half-billion-dollar budget.  The Director is insulated from presidential control because the President may not remove him except for cause.  And he is shielded from congressional control because he has sole authority to dictate the CFPB's budget from the Federal Reserve without any congressional oversight.  He is answerable to nobody in the federal government (save the courts).   Together, these unique and unprecedented features of the CFPB violate the separation of powers, and thus invalidate any action taken by this unconstitutional agency.

**II.**    The CFPB's Order is also invalid because the injunctions and disgorgement provisions required by the Order exceed the CFPB's authority.

**A.**    Each of the injunctive provisions is unlawful.  Provision I purports to bar Petitioners from violating RESPA, but it is well-settled that so-called "obey-the-law injunctions" are invalid.  Provision III purports to prohibit Petitioners from any referrals involving any "real estate settlement service," and Provision II limits Petitioners' involvement in any "captive" reinsurance arrangement, not just

mortgage insurance. Those prohibitions sweep far beyond the charges in this proceeding and, thus, beyond what the CFPB can permissibly impose. And Provision IV imposes onerous record-keeping requirements that not only extend far beyond the issues in this case, but also would impose massive—and unreasonable—burdens on Petitioners for 22 years.

**B.**     **The CFPB's disgorgement order is invalid.**

**1.**     Disgorgement is categorically unavailable to the CFPB under RESPA, which permits the "full range of equitable relief" to be ordered only by a court— not, as here, in an administrative proceeding. It is irrelevant that the CFPA permits broader relief: The relevant statute governing the scope of relief under RESPA is RESPA itself. In any event, even if the CFPA's remedial provisions applied in lieu of RESPA's, they cannot be applied to conduct that occurred before the statute was enacted because HUD—which was previously charged with administering RESPA—had authority only to pursue injunctions.

**2.**     The $109 million disgorgement amount assessed by the Director lacks any evidentiary foundation because it is based on "book years" that the ALJ specifically excluded from consideration. The ALJ determined that he would not consider any loans closed before July 21, 2008. The Director disagreed with this conclusion based on his reading of Section 8(a) as imposing liability based on the receipt of premiums well after the relevant loan closed, and he thus required

22

disgorgement of premiums related to book years that were never considered by the ALJ.

**3.**    The Director improperly assessed the amount of disgorgement based on the gross receipts supposedly received by Petitioners.  But it is settled law that disgorgement requires the affected party to repay only the *profits* that it received from the relevant transactions, not the entire amount received.

**III.**    For all of these reasons, the Director's Decision and Order should be vacated.  The CFPB's actions in this proceeding are patently and incurably unlawful.  In addition, because this Court granted a stay pending this appeal, vacatur would simply maintain the status quo and not produce any disruptive consequences.

## STANDING

Petitioners have Article III standing because they are the objects of the Decision and Order on review.  *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002).  Petitioners have statutory standing because each of them participated in, and was a party to, the agency proceedings.  *See* 12 U.S.C. § 5563(b)(4).

## ARGUMENT

### I.    The Director's Liability Determination Is Unlawful.

For at least three independent reasons, the Director's determination that Petitioners violated Section 8 must be set aside.  *First*, the determination rests on

radical new interpretations of Sections 8(a) and 8(c) that cannot, consistent with fundamental principles of fair notice, be applied retroactively to punish Petitioners for conduct undertaken in reliance on prior agency precedent. *Second*, the Director's new interpretations of Sections 8(a) and 8(c) cannot be squared with the plain text of RESPA. *Third*, the Director had no valid authority to render the Decision and Order: The separation of powers prohibits giving such enormous, unchecked, multi-branch authority to a single, democratically unaccountable individual.

### A.    The Director's Decision Violates Fundamental Principles Of Fair Notice.

The Due Process Clause prevents the government from retroactively imposing liability without giving "fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). This "bedrock principle of American law," *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013), "preclude[s] an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule," *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987).

Accordingly, "an agency should not change an interpretation in an adjudicative proceeding where doing so would impose 'new liability . . . on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements' or in a case involving 'fines or damages.'" *Christopher v.*

*SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)).  This "fair notice" requirement is particularly critical for statutes, such as Section 8, that impose criminal as well as civil liability.  *See Carter*, 736 F.3d at 727.

The CFPB violated these basic constitutional requirements by imposing massive, nine-figure liability on Petitioners based on two radical new interpretations of RESPA that abruptly "reject," Dec. 17 (JA ___), almost two decades of agency and judicial interpretation and application.  It was entirely impossible for Petitioners to have "identif[ied]" at the time of the challenged conduct, let alone with the requisite "ascertainable certainty," "the standards with which the [CFPB] [now] expects parties to conform."  *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).  Thus, whether or not the Director's interpretations of RESPA are permissible going forward—and they are not, *see infra* Section I.B—they *certainly* cannot be retroactively applied to punish Petitioners.

### 1.    The Director's New Interpretation Of Section 8(c)(2) Contradicts Nearly Two Decades Of Consistent Agency Guidance.

Section 8(a) provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement

25

service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). But it is subject to a critical caveat: "Section 8(c) . . . specifically excludes [payments for services actually furnished or performed] from the Section 8(a) proscription." *Glover v. Standard Fed. Bank*, 283 F.3d 953, 965 (8th Cir. 2002).

*a.* As relevant here, HUD's long-standing interpretation of RESPA established the prevailing standard for evaluating whether affiliated-reinsurance agreements complied with Section 8.

Regulation X, promulgated by HUD and expressly adopted by the CFPB, unambiguously provides that "Section 8 of RESPA permits . . . [a] payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 24 C.F.R. § 3500.14(g) (2011); 12 C.F.R. § 1024.14(g)(2). Only "if the payment of a thing of value bears no reasonable relationship to the market value of the . . . services provided" could the "excess" amount possibly represent an improper payment "not for services . . . actually performed or provided." 24 C.F.R. § 3500.14(g) (2011); 12 C.F.R. § 1024.14(g)(2).

Applying that interpretation, the HUD Secretary's designee stated in the HUD Letter that affiliated-reinsurance arrangements are permissible under RESPA if the payments "(1) are for reinsurance services 'actually furnished or for services

26

performed' and (2) are *bona fide* compensation that does not exceed the value of such services."  HUD Letter at 3 (JA __).  HUD (and other agencies) repeatedly held to that legal interpretation.  *See* Confirmation Letter at 1 (JA __); *see also supra* at 6–10 (collecting examples).

Before the Director issued his novel interpretation in this proceeding, HUD's interpretation of Section 8 as applied to reinsurance arrangements was universally understood to be the governing standard.  A leading RESPA treatise recently observed: "HUD concluded (and there is no reason to think the CFPB does not agree) that captive mortgage reinsurance arrangements are permissible under RESPA if the payments to the reinsurer:  (1) are for reinsurance services actually furnished or for services performed and (2) are bona fide compensation that does not exceed the value of such services."  James H. Pannabecker & David Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* § 8.04[6][a] (2013) (citation omitted).  Courts have relied on HUD's two-part test to determine the legality of affiliated-reinsurance arrangements under RESPA. *See*, *e.g.*, *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1010–14 (9th Cir. 2002); *Munoz v. PHH Corp.*, No. 08-cv-759, 2013 WL 2146925, at *5 (E.D. Cal. May 15, 2013); *Reyes v. Premier Home Funding, Inc.*, 640 F. Supp. 2d 1147, 1159 (N.D. Cal. 2009); *Pedraza v. United Guar. Corp.*, No. 99-239, Dkt. 172, ¶¶ 2, 7 (S.D. Ga. June 25, 2001).

Indeed, *in this very proceeding*, both the ALJ and Enforcement Counsel understood HUD's interpretation of RESPA as providing the controlling legal standard.  As the ALJ explained, the HUD Letter's "'guidance is a straightforward application of [Regulation X] to captive reinsurance,'" and it "has been 'relied upon by mortgage insurers, lender-owned reinsurers and courts alike to evaluate a captive arrangement's compliance with Section 8.'"  Dkt. 205, at 41 (citation omitted) (JA __); *see also* Dkt. 1, ¶ 96 (alleging that premiums "were not for services furnished or performed," or "grossly exceeded the value of any such services") (JA __).  Indeed, Enforcement Counsel's own expert witness relied on the HUD Letter.  *See* Expert Report of Mark Crawshaw, Ph.D., Dkt. 55, at 34 (JA __) ("Another guideline for assessing risk transfer is described in a 1997 letter from Nicholas Retsinas of [HUD].").

*b.*     Upending this well-settled interpretation of Section 8(c), the Director concluded that affiliated reinsurance violates Section 8(a) even when the reinsurance coverage was provided at a "commensurate price."  Dec. 20 (JA __).  The Decision thus punishes the precise activity that HUD at the time was telling regulated entities (including Petitioners) was legal.

The Director dismissed the HUD Letter as not "binding."  Dec. 17 (JA __).  As an initial matter, that position ignores the CFPB's own regulations, which contain the *same* two-part test as the HUD Letter and expressly "permit"

qualifying payments.  *See* 12 C.F.R. § 1024.14(g)(2).  And it disregards the voluminous *other* published guidance from HUD adopting the *same* interpretation of Section 8, and the agreement of other agencies and courts.  *See supra* at 6–10.

But even if the HUD Letter had been the *only* source of the relevant test, that letter reflected HUD's official legal interpretation, and the Director cannot brush it aside.  HUD plainly intended its letter ruling to provide guidance to regulated entities and to govern RESPA's application to them.  It "detail[ed]" "how [HUD] will scrutinize these arrangements to determine whether any specific captive reinsurance program is permissible under RESPA," and concluded by reassuring Countrywide that "this guidance will assist you to conduct your business in accordance with RESPA."  HUD Letter at 1, 8 (JA __, __).  HUD later reiterated that its "1997 guidance" would be "useful" in "evaluat[ing]" the "legality of captive mortgage reinsurance agreements under RESPA."  Confirmation Letter at 1 (JA __).  And on its first day of existence, the CFPB confirmed that all "official commentary, guidance, and policy statements" from HUD would continue to control "pending further CFPB action."  Identification of Enforceable Rules and Orders, 76 Fed. Reg. at 43,570.  Until the Director issued his Decision, the CFPB took no administrative action suggesting otherwise.

The consistent interpretation of RESPA by HUD, other federal regulators, courts, commentators, and regulated entities alike makes clear that Petitioners

29

lacked "fair notice" of the Director's contrary interpretation at the time that they engaged in the relevant conduct. Indeed, even the ALJ and Enforcement Counsel (as well as its expert) believed that the HUD Letter provided the proper framework for decision under Section 8: the *entire hearing*—including PHH's evidentiary submissions—was conducted on that basis.

Under these circumstances, how could Petitioners have predicted that, years after they closed the mortgages at issue and stopped receiving premiums, the Director would jettison HUD's well-settled interpretation of RESPA and impose a retroactive, punitive *per se* bar on affiliated-mortgage reinsurance programs, *after* Atrium paid out millions in claims under those arrangements? Even *silent agency acquiescence* can preclude fair notice. *See Christopher*, 132 S. Ct. at 2168 (involving "lengthy period of conspicuous inaction"). This case is even worse: what the CFPB now says was forbidden was affirmatively *permitted* by the "regulations and other public statements issued by the agency," *Gen. Elec*. 53 F.3d at 1329. Regulated entities were assured they could "conduct [their] business," HUD Letter at 8, in ways the CFPB now says were illegal. The Director's attempt to manufacture retroactive liability against those who took the government at its word violates the bedrock requirements of fair notice.

### 2.    The Director's New Interpretation Of Section 8(a) Contradicts The Previously Settled Interpretation Of That Provision.

Petitioners also never received fair notice of the Director's new interpretation of Section 8(a) as creating a violation every time a mortgage-reinsurance premium is received, rather than when the relevant loan closed.

The Director's interpretation was literally unprecedented. As the ALJ acknowledged, Dkt. 152, at 11 (JA __), courts have consistently found that a RESPA violation occurs (if at all) when the loan closes. *See Snow v. First American Title Ins. Co.*, 332 F.3d 356, 359–60 (5th Cir. 2003); *see also*, *e.g.*, *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 325 (M.D.N.C. 2002). As further explained below, *see infra* Section I.B, these courts have rested their conclusion on the plain language of the statute of limitations, which runs from a *singular* point: "*the* date of *the* occurrence of *the* violation." 12 U.S.C. § 2614 (emphasis added). No court has disagreed. *See* Dkt. 152, at 11 (JA __). As the ALJ correctly recognized, "the *Snow* doctrine is authoritative." *Id.* at 12 (JA __).

The Director brazenly "reject[ed]" this long-established and widely accepted interpretation of RESPA. Dec. 17 (JA __). Fair-notice principles prevent the Director from punishing Petitioners for receiving payments that were not previously considered independently actionable under RESPA.

*        *        *

31

The Director's retroactive reinterpretations of Sections 8(c)(2) and 8(a) violate the most basic of constitutional guarantees: fair notice. An agency cannot "punish a member of the regulated class for reasonably interpreting [its precedent]. Otherwise the practice of administrative law would come to resemble 'Russian Roulette.'" *Satellite Broad. Co.*, 824 F.2d at 4. The Director may wish to rewrite RESPA, but he cannot rewrite history: HUD, industry, other federal agencies, courts, commentators, the ALJ, and Enforcement Counsel *all* read Section 8 to make lawful what the Director now seeks to punish. Due process does not permit that outcome.

## B.    The Director's New Interpretations Of RESPA Are Contrary To Law.

The clear violation of Petitioners' fundamental right to fair notice is sufficient in itself to warrant setting the Director's action aside. But the Director's new interpretations of RESPA are independently impermissible. They contravene the statute's plain language and Congress's obvious intent to carve out certain referrals from liability under Section 8.

In concluding that Section 8(c)(2) is irrelevant where a referral agreement exists, and that a Section 8(a) violation occurs each time a payment is received, the Director shrugged off the clear text of RESPA in favor of sweeping reinterpretations that effectively nullify critical parts of the statute. The Director compounded these errors by interpreting RESPA not to include *any* statute of

32

limitations for administrative enforcement proceedings, sweeping within the CFPB's dragnet even *more* conduct that was lawful when undertaken.

Even if Sections 8(a) or 8(c)(2) were ambiguous, they must be interpreted in Petitioners' favor. Where a statute carries both criminal and civil penalties, as here, the rule of lenity governs its interpretation in both contexts and requires any ambiguities to be construed against the government. *See Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004); *see also Carter*, 736 F.3d at 727 (applying rule of lenity to Section 8). Moreover, the Director's cavalier dismissal of the "serious reliance interests," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015), induced by the government's prior, repeated constructions of these provisions is arbitrary and capricious.

### 1. The Director's New Interpretation Of Section 8(c)(2) Contravenes The Plain Statutory Text And Guts Its Purpose.

Section 8(c) is written with particular clarity: "*Nothing in this section shall be construed as prohibiting* . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2) (emphasis added). The provision uses the absolute term "nothing," and contains no restrictions. It unambiguously permits the payment of any "bona fide salary or compensation or other payment" made related to "services actually performed," regardless of

Section 8(a)'s otherwise-applicable prohibition.  Congress plainly never intended to outlaw all referrals; rather, it prohibited paying for referrals by charging more than the value of the services provided.  *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038 (D.C. Cir. 1986) (RESPA enacted to address "unnecessarily high settlement charges caused by *certain* abusive practices") (emphasis added) (internal quotation marks omitted); *supra* at 9 (quoting Conf. Rep.).

Consistent with Section 8(c)(2)'s plain text, and as explained above,  HUD repeatedly interpreted the provision to impose a two-part test that expressly *exempted* certain payments from liability under RESPA:  Payments are permissible if they "(1) are for reinsurance services 'actually furnished or for services performed' and (2) are <u>bona fide</u> compensation that does not exceed the value of such services."  HUD Letter at 3 (JA __); *see also* 24 C.F.R. § 3500.14(g)(1) (2011) (listing types of payments that "Section 8 of RESPA permits"); 12 C.F.R. § 1024.14(g) (same); *supra* at 6–10 (collecting examples).

The Director, however, read an unwritten limitation into Section 8(c)(2), claiming that "[S]ection 8(c)(2) only becomes relevant if there is a question as to whether the parties actually did enter into an agreement to refer settlement service business."  Dec. 17 (JA __).  There is no textual basis for that reading.  Section 8(c)(2) does not draw distinctions among referral agreements, or even mention such agreements at all; rather, it states that legitimate payments are not prohibited.

34

The Director's reading directly contravenes the unqualified nature of Section 8(c)(2) and effectively reads that provision out of existence.

The Director asserted that Section 8(c) merely "clarifies section 8(a), providing direction as to how that section should be interpreted, but does not provide a substantive exemption from section 8(a)." Dec. 16 (JA __) (emphasis omitted). But that's not what the statute says, and indeed Regulation X says exactly the opposite. Moreover, courts,[3] HUD, and the CFPB itself[4] have correctly found that Section 8(c) operates as an exemption from liability. Yet whether couched as a clarification, exemption, defense, qualification, safe harbor, or "interpretive gloss," Section 8(c)(2)'s effect is obvious: It expressly *permits*

---

[3] *See, e.g., Geraci v. Homestead Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (Section 8(c) "provides a safe harbor"); *Glover*, 283 F.3d at 965 (Section 8(c) "specifically excludes [payments for services actually furnished or performed] from the Section 8(a) proscription."); *Price v. Landsafe Credit, Inc.*, No. CIV.A.CV205-156, 2006 WL 3791391, at *3 (S.D. Ga. Dec. 22, 2006) (Section 8(c) "creates a safe harbor from liability"), *aff'd*, 514 F.3d 1153 (11th Cir. 2008).

[4] *See, e.g.*, Consent Order ¶ 9, *In re Lighthouse Title, Inc.*, No. 2014-CFPB-0015 (Sept. 30, 2014) (Section 8(c)(2) "provides an exemption"); Consent Order ¶ 9, *In re Fidelity Mortg. Corp.*, No. 2014-CFPB-0001 (Jan. 16, 2014) (Section 8(c) "lists exemptions to the prohibitions [of Section 8(a)]"); *see also* Brief for the United States as Amicus Curiae at 22, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) (No. 10-1042) (Section 8(c) "provid[es] a safe harbor").

certain conduct that would otherwise be proscribed by removing that conduct from the scope of Section 8(a) and (b).[5]

The Director also contended that "permit[ing] compensated referrals . . . would distort the market in ways that the statute as a whole plainly sought to prevent." Dec. 16 (JA __). But Congress thought otherwise, and for good reason: the market for real estate settlement services is not distorted—and no "unnecessar[y]" settlement costs incurred, *Hardin*, 797 F.2d at 1038 (quoting 12 U.S.C. § 2601)—when mortgage insurers pay no more than the commensurate price for the reinsurance services they actually receive. Congress deliberately excluded such payments from liability, and the Director was not free to disregard Congress's clear textual command based on his skewed view of Congress's "intent."

The Director attempted to conclude in the alternative that Petitioners' arrangements did not comply with Section 8(c) even as correctly (and long) interpreted, but was able to arrive at this conclusion only by shifting the burden of

---

[5]   The Director relied in part on the Eleventh Circuit's statement in *Culpepper v. Irwin Mortgage Corp.* that, "[i]f [Section] 8(c) is only a gloss on [Section] 8(a), making clear what [Section] 8(a) allows in certain contexts, we should avoid reading [Section] 8(c) to bless conduct that [Section] 8(a) plainly outlaws." 253 F.3d 1324, 1330 (11th Cir. 2001). The Eleventh Circuit, however, later *rejected* this interpretation in light of HUD's two-part test. *See Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1263 (11th Cir. 2002).

proof from the government to Petitioners and assuming that evidentiary *silence* equaled liability.   *See* Dec. 20 (JA ___).   That was fundamental legal error; rather than defend the conclusion, the CFPB has already abandoned it in this Court.   Stay Opp. 14 n.5.   Rightly so.   Section 8(c) does not set forth an affirmative defense, but rather elements of the offense that the government must prove.   *See*, *e.g.*, *Franks v. Bowman Transp., Co.*, 424 U.S. 747, 758 (1976).   The government—not the defendant—therefore bears the burden of proving that the conduct at issue does not fall within Section 8(c).   *See*, *e.g.*, *Capell v. Pulte Mortg. L.L.C.*, Civ. A. No. 07-1901, 2007 WL 3342389, at *6 (E.D. Pa. Nov. 7, 2007).

### 2.    The Director's New Interpretation Of Section 8(a) Contravenes The Plain Statutory Text And Structure.

The Director similarly ignored the plain text of RESPA in concluding that a statutory violation occurs under Section 8(a) each time a payment is made by the mortgage insurer to the reinsurer.   *See* Dec. 22 (JA __).

Although RESPA prohibits "giv[ing]" or "accept[ing]" things of value pursuant to a fee-for-referral agreement, 12 U.S.C. § 2607(a), RESPA's statute of limitation provision is triggered by "*the* date of *the* occurrence of the violation," *id.* § 2614 (emphasis added).   Accordingly, courts have long concluded that a RESPA violation occurs at the date that the loan closes, rather than every subsequent date when a payment related to the loan may be received.   *See*, *e.g.*, *Snow*, 332 F.3d at 359–60 (5th Cir. 2003); *Menichino v. Citibank, N.A.*, No. 12-0058, 2013 WL

3802451, at *12 (W.D. Pa. July 19, 2013); *Palmer v. Homecomings Fin., LLC*, 677 F. Supp. 2d 233, 237 (D.D.C. 2010); *Mullinax*, 199 F. Supp. 2d at 325.

At closing, the referral has already occurred, and the lender and the affiliated reinsurer have received the "thing of value"—that is, the contractual right of the reinsurer to receive payments from the mortgage insurer over time, in exchange for the promise to reinsure the risk. The fact that the "thing of value" is later exchanged for its equivalent—that is, the payments themselves—is immaterial. In *Snow*, the plaintiff alleged that title agents violated Section 8(a) by receiving payments for certain insurance referrals long after the relevant loans closed. The Fifth Circuit rejected that contention, holding that "[t]he phrase 'the date of the occurrence of the violation' refers to the closing, i.e., when the plaintiffs paid for the insurance, because that is when the agents earned the allegedly prohibited 'thing of value.'" 332 F.3d at 359. Moreover, "extending indefinitely the limitations period for private plaintiffs suing under [Section] 2607 . . . would creat[e] a limitations period that is longer than Congress could have contemplated," thereby "negat[ing] Congress' decision to impose three different limitations periods in [Section] 2614." *Id*. (citation omitted).

In *Mullinax*, the district court similarly considered and rejected the kind of continuing-violations theory that the Director embraced. The court emphasized that RESPA "focus[es] on the settlement transaction itself," and that, if the

continuing-violations theory were adopted, it would create "disparate results" among the limitations periods applicable to different borrowers, "who apparently can elect either to pay for their insurance in one lump sum or through multiple payments." 199 F. Supp. 2d at 325.

The Director's contrary reading is also unworkable, because a private plaintiff's cause of action would arise not on an objective date the borrower knows (the closing) but on dates determined by the happenstance of payments between providers, and nonsensically implies that a new decision to refer settlement service business is made every time a premium cedes (here, monthly). Finally, it would create a shocking multiplier effect on the statutory penalties, *see* 12 U.S.C. § 2607(d)—and in this case, it operated to increase *by a multiple of 18* the disgorgement amount (assuming that is a valid remedy) from $6 million to $109 million. Especially when the Director's continuing-violations theory is combined with his conclusion that there are *no* time limits on administrative enforcement actions, *see infra* Section I.B.4, the potential for staggering and unconstitutional fines, *see*, *e.g.*, *United States v. Bajakajian*, 524 U.S. 321 (1998), further militates against the Director's construction of Section 8(a).

### 3.    Even If Sections 8(a) Or 8(c)(2) Were Ambiguous, Those Provisions Must Be Interpreted In Petitioners' Favor.

Even if Sections 8(a) and 8(c)(2) were ambiguous, deference is not appropriate under the rule of lenity, and the Director's dismissal of Petitioners'

reliance interests as "not particularly germane," Dec. 19 (JA __), further compels rejection of his interpretations.

*a.*    Because Section 8 has both civil and criminal applications, the rule of lenity governs its construction.   Any possible ambiguities therefore must be resolved in favor of Petitioners.  *See Leocal*, 543 U.S. at 12 n.8; *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) ("[T]he rule of lenity can apply when a statute with criminal sanctions is applied in a noncriminal context."); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality opinion).

Courts "must interpret [Section 8] consistently, whether [they] encounter its application in a criminal or noncriminal context."  *Leocal*, 543 U.S. at 11 n.8.  To permit otherwise would allow courts (or, worse, agencies) to "'give the same statutory text different meanings in different cases.'"  *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez*, 543 U.S. 371, 386 (2005)).  That will not do:  a "statute is not a chameleon.  Its meaning does not change from case to case."  *Carter*, 736 F.3d at 730 (Sutton, J., concurring).

Moreover, because the rule of lenity resolves any possible ambiguity in Section 8, *Chevron* deference could not apply in any circumstances.  A court should defer to the agency's interpretation of a statute only if ambiguity remains

40

*after* deploying all the "normal 'tools of statutory construction.'" *See*, *e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 321 n.45 (2001) (quoting *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). The rule of lenity, as a "rule of statutory construction," *Thompson/Ctr. Arms Co.*, 504 U.S. at 519 n.10, is therefore applicable before the question of deference even arises. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 985 (2005) (deferring to agency because lower court, in refusing to give deference, "invoked no . . . rule of construction (such as the rule of lenity) requiring it to conclude that the statute was unambiguous"). Thus, "*Chevron* accommodates rather than trumps the lenity principle." *Carter*, 736 F.3d at 732 (Sutton, J., concurring). That is as it should be, because the power to "define criminal activity" rests exclusively with Congress, *United States v. Bass*, 404 U.S. 336, 348 (1971), not executive agencies—and especially not *unaccountable* agencies. *See Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., respecting the denial of certiorari) ("[T]he Government's pretensions to deference . . . collide with the norm that legislatures, not executive officers, define crimes.").

Thus, it is the Director who must show that the statute unambiguously favors *his* construction, as the rule of lenity resolves any ambiguity in Petitioners' favor. He cannot carry that burden, because Petitioners' interpretations are at a minimum reasonable; under the rule of lenity, the Director's harsher interpretations must give

41

way.  *See Carter*, 736 F.3d at 727.  Any contrary holding would "turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity."  *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring).

*b.*      It is undisputed that "[t]he [HUD] Letter has been relied upon by mortgage insurers [and] lender-owned reinsurers [*i.e.*, affiliated reinsurers] . . . to evaluate a captive reinsurance arrangement's compliance with Section 8."  *Munoz*, 2013 WL 214695, at *5.  For that reason, the Director's decision to throw that guidance overboard is subject to heightened scrutiny.  *See Perez*, 135 S. Ct. at 1209 (agencies must "provide more substantial justification" when they change a policy that "has engendered serious reliance interests") (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The Director barely acknowledged Petitioners' reliance interests in the existing HUD interpretation, much less offered a "substantial justification" for reversing course.  Instead, he spurned those interests as "not particularly germane." Dec. 19 (JA ___).  Yet Petitioners (and, indeed, the entire industry) were lulled into a false sense of security that their affiliated-mortgage-reinsurance programs were permissible so long as they satisfied the two-part test that HUD articulated, emphasized, and reaffirmed, and that the CFPB adopted.  "It [was] arbitrary or capricious to ignore such matters."  *Fox*, 556 U.S. at 515.

42

### 4.    The Director Erred In Concluding That Administrative Enforcement Actions Under RESPA Are Not Subject To Any Limitations Period.

The Director's sweeping constructions of Section 8 were expanded even further by his conclusion that the CFPB is not restrained by *any* limitations period for administrative enforcement actions under RESPA.  This position, which would permit the CFPB to have initiated this proceeding even a century from now, is as illogical as it is unsupported by the statute.  RESPA provides that actions such as this one are subject to a three-year statute of limitations, and, accordingly, all of the CFPB's claims involving loans closed before January 25, 2009 are time-barred.

Section 16 of RESPA provides that "[a]ny action" by the CFPB "may be brought within 3 years from the date of the occurrence of the violation."  12 U.S.C. § 2614.  Relying on *BP America Production Co. v. Burton*, 549 U.S. 84 (2006), the Director stated that "action" refers exclusively to lawsuits in court, not to administrative enforcement proceedings, *see* Dec. 10 (JA __).  That is incorrect.

The issue in *BP America* was whether the six-year statute of limitations generally applicable to "every [contract] action for money damages brought by the United States," 28 U.S.C. § 2415(a), applies to administrative payment orders issued by the Department of Interior.  In deciding that it does not, the Supreme Court reasoned that "[Section] 2415(a) applies when the Government commences any 'action for money damages' by filing a 'complaint' to enforce a contract, and

43

the statute runs from the point when 'the right of action accrues.'"  549 U.S. at 91 (quoting 28 U.S.C. § 2415(a)).  The Court emphasized that the "key terms in this provision—'action' and 'complaint'—are ordinarily used in connection with judicial, not administrative, proceedings."  *Ibid.*  Moreover, "[t]he phrase 'action for money damages' reinforces this reading because the term 'damages' is generally used to mean 'pecuniary compensation or indemnity, which may be recovered *in the courts*.'"  *Id.* at 91–92 (citation omitted).

The Supreme Court's holding that an administrative payment order does not fall within the definition of an "action for money damages" initiated by a "complaint," and which runs from the accrual of the "right of action," has little bearing here.  Although both Section 16 and Section 2415(a) use the term "action," the remaining textual clues that the Supreme Court used to inform its understanding of that term in Section 2415(a)—"complaint" and "money damages"—are absent from Section 16.  And while "action" can, as the Court noted, be used to refer to judicial proceedings, the Court relied on the more specific language of Section 2415(a)—that is, "right of action"—in interpreting the statute.  *See BP Am.*, 549 U.S. at 91.

The relevant textual clues in *this* case point in the opposite direction.  Most notably, the very authority invoked by the CFPB to pursue equitable relief in this enforcement proceeding—12 U.S.C. § 2607(d)(4)—states that the CFPB "may

44

bring an action to enjoin violations" of Section 8. The CFPB's administrative-tribunal statute, in contrast, refers only to "ensur[ing] or enforc[ing] compliance with" consumer laws such as RESPA. *Id.* § 5563(a). Unless Section 2607(d)(4)'s reference to "action" is interpreted to include administrative enforcement proceedings, as the CFPB must believe to have instituted this proceeding, then the injunctive relief ordered would have been impermissible. If the CFPB wants to rely on the phrase "an action to enjoin," it must accept the consequence: That "action" is subject to a three-year limitations period under Section 2614(a).

### C.    The CFPB Violates The Constitutional Separation Of Powers.

The Director's blatant disregard for fair notice, statutory text, and industry's reliance interests is a symptom of larger constitutional problems. The CFPA places sweeping legislative, executive, and judicial power all "in the same hands" of a *single person* who is entirely unaccountable to the democratic process—what James Madison called "the very definition of tyranny." *The Federalist No. 47*, at 301 (Clinton Rossiter ed., 1961).

The Director is not answerable to the President, as he is removable only for cause. *See* 12 U.S.C. § 5491(c)(3). Nor is Congress able to rein in the Director using its power over the purse, as he has the sole power to fund his agency from the Federal Reserve System's operating expenses, *id.* § 5497(a)(1), and Congress is *prohibited* from reviewing the Director's budget determinations, *id.*

§ 5497(a)(2)(C).  The Director is not checked by the deliberative decision-making process of a multi-member commission structure, nor is he checked by a short tenure, as he serves a fixed five-year term.  *Id.* § 5491(c)(1).  And far from a limited scope of power, the Director wields vast authority under eighteen statutes previously enforced by seven different agencies.  Mark P. Goodman & Daniel J. Fetterman, *Defending Corporations and Individuals in Government Investigations* § 9:4 (2014).

Never before has so much power been accumulated in the hands of one individual so thoroughly shielded from democratic accountability.  The combination of these unprecedented structural features violates the separation of powers.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010).  The CFPB is an unconstitutional body, and its action against PHH thus is void.  *See*, *e.g.*, *Noel Canning v. NLRB*, 705 F.3d 490, 499, 514 (D.C. Cir. 2013), *aff'd on other grounds*, 134 S. Ct. 2550 (2014).

1.    The Constitution vests the Executive power in the President, who must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," *Free Enter. Fund*, 561 U.S. at 484, and thus the President "must have the power to remove [executive officers] without delay," *Myers v. United States*, 272 U.S. 52, 134 (1926).

Restrictions on the President's removal power are presumptively unconstitutional, and the Supreme Court has recognized only two exceptions:  Congress may limit the President's ability to remove (1) a multimember "body of experts," *see Humphrey's Ex'r v. United States*, 295 U.S. 602, 624 (1935),[6] and (2) inferior officers with limited tenure and a narrow scope of powers, *see Morrison v. Olson*, 487 U.S. 654, 671–73, 695–97 (1988).

When a court is asked "to consider a new situation not yet encountered by the [Supreme] Court," there must be special "circumstances" to justify "restrict[ing] the President] in his ability to remove" an officer.  *Free Enter. Fund*, 561 U.S. at 483–84.  The CFPB is precisely such a "new situation."  Unlike the Federal Trade Commission, the Director is not meant to be "non-partisan" or to "act with entire impartiality," nor is he "called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Humphrey's Ex'r*, 295 U.S. at 624 (citation omitted).  Further, the CFPB is headed not by a multimember commission that contains its own internal checks, but by a single unchecked

---

[6]    The continued viability of *Humphrey's Executor* after *Free Enterprise Fund* has been questioned.  *See*, *e.g.*, *In re Aiken Cnty.*, 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("The [*Free Enterprise Fund*] Court's rhetoric and reasoning are notably in tension with *Humphrey's Executor*.").  In light of *Free Enterprise Fund*, *Humphrey's Executor* should be read narrowly and not extended.  Further, Petitioners respectfully preserve the argument that the Supreme Court should revisit *Humphrey's Executor*.

Director.  And unlike the "independent counsel," the Director does not have "limited jurisdiction and tenure" or "lac[k] policymaking or significant administrative authority."  *Morrison*, 487 U.S. at 691.  To the contrary, he has lengthy tenure, Hydra-headed authority, and sweeping enforcement powers.

Moreover, Congress eliminated other important checks on the Director by abdicating its *own* core responsibilities over the CFPB.  The Director has sole authority to set the CFPB's budget and to demand up to 12% of the Federal Reserve System's operating expenses, totaling over half a billion dollars,[7] *see* 12 U.S.C. § 5497(a)(2)(A)—a demand *exempt* from "review by the Committees on Appropriations of the House of Representatives and the Senate," *id.* § 5497(a)(2)(C).  Under the Constitution, however, Congress has exclusive control over the power of the purse.  *See* U.S. Const. art. I, § 7, cl. 1 (Origination Clause); § 8, cl. 1 (Taxing and Spending Clause); § 9, cl. 7 (Appropriations Clause).  "'This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people[.]'"  *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347

---

[7]    $618.7 million for the fiscal year 2015, and $631.7 million for the fiscal year 2016.  Consumer Financial Protection Bureau, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* 11 (2015), *available at* http://files.consumerfinance.gov/f/201502_cfpb_report_ strategic-plan-budget-and-performance-plan_FY2014-2016.pdf.

(D.C. Cir. 2012) (quoting *The Federalist No. 58*, at 359 (James Madison) (Clinton Rossiter ed., 1961)).  The Director's funding decisions thus are shielded from any Congressional accountability—an essential constitutional aim.  *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (Appropriations Clause has "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents").

There are, accordingly, no special "circumstances," *Free Enter. Fund*, 561 U.S. at 483–84, here that could justify encroaching on the President's removal power.  Quite the opposite, the CFPB combines vast authority for the Director with unprecedented insulation.  *See id.* at 498 (striking down removal limitations because "the public c[ould not] 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall'") (quoting *The Federalist No. 70*, at 428 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

**2.**     It would be erroneous to examine each of the CFPB's anomalous structural features separately, finding a precedential justification for each one in isolation, as some courts have done.  *See*, *e.g.*, *CFPB v. Morgan Drexen, Inc*., 60 F. Supp. 3d 1082, 1086–92 (C.D. Cal. 2014).  Rather, the constitutionality of

agency "independence" must be examined holistically, and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001); *see also Morrison*, 487 U.S. at 671–73, 695–97 (finding fewer protections necessary where scope of delegated power is narrow).

"[J]ust because two [or more] structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute." *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1225 (2015). While the Supreme Court has "previously upheld limited restrictions" on particular checks and balances, the combined elements of CFPB's "novel structure does not merely add to the [agency's] independence, but transforms it." *Free Enter. Fund*, 561 U.S. at 495, 496. Indeed, the CFPB's unconstitutionality lies in its unprecedented level of insulation from *all* democratic checks and accountability. Thus, "[p]erhaps the most telling indication of the severe constitutional problem" with the CFPB's structure "is the lack of historical precedent for this entity." *Id*. at 505 (internal quotation marks omitted).

Aggravating the constitutional problems in this case is the fact that the ALJ who presided over the hearing, despite being an "inferior Office[r]," was not appointed by the President, a court, or a "Hea[d] of Departmen[t]." U.S. Const.

art. II, § 2, cl. 2.  Pursuant to an Interagency Agreement between the CFPB and the SEC, this enforcement action was assigned to the ALJ by the SEC's Chief ALJ.  *Order Assigning ALJ* at 1 (JA __).  Neither the CFPB Director, *see* 12 U.S.C. § 5491(a), nor the SEC's Chief ALJ, is among the "Heads of Departments." Moreover, ALJs are inferior officers because, even though they cannot enter final orders, "[t]hey take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders."  *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881–82 (1991).[8]

All of these unique and unprecedented features, taken as a whole, render the CFPB unconstitutional and this enforcement action void.

## II.    The Order's Sanctions Are Unlawful.

The Director's liability determinations should be set aside, in which case there is no legal basis for the imposition of any sanctions against Petitioners.  But those sanctions are themselves invalid.  The Order's staggeringly broad injunctions cover activities far beyond the conduct addressed in the Notice of Charges and are

---

[8]    *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125 (D.C. Cir. 2000), held that ALJs who cannot issue final orders are not "officers."  Three courts have recently disagreed.  *See Duka v. SEC*, No. 15-CIV-357, 2015 WL 4940083, at *2 (S.D.N.Y. Aug. 12, 2015); *Gray Fin. Grp. v. SEC*, 15-CV-492, Dkt. 56, at 33, 35 (N.D. Ga. Aug. 4, 2015); *Hill v. SEC*, No. 1:15-CV-1801, 2015 WL 4307088, at *16–19 (N.D. Ga. June 8, 2015); *see also Landry*, 204 F.3d at 1140–43 (Randolph, J., concurring in part and concurring in the judgment).  Petitioners respectfully preserve this argument for review by the *en banc* Court or the Supreme Court.

otherwise unlawful.    As for the Order's disgorgement mandate, the CFPB

possesses no statutory authority to issue any such remedy in the first place; there is,

in any event, a grievous disconnect between the total amount of disgorgement

required by the Director and the evidence actually before the ALJ.  The sanctions

cannot survive judicial review

### A.    The Injunctive Provisions Exceed The CFPB's Statutory Authority And Are Otherwise Invalid.

Under the "[s]pecial rules for cease-and-desist proceedings," when "the

[CFPB] finds that *any violation specified in the notice of charges* has been

established, the [CFPB] may issue and serve upon the covered person or service

provider an order to cease and desist from *the violation or practice*."  12 U.S.C.

§ 5563(b)(1)(D) (emphases added).   Moreover, the injunctive provisions in the

Order are subject to Rule 65, *see Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417

(7th Cir. 1995) ("Long ago . . . the Supreme Court held that Rule 65(d) simply

restates a norm of federal equity practice and therefore is equally germane to

orders enforcing decisions of administrative agencies."), which requires

"specific[ity]" and "reasonable detail," Fed. R. Civ. P. 65(d)(1); *see also Granny*

*Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70 of*

*Alameda Cnty.*, 415 U.S. 423, 444 (1974) ("[T]hose against whom an injunction is

issued should receive fair and precisely drawn notice of what the injunction

actually prohibits.").  None of the injunctive provisions in the Order adheres to these requirements.

1.    Provision I of the Order requires Petitioners "in connection with the referral of any borrower to a provider of mortgage insurance, [to] CEASE AND DESIST from violating section 8 of the Real Estate Settlement Procedures Act, 12 USC § 2607(a)."  Order at 1 (JA __).  This "obey-the-law" injunction is patently invalid.

Provision I is not tied in any way to the Notice of Charges at issue here.  It also fails to describe in any kind of detail, let alone "reasonable detail," the actions to be prohibited.  *See*, *e.g.*, *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 433 (1941) (rejecting "a blanket order restraining the employer from committing any act in violation of the statute, however unrelated it may be to those charged and found"); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (rejecting an injunction that "might subject defendants to contempt for activities having no resemblance to the activities that led to the injunction, thereby being overly broad in its reach").

And because Provision I refers generically to Section 8, without explanation, it does not provide Petitioners with fair notice of the *particular* acts enjoined, thus violating "the most fundamental postulates of our legal order forbid[ding] the

imposition of a penalty for disobeying a command that defies comprehension." *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

**2.** Provision III requires Petitioners to "CEASE AND DESIST, for a period of 15 years, from referring any borrower to any provider of a real estate settlement service if that provider has agreed to purchase or pay for any service from any of the [Petitioners], and the provider's purchase of or payment for that service is triggered by those referrals." Order at 2 (JA __).

The reference to any "real estate settlement service" ensures that Provision III reaches far beyond the conduct described in the Notice of Charges to services *completely unrelated* to mortgage reinsurance. Indeed, the CFPB has admitted as much, conceding in this Court that "this provision applies to referrals that do not involve mortgage insurance." Stay Opp. at 16. But the Notice of Charges in this proceeding concerned *only* mortgage reinsurance. *Contra* 12 U.S.C. § 5563(b)(1)(D); *see also Express Publ'g Co.*, 312 U.S. at 435–36 ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction" that would "subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."). Indeed, the reference to any "real estate settlement service" means that the

provision would prohibit conduct expressly *allowed* under the CFPB's own regulations.  *See* 12 C.F.R. § 1024.14(g)(1).

Provision III also fails to define the term "triggered," which appears nowhere in RESPA or its implementing regulations.  *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (per curiam) ("[W]e have held injunctions to be too vague . . . when they include, as a necessary descriptor of the forbidden conduct, an undefined term that the circumstances of the case do not clarify.").

**3.**    Provision II requires Petitioners to "CEASE AND DESIST, for a period of 15 years, from entering into *any* captive reinsurance agreement."  Order at 1 (JA __) (emphasis added).  The provision thus purports to limit Petitioners' participation in numerous reinsurance areas, such as life and property insurance, wholly outside of the mortgage realm.  Again, the Notice of Charges concerned only mortgage reinsurance.  And by enjoining conduct not covered by RESPA and perhaps even outside the CFPB's authority entirely, the provision goes too far under Rule 65.  *See SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1318–19 (D.C. Cir. 1981) (rejecting part of injunction that "could embrace nearly any sort of violation of the securities laws, and possibly reach out even beyond the securities area").

**4.**    Provision IV requires Petitioners to "maintain records of all things of value that any [Petitioner] receives or has received from any real estate settlement

service provider to which any [Petitioner] has referred borrowers since July 21, 2008, and for the next 15 years." Order at 2 (JA __). The breadth of this provision is jaw-dropping: It applies to *anything* of value that *any* Petitioner received within two years of a referral from any real estate settlement service provider to which *any* (and potentially a different) Petitioner referred borrowers—for a period of 22 years. *Ibid.*

This vast information-collecting and record-keeping obligation would impose massive burdens on Petitioners for years to come, and would require them immediately to determine whether any of their more than 10,700 current and former employees ever received a relevant "thing of value" during the past seven years. And, like the other injunctive provisions, it does not adhere to the relevant statutory or other legal requirements: It is not tied to the Notice of Charges, does not provide Petitioners with fair notice of the specific prohibited conduct, and reaches conduct not covered by RESPA because it is unrelated to payments made "pursuant to" an "agreement or understanding" that business would be "referred." 12 U.S.C. § 2607(a).

## B. The Disgorgement Order Exceeds The CFPB's Statutory Authority And Is Otherwise Invalid.

Provision V of the Order requires Petitioners to disgorge $109,188,618. But that equitable remedy is categorically unavailable under RESPA and suffers from numerous other legal flaws.

1.      RESPA's statutory provisions specifically and clearly address the penalties that violators may face, and disgorgement is not among them.  *See* 12 U.S.C. § 2607(d)(4).  To be sure, RESPA provides the CFPB with the ability to obtain equitable remedies through the *courts*, and, where injunctive relief is authorized by statute, "a *court* may award the full range of equitable relief, including disgorgement."  Dec. 12 (emphasis added) (JA __).  But that is irrelevant in this *administrative* proceeding: Agencies, unlike courts, have no inherent equitable authority.  *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 708 (D.C. Cir. 2005).

Moreover, while the CFPB may seek disgorgement in an administrative action brought pursuant to the CFPA, *see* 12 U.S.C. § 5565(a)(2)(D), this action is controlled by the particular remedial provisions of RESPA.  "'Where there is no clear intention otherwise,'" the Supreme Court has noted, "'a specific statute will not be controlled or nullified by a general one.'"  *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (citation omitted); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987).  There is no suggestion—let alone a "clear" indication—that, in transferring authority from HUD to the CFPB, Congress intended to radically alter RESPA's remedial scheme.  To the contrary, the CFPA provides that the CFPB "shall have all powers and duties that were vested in the Secretary of the Department of Housing and Urban Development

relating to the Real Estate Settlement Procedures Act of 1974." 12 U.S.C. § 5581(b)(7)(B). The "powers and duties" exercised by HUD did *not* include disgorgement, and thus neither do the "powers and duties" now exercised by the CFPB.

Even assuming that the CFPA's remedial provisions applied here, they cannot be applied retroactively to penalize conduct that occurred *before* the CFPB itself was granted enforcement authority on July 21, 2011. That is so because HUD was statutorily authorized only to "bring an *action to enjoin* violations" of Section 8. *See* 12 U.S.C. § 2607(d)(4) (2006) (emphasis added); *see also* Mar. 5 Tr. 38 (JA __) ("[T]o the extent that the [CFPA] creates additional remedies . . . that HUD did not possess, [Enforcement Counsel] agree that those can only apply to conduct that occurred after the effective date of the statute."). If the CFPB wanted to seek disgorgement from PHH for conduct before July 21, 2011, it should have brought suit in court, which was all that HUD could have done. 12 U.S.C. § 2607(d)(4).

**2.** The total amount of disgorgement also lacks any evidentiary foundation. The $109 million sum is based on the Director's liability determination with respect to book years that were literally never evaluated by the ALJ.

In ruling on Petitioners' pre-trial motions, the ALJ held that "no claims arising from loans closed before July 21, 2008, are actionable." Dkt. 152, at 14 (JA __) (citing 12 U.S.C. § 2614). As a result, the ALJ analyzed only book years that included loans that closed on or after July 21, 2008: UGI 2009, Genworth 2008-B, Radian 2008, and CMG 2008. But when the Director adopted his new construction of Section 8(a) and found that the receipt of individual premiums violated the statute, regardless of when the underlying mortgage was settled, he effectively reached back in time to earlier book years.

Thus, of the $109 million in disgorgement ordered by the Director, approximately $102.6 million is based on reinsurance premiums received on loans originated *before* July 21, 2008—*i.e.*, on books of reinsurance business that the ALJ specifically *excluded* from consideration during the hearing. Dec. 34–37 (JA __–__). There was no relevant evidence on these books at the hearing, much less any findings of fact as to whether Petitioners performed actual reinsurance services and received bona fide compensation for those services.

3.    Disgorgement is meant to deprive violators of "ill-gotten gains," thus restoring the *status quo ante*. *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Although a disgorgement order may be based on a "reasonable approximation of profits causally connected to the violation," *SEC v. Whittemore*, 659 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks omitted), the

59

relevant metric is "*profits*," *id.* (emphasis added), not gross receipts, *see United States v. Masters*, 924 F.2d 1362, 1369–70 (7th Cir. 1991) (disgorgement refers to "net, not gross revenues—profits, not sales, for only the former are gains").

The Director, however, calculated disgorgement based on the total *premiums* received from the mortgage reinsurers, which do not reflect the "profits" earned by Petitioners but total receipts.  The Director's disgorgement calculation was flawed because it failed to discount reinsurance claims and commutation payments, which is necessary for deriving the alleged "profit."  *Compare* Admin. Hr. Tr. 1905–07, 2307 (JA __–__, __) (showing no profit expectation from Genworth 2008-B, and expected losses for UGI 2009 Book), *with* Dec. 34–35 (JA __–__) (basing yearly disgorgement calculation only on total gross premiums of $10,996,782 and $21,148,628).  When a disgorgement award is based entirely on what an entity received, without accounting for costs, the disgorgement is not equitable but punitive.  *See SEC v. Teo*, 746 F.3d 90, 106 n.29 (3d Cir. 2014) ("[R]evenue disgorgement (gross benefit) is generally understood as outside the traditional realm of equity.").  And Congress did not authorize HUD to seek punitive disgorgement, because, as the Director noted, HUD could have called upon only the equitable powers of courts.  Dec. at 12 (JA __).  The Director's disgorgement order is therefore arbitrary, capricious, and contrary to law.

The Order further directs Petitioners to pay $2,104,108 as a result of reinsurance premiums paid by Radian and CMG, without acknowledging that Petitioners never received those premiums, which were held in trust accounts. Dec. 34, 36; Dkt. 205 30–31, 89.  Nor does the Order acknowledge that, pursuant to the commutations of the Genworth and UGI agreements, more than $85 million of premiums was returned to those insurers.  Statement of Undisputed Facts in Support of Motion for Summary Disposition, Dkt. 19, at 3 (JA __).  Disgorgement notwithstanding the commutations of those agreements would result in Petitioners paying twice—a result that is arbitrary by *any* measure.  *See*, *e.g.*, *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (duplicative disgorgement order "not reasonable").

## III.   The Decision And Order Should Be Vacated.

The appropriate remedy for the Director's multiple legal errors is vacatur. *See* 5 U.S.C. § 706(2); *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).  There is no doubt about the grave nature of these violations:  The Decision and Order constitute unprecedented agency action that ignores fundamental constitutional principles and the limits of the CFPB's statutory authority, all in order to punish a regulated entity with shocking monetary liability and vast injunctions for conduct undertaken years ago in reliance on well-established federal guidance.  *See Nat. Res. Def. Council v. EPA*, 489 F.3d 1364,

1374 (D.C. Cir. 2007) ("The agency's errors could not be more serious insofar as it acted unlawfully, which is more than sufficient reason to vacate the rules.").

In addition, vacatur would not produce any disruptive consequences. Implementation of the Decision and Order was stayed pending the outcome of this appeal. By setting aside that action, this Court would simply maintain the status quo. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014).

## CONCLUSION

For the foregoing reasons, the Decision and Order should be vacated.

Dated:  September 28, 2015                    Respectfully submitted,

  /s/ Theodore B. Olson

Mitchel H. Kider                              Theodore B. Olson
David M. Souders                                *Counsel of Record*
Sandra B. Vipond                              Helgi C. Walker
Michael S. Trabon                             Scott P. Martin
WEINER BRODSKY KIDER PC                        GIBSON, DUNN & CRUTCHER LLP
1300 19th Street, N.W., Fifth Floor           1050 Connecticut Avenue, N.W.
Washington, D.C.  20036                       Washington, D.C.  20036
(202) 628-2000                                (202) 955-8500

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 13,991 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

  /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

# Addendum

# TABLE OF CONTENTS

                                                                                    Page

12 U.S.C. § 2601 ...................................................................................Add. 1

12 U.S.C. § 2607 ...................................................................................Add. 3

12 U.S.C. § 2614 ...................................................................................Add. 5

12 U.S.C. § 5491 ...................................................................................Add. 7

12 U.S.C. § 5497 ...................................................................................Add. 9

12 U.S.C. § 5563 .................................................................................Add. 13

12 C.F.R. § 1024.14 ............................................................................Add. 16

24 C.F.R. § 3500.14 (2011) ...............................................................Add. 19

U.S. Const. art. I, § 7 .........................................................................Add. 22

U.S. Const. art. I, § 8 .........................................................................Add. 23

U.S. Const. art. I, § 9 .........................................................................Add. 24

U.S. Const. art. II, § 2 ........................................................................Add. 26

U.S. Const. art. II, § 3 ........................................................................Add. 27

Statement of Policy 1996-3 Rental of Office Space, Lock-outs, and
Retaliation, 61 Fed. Reg. 29,264 (June 7, 1996) (Excerpts)............................Add. 28

RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49,398
(Sept. 19, 1996) (Excerpts) ...............................................................Add. 30

RESPA Statement of Policy 1999-1 Regarding Lender Payments to
Mortgage Brokers, 64 Fed. Reg. 10,080 (Mar. 1, 1999) (Excerpts)...............Add. 32

Real Estate Settlement Procedures Act Statement of Policy 2001-1:
Clarification of Statement of Policy 1999-1 Regarding Lender Payments
to Mortgage Brokers, and Guidance Concerning Unearned Fees Under
Section 8(b), 66 Fed. Reg. 53,052 (Oct. 18, 2001) (Excerpts) ......................Add. 35

RESPA: Home Warranty Companies' Payments to Real Estate Brokers
and Agents, 75 Fed. Reg. 36,271 (June 25, 2010) (Excerpts) ......................Add. 37

Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43,569
(July 21, 2011) (Excerpts)..................................................................Add. 39

(1) ''banking organization'' means any bank, trust company, savings bank, safe deposit company, or a private banker engaged in business in the United States;

(2) ''business association'' means any corporation (other than a public corporation), joint stock company, business trust, partnership, or any association for business purposes of two or more individuals; and

(3) ''financial organization'' means any savings and loan association, building and loan association, credit union, or investment company engaged in business in the United States.

(Pub. L. 93–495, title VI, § 602, Oct. 28, 1974, 88 Stat. 1525.)

## § 2503. State entitlement to escheat or custody

Where any sum is payable on a money order, traveler's check, or other similar written instrument (other than a third party bank check) on which a banking or financial organization or a business association is directly liable—

(1) if the books and records of such banking or financial organization or business association show the State in which such money order, traveler's check, or similar written instrument was purchased, that State shall be entitled exclusively to escheat or take custody of the sum payable on such instrument, to the extent of that State's power under its own laws to escheat or take custody of such sum;

(2) if the books and records of such banking or financial organization or business association do not show the State in which such money order, traveler's check, or similar written instrument was purchased, the State in which the banking or financial organization or business association has its principal place of business shall be entitled to escheat or take custody of the sum payable on such money order, traveler's check, or similar written instrument, to the extent of that State's power under its own laws to escheat or take custody of such sum, until another State shall demonstrate by written evidence that it is the State of purchase; or

(3) if the books and records of such banking or financial organizations or business association show the State in which such money order, traveler's check, or similar written instrument was purchased and the laws of the State of purchase do not provide for the escheat or custodial taking of the sum payable on such instrument, the State in which the banking or financial organization or business association has its principal place of business shall be entitled to escheat or take custody of the sum payable on such money order, traveler's check, or similar written instrument, to the extent of that State's power under its own laws to escheat or take custody of such sum, subject to the right of the State of purchase to recover such sum from the State of principal place of business if and when the law of the State of purchase makes provision for escheat or custodial taking of such sum.

(Pub. L. 93–495, title VI, § 603, Oct. 28, 1974, 88 Stat. 1525.)

## CHAPTER 27—REAL ESTATE SETTLEMENT PROCEDURES

Sec.
2601.    Congressional findings and purpose.
2602.    Definitions.
2603.    Uniform settlement statement.
2604.    Home buying information booklets.
2605.    Servicing of mortgage loans and administration of escrow accounts.
2606.    Exempted transactions.
2607.    Prohibition against kickbacks and unearned fees.
2608.    Title companies; liability of seller.
2609.    Limitation on requirement of advance deposits in escrow accounts.
2610.    Prohibition of fees for preparation of truth-in-lending, uniform settlement, and escrow account statements.
2611 to 2613. Repealed.
2614.    Jurisdiction of courts; limitations.
2615.    Contracts and liens; validity.
2616.    State laws unaffected; inconsistent Federal and State provisions.
2617.    Authority of Bureau.

## § 2601. Congressional findings and purpose

(a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. The Congress also finds that it has been over two years since the Secretary of Housing and Urban Development and the Administrator of Veterans' Affairs submitted their joint report to the Congress on ''Mortgage Settlement Costs'' and that the time has come for the recommendations for Federal legislative action made in that report to be implemented.

(b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result—

(1) in more effective advance disclosure to home buyers and sellers of settlement costs;

(2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;

(3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and

(4) in significant reform and modernization of local recordkeeping of land title information.

(Pub. L. 93–533, § 2, Dec. 22, 1974, 88 Stat. 1724.)

### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original ''this Act'', meaning Pub. L. 93–533, Dec. 22, 1974, 88 Stat. 1724, as amended, known as the Real Estate Settlement Procedures Act of 1974, which is classified principally to this chapter (§ 2601 et seq.). For complete classification of this Act to the Code, see Short Title note below and Tables.

### CHANGE OF NAME

Reference to Administrator of Veterans' Affairs deemed to refer to Secretary of Veterans Affairs pursuant to section 10 of Pub. L. 100–527, set out as a Depart-

ment of Veterans Affairs Act note under section 301 of Title 38, Veterans' Benefits.

#### Effective Date

Pub. L. 93–533, §20, formerly §19, Dec. 22, 1974, 88 Stat. 1731, renumbered §20, Pub. L. 94–205, §10, Jan. 2, 1976, 89 Stat. 1159, provided that: "The provisions of this Act, and the amendments made thereby [see Short Title note below], shall become effective one hundred and eighty days after the date of the enactment of this Act [Dec. 22, 1974]."

#### Short Title of 1976 Amendment

Pub. L. 94–205, §1, Jan. 2, 1976, 89 Stat. 1157, provided: "That this Act [enacting section 2617 of this title, amending sections 2602, 2603, 2604, 2607, 2609 and 2616 of this title and section 1631 of Title 15, Commerce and Trade, repealing sections 2605 and 2606 of this title, enacting provisions set out as a note under section 2602 of this title and amending provisions set out as a note under this section] may be cited as the 'Real Estate Settlement Procedures Act Amendments of 1975'."

#### Short Title

Pub. L. 93–533, §1, Dec. 22, 1974, 88 Stat. 1724, provided that: "This Act [enacting this chapter and sections 1730f and 1831b of this title and provisions set out as notes under this section and section 1730f of this title] may be cited as the 'Real Estate Settlement Procedures Act of 1974'."

#### Simplification and Unification of Disclosures Required Under RESPA and TILA for Mortgage Transactions

Pub. L. 104–208, div. A, title II, §2101, Sept. 30, 1996, 110 Stat. 3009–398, provided that:

"(a) In General.—With respect to credit transactions which are subject to the Real Estate Settlement Procedures Act of 1974 [12 U.S.C. 2601 et seq.] and the Truth in Lending Act [15 U.S.C. 1601 et seq.], the Board of Governors of the Federal Reserve System (hereafter in this section referred to as the 'Board') and the Secretary of Housing and Urban Development (hereafter in this section referred to as the 'Secretary') shall take such action as may be necessary before the end of the 6-month period beginning on the date of enactment of this Act [Sept. 30, 1996]—

"(1) to simplify and improve the disclosures applicable to such transactions under such Acts, including the timing of the disclosures; and

"(2) to provide a single format for such disclosures which will satisfy the requirements of each such Act with respect to such transactions.

"(b) Regulations.—To the extent that it is necessary to prescribe any regulation in order to effect any changes required to be made under subsection (a), the proposed regulation shall be published in the Federal Register before the end of the 6-month period referred to in subsection (a).

"(c) Recommendations for Legislation.—If the Board and the Secretary find that legislative action may be necessary or appropriate in order to simplify and unify the disclosure requirements under the Real Estate Settlement Procedures Act of 1974 [12 U.S.C. 2601 et seq.] and the Truth in Lending Act [15 U.S.C. 1601 et seq.], the Board and the Secretary shall submit a report containing recommendations to the Congress concerning such action."

### § 2602. Definitions

For purposes of this chapter—

(1) the term "federally related mortgage loan" includes any loan (other than temporary financing such as a construction loan) which—

(A) is secured by a first or subordinate lien on residential real property (including individual units of condominiums and coopera-

tives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property; and

(B)(i) is made in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or is made in whole or in part by any lender which is regulated by any agency of the Federal Government, or

(ii) is made in whole or in part, or insured, guaranteed, supplemented, or assisted in any way, by the Secretary or any other officer or agency of the Federal Government or under or in connection with a housing or urban development program administered by the Secretary or a housing or related program administered by any other such officer or agency; or

(iii) is intended to be sold by the originating lender to the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, or a financial institution from which it is to be purchased by the Federal Home Loan Mortgage Corporation; or

(iv) is made in whole or in part by any "creditor", as defined in section 1602(f)[1] of title 15, who makes or invests in residential real estate loans aggregating more than $1,000,000 per year, except that for the purpose of this chapter, the term "creditor" does not include any agency or instrumentality of any State;

(2) the term "thing of value" includes any payment, advance, funds, loan, service, or other consideration;

(3) the term "settlement services" includes any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement;

(4) the term "title company" means any institution which is qualified to issue title insurance, directly or through its agents, and also refers to any duly authorized agent of a title company;

(5) the term "person" includes individuals, corporations, associations, partnerships, and trusts;

(6) the term "Secretary" means the Secretary of Housing and Urban Development;

(7) the term "affiliated business arrangement" means an arrangement in which (A) a person who is in a position to refer business

_____

[1] See References in Text note below.

## § 2606. Exempted transactions

### (a) In general

This chapter does not apply to credit transactions involving extensions of credit—

(1) primarily for business, commercial, or agricultural purposes; or

(2) to government or governmental agencies or instrumentalities.

### (b) Interpretation

In prescribing regulations under section 2617(a) of this title, the Bureau shall consider that, with respect to subsection (a) of this section, the exemption for credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, as provided in subsection (a)(1)[1] of this section shall be the same as the exemption for such credit transactions under section 1603(1) of title 15.

(Pub. L. 93–533, §7, as added Pub. L. 103–325, title III, §312, Sept. 23, 1994, 108 Stat. 2221; amended Pub. L. 104–208, div. A, title II, §2103(b), Sept. 30, 1996, 110 Stat. 3009–399; Pub. L. 111–203, title X, §1098(5), July 21, 2010, 124 Stat. 2104.)

#### REFERENCES IN TEXT

Subsection (a)(1) of this section, referred to in subsec. (b), was in the original "section 7(1) of the Real Estate Settlement Procedures Act of 1974", and was translated as referring to section 7(a)(1) of that Act to reflect the probable intent of Congress.

#### PRIOR PROVISIONS

A prior section 2606, Pub. L. 93–533, §7, Dec. 22, 1974, 88 Stat. 1727, related to seller or his agent confirming that information concerning an existing residence was disclosed to buyer in writing before a commitment for a mortgage loan was made, prior to repeal by Pub. L. 94–205, §6, Jan. 2, 1976, 89 Stat. 1158.

#### AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 substituted "Bureau" for "Secretary".

1996—Pub. L. 104–208 designated existing provisions as subsec. (a), inserted heading, and added subsec. (b).

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 2607. Prohibition against kickbacks and unearned fees

### (a) Business referrals

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

### (b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related

mortgage loan other than for services actually performed.

### (c) Fees, salaries, compensation, or other payments

Nothing in this section shall be construed as prohibiting (1) the payment of a fee (A) to attorneys at law for services actually rendered or (B) by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance or (C) by a lender to its duly appointed agent for services actually performed in the making of a loan, (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed, (3) payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and brokers, (4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business); (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone,[1] (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral); or (iii) in the case of a referral by a lender (including a referral by a lender to an affiliated lender), at the time the estimates required under section 2604(c) of this title are provided (notwithstanding clause (i) or (ii)); and any required written receipt of such disclosure (without regard to the manner of the disclosure under clause (i), (ii), or (iii)) may be obtained at the closing or settlement (except that a person making a face-to-face referral who provides the written disclosure at or before the time of the referral shall attempt to obtain any required written receipt of such disclosure at such time and if the person being referred chooses not to acknowledge the receipt of the disclosure at that time, that fact shall be noted in the written, electronic, or similar system of records maintained in the regular course of business by the person making the referral), (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship, or (5) such other payments or classes of payments or other transfers as are specified in regulations prescribed by the Bureau, after consultation with the Attorney General, the Secretary of Veterans Affairs, the Federal Home Loan Bank Board, the Federal De-

---

[1] See References in Text note below.

[1] So in original.

posit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Secretary of Agriculture. For purposes of the preceding sentence, the following shall not be considered a violation of clause (4)(B): (i) any arrangement that requires a buyer, borrower, or seller to pay for the services of an attorney, credit reporting agency, or real estate appraiser chosen by the lender to represent the lender's interest in a real estate transaction, or (ii) any arrangement where an attorney or law firm represents a client in a real estate transaction and issues or arranges for the issuance of a policy of title insurance in the transaction directly as agent or through a separate corporate title insurance agency that may be established by that attorney or law firm and operated as an adjunct to his or its law practice.

**(d) Penalties for violations; joint and several liability; treble damages; actions for injunction by Bureau and Secretary and by State officials; costs and attorney fees; construction of State laws**

(1) Any person or persons who violate the provisions of this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

(3) No person or persons shall be liable for a violation of the provisions of subsection (c)(4)(A) of this section if such person or persons proves by a preponderance of the evidence that such violation was not intentional and resulted from a bona fide error notwithstanding maintenance of procedures that are reasonably adapted to avoid such error.

(4) The Bureau, the Secretary, or the attorney general or the insurance commissioner of any State may bring an action to enjoin violations of this section. Except, to the extent that a person is subject to the jurisdiction of the Bureau, the Secretary, or the attorney general or the insurance commissioner of any State, the Bureau shall have primary authority to enforce or administer this section, subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.].

(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.

(6) No provision of State law or regulation that imposes more stringent limitations on affiliated business arrangements shall be construed as being inconsistent with this section.

(Pub. L. 93–533, §8, Dec. 22, 1974, 88 Stat. 1727; Pub. L. 94–205, §7, Jan. 2, 1976, 89 Stat. 1158; Pub. L. 98–181, title I [title IV, §461(b), (c)], Nov. 30, 1983, 97 Stat. 1231; Pub. L. 100–242, title V, §570(g), Feb. 5, 1988, 101 Stat. 1950; Pub. L. 102–54, §13(d)(4), June 13, 1991, 105 Stat. 275; Pub. L. 104–208, div. A, title II, §2103(c)(2), (d), Sept. 30, 1996, 110 Stat. 3009–400; Pub. L. 111–203, title X, §1098(6), (7), July 21, 2010, 124 Stat. 2104.)

REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsec. (d)(4), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitle B of the Act is classified generally to part B (§5511 et seq.) of subchapter V of chapter 53 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 5301 of this title and Tables.

AMENDMENTS

2010—Subsec. (c)(5). Pub. L. 111–203, §1098(6), which directed substituting ''Bureau'' for ''Secretary'', was executed by making the substitution for ''Secretary'' the first time appearing, to reflect the probable intent of Congress.

Subsec. (d). Pub. L. 111–203, §1098(7)(A), inserted ''Bureau and'' before ''Secretary'' in heading that had been supplied editorially.

Subsec. (d)(4). Pub. L. 111–203, §1098(7)(B), added par. (4) and struck out former par. (4) which read as follows: ''The Secretary, the Attorney General of any State, or the insurance commissioner of any State may bring an action to enjoin violations of this section.''

1996—Subsec. (c)(4). Pub. L. 104–208, §2103(c)(2), substituted ''affiliated business arrangements'' for ''controlled business arrangements''.

Subsec. (c)(4)(A). Pub. L. 104–208, §2103(d), amended subcl. (A) generally. Prior to amendment, subcl. (A) read as follows: ''at or prior to the time of the referral a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with the referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred, except that where a lender makes the referral, this requirement may be satisfied as part of and at the time that the estimates of settlement charges required under section 2604(c) of this title are provided,''.

Subsec. (d)(6). Pub. L. 104–208, §2103(c)(2), substituted ''affiliated business arrangements'' for ''controlled business arrangements''.

1991—Subsec. (c)(5). Pub. L. 102–54 substituted ''Secretary of Veterans Affairs'' for ''Administrator of Veterans' Affairs''.

1988—Subsec. (c)(5). Pub. L. 100–242 substituted ''clause (4)(B)'' for ''clause 4(B)''.

1983—Subsec. (c). Pub. L. 98–181, §461(b), redesignated cl. (4) as (5), added cl. (4) and provisions following cl. (5), as so redesignated, relating to arrangements which shall not be considered a violation of cl. (4)(B).

Subsec. (d)(2). Pub. L. 98–181, §461(c), substituted provisions setting forth the liability of persons violating the prohibitions or limitations of this section for provisions setting forth liability, in addition to penalties provided in par. (1), of persons violating subsecs. (a) and (b) of this section, plus costs and attorney's fees.

Subsec. (d)(3) to (6). Pub. L. 98–181, §461(c), added pars. (3) to (6).

1976—Subsec. (c). Pub. L. 94–205 added cls. (3) and (4).

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 98–181 effective Jan. 1, 1984, see section 461(f) of Pub. L. 98–181, set out as a note under section 2602 of this title.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–205 effective Jan. 2, 1976, see section 12 of Pub. L. 94–205, set out as a note under section 2602 of this title.

TRANSFER OF FUNCTIONS

Federal Home Loan Bank Board abolished and functions transferred, see sections 401 to 406 of Pub. L. 101–73, set out as a note under section 1437 of this title.

the first such period beginning on the first January 1st that occurs after November 28, 1990, and shall be submitted not more than 30 days after the conclusion of each such 1-year period.

**(d) Penalties**

**(1) In general**

In the case of each failure to submit a statement to a borrower as required under subsection (c) of this section, the Secretary shall assess to the lender or escrow servicer failing to submit the statement a civil penalty of $50 for each such failure, but the total amount imposed on such lender or escrow servicer for all such failures during any 12-month period referred to in subsection (b)[1] of this section may not exceed $100,000.

**(2) Intentional violations**

If any failure to which paragraph (1) applies is due to intentional disregard of the requirement to submit the statement, then, with respect to such failure—

(A) the penalty imposed under paragraph (1) shall be $100; and

(B) in the case of any penalty determined under subparagraph (A), the $100,000 limitation under paragraph (1) shall not apply.

(Pub. L. 93–533, §10, Dec. 22, 1974, 88 Stat. 1728; Pub. L. 94–205, §8, Jan. 2, 1976, 89 Stat. 1158; Pub. L. 101–625, title IX, §942(a), Nov. 28, 1990, 104 Stat. 4411; Pub. L. 104–208, div. A, title II, §2103(g)(2), Sept. 30, 1996, 110 Stat. 3009–401; Pub. L. 111–203, title X, §1098(8), July 21, 2010, 124 Stat. 2104.)

AMENDMENTS

2010—Subsec. (c)(1)(C). Pub. L. 111–203, which directed amendment of "section 10(c) (12 U.S.C. 2609(c) and (d))" by substituting "Bureau" for "Secretary", was executed by making the substitution only in subsec. (c) as directed.

1996—Subsec. (c)(1)(C). Pub. L. 104–208 substituted "The Secretary" for "Not later than the expiration of the 90-day period beginning on November 28, 1990, the Secretary" in second sentence.

1990—Pub. L. 101–625 designated existing provisions as subsec. (a), inserted heading, and added subsecs. (b) to (d).

1976—Pub. L. 94–205 provided that in addition to amounts required for the payment of taxes, insurance premiums, and other charges due at settlement, the buyer could not be required at settlement to place into an escrow account more than one-sixth of the estimated total amount of such taxes, insurance premiums, and other charges payable within a twelve month period beginning on the date of settlement, but the buyer could be required to make monthly payments into an escrow account sufficient to maintain a surplus of one-sixth of the estimated total amount payable in the coming twelve month period.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–205 effective Jan. 2, 1976, see section 12 of Pub. L. 94–205, set out as a note under section 2602 of this title.

[1] So in original. Probably should be subsection "(c)".

**§ 2610. Prohibition of fees for preparation of truth-in-lending, uniform settlement, and escrow account statements**

No fee shall be imposed or charge made upon any other person (as a part of settlement costs or otherwise) by a lender in connection with a federally related mortgage loan made by it (or a loan for the purchase of a mobile home), or by a servicer (as the term is defined under section 2605(i) of this title), for or on account of the preparation and submission by such lender or servicer of the statement or statements required (in connection with such loan) by sections 2603 and 2609(c) of this title or by the Truth in Lending Act [15 U.S.C. 1601 et seq.].

(Pub. L. 93–533, §12, Dec. 22, 1974, 88 Stat. 1729; Pub. L. 101–625, title IX, §942(b), Nov. 28, 1990, 104 Stat. 4412.)

REFERENCES IN TEXT

Truth in Lending Act, referred to in text, is title I of Pub. L. 90–321, May 29, 1968, 82 Stat. 146, as amended, which is classified generally to subchapter I (§1601 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

AMENDMENTS

1990—Pub. L. 101–625 substituted present section catchline for "Fee for preparation of truth-in-lending and uniform settlement statements", inserted after first comma "or by a servicer (as the term is defined under section 2605(i) of this title),", and substituted "lender or servicer" for second reference to "lender" and "2609(c)" for "2605".

**§§ 2611 to 2613. Repealed. Pub. L. 104–208, div. A, title II, §2103(h), Sept. 30, 1996, 110 Stat. 3009–401**

Section 2611, Pub. L. 93–533, §13, Dec. 22, 1974, 88 Stat. 1730, related to establishment of land parcel recordation system on demonstration basis.

Section 2612, Pub. L. 93–533, §14, Dec. 22, 1974, 88 Stat. 1730, directed Secretary of Housing and Urban Development to report on necessity for further legislation involving real estate settlements.

Section 2613, Pub. L. 93–533, §15, Dec. 22, 1974, 88 Stat. 1730, directed Secretary of Housing and Urban Development to determine, and report to Congress on, feasibility of including statements of settlement costs in special information booklets.

**§ 2614. Jurisdiction of courts; limitations**

Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation, except that actions brought by the Bureau, the Secretary, the Attorney General of any State, or the insurance commissioner of any State may be brought within 3 years from the date of the occurrence of the violation.

(Pub. L. 93–533, §16, Dec. 22, 1974, 88 Stat. 1731; Pub. L. 98–181, title I [title IV, §461(d)], Nov. 30, 1983, 97 Stat. 1232; Pub. L. 104–208, div. A, title II,

§ 2103(e), Sept. 30, 1996, 110 Stat. 3009–400; Pub. L. 111–203, title X, § 1098(9), July 21, 2010, 124 Stat. 2104.)

AMENDMENTS

2010—Pub. L. 111–203 inserted ''the Bureau,'' before ''the Secretary''.

1996—Pub. L. 104–208 substituted ''section 2605, 2607, or 2608 of this title'' for ''section 2607 or 2608 of this title'' and ''within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title'' for ''within one year''.

1983—Pub. L. 98–181 amended section generally, striking out a reference to section 2605 of this title, and inserting provision allowing action in district where violation is alleged to have occurred, and provision relating to time limitations in actions brought by the Secretary, the Attorney General of any State, or the insurance commissioner of any State.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 98–181 effective Jan. 1, 1984, see section 461(f) of Pub. L. 98–181, set out as a note under section 2602 of this title.

## § 2615. Contracts and liens; validity

Nothing in this chapter shall affect the validity or enforceability of any sale or contract for the sale of real property or any loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan.

(Pub. L. 93–533, § 17, Dec. 22, 1974, 88 Stat. 1731.)

## § 2616. State laws unaffected; inconsistent Federal and State provisions

This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency. The Bureau is authorized to determine whether such inconsistencies exist. The Bureau may not determine that any State law is inconsistent with any provision of this chapter if the Bureau determines that such law gives greater protection to the consumer. In making these determinations the Bureau shall consult with the appropriate Federal agencies.

(Pub. L. 93–533, § 18, Dec. 22, 1974, 88 Stat. 1731; Pub. L. 94–205, § 9, Jan. 2, 1976, 89 Stat. 1159; Pub. L. 111–203, title X, § 1098(10), July 21, 2010, 124 Stat. 2104.)

AMENDMENTS

2010—Pub. L. 111–203 substituted ''Bureau'' for ''Secretary'' wherever appearing.

1976—Pub. L. 94–205 struck out ''(a)'' before ''This chapter'' and struck out subsec. (b) which provided for Federal protection against liability for acts done or omitted in good faith in accordance with the rules, regulations, or interpretations issued by the Secretary. See section 2617(b) of this title.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L.

111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–205 effective Jan. 2, 1976, see section 12 of Pub. L. 94–205, set out as a note under section 2602 of this title.

## § 2617. Authority of Bureau

### (a) Issuance of regulations; exemptions

The Bureau is authorized to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter.

### (b) Liability for acts done in good faith in conformity with rule, regulation, or interpretation

No provision of this chapter or the laws of any State imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Attorney General, notwithstanding that after such act or omission has occurred, such rule, regulation, or interpretation is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

### (c) Investigations; hearings; failure to obey order; contempt

(1) The Secretary[1] may investigate any facts, conditions, practices, or matters that may be deemed necessary or proper to aid in the enforcement of the provisions of this chapter, in prescribing of rules and regulations thereunder, or in securing information to serve as a basis for recommending further legislation concerning real estate settlement practices. To aid in the investigations, the Bureau is authorized to hold such hearings, administer such oaths, and require by subpena the attendance and testimony of such witnesses and production of such documents as the Bureau deems advisable.

(2) Any district court of the United States within the jurisdiction of which an inquiry is carried on may, in the case of contumacy or refusal to obey a subpena of the Bureau issued under this section, issue an order requiring compliance therewith; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (d) Delay of effectiveness of recent final regulation relating to payments to employees

#### (1) In general

The amendment to part 3500 of title 24 of the Code of Federal Regulations contained in the final regulation prescribed by the Secretary and published in the Federal Register on June 7, 1996, which will, as of the effective date of such amendment—

(A) eliminate the exemption for payments by an employer to employees of such employer for referral activities which is currently codified as section 3500.14(g)(1)(vii) of such title 24; and

(B) replace such exemption with a more limited exemption in new clauses (vii), (viii), and (ix) of section 3500.14 of such title 24,

---

[1] Probably should be ''The Bureau''.

The Fair Credit Billing Act, referred to in par. (12)(E), is title III of Pub. L. 93–495, Oct. 28, 1974, 88 Stat. 1511, which enacted sections 1666 to 1666i and 1666j of Title 15, Commerce and Trade, amended sections 1601, 1602, 1610, 1631, 1632, and 1637 of Title 15, and enacted provisions set out as a note under section 1666 of Title 15. For complete classification of this Act to the Code, see Short Title of 1974 Amendment note set out under section 1601 of Title 15 and Tables.

The Fair Credit Reporting Act, referred to in par. (12)(F), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

The Homeowners Protection Act of 1998, referred to in par. (12)(G), is Pub. L. 105–216, July 29, 1998, 112 Stat. 897, which is classified principally to chapter 49 (§ 4901 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4901 of this title and Tables.

The Fair Debt Collection Practices Act, referred to in par. (12)(H), is title VIII of Pub. L. 90–321, as added by Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874, which is classified generally to subchapter V (§ 1692 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

The Home Mortgage Disclosure Act of 1975, referred to in par. (12)(K), is title III of Pub. L. 94–200, Dec. 31, 1975, 89 Stat. 1125, which is classified principally to chapter 29 (§ 2801 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2801 of this title and Tables.

The Home Ownership and Equity Protection Act of 1994, referred to in par. (12)(L), is subtitle B (§§ 151–158) of title I of Pub. L. 103–325, Sept. 23, 1994, 108 Stat. 2190, which enacted sections 1639 and 1648 of Title 15, Commerce and Trade, amended sections 1602, 1604, 1610, 1640, 1641, and 1647 of Title 15, and enacted provisions set out as notes under sections 1601 and 1602 of Title 15. For complete classification of this Act to the Code, see Short Title of 1994 Amendment note set out under section 1601 of Title 15 and Tables.

The Real Estate Settlement Procedures Act of 1974, referred to in par. (12)(M), is Pub. L. 93–533, Dec. 22, 1974, 88 Stat. 1724, which is classified principally to chapter 27 (§ 2601 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of this title and Tables.

The S.A.F.E. Mortgage Licensing Act of 2008, referred to in par. (12)(N), is title V of div. A of Pub. L. 110–289, July 30, 2008, 122 Stat. 2810, also known as the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, which is classified generally to chapter 51 (§ 5101 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 5101 of this title and Tables.

The Truth in Lending Act, referred to in par. (12)(O), is title I of Pub. L. 90–321, May 29, 1968, 82 Stat. 146, which is classified generally to subchapter I (§ 1601 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

The Truth in Savings Act, referred to in par. (12)(P), is subtitle F (§§ 261–274) of title II of Pub. L. 102–242, Dec. 19, 1991, 105 Stat. 2334, which is classified generally to chapter 44 (§ 4301 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4301 of this title and Tables.

Section 626 of the Omnibus Appropriations Act, 2009, referred to in par. (12)(Q), is section 626 of div. D of Pub. L. 111–8. Subsecs. (a) and (b) of section 626 are classified to section 5538 of this title, and subsec. (c) of section 626 amended section 1639 of Title 15, Commerce and Trade.

The Interstate Land Sales Full Disclosure Act, referred to in par. (12)(R), is title XIV of Pub. L. 90–448,

Aug. 1, 1968, 82 Stat. 590, which is classified generally to chapter 42 (§ 1701 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 15 and Tables.

Subtitle F, referred to in pars. (14) and (15)(B)(ii)(II), is subtitle F (§§ 1061–1067) of title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 2035, which is classified generally to part F (§ 5581 et seq.) of this subchapter. For complete classification of subtitle F to the Code, see Tables.

The Federal Trade Commission Act, referred to in par. (14), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

The Commodity Exchange Act, referred to in par. (20), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Securities Exchange Act of 1934, referred to in par. (21)(A), (D) to (F), and (K), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§ 78a et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 78a of Title 15 and Tables.

The Investment Advisers Act of 1940, referred to in par. (21)(B), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§ 80b–1 et seq.) of chapter 2D of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 80b–20 of Title 15 and Tables.

The Investment Company Act of 1940, referred to in par. (21)(C), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, which is classified generally to subchapter I (§ 80a–1 et seq.) of chapter 2D of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 80a–51 of Title 15 and Tables.

### EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of this title.

### DESIGNATION AS ENUMERATED CONSUMER LAW UNDER THE PURVIEW OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION

Pub. L. 111–203, title XIV, § 1400(b), July 21, 2010, 124 Stat. 2136, provided that: "Subtitles A, B, C, and E [subtitles A (§§ 1401–1406), B (§§ 1411–1422), C (§§ 1431–1433), and E (§§ 1461–1465) of title XIV of Pub. L. 111–203, enacting sections 1638a, 1639b to 1639d, 1639f, and 1639g of Title 15, Commerce and Trade, amending section 2605 of this title, sections 1602, 1607, 1638, 1639 to 1639d, and 1640 of Title 15, and enacting provisions set out as notes under sections 1601 and 1639b to 1639d of Title 15] and sections 1471 [enacting section 1639h of Title 15], 1472 [enacting section 1639e of Title 15 and amending section 1604 of Title 15], 1475 [amending section 2603 of this title], and 1476 [not classified to the Code], and the amendments made by such subtitles and sections, shall be enumerated consumer laws, as defined in section 1002 [12 U.S.C. 5481], and come under the purview of the Bureau of Consumer Financial Protection for purposes of title X [see Short Title note set out under section 5301 of this title], including the transfer of functions and personnel under subtitle F of title X [§§ 1061–1067, enacting part F of this subchapter] and the savings provisions of such subtitle."

## PART A—BUREAU OF CONSUMER FINANCIAL PROTECTION

### § 5491. Establishment of the Bureau of Consumer Financial Protection

#### (a) Bureau established

There is established in the Federal Reserve System, an independent bureau to be known as

the ''Bureau of Consumer Financial Protection'', which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Bureau shall be considered an Executive agency, as defined in section 105 of title 5. Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Bureau.

**(b) Director and Deputy Director**

**(1) In general**

There is established the position of the Director, who shall serve as the head of the Bureau.

**(2) Appointment**

Subject to paragraph (3), the Director shall be appointed by the President, by and with the advice and consent of the Senate.

**(3) Qualification**

The President shall nominate the Director from among individuals who are citizens of the United States.

**(4) Compensation**

The Director shall be compensated at the rate prescribed for level II of the Executive Schedule under section 5313 of title 5.

**(5) Deputy Director**

There is established the position of Deputy Director, who shall—

(A) be appointed by the Director; and
(B) serve as acting Director in the absence or unavailability of the Director.

**(c) Term**

**(1) In general**

The Director shall serve for a term of 5 years.

**(2) Expiration of term**

An individual may serve as Director after the expiration of the term for which appointed, until a successor has been appointed and qualified.

**(3) Removal for cause**

The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office.

**(d) Service restriction**

No Director or Deputy Director may hold any office, position, or employment in any Federal reserve bank, Federal home loan bank, covered person, or service provider during the period of service of such person as Director or Deputy Director.

**(e) Offices**

The principal office of the Bureau shall be in the District of Columbia. The Director may establish regional offices of the Bureau, including in cities in which the Federal reserve banks, or branches of such banks, are located, in order to carry out the responsibilities assigned to the Bureau under the Federal consumer financial laws.

(Pub. L. 111–203, title X, §1011, July 21, 2010, 124 Stat. 1964.)

EFFECTIVE DATE

Pub. L. 111–203, title X, §1018, July 21, 2010, 124 Stat. 1979, provided that: ''This subtitle [subtitle A (§§1011–1018), enacting this part and amending section 9702 of Title 20, Education] shall become effective on the date of enactment of this Act [July 21, 2010].''

**§ 5492. Executive and administrative powers**

**(a) Powers of the Bureau**

The Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including—

(1) the establishment of rules for conducting the general business of the Bureau, in a manner not inconsistent with this title;[1]

(2) to bind the Bureau and enter into contracts;

(3) directing the establishment and maintenance of divisions or other offices within the Bureau, in order to carry out the responsibilities under the Federal consumer financial laws, and to satisfy the requirements of other applicable law;

(4) to coordinate and oversee the operation of all administrative, enforcement, and research activities of the Bureau;

(5) to adopt and use a seal;

(6) to determine the character of and the necessity for the obligations and expenditures of the Bureau;

(7) the appointment and supervision of personnel employed by the Bureau;

(8) the distribution of business among personnel appointed and supervised by the Director and among administrative units of the Bureau;

(9) the use and expenditure of funds;

(10) implementing the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions; and

(11) performing such other functions as may be authorized or required by law.

**(b) Delegation of authority**

The Director of the Bureau may delegate to any duly authorized employee, representative, or agent any power vested in the Bureau by law.

**(c) Autonomy of the Bureau**

**(1) Coordination with the Board of Governors**

Notwithstanding any other provision of law applicable to the supervision or examination of persons with respect to Federal consumer financial laws, the Board of Governors may delegate to the Bureau the authorities to examine persons subject to the jurisdiction of the Board of Governors for compliance with the Federal consumer financial laws.

**(2) Autonomy**

Notwithstanding the authorities granted to the Board of Governors under the Federal Reserve Act [12 U.S.C. 221 et seq.], the Board of Governors may not—

---

[1] See References in Text note below.

**(b) Reports required**

The Bureau shall, concurrent with each semi-annual hearing referred to in subsection (a), prepare and submit to the President and to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Energy and Commerce of the House of Representatives, a report, beginning with the session following the designated transfer date. The Bureau may also submit such report to the Committee on Commerce, Science, and Transportation of the Senate.

**(c) Contents**

The reports required by subsection (b) shall include—

(1) a discussion of the significant problems faced by consumers in shopping for or obtaining consumer financial products or services;

(2) a justification of the budget request of the previous year;

(3) a list of the significant rules and orders adopted by the Bureau, as well as other significant initiatives conducted by the Bureau, during the preceding year and the plan of the Bureau for rules, orders, or other initiatives to be undertaken during the upcoming period;

(4) an analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year;

(5) a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year;

(6) the actions taken regarding rules, orders, and supervisory actions with respect to covered persons which are not credit unions or depository institutions;

(7) an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;

(8) an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau; and

(9) an analysis of the efforts of the Bureau to increase workforce and contracting diversity consistent with the procedures established by the Office of Minority and Women Inclusion.

(Pub. L. 111–203, title X, §1016, July 21, 2010, 124 Stat. 1974.)

### §5496a. Annual audits

**(a) Annual independent audit**

The Bureau shall order an annual independent audit of the operations and budget of the Bureau.

**(b) Annual GAO audit**

The Comptroller General of the United States shall conduct an annual audit of the Bureau's financial statements in accordance with generally accepted government accounting standards.

(Pub. L. 111–203, title X, §1016A, as added Pub. L. 112–10, div. B, title V, §1573(a), Apr. 15, 2011, 125 Stat. 138.)

INITIAL AUDITS

Pub. L. 112–10, div. B, title V, §1573(c), Apr. 15, 2011, 125 Stat. 139, provided that: "The initial audits described under section 1016A of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5496a] shall be completed not later than the end of the 180-day period beginning on the date of the enactment of this Act [Apr. 15, 2011]."

### §5496b. GAO study of financial regulations

**(a) Study**

Not later than the end of the 180-day period beginning on the date of the enactment of this Act, and annually thereafter, the Comptroller General of the United States shall conduct a study of financial services regulations, including activities of the Bureau. Such study shall include an analysis of—

(1) the impact of regulation on the financial marketplace, including the effects on the safety and soundness of regulated entities, cost and availability of credit, savings realized by consumers, reductions in consumer paperwork burden, changes in personal and small business bankruptcy filings, and costs of compliance with rules, including whether relevant Federal agencies are applying sound cost-benefit analysis in promulgating rules;

(2) efforts to avoid duplicative or conflicting rulemakings, including an evaluation of the consultative process under subparagraphs (B) and (C) of section 5512(b)(2) of this title, information requests, and examinations; and

(3) other matters related to the operations of financial services regulations deemed by the Comptroller General to be appropriate.

**(b) Report**

Not later than the end of the 30-day period following the completion of a study conducted pursuant to subsection (a), the Comptroller General shall issue a report to the Congress containing a detailed description of all findings and conclusions made by the Comptroller General in carrying out such study, together with such recommendations for legislative or administrative action as the Comptroller General may determine to be appropriate.

(Pub. L. 111–203, title X, §1016B, as added Pub. L. 112–10, div. B, title V, §1573(a), Apr. 15, 2011, 125 Stat. 138.)

REFERENCES IN TEXT

The date of the enactment of this Act, referred to in subsec. (a), probably means the date of enactment of Pub. L. 112–10, which enacted this section and was approved Apr. 15, 2011.

### §5497. Funding; penalties and fines

**(a) Transfer of funds from Board Of Governors**

**(1) In general**

Each year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year).

**(2) Funding cap**

**(A) In general**

Notwithstanding paragraph (1), and in accordance with this paragraph, the amount that shall be transferred to the Bureau in each fiscal year shall not exceed a fixed percentage of the total operating expenses of the Federal Reserve System, as reported in the Annual Report, 2009, of the Board of Governors, equal to—

(i) 10 percent of such expenses in fiscal year 2011;

(ii) 11 percent of such expenses in fiscal year 2012; and

(iii) 12 percent of such expenses in fiscal year 2013, and in each year thereafter.

**(B) Adjustment of amount**

The dollar amount referred to in subparagraph (A)(iii) shall be adjusted annually, using the percent increase, if any, in the employment cost index for total compensation for State and local government workers published by the Federal Government, or the successor index thereto, for the 12-month period ending on September 30 of the year preceding the transfer.

**(C) Reviewability**

Notwithstanding any other provision in this title,[1] the funds derived from the Federal Reserve System pursuant to this subsection shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate.

**(3) Transition period**

Beginning on July 21, 2010, and until the designated transfer date, the Board of Governors shall transfer to the Bureau the amount estimated by the Secretary needed to carry out the authorities granted to the Bureau under Federal consumer financial law, from July 21, 2010 until the designated transfer date.

**(4) Budget and financial management**

**(A) Financial operating plans and forecasts**

The Director shall provide to the Director of the Office of Management and Budget copies of the financial operating plans and forecasts of the Director, as prepared by the Director in the ordinary course of the operations of the Bureau, and copies of the quarterly reports of the financial condition and results of operations of the Bureau, as prepared by the Director in the ordinary course of the operations of the Bureau.

**(B) Financial statements**

The Bureau shall prepare annually a statement of—

(i) assets and liabilities and surplus or deficit;

(ii) income and expenses; and

(iii) sources and application of funds.

**(C) Financial management systems**

The Bureau shall implement and maintain financial management systems that comply substantially with Federal financial management systems requirements and applicable Federal accounting standards.

**(D) Assertion of internal controls**

The Director shall provide to the Comptroller General of the United States an assertion as to the effectiveness of the internal controls that apply to financial reporting by the Bureau, using the standards established in section 3512(c) of title 31.

**(E) Rule of construction**

This subsection may not be construed as implying any obligation on the part of the Director to consult with or obtain the consent or approval of the Director of the Office of Management and Budget with respect to any report, plan, forecast, or other information referred to in subparagraph (A) or any jurisdiction or oversight over the affairs or operations of the Bureau.

**(F) Financial statements**

The financial statements of the Bureau shall not be consolidated with the financial statements of either the Board of Governors or the Federal Reserve System.

**(5) Audit of the Bureau**

**(A) In general**

The Comptroller General shall annually audit the financial transactions of the Bureau in accordance with the United States generally accepted government auditing standards, as may be prescribed by the Comptroller General of the United States. The audit shall be conducted at the place or places where accounts of the Bureau are normally kept. The representatives of the Government Accountability Office shall have access to the personnel and to all books, accounts, documents, papers, records (including electronic records), reports, files, and all other papers, automated data, things, or property belonging to or under the control of or used or employed by the Bureau pertaining to its financial transactions and necessary to facilitate the audit, and such representatives shall be afforded full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians. All such books, accounts, documents, records, reports, files, papers, and property of the Bureau shall remain in possession and custody of the Bureau. The Comptroller General may obtain and duplicate any such books, accounts, documents, records, working papers, automated data and files, or other information relevant to such audit without cost to the Comptroller General, and the right of access of the Comptroller General to such information shall be enforceable pursuant to section 716(c) of title 31.

**(B) Report**

The Comptroller General shall submit to the Congress a report of each annual audit conducted under this subsection. The report to the Congress shall set forth the scope of the audit and shall include the statement of assets and liabilities and surplus or deficit,

---

[1] See References in Text note below.

the statement of income and expenses, the statement of sources and application of funds, and such comments and information as may be deemed necessary to inform Congress of the financial operations and condition of the Bureau, together with such recommendations with respect thereto as the Comptroller General may deem advisable. A copy of each report shall be furnished to the President and to the Bureau at the time submitted to the Congress.

**(C) Assistance and costs**

For the purpose of conducting an audit under this subsection, the Comptroller General may, in the discretion of the Comptroller General, employ by contract, without regard to section 6101 of title 41, professional services of firms and organizations of certified public accountants for temporary periods or for special purposes. Upon the request of the Comptroller General, the Director of the Bureau shall transfer to the Government Accountability Office from funds available, the amount requested by the Comptroller General to cover the full costs of any audit and report conducted by the Comptroller General. The Comptroller General shall credit funds transferred to the account established for salaries and expenses of the Government Accountability Office, and such amount shall be available upon receipt and without fiscal year limitation to cover the full costs of the audit and report.

**(b) Consumer Financial Protection Fund**

**(1) Separate fund in Federal Reserve established**

There is established in the Federal Reserve a separate fund, to be known as the ''Bureau of Consumer Financial Protection Fund'' (referred to in this section as the ''Bureau Fund''). The Bureau Fund shall be maintained and established at a Federal reserve bank, in accordance with such requirements as the Board of Governors may impose.

**(2) Fund receipts**

All amounts transferred to the Bureau under subsection (a) shall be deposited into the Bureau Fund.

**(3) Investment authority**

**(A) Amounts in Bureau Fund may be invested**

The Bureau may request the Board of Governors to direct the investment of the portion of the Bureau Fund that is not, in the judgment of the Bureau, required to meet the current needs of the Bureau.

**(B) Eligible investments**

Investments authorized by this paragraph shall be made in obligations of the United States or obligations that are guaranteed as to principal and interest by the United States, with maturities suitable to the needs of the Bureau Fund, as determined by the Bureau.

**(C) Interest and proceeds credited**

The interest on, and the proceeds from the sale or redemption of, any obligations held

in the Bureau Fund shall be credited to the Bureau Fund.

**(c) Use of funds**

**(1) In general**

Funds obtained by, transferred to, or credited to the Bureau Fund shall be immediately available to the Bureau and under the control of the Director, and shall remain available until expended, to pay the expenses of the Bureau in carrying out its duties and responsibilities. The compensation of the Director and other employees of the Bureau and all other expenses thereof may be paid from, obtained by, transferred to, or credited to the Bureau Fund under this section.

**(2) Funds that are not Government funds**

Funds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies.

**(3) Amounts not subject to apportionment**

Notwithstanding any other provision of law, amounts in the Bureau Fund and in the Civil Penalty Fund established under subsection (d) shall not be subject to apportionment for purposes of chapter 15 of title 31 or under any other authority.

**(d) Penalties and fines**

**(1) Establishment of victims relief fund**

There is established in the Federal Reserve a separate fund, to be known as the ''Consumer Financial Civil Penalty Fund'' (referred to in this section as the ''Civil Penalty Fund''). The Civil Penalty Fund shall be maintained and established at a Federal reserve bank, in accordance with such requirements as the Board of Governors may impose. If the Bureau obtains a civil penalty against any person in any judicial or administrative action under Federal consumer financial laws, the Bureau shall deposit into the Civil Penalty Fund, the amount of the penalty collected.

**(2) Payment to victims**

Amounts in the Civil Penalty Fund shall be available to the Bureau, without fiscal year limitation, for payments to the victims of activities for which civil penalties have been imposed under the Federal consumer financial laws. To the extent that such victims cannot be located or such payments are otherwise not practicable, the Bureau may use such funds for the purpose of consumer education and financial literacy programs.

**(e) Authorization of appropriations; annual report**

**(1) Determination regarding need for appropriated funds**

**(A) In general**

The Director is authorized to determine that sums available to the Bureau under this section will not be sufficient to carry out the authorities of the Bureau under Federal consumer financial law for the upcoming year.

**(B) Report required**

When making a determination under subparagraph (A), the Director shall prepare a

report regarding the funding of the Bureau, including the assets and liabilities of the Bureau, and the extent to which the funding needs of the Bureau are anticipated to exceed the level of the amount set forth in subsection (a)(2). The Director shall submit the report to the President and to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives.

**(2) Authorization of appropriations**

If the Director makes the determination and submits the report pursuant to paragraph (1), there are hereby authorized to be appropriated to the Bureau, for the purposes of carrying out the authorities granted in Federal consumer financial law, $200,000,000 for each of fiscal years 2010, 2011, 2012, 2013, and 2014.

**(3) Apportionment**

Notwithstanding any other provision of law, the amounts in paragraph (2) shall be subject to apportionment under section 1517 of title 31 and restrictions that generally apply to the use of appropriated funds in title 31 and other laws.

**(4) Annual report**

The Director shall prepare and submit a report, on an annual basis, to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives regarding the financial operating plans and forecasts of the Director, the financial condition and results of operations of the Bureau, and the sources and application of funds of the Bureau, including any funds appropriated in accordance with this subsection.

(Pub. L. 111–203, title X, § 1017, July 21, 2010, 124 Stat. 1975.)

REFERENCES IN TEXT

This title, referred to in subsec. (a)(2)(C), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, known as the Consumer Financial Protection Act of 2010, which enacted this subchapter and enacted, amended, and repealed numerous other sections and notes in the Code. For complete classification of title X to the Code, see Short Title note set out under section 5301 of this title and Tables.

CODIFICATION

In subsec. (a)(5)(C), "section 6101 of title 41" substituted for "section 3709 of the Revised Statutes of the United States (41 U.S.C. 5)" on authority of Pub. L. 111–350, § 6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

PART B—GENERAL POWERS OF THE BUREAU

## § 5511. Purpose, objectives, and functions

**(a) Purpose**

The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.

**(b) Objectives**

The Bureau is authorized to exercise its authorities under Federal consumer financial law

for the purposes of ensuring that, with respect to consumer financial products and services—

(1) consumers are provided with timely and understandable information to make responsible decisions about financial transactions;

(2) consumers are protected from unfair, deceptive, or abusive acts and practices and from discrimination;

(3) outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed in order to reduce unwarranted regulatory burdens;

(4) Federal consumer financial law is enforced consistently, without regard to the status of a person as a depository institution, in order to promote fair competition; and

(5) markets for consumer financial products and services operate transparently and efficiently to facilitate access and innovation.

**(c) Functions**

The primary functions of the Bureau are—

(1) conducting financial education programs;

(2) collecting, investigating, and responding to consumer complaints;

(3) collecting, researching, monitoring, and publishing information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets;

(4) subject to sections 5514 through 5516 of this title, supervising covered persons for compliance with Federal consumer financial law, and taking appropriate enforcement action to address violations of Federal consumer financial law;

(5) issuing rules, orders, and guidance implementing Federal consumer financial law; and

(6) performing such support activities as may be necessary or useful to facilitate the other functions of the Bureau.

(Pub. L. 111–203, title X, § 1021, July 21, 2010, 124 Stat. 1979.)

EFFECTIVE DATE

Pub. L. 111–203, title X, § 1029A, July 21, 2010, 124 Stat. 2005, provided that: "This subtitle [subtitle B (§§ 1021–1029A), enacting this part] shall become effective on the designated transfer date, except that sections 1022, 1024, and 1025(e) [12 U.S.C. 5512, 5514, and 5515(e)] shall become effective on the date of enactment of this Act [July 21, 2010]."

[The term "designated transfer date" is defined in section 5481(9) of this title as the date established under section 5582 of this title.]

## § 5512. Rulemaking authority

**(a) In general**

The Bureau is authorized to exercise its authorities under Federal consumer financial law to administer, enforce, and otherwise implement the provisions of Federal consumer financial law.

**(b) Rulemaking, orders, and guidance**

**(1) General authority**

The Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives

Add. 12

**(f) Petition for order modifying or setting aside demand**

**(1) In general**

Not later than 20 days after the service of any civil investigative demand upon any person under subsection (b), or at any time before the return date specified in the demand, whichever period is shorter, or within such period exceeding 20 days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any Bureau investigator named in the demand, such person may file with the Bureau a petition for an order by the Bureau modifying or setting aside the demand.

**(2) Compliance during pendency**

The time permitted for compliance with the demand in whole or in part, as determined proper and ordered by the Bureau, shall not run during the pendency of a petition under paragraph (1) at the Bureau, except that such person shall comply with any portions of the demand not sought to be modified or set aside.

**(3) Specific grounds**

A petition under paragraph (1) shall specify each ground upon which the petitioner relies in seeking relief, and may be based upon any failure of the demand to comply with the provisions of this section, or upon any constitutional or other legal right or privilege of such person.

**(g) Custodial control**

At any time during which any custodian is in custody or control of any documentary material, tangible things, reports, answers to questions, or transcripts of oral testimony given by any person in compliance with any civil investigative demand, such person may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian, a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this section or rule promulgated by the Bureau.

**(h) Jurisdiction of court**

**(1) In general**

Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry out the provisions of this section.

**(2) Appeal**

Any final order entered as described in paragraph (1) shall be subject to appeal pursuant to section 1291 of title 28.

(Pub. L. 111–203, title X, § 1052, July 21, 2010, 124 Stat. 2019.)

REFERENCES IN TEXT

This title, referred to in subsecs. (a)(1) and (b)(1), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, known as the Consumer Financial Protection Act of 2010, which enacted this subchapter and enacted, amended, and repealed numerous other sections and notes in the Code. For complete classification of title

X to the Code, see Short Title note set out under section 5301 of this title and Tables.

EFFECTIVE DATE

Section effective on the designated transfer date, see section 1058 of Pub. L. 111–203, set out as a note under section 5561 of this title.

**§ 5563. Hearings and adjudication proceedings**

**(a) In general**

The Bureau is authorized to conduct hearings and adjudication proceedings with respect to any person in the manner prescribed by chapter 5 of title 5 in order to ensure or enforce compliance with—

(1) the provisions of this title,[1] including any rules prescribed by the Bureau under this title;[1] and

(2) any other Federal law that the Bureau is authorized to enforce, including an enumerated consumer law, and any regulations or order prescribed thereunder, unless such Federal law specifically limits the Bureau from conducting a hearing or adjudication proceeding and only to the extent of such limitation.

**(b) Special rules for cease-and-desist proceedings**

**(1) Orders authorized**

**(A) In general**

If, in the opinion of the Bureau, any covered person or service provider is engaging or has engaged in an activity that violates a law, rule, or any condition imposed in writing on the person by the Bureau, the Bureau may, subject to sections 5514, 5515, and 5516 of this title, issue and serve upon the covered person or service provider a notice of charges in respect thereof.

**(B) Content of notice**

The notice under subparagraph (A) shall contain a statement of the facts constituting the alleged violation or violations, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist should issue against the covered person or service provider, such hearing to be held not earlier than 30 days nor later than 60 days after the date of service of such notice, unless an earlier or a later date is set by the Bureau, at the request of any party so served.

**(C) Consent**

Unless the party or parties served under subparagraph (B) appear at the hearing personally or by a duly authorized representative, such person shall be deemed to have consented to the issuance of the cease-and-desist order.

**(D) Procedure**

In the event of consent under subparagraph (C), or if, upon the record, made at any such hearing, the Bureau finds that any violation specified in the notice of charges has been established, the Bureau may issue and serve upon the covered person or service provider an order to cease and desist from

---

[1] See References in Text note below.

the violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the covered person or service provider to cease and desist from the subject activity, and to take affirmative action to correct the conditions resulting from any such violation.

**(2) Effectiveness of order**

A cease-and-desist order shall become effective at the expiration of 30 days after the date of service of an order under paragraph (1) upon the covered person or service provider concerned (except in the case of a cease-and-desist order issued upon consent, which shall become effective at the time specified therein), and shall remain effective and enforceable as provided therein, except to such extent as the order is stayed, modified, terminated, or set aside by action of the Bureau or a reviewing court.

**(3) Decision and appeal**

Any hearing provided for in this subsection shall be held in the Federal judicial district or in the territory in which the residence or principal office or place of business of the person is located unless the person consents to another place, and shall be conducted in accordance with the provisions of chapter 5 of title 5. After such hearing, and within 90 days after the Bureau has notified the parties that the case has been submitted to the Bureau for final decision, the Bureau shall render its decision (which shall include findings of fact upon which its decision is predicated) and shall issue and serve upon each party to the proceeding an order or orders consistent with the provisions of this section. Judicial review of any such order shall be exclusively as provided in this subsection. Unless a petition for review is timely filed in a court of appeals of the United States, as provided in paragraph (4), and thereafter until the record in the proceeding has been filed as provided in paragraph (4), the Bureau may at any time, upon such notice and in such manner as the Bureau shall determine proper, modify, terminate, or set aside any such order. Upon filing of the record as provided, the Bureau may modify, terminate, or set aside any such order with permission of the court.

**(4) Appeal to court of appeals**

Any party to any proceeding under this subsection may obtain a review of any order served pursuant to this subsection (other than an order issued with the consent of the person concerned) by the filing in the court of appeals of the United States for the circuit in which the principal office of the covered person is located, or in the United States Court of Appeals for the District of Columbia Circuit, within 30 days after the date of service of such order, a written petition praying that the order of the Bureau be modified, terminated, or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Bureau, and thereupon the Bureau shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon the filing of such petition, such court shall have juris-

diction, which upon the filing of the record shall except as provided in the last sentence of paragraph (3) be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the Bureau. Review of such proceedings shall be had as provided in chapter 7 of title 5. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court of the United States, upon certiorari, as provided in section 1254 of title 28.

**(5) No stay**

The commencement of proceedings for judicial review under paragraph (4) shall not, unless specifically ordered by the court, operate as a stay of any order issued by the Bureau.

**(c) Special rules for temporary cease-and-desist proceedings**

**(1) In general**

Whenever the Bureau determines that the violation specified in the notice of charges served upon a person, including a service provider, pursuant to subsection (b), or the continuation thereof, is likely to cause the person to be insolvent or otherwise prejudice the interests of consumers before the completion of the proceedings conducted pursuant to subsection (b), the Bureau may issue a temporary order requiring the person to cease and desist from any such violation or practice and to take affirmative action to prevent or remedy such insolvency or other condition pending completion of such proceedings. Such order may include any requirement authorized under this part. Such order shall become effective upon service upon the person and, unless set aside, limited, or suspended by a court in proceedings authorized by paragraph (2), shall remain effective and enforceable pending the completion of the administrative proceedings pursuant to such notice and until such time as the Bureau shall dismiss the charges specified in such notice, or if a cease-and-desist order is issued against the person, until the effective date of such order.

**(2) Appeal**

Not later than 10 days after the covered person or service provider concerned has been served with a temporary cease-and-desist order, the person may apply to the United States district court for the judicial district in which the residence or principal office or place of business of the person is located, or the United States District Court for the District of Columbia, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings pursuant to the notice of charges served upon the person under subsection (b), and such court shall have jurisdiction to issue such injunction.

**(3) Incomplete or inaccurate records**

**(A) Temporary order**

If a notice of charges served under subsection (b) specifies, on the basis of particular facts and circumstances, that the books and records of a covered person or service

provider are so incomplete or inaccurate that the Bureau is unable to determine the financial condition of that person or the details or purpose of any transaction or transactions that may have a material effect on the financial condition of that person, the Bureau may issue a temporary order requiring—

(i) the cessation of any activity or practice which gave rise, whether in whole or in part, to the incomplete or inaccurate state of the books or records; or

(ii) affirmative action to restore such books or records to a complete and accurate state, until the completion of the proceedings under subsection (b)(1).

**(B) Effective period**

Any temporary order issued under subparagraph (A)—

(i) shall become effective upon service; and

(ii) unless set aside, limited, or suspended by a court in proceedings under paragraph (2), shall remain in effect and enforceable until the earlier of—

(I) the completion of the proceeding initiated under subsection (b) in connection with the notice of charges; or

(II) the date the Bureau determines, by examination or otherwise, that the books and records of the covered person or service provider are accurate and reflect the financial condition thereof.

**(d) Special rules for enforcement of orders**

**(1) In general**

The Bureau may in its discretion apply to the United States district court within the jurisdiction of which the principal office or place of business of the person is located, for the enforcement of any effective and outstanding notice or order issued under this section, and such court shall have jurisdiction and power to order and require compliance herewith.

**(2) Exception**

Except as otherwise provided in this subsection, no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order or to review, modify, suspend, terminate, or set aside any such notice or order.

**(e) Rules**

The Bureau shall prescribe rules establishing such procedures as may be necessary to carry out this section.

(Pub. L. 111–203, title X, §1053, July 21, 2010, 124 Stat. 2025.)

REFERENCES IN TEXT

This title, referred to in subsec. (a)(1), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, known as the Consumer Financial Protection Act of 2010, which enacted this subchapter and enacted, amended, and repealed numerous other sections and notes in the Code. For complete classification of title X to the Code, see Short Title note set out under section 5301 of this title and Tables.

EFFECTIVE DATE

Section effective on the designated transfer date, see section 1058 of Pub. L. 111–203, set out as a note under section 5561 of this title.

**§ 5564. Litigation authority**

**(a) In general**

If any person violates a Federal consumer financial law, the Bureau may, subject to sections 5514, 5515, and 5516 of this title, commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law.

**(b) Representation**

The Bureau may act in its own name and through its own attorneys in enforcing any provision of this title,[1] rules thereunder, or any other law or regulation, or in any action, suit, or proceeding to which the Bureau is a party.

**(c) Compromise of actions**

The Bureau may compromise or settle any action if such compromise is approved by the court.

**(d) Notice to the Attorney General**

**(1) In general**

When commencing a civil action under Federal consumer financial law, or any rule thereunder, the Bureau shall notify the Attorney General and, with respect to a civil action against an insured depository institution or insured credit union, the appropriate prudential regulator.

**(2) Notice and coordination**

**(A) Notice of other actions**

In addition to any notice required under paragraph (1), the Bureau shall notify the Attorney General concerning any action, suit, or proceeding to which the Bureau is a party, except an action, suit, or proceeding that involves the offering or provision of consumer financial products or services.

**(B) Coordination**

In order to avoid conflicts and promote consistency regarding litigation of matters under Federal law, the Attorney General and the Bureau shall consult regarding the coordination of investigations and proceedings, including by negotiating an agreement for coordination by not later than 180 days after the designated transfer date. The agreement under this subparagraph shall include provisions to ensure that parallel investigations and proceedings involving the Federal consumer financial laws are conducted in a manner that avoids conflicts and does not impede the ability of the Attorney General to prosecute violations of Federal criminal laws.

**(C) Rule of construction**

Nothing in this paragraph shall be construed to limit the authority of the Bureau under this title,[1] including the authority to interpret Federal consumer financial law.

---

[1] See References in Text note below.

in paragraphs (c) and (d) of this section.

(c) *Waiver.* The borrower may waive the right to delivery of the completed HUD–1 or HUD–1A no later than at settlement by executing a written waiver at or before settlement. In such case, the completed HUD–1 or HUD–1A shall be mailed or delivered to the borrower, seller, and lender (if the lender is not the settlement agent) as soon as practicable after settlement.

(d) *Exempt transactions.* When the borrower or the borrower's agent does not attend the settlement, or when the settlement agent does not conduct a meeting of the parties for that purpose, the transaction shall be exempt from the requirements of paragraphs (a) and (b) of this section, except that the HUD–1 or HUD–1A shall be mailed or delivered as soon as practicable after settlement.

(e) *Recordkeeping.* The lender shall retain each completed HUD–1 or HUD–1A and related documents for five years after settlement, unless the lender disposes of its interest in the mortgage and does not service the mortgage. In that case, the lender shall provide its copy of the HUD–1 or HUD–1A to the owner or servicer of the mortgage as a part of the transfer of the loan file. Such owner or servicer shall retain the HUD–1 or HUD–1A for the remainder of the five-year period. The Bureau shall have the right to inspect or require copies of records covered by this paragraph (e).

### § 1024.11   Mailing.

The provisions of this part requiring or permitting mailing of documents shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application or in other information submitted to or obtained by the lender at the time of loan application or submitted or obtained by the lender or settlement agent, except that a revised address shall be used where the lender or settlement agent has been expressly informed in writing of a change in address.

### § 1024.12   No fee.

No fee shall be imposed or charge made upon any other person, as a part of settlement costs or otherwise, by a lender in connection with a federally related mortgage loan made by it (or a loan for the purchase of a manufactured home), or by a servicer (as that term is defined under 12 U.S.C. 2605(i)(2)) for or on account of the preparation and distribution of the HUD–1 or HUD–1A settlement statement, escrow account statements required pursuant to section 10 of RESPA (12 U.S.C. 2609), or statements required by the Truth in Lending Act (15 U.S.C. 1601 *et seq.*).

### § 1024.13   [Reserved]

### § 1024.14   Prohibition against kickbacks and unearned fees.

(a) *Section 8 violation.* Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607).

(b) *No referral fees.* No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 1024.14(g)(1). A company may not pay any other company or the employees of any other company for the referral of settlement service business.

(c) *No split of charges except for actual services performed.* No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

516

**Bur. of Consumer Financial Protection**                                    **§ 1024.14**

(d) *Thing of value.* This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term ''payment'' is used throughout §§ 1024.14 and 1024.15 as synonymous with the giving or receiving of any ''thing of value'' and does not require transfer of money.

(e) *Agreement or understanding.* An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

(f) *Referral.* (1) A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.

(2) A referral also occurs whenever a person paying for a settlement service or business incident thereto is required to use (see § 1024.2, ''required use'') a particular provider of a settlement service or business incident thereto.

(g) *Fees, salaries, compensation, or other payments.* (1) Section 8 of RESPA permits:

(i) A payment to an attorney at law for services actually rendered;

(ii) A payment by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance;

(iii) A payment by a lender to its duly appointed agent or contractor for services actually performed in the origination, processing, or funding of a loan;

(iv) A payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed;

(v) A payment pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and real estate brokers. (The statutory exemption restated in this paragraph refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers.);

(vi) Normal promotional and educational activities that are not conditioned on the referral of business and that do not involve the defraying of expenses that otherwise would be incurred by persons in a position to refer settlement services or business incident thereto; or

(vii) An employer's payment to its own employees for any referral activities.

(2) The Bureau may investigate high prices to see if they are the result of a referral fee or a split of a fee. If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided. These facts may be used as evidence of a violation of section 8 and may serve as a basis for a RESPA investigation. High prices standing alone are not proof of a RESPA violation. The value of a referral (*i.e.,* the value of any additional business obtained thereby) is not

517

to be taken into account in determining whether the payment exceeds the reasonable value of such goods, facilities or services. The fact that the transfer of the thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited.

(3) *Multiple services.* When a person in a position to refer settlement service business, such as an attorney, mortgage lender, real estate broker or agent, or developer or builder, receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person. For example, for an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing.

(h) *Recordkeeping.* Any documents provided pursuant to this section shall be retained for five (5) years from the date of execution.

(i) *Appendix B of this part.* Illustrations in appendix B of this part demonstrate some of the requirements of this section.

## § 1024.15 Affiliated business arrangements.

(a) *General.* An affiliated business arrangement is defined in section 3(7) of RESPA (12 U.S.C. 2602(7)).

(b) *Violation and exemption.* An affiliated business arrangement is not a violation of section 8 of RESPA (12 U.S.C. 2607) and of § 1024.14 if the conditions set forth in this section are satisfied. Paragraph (b)(1) of this section shall not apply to the extent it is inconsistent with section 8(c)(4)(A) of RESPA (12 U.S.C. 2607(c)(4)(A)).

(1) The person making each referral has provided to each person whose business is referred a written disclosure, in the format of the Affiliated Business Arrangement Disclosure Statement set forth in appendix D of this part, of the nature of the relationship (explaining the ownership and financial interest) between the provider of settlement services (or business incident thereto) and the person making the referral and of an estimated charge or range of charges generally made by such provider (which describes the charge using the same terminology, as far as practical, as section L of the HUD–1 settlement statement). The disclosures must be provided on a separate piece of paper no later than the time of each referral or, if the lender requires use of a particular provider, the time of loan application, except that:

(i) Where a lender makes the referral to a borrower, the condition contained in paragraph (b)(1) of this section may be satisfied at the time that the good faith estimate or a statement under § 1024.7(d) is provided; and

(ii) Whenever an attorney or law firm requires a client to use a particular title insurance agent, the attorney or law firm shall provide the disclosures no later than the time the attorney or law firm is engaged by the client.

(iii) Failure to comply with the disclosure requirements of this section may be overcome if the person making a referral can prove by a preponderance of the evidence that procedures reasonably adopted to result in compliance with these conditions have been maintained and that any failure to comply with these conditions was unintentional and the result of a *bona fide* error. An error of legal judgment with respect to a person's obligations under RESPA is not a *bona fide* error. Administrative and judicial interpretations of section 130(c) of the Truth in Lending Act shall not be binding interpretations of the preceding sentence or section 8(d)(3) of RESPA (12 U.S.C. 2607(d)(3)).

(2) No person making a referral has required (as defined in § 1024.2, "required use") any person to use any particular provider of settlement services or business incident thereto, except if such person is a lender, for requiring a buyer, borrower or seller to pay for the



§ 3500.14                                                     24 CFR Ch. XX (4–1–11 Edition)

law or judicial or administrative opinion that implements, interprets or applies the relevant provision, and an explanation of the possible inconsistency. A determination by the Secretary that an inconsistency with State law exists will be made by publication of a notice in the FEDERAL REGISTER. ''Law'' as used in this section includes regulations and any enactment which has the force and effect of law and is issued by a State or any political subdivision of a State.

(d) A specific preemption of conflicting State laws regarding notices and disclosures of mortgage servicing transfers is set forth in § 3500.21(h).

[61 FR 13233, Mar. 26, 1996, as amended at 61 FR 58476, Nov. 15, 1996]

### § 3500.14  Prohibition against kickbacks and unearned fees.

(a) *Section 8 violation.* Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19.

(b) *No referral fees.* No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.14(g)(1). A company may not pay any other company or the employees of any other company for the referral of settlement service business.

(c) *No split of charges except for actual services performed.* No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

(d) *Thing of value.* This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term ''payment'' is used throughout §§ 3500.14 and 3500.15 as synonymous with the giving or receiving any ''thing of value'' and does not require transfer of money.

(e) *Agreement or understanding.* An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

(f) *Referral.* (1) A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.

(2) A referral also occurs whenever a person paying for a settlement service or business incident thereto is required to use (see § 3500.2, ''required use'') a

358

**Office of Asst. Sec. for Housing, HUD**                    **§ 3500.14**

particular provider of a settlement service or business incident thereto.

(g) *Fees, salaries, compensation, or other payments.* (1) Section 8 of RESPA permits:

(i) A payment to an attorney at law for services actually rendered;

(ii) A payment by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance;

(iii) A payment by a lender to its duly appointed agent or contractor for services actually performed in the origination, processing, or funding of a loan;

(iv) A payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed;

(v) A payment pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and real estate brokers. (The statutory exemption restated in this paragraph refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers.);

(vi) Normal promotional and educational activities that are not conditioned on the referral of business and that do not involve the defraying of expenses that otherwise would be incurred by persons in a position to refer settlement services or business incident thereto; or

(vii) An employer's payment to its own employees for any referral activities.

(2) The Department may investigate high prices to see if they are the result of a referral fee or a split of a fee. If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided. These facts may be used as evidence of a violation of section 8 and may serve as a basis for a RESPA investigation. High prices standing alone are not proof of a RESPA violation. The value of a referral (i.e., the value of any addi-

tional business obtained thereby) is not to be taken into account in determining whether the payment exceeds the reasonable value of such goods, facilities or services. The fact that the transfer of the thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited.

(3) *Multiple services.* When a person in a position to refer settlement service business, such as an attorney, mortgage lender, real estate broker or agent, or developer or builder, receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person. For example, for an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing.

(h) *Recordkeeping.* Any documents provided pursuant to this section shall be retained for five (5) years from the date of execution.

(i) *Appendix B of this part.* Illustrations in appendix B of this part demonstrate some of the requirements of this section.

[61 FR 13233, Mar. 26, 1996, as amended at 61 FR 29252, June 7, 1996; 61 FR 58476, Nov. 15, 1996]

EFFECTIVE DATE NOTE: At 61 FR 29252, June 7, 1996, § 3500.14 was amended by revising the last sentence of paragraph (b), the heading of paragraph (g), and paragraph (g)(1), effective Oct. 7, 1996. At 61 FR 51782, Oct. 4, 1996, the effective date was delayed until further notice. For the convenience of the user, the new text is set forth as follows:

**§ 3500.14  Prohibition against kickbacks and unearned fees.**

\*      \*      \*      \*      \*

359

§ 3500.15

(b) * * * A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

* * * * *

(g) *Exemptions for fees, salaries, compensation, or other payments.* (1) The following are permissible:

(i) A payment to an attorney at law for services actually rendered;

(ii) A payment by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance;

(iii) A payment by a lender to its duly appointed agent or contractor for services actually performed in the origination, processing, or funding of a loan;

(iv) A payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed;

(v) A payment pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and real estate brokers. (The statutory exemption restated in this paragraph refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers.)

(vi) Normal promotional and educational activities that are not conditioned on the referral of business and do not involve the defraying of expenses that otherwise would be incurred by persons in a position to refer settlement services or business incident thereto;

(vii) A payment by an employer to its own *bona fide* employee for generating business for that employer;

(viii) In a controlled business arrangement, a payment by an employer of a bonus to a managerial employee based on criteria relating to performance (such as profitability, capture rate, or other thresholds) of a business entity in the controlled business arrangement. However, the amount of such bonus may not be calculated as a multiple of the number or value of referrals of settlement service business to a business entity in a controlled business arrangement; and

(ix)(A) A payment by an employer to its *bona fide* employee for the referral of settlement service business to a settlement service provider that has an affiliate relationship with the employer or in which the employer has a direct or beneficial ownership interest of more than 1 percent, if the following conditions are met:

(*1*) The employee does not perform settlement services in any transaction; and

(*2*) Before the referral, the employee provides to the person being referred a written disclosure in the format of the Controlled Business Arrangement Disclosure Statement, set forth in appendix D to this part.

(B) For purposes of this paragraph (g)(1)(ix), the marketing of a settlement service or product of an affiliated entity, including the collection and conveyance of information or the taking of an application or order for an affiliated entity, does not constitute the performance of a settlement service. Under this paragraph (g)(1)(ix), marketing of a settlement service or product may include incidental communications with the consumer after the application or order, such as providing the consumer with information about the status of an application or order; marketing shall not include serving as the ongoing point of contact for coordinating the delivery and provision of settlement services.

* * * * *

§ 3500.15 **Affiliated business arrangements.**

(a) *General.* An affiliated business arrangement is defined in section 3(7) of RESPA (12 U.S.C. 2602(7)).

(b) *Violation and exemption.* An affiliated business arrangement is not a violation of section 8 of RESPA (12 U.S.C. 2607) and of § 3500.14 if the conditions set forth in this section are satisfied. Paragraph (b)(1) of this section shall not apply to the extent it is inconsistent with section 8(c)(4)(A) of RESPA (12 U.S.C. 2607(c)(4)(A)).

(1) The person making each referral has provided to each person whose business is referred a written disclosure, in the format of the Affiliated Business Arrangement Disclosure Statement set forth in appendix D of this part, of the nature of the relationship (explaining the ownership and financial interest) between the provider of settlement services (or business incident thereto) and the person making the referral and of an estimated charge or range of charges generally made by such provider (which describes the charge using the same terminology, as far as practical, as section L of the HUD–1 settlement statement). The disclosures must be provided on a separate piece of paper no later than the time of each referral or, if the lender requires use of a particular provider,

360



Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

Section 7. All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as on other Bills.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take



8          CONSTITUTION OF THE UNITED STATES

Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

Section 8. The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;



CONSTITUTION OF THE UNITED STATES                    9

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of Particular States, and the Acceptance of Congress, become the seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Section 9. The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thou-



sand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

The Privilege of the Writ of *Habeas Corpus* shall not be suspended, unless when in Cases or Rebellion or Invasion the public Safety may require it.

No Bill of Attainder or *ex post facto* Law shall be passed.

No Capitation, or other direct, Tax shall be laid, unless in the Proportion to the Census of Enumeration herein before directed to be taken.

No Tax or Duty shall be laid on Articles exported from any State.

No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear or pay Duties in another.

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

No Title of Nobility shall be granted by the United States: and no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Section 10. No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attain-



CONSTITUTION OF THE UNITED STATES             13

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:—"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

Section 2. The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to Grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with



14                   CONSTITUTION OF THE UNITED STATES

the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

Section 3. He shall from time to time give to the Congress Information on the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

Section 4. The President, Vice President and all Civil Officers of the United States, shall be removed from Office on Impeachment for and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

Article III.

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges,

Add. 27

ownership interest and unrelated to referrals of business.

*HUD Analysis.* A review of the factors reflects an arrangement involving a *bona fide* provider of settlement services. In this example, the real estate brokerage company is not the sole source of referrals to the title agency. However, the title agency continues its exclusive agency arrangement with the title insurance company owner. While this last factor initially may raise a question as to why other title insurance companies are not used for title insurance policies, upon review there appears to be nothing impermissible about these referrals of title business from the title agency to the title insurance company.

This example involves the purchase of stock in an existing full service provider. In such a situation, HUD would carefully examine the investment made by the real estate brokerage company. In this example, the real estate brokerage company pays a fair value contribution for its ownership share and receives a return on its investment that is not based on referrals of business. Since the real estate brokerage provides the CBA disclosure, does not require the use of the title agency and the only return to the brokerage is based on the profits of the agency and not reflective of referrals made, the arrangement meets the CBA exemption requirements. HUD would consider this a *bona fide* controlled business arrangement.

5. A mortgage banker sets up a limited liability mortgage brokerage company. The mortgage banker sells shares in divisions of the limited liability company to real estate brokers and real estate agents. For $500 each, the real estate brokers and agents may purchase separate ''divisions'' within the limited liability mortgage brokerage company to which they refer customers for loans. In later years ownership may vary by the amount of referrals made by a real estate broker or agent in the previous year. Under this structure, the ownership distributions are based on the business each real estate broker or real estate agent refers to his/her division and not on the basis of their capital contribution to the entity as a whole. The limited liability mortgage brokerage company provides all the substantial services of a mortgage broker. It does not contract out any processing to its mortgage banker owner. It sends loan packages to its mortgage banker owner as well as other lenders.

*HUD analysis.* Although HUD would consider the mortgage brokerage company to be a *bona fide* provider of mortgage brokerage services, this example illustrates an arrangement that fails to meet the third condition of the CBA exception. 12 U.S.C. 2607(c)(4)(C). Here, the capitalization, ownership and

payment structure with ownership in separate ''divisions'' is a method in which ownership returns or ownership shares vary based on referrals made and not on the amount contributed to the capitalization of the company. In cases where the percent of ownership interest or the amount of payment varies by the amount of business the real estate agent or broker refers, such payments are not *bona fide* returns on ownership interest, but instead, are an indirect method of paying a kickback based on the amount of business referred. 24 CFR 3500.15(b)(3).

**Authority:** 12 U.S.C. 2617; 42 U.S.C. 3535(d).

Dated: May 31, 1996.

**Nicolas P. Retsinas,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 96–14331 Filed 6–6–96; 8:45 am]

**BILLING CODE 4210–27–P**

---

**24 CFR Part 3500**

**[Docket No. FR–3638–N–05]**

**Office of the Assistant Secretary for Housing-Federal Housing Commissioner; Real Estate Settlement Procedures Act (RESPA); Statement of Policy 1996–3, Rental of Office Space, Lock-outs, and Retaliation**

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of Policy 1996–3, Rental of Office Space, Lock-outs, and Retaliation.

**SUMMARY:** This statement sets forth the Department's interpretation of Section 8 of the Real Estate Settlement Procedures Act (RESPA) and its implementing regulations with regard to the rental of office space, lock-outs and retaliation. It is published to give guidance and to inform interested members of the public of the Department's position on enforcement of this section of the law.

**FOR FURTHER INFORMATION CONTACT:** David R. Williamson, Director of the Office of Consumer and Regulatory Affairs, Room 5241, telephone: (202) 708–4560. For legal enforcement questions, Peter Race, Assistant General Counsel for Program Compliance, or Rebecca J. Holtz, Attorney, Room 9253, telephone: (202) 708–4184. (The telephone numbers are not toll-free.) For hearing- and speech-impaired persons, this number may be accessed via TTY (text telephone) by calling the Federal Information Relay Service at 1–800–877–8339. The address for the above-listed persons is: Department of Housing

and Urban Development, 451 Seventh Street, SW, Washington, DC 20410.

**SUPPLEMENTARY INFORMATION:**

**General Background**

Section 8 (a) of the Real Estate Settlement Procedures Act (RESPA) prohibits any person from giving or accepting any fee, kickback, or thing of value for the referral of settlement service business involving a federally related mortgage loan. 12 U.S.C. 2607(a). Congress specifically stated it intended to eliminate kickbacks and referral fees that tend to increase unnecessarily the costs of settlement services. 12 U.S.C. 2601(b)(2).

Since July 1993, the Department has been seeking comments and advice concerning the final rule of November 2, 1992, implementing Section 8 of RESPA. On July 21, 1994, the Department published a new proposed rule on certain Section 8 issues. Simultaneously with the issuance of this Statement of Policy, HUD is publishing a final rule in that rulemaking. As part of that rulemaking process, the Department received comments concerning the application of Section 8 of RESPA to the rental of office space, lock-outs and retaliation in connection with real estate brokerage office practices. In addition, the Department's enforcement officials have received numerous complaints dealing with these same issues.

**Rental of Office Space**

In the last few years, the Department has received numerous complaints alleging that certain settlement service providers, particularly lenders, are leasing desks or office space in real estate brokerage offices at higher than market rate in exchange for referrals of business. In HUD's rulemaking docket, number R–94–1725 (FR–3638), many commenters argued that HUD should scrutinize this rental practice. The concern expressed is that real estate brokers charge, and settlement service providers pay, high rent payments for the desk or office space to disguise kickbacks to the real estate broker for the referral of business to the settlement service provider. In this Statement of Policy, the Department sets forth how it distinguishes legitimate payments for rentals from payments that are for the referral of business in violation of Section 8.

**Lock-outs**

The Department also received comments and complaints alleging that settlement service providers were being excluded from, or locked-out of, places of business where they might find

potential customers. The most common occurrence cited was where a real estate brokerage company had leased space to a particular provider of services, and had prevented any other provider from entering its office space.

As part of the July 21, 1994, rulemaking, a Nebraska lender commented:

> We are experiencing a rapid growth of lender lock-out relationships wherein real estate companies lease office space within their sales offices to a particular mortgage company. A part of the agreement is that other lenders are not allowed in the sales offices to solicit business. This clearly prevents free competition in financing to the home buyer.

> \*      \*      \*      \*      \*

> \* \* \* [I]t is very clear that the [real estate] office managers are exerting a lot of control to keep all other lenders out. This would not be done without proper incentive ($$$) \* \* \*.

Several other commenters alleged that real estate office space arrangements with particular lenders, coupled with limiting or denying rival lenders access to customers, were being used in their communities to eliminate competition. These commenters called for special RESPA rules to ban these practices.

**Retaliation**

The Department also has received complaints concerning retaliation practices used to influence consumer referrals. In one complaint, financial service representatives in a real estate broker's office were given specific quotas of referrals of home buyers to an affiliated lender and were threatened with the loss of their jobs if they did not meet the quotas.

Commenters on the proposed rules also alleged that some employers were engaging in practices of retaliation or discrimination against employees and agents who did not refer business to affiliated entities. Reprisals could range from loss of benefits, such as fewer sales leads, higher desk fees, less desirable work space, and ultimately, loss of job. Some commenters requested that the Department issue guidelines or other regulatory provisions to restrict such retaliatory activities.

The Coalition to Retain Independent Services in Settlement (CRISIS) called for a rule prohibiting retaliation against employees and agents who refer business to non-affiliated entities as most consistent with the language of the RESPA statute. CRISIS suggested strong language to prohibit negative actions against employees and agents who refer business to non-affiliated entities, including prohibitions against more

subtle actions, such as loss of work space or increases in desk fees.

**Statement of Policy—1996–3**

To give guidance to interested members of the public on the application of RESPA and its implementing regulations to these issues, the Secretary, pursuant to Section 19(a) of RESPA and 24 CFR 3500.4(a)(1)(ii),[1] hereby issues the following Statement of Policy.

*Rental of Office Space*

Section 8 of RESPA prohibits a person from giving or from accepting any fee, kickback or thing of value pursuant to an agreement that business incident to a settlement service involving a federally related mortgage loan shall be referred to any person. 12 U.S.C. § 2607(a). An example of a thing of value is a rental payment that is higher than that ordinarily paid for the facilities. The statute, however, permits payments for goods or facilities actually furnished or for services actually performed. 12 U.S.C. § 2607(c)(2). Thus, when faced with a complaint that a settlement service provider is paying a high rent for referrals of settlement service business, HUD analyzes whether the rental payment is bona fide or is really a disguised referral fee.

HUD's regulations implement the statutory provisions at 24 CFR 3500.14 and give greater guidance to this analysis. Section 3500.14(g)(2) of the regulations provides that the Department may investigate high prices to see if they are the result of a referral fee or a split of a fee. It states: "If the payment bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided \* \* \*. The value of a referral (i.e., the value of any additional business obtained thereby) is not to be taken into account in determining whether the payment exceeds the reasonable value of such goods, facilities or services." *Id.*

Thus, under existing regulations, when faced with a complaint that a person is renting space from a person who is referring business to that person, HUD examines the facts to determine whether the rental payment bears a reasonable relationship to the market value of the rental space provided or is a disguised referral fee. The market value of the rental space may include an appropriate proportion of the cost for office services actually provided to the

tenant, such as secretarial services, utilities, telephone and other office equipment. In some situations, a market price rental payment from the highest bidding settlement service provider could reflect payments for referrals of business to that settlement service provider from the person whose space is being rented. Thus, to distinguish between rental payments that may include a payment for referrals of settlement service business and a payment for the facility actually provided, HUD interprets the existing regulations to require a "general market value" standard as the basis for the analysis, rather than a market rate among settlement service providers.

In a rental situation, the general market value is the rent that a non-settlement service provider would pay for the same amount of space and services in the same or a comparable building. A general market value standard allows payments for facilities and services actually furnished, but does not take into account any value for the referrals that might be reflected in the rental payment. A general market standard is not only consistent with the existing regulations, it furthers the statute's purpose. Congress specifically stated that it intended to protect consumers from unnecessarily high settlement charges caused by abusive practices. 12 U.S.C. § 2601. Some settlement service providers might be willing to pay a higher rent than the general market value to reflect the value of referrals of settlement service business. The cost of an above-general-market-rate rental payment could likely be passed on to the consumer in higher settlement costs. If referrals of settlement service business are taking place in a given rental situation, and the rental payment is above the general market value, then it becomes difficult to distinguish any increase in rental payment over the general market from a referral fee payment.

HUD, therefore, interprets Section 8 of RESPA and its implementing regulations to allow payments for the rental of desk space or office space. However, if a settlement service provider rents space from a person who is referring settlement service business to the provider, then HUD will examine whether the rental payments are reasonably related to the general market value of the facilities and services actually furnished. If the rental payments exceed the general market value of the space provided, then HUD will consider the excess amount to be for the referral of business in violation of Section 8(a).

---

[1] All citations in this Statement of Policy refer to recently streamlined regulations published on March 26, 1996 (61 FR 13232), in the **Federal Register** (to be codified at 24 CFR part 3500).

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 3500

### [Docket No. FR–4114–N–01]

### Office of the Assistant Secretary for Housing-Federal Housing Commissioner; Real Estate Settlement Procedures Act; Statement of Enforcement Standards: Title Insurance Practices in Florida; RESPA Statement of Policy 1996–4

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of policy.

**SUMMARY:** This Statement advises the public of the enforcement standards HUD applies to determine whether certain practices involving title insurance companies and title insurance agents comply with the Real Estate Settlement Procedures Act (RESPA). Although this Statement specifically addresses issues and practices that HUD reviewed in the State of Florida, its general principles may apply by analogy to other geographic and settlement service areas.

This Statement discusses HUD's interpretation of two exceptions: Section 8(c)(1)(B) involving ''payments of a fee by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance;'' and Section 8(c)(2) involving the ''payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.'' HUD is publishing this Statement to inform the public of its interpretation of the law.

**EFFECTIVE DATE:** September 19, 1996.

**FOR FURTHER INFORMATION CONTACT:** David R. Williamson, Director, Office of Consumer and Regulatory Affairs, Room 5241, telephone: (202) 708–4560. For legal enforcement questions, contact Peter S. Race, Assistant General Counsel, Program Compliance Division, Room 9253, telephone: (202) 708–4184. (These are not toll free numbers.) For hearing and speech-impaired persons, this number may be accessed via TTY (text telephone) by calling the Federal Information Relay Service at 1–800–877–8339. (This number is toll free.) The address for the above listed persons is: Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, DC 20410.

**SUPPLEMENTARY INFORMATION:**

## General Background

Section 8(a) of the Real Estate Settlement Procedures Act (RESPA) prohibits any person from giving or accepting any fee, kickback, or thing of value for the referral of settlement service business involving a federally related mortgage loan. (See 12 U.S.C. 2607(a).) Section 8(b) of RESPA prohibits any person from giving or accepting any portion, split or percentage of any charge made or received for the rendering of a settlement service other than for services actually performed. (See 12 U.S.C. 2607(b).) Two exemptions to section 8's prohibitions against compensated referrals in RESPA covered transactions involve payments for title insurance services actually performed. Section 8(c)(1)(B) specifically exempts payments of a fee ''by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance.'' A more general provision, section 8(c)(2), exempts the ''payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.'' (See also 24 CFR 3500.14(g)(1).)

In enacting RESPA, Congress stated its intent that section 8 of RESPA did not prohibit payments by title insurance companies for ''goods furnished or services actually rendered, so long as the payment bears a reasonable relationship to the value of the goods or services received by the person or company making the payment.'' (H. Rep. No. 1177, 93d Cong., 2nd Sess. 1974 at 7–8 (hereafter ''the Report'').) The Report stated that ''to the extent the payment is in excess of the reasonable value of the goods provided or services performed, the excess may be considered a kickback or referral fee proscribed by Section [8].'' The legislative history of section 8(c)(1)(B) also noted that the ''value of the referral itself is not to be taken into account in determining whether the payment is reasonable.'' (Report at 8.) The Report specifically elaborated on the exemption for payments made by title insurance companies to duly appointed agents for services actually performed in the issuance of a policy of title insurance and stated:

Such agents, who in many areas of the country may also be attorneys, typically perform substantial services for and on behalf of a title insurance company. These services may include a title search, an evaluation of the title search to determine the insurability of the title (title examination), the actual issuance of the policy on behalf of the title insurance company, and the maintenance of records relating to the policy and policy-holder. In essence, the agent does all of the work that a branch office of the title insurance company would otherwise have to perform.

Report at 8.

On November 2, 1992, HUD issued regulations that, among other things, gave guidance concerning title agent services under RESPA. These regulations relied in part on the legislative history. Section 3500.14(g)(3)[1] of the regulations provides an example of the type of substantial or ''core'' title insurance agent services necessary for an attorney to receive multiple fees in a RESPA covered transaction. It states:

For example, for an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, the issuance of the title commitment, and the conducting of the title search and closing.

Appendix B to the regulations provides additional guidance on the meaning and coverage of RESPA. Illustration 4 provides a factual situation in which an attorney represented a client as an attorney and as a title insurance agent and received fees for each role in a residential real estate transaction. In its comments on Illustration 4, HUD stated that the attorney was double billing his clients because the work he performed as a ''title agent'' was work he was already performing for his clients as an attorney. The title insurance company was actually performing the title agent work and providing the attorney with an opportunity to collect a fee as a title agent in exchange for referrals of title insurance business. HUD also stated that for the attorney to receive a separate payment as a title insurance agent, the attorney must ''perform necessary core title work and may not contract out the work.''

To qualify for a section 8(c)(1)(B) exemption, the attorney title insurance agent must ''provide his client with core title agent services for which he assumes liability, and which includes, at a minimum, the evaluation of the title search to determine insurability of the title, and the issuance of a title

---

[1] All citations in this Statement of Policy refer to recently streamlined regulations published on March 26, 1996 (61 FR 13,232), in the **Federal Register** (to be codified at 24 C.F.R. 3500 *et seq.*).

commitment where customary, the clearance of underwriting objections, and the actual issuance of the policy or policies on behalf of the title company.'' (See 24 CFR part 3500, Appendix B, Illustration 4.)

In another example, Illustration 10 of Appendix B, a real estate broker refers title insurance business to its own affiliate title company. This company, in turn, refers or contracts out all of its business to another title company that performs all the title work and splits its fees with the affiliate. HUD stated that because the affiliate title company provided no substantive services for its portion of the fee, the arrangement between the two title companies would be in violation of section 8 of RESPA. This illustration showed that the controlled business arrangement exemption did not extend to ''shell'' entities that did not perform substantive services for the fees it collected from the transaction. (See 24 CFR part 3500, Appendix B, Illustration 10.)

Section 19(a) of RESPA authorizes the Secretary to interpret RESPA to achieve the purposes of the Act. Section 19(c) of RESPA authorizes HUD to investigate possible violations of RESPA. During the course of its RESPA investigations, HUD applies the facts revealed by the investigation to the statute and regulations in determining whether a violation exists.

After receiving complaints of possible RESPA violations, HUD, in 1993, initiated an investigation of practices by some title insurance companies and some title insurance agents in the State of Florida. On September 21, 1995, HUD sent a letter and document entitled ''Findings of HUD's Investigation of Florida Title Insurance Companies and Statement of Enforcement Standards'' to certain title insurance companies in Florida. In November 1995, HUD met with Florida title insurance companies and received input from them on the enforcement standards. On June 19, 1996, HUD sent additional guidance to the particular companies that received the September 21, 1995 letter.

**Statement of Policy—1996–4**

To give guidance to interested members of the public on the application of RESPA and its implementing regulations to these issues, the Secretary, pursuant to section 19(a) of RESPA and 24 CFR 3500.4(a)(1)(ii), hereby issues the following Statement of Policy.[2] In issuing this Statement, HUD is not

[2] This Statement provides additional guidance to the 1995 standards issued to the particular companies and, to the extent there are any inconsistencies, supersedes those standards.

dictating particular practices for title insurance companies and their agents but is setting forth HUD's enforcement position for qualification in Florida for exemptions from section 8 violations.

Generally, it is beneficial for title insurance companies and their agents to qualify under the section 8(c)(1)(B) exemption since HUD does not normally scrutinize the payments as long as they are ''for services actually performed in the issuance of a policy of title insurance.'' (HUD will, however, continue to examine payments to agents that are merely for the referral of business such as gifts or trips based on the volume of business referred.) If the practices of a title insurance company or its agent do not qualify under the section 8(c)(1)(B) exemption, the company and the agent may still qualify under section 8(c)(2). Under a section 8(c)(2) standard, HUD will examine the amount of the payments to or retentions by the title insurance agent to see if they are reasonably related to services actually performed by the agent.

*A. Definitions*

For purposes of this statement, the terms listed below are defined as follows:

1. ''*Title Insurance Agent*'' means a person who has entered into an agreement with a title insurance company to act as an agent in connection with the issuance of title insurance policies, and includes title agents, title agencies, attorneys, and law firms.

2. ''*Core title services*'' are those basic services that a title insurance agent must actually perform for the payments from or retention of the title insurance premium to qualify for RESPA's section 8(c)(1)(B) exemption for ''payments by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance.''

In performing core title services, the title insurance agent must be liable to his/her title insurance company for any negligence in performing the services. In considering liability, HUD will examine the following type of indicia: the provisions of the agency contract, whether the agent has errors and omissions insurance or malpractice insurance, whether a contract provision regarding an agent's liability for a loss is ever enforced, whether an agent is financially viable to pay a claim, and other factors the Secretary may consider relevant.

''*Core title services*'' mean the following in Florida:

a. The examination and evaluation, based on relevant law and title

insurance underwriting principles and guidelines, of the title evidence (as defined below) to determine the insurability of the title being examined, and what items to include and/or exclude in any title commitment and policy to be issued.

b. The preparation and issuance of the title commitment, or other document, that discloses the status of the title as it is proposed to be insured, identifies the conditions that must be met before the policy will be issued, and obligates the insurer to issue a policy of title insurance if such conditions are met.

c. The clearance of underwriting objections and the taking of those steps that are needed to satisfy any conditions to the issuance of the policies.

d. The preparation and issuance of the policy or policies of title insurance.

e. The handling of the closing or settlement, when it is customary for title insurance agents to provide such services and when the agent's compensation for such services is customarily part of the payment or retention from the insurer.

3. A ''*pro forma commitment*'' is a document that contains a determination of the insurability of the title upon which a title insurance commitment or policy may be based and that contains essentially the information stated in Schedule A and B of a title insurance commitment (and may legally constitute a commitment when countersigned by an authorized representative). A pro forma commitment is a document that contains determinations or conclusions that are the product of legal or underwriting judgment regarding the operation or effect of the various documents or instruments or how they affect the title, or what matters constitute defects in title, or how the defects can be removed, or instructions concerning what items to include and/ or to exclude in any title commitment or policy to be issued on behalf of the underwriter.

4. ''*Title evidence*'' means a written or computer generated document that identifies and either describes or compiles those documents, records, judgments, liens, and other information from the public records relevant to the history and current condition of the title to be insured. Title evidence does not, however, include a pro forma commitment.

*B. Qualification Under Section 8(c)(1)(B)*

To qualify for an exemption as an agent in Florida under section 8(c)(1)(B), the payments to (or retentions by) a title insurance agent must be ''for services actually performed in the issuance of a

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 3500

[Docket No. FR–4450–N–01]

RIN 2502–AH33

## Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of Policy 1999–1.

**SUMMARY:** This Statement of Policy sets forth the Department of Housing and Urban Development's position on the legality of lender payments to mortgage brokers in connection with federally related mortgage loans under the Real Estate Settlement Procedures Act ("RESPA") and HUD's implementing regulations. While this statement satisfies the Conferees' directive in the Conference Report on the 1999 HUD Appropriations Act that the Department clarify its position on this subject, HUD believes that broad legislative reform along the lines specified in the HUD/Federal Reserve Board Report remains the most effective way to resolve the difficulties and legal uncertainties under RESPA and the Truth in Lending Act (TILA) for industry and consumers alike. Statutory changes like those recommended in the Report would, if adopted, provide the most balanced approach to resolving these contentious issues by providing consumers with better and firmer information about the costs associated with home-secured credit transactions and providing creditors and mortgage brokers with clearer rules. Such an approach is far preferable to piecemeal actions.

**EFFECTIVE DATE:** This Statement of Policy is effective March 1, 1999.

**FOR FURTHER INFORMATION CONTACT:** Rebecca J. Holtz, Director RESPA/ILS Division Room 9146, Department of Housing and Urban Development, Washington, DC 20410; telephone 202–708–4560, or (for legal questions) Kenneth A. Markison, Assistant General Counsel for GSE/RESPA or Rodrigo Alba, Attorney for RESPA, Room 9262, Department of Housing and Urban Development, Washington, DC 20410; telephone 202–708–3137 (these are not toll free numbers). Hearing or speech-impaired individuals may access these numbers via TTY by calling the toll-free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** This Preamble to the Statement of Policy includes descriptions of current practices in the industry. It is not intended to take positions with respect to the legality or illegality of any practices; such positions are set forth in the Statement of Policy itself.

## I. Background

### A. General Background

The Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (H.R. Conf. Rep. No. 105–769, 105th Cong. 2d Sess. 260 (1998)) (FY 1999 HUD Appropriations Act) directs HUD to clarify its position on lender payments to mortgage brokers within 90 days after the enactment of the FY 1999 HUD Appropriations Act on October 21, 1998. The Report states that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of [Sections 8](a) or (b) of the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) (RESPA)]" (Id.). The Report also states that the Conferees "are concerned about the legal uncertainty that continues absent such a policy statement" and "expect HUD to work with representatives of industry, Federal agencies, consumer groups, and other interested parties on this policy statement" (Id.).

This issue of lender payments, or indirect fees, to mortgage brokers has proven particularly troublesome for industry and consumers alike. It has been the subject of litigation in more than 150 cases nationwide (see additional discussion below). To understand the issue and HUD's position regarding the legality of these payments requires background information concerning the nature of the services provided by mortgage brokers and their compensation, as well as the applicable legal requirements under RESPA.

During the last seven years, HUD has conducted three rulemakings respecting mortgage broker fees. These rulemakings first addressed definitional issues and issues concerning disclosure of payments to mortgage brokers in transactions covered under RESPA. (See 57 FR 49600 (November 2, 1992); 60 FR 47650 (September 13, 1995).) Most recently in a regulatory negotiation (see 60 FR 54794 (October 25, 1995) and 60 FR 63008 (December 8, 1995)) and then a proposed rule (62 FR 53912 (October 16, 1997)), HUD addressed the issue of the legality of payments to brokers

under RESPA. In the latter, HUD proposed that payments from lenders to mortgage brokers be presumed legal if the mortgage broker met certain specified conditions, including disclosing its role in the transaction and its total compensation through a binding contract with the borrower. This rulemaking is pending.

In July 1998, HUD and the Board of Governors of the Federal Reserve delivered to Congress a joint report containing legislative proposals to reform RESPA and the Truth in Lending Act. If the proposals in this reform package were to be adopted, the disclosure and legality issues raised herein would be resolved for any mortgage broker following certain of the proposed requirements, and consumers would be offered significant new protections.

### B. Mortgage Brokerage Industry

When RESPA was enacted in 1974, single family mortgages were largely originated and held by savings and loans, commercial banks, and mortgage bankers. During the 1980's and 1990's, the rise of secondary mortgage market financing resulted in new wholesale and retail entities to compete with the traditional funding entities to provide mortgage financing. This made possible the origination of loans by retail entities that worked with prospective borrowers, collected application information, and otherwise processed the data required to complete the mortgage transaction. These retail entities generally operated with the intent of developing the origination package, and then immediately transmitting it to a wholesale lender who funded the loan. The rise in technology permitted much more effective and faster exchange of information and funds between originators and lenders for the retail transaction.

Entities that provide mortgage origination or retail services and that bring a borrower and a lender together to obtain a loan (usually without providing the funds for loans) are generally referred to as "mortgage brokers." These entities serve as intermediaries between the consumer and the entity funding the loan, and currently initiate an estimated half of all home mortgages made each year in the United States. Mortgage brokers generally fit into two broad categories: those that hold themselves out as representing the borrower in shopping for a loan, and those that simply offer loans as do other retailers of loans. The first type may have an agency relationship with the borrower and, in some states, may be found to owe a

mortgage brokers are intermediaries, the broker provides loan origination services and the loan funds are provided by the lender; the loan, however, is closed in the lender's name.

### C. Payments Must Be for Goods, Facilities or Services

In the determination of whether payments from lenders to mortgage brokers are permissible under Section 8 of RESPA, the threshold question is whether there were goods or facilities actually furnished or services actually performed for the total compensation paid to the mortgage broker. In making the determination of whether compensable services are performed, HUD's letter to the Independent Bankers Association of America, dated February 14, 1995 (IBAA letter) may be useful. In that letter, HUD identified the following services normally performed in the origination of a loan:

(a) Taking information from the borrower and filling out the application;[4]

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

(l) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such service; and

(n) Participating in the loan closing.

While this list does not exhaust all possible settlement services, and while the advent of computer technology has, in some cases, changed how a broker's settlement services are performed, HUD believes that the letter still represents a generally accurate description of the mortgage origination process. For other services to be acknowledged as compensable under RESPA, they should be identifiable and meaningful services akin to those identified in the IBAA letter including, for example, the operation of a computer loan origination system (CLO) or an automated underwriting system (AUS).

The IBAA letter provided guidance on whether HUD would take an enforcement action under RESPA. In the context of the letter's particular facts and subject to the reasonableness test which is discussed below, HUD articulated that it generally would be satisfied that sufficient origination work was performed to justify compensation if it found that:

• The lender's agent or contractor took the application information (under item (a)); and

• The lender's agent or contractor performed at least five additional items on the list above.

In the letter and in the context of its facts, HUD also pointed out that it is concerned that a fee for steering a customer to a particular lender could be disguised as compensation for "counseling-type" activities. Therefore, the letter states that if an agent or contractor is relying on taking the application and performing only "counseling type" services—(b), (c), (d), (j), and (k) on the list above—to justify its fee, HUD would also look to see that meaningful counseling—not steering—is provided. In analyzing transactions addressed in the IBAA letter, HUD said it would be satisfied that no steering occurred if it found that:

• Counseling gave the borrower the opportunity to consider products from at least three different lenders;

• The entity performing the counseling would receive the same compensation regardless of which lender's products were ultimately selected; *and*

• Any payment made for the "counseling-type" services is reasonably related to the services performed and not based on the amount of loan business referred to a particular lender.

In examining services provided by mortgage brokers and payments to mortgage brokers, HUD will look at the types of origination services listed in the IBAA letter to help determine whether compensable services are performed.[5] However, the IBAA letter responded to a program where a relatively small fee was to be provided for limited services by lenders that were brokering loans.[6]

Accordingly, the formulation in the IBAA letter of the number of origination services which may be required to be performed for compensation is not dispositive in analyzing more costly mortgage broker transactions where more comprehensive services are provided. The determinative test under RESPA is the relationship of the services, goods or facilities furnished to the total compensation received by the broker (discussed below). In addition to services, mortgage brokers may furnish goods or facilities to the lender. For example, appraisals, credit reports, and other documents required for a complete loan file may be regarded as goods, and a reasonable portion of the broker's retail or "store-front" operation may generally be regarded as a facility for which a lender may compensate a broker. However, while a broker may be compensated for goods or facilities actually furnished or services actually performed, the loan itself, which is arranged by the mortgage broker, cannot be regarded as a "good" that the broker may sell to the lender and that the lender may pay for based upon the loan's yield's relation to market value, reasonable or otherwise. In other words, in the context of a non-secondary market mortgage broker transaction, under HUD's rules, it is not proper to argue that a loan is a "good," in the sense of an instrument bearing a particular yield, thus justifying any yield spread premium to the mortgage broker, however great, on the grounds that such yield spread premium is the "market value" of the good.

### D. Compensation Must Be Reasonably Related to Value of Goods, Facilities or Services

The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker, as described in the IBAA letter, does not by itself make a payment by a lender to a mortgage

---

[4] In a subsequent informal interpretation, dated June 20, 1995, HUD stated that the filling out of a mortgage loan application could be substituted by a comparable activity, such as the filling out of a borrower's worksheet.

[5] In the June 20, 1995 letter, the Department clarified that the counseling test in the IBAA letter would not apply if an entity performed only non-counseling services (a, e, f, g, h, i, l, m, n) or a mix of counseling and non-counseling services (but did not rely only on the five counseling services (b, c, d, j, and k)).

[6] In the particular program reviewed by HUD in the IBAA letter, the average total compensation for performing six of the origination services listed above was below $200.

Add. 33

USCA Case #15-1177    Document #1575240    Filed: 09/28/2015    Page 115 of 122

broker legal. The next inquiry is whether the payment is reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. Although RESPA is not a rate-making statute, HUD is authorized to ensure that payments from lenders to mortgage brokers are reasonably related to the value of the goods or facilities actually furnished or services actually performed, and are not compensation for the referrals of business, splits of fees or unearned fees.

In analyzing whether a particular payment or fee bears a reasonable relationship to the value of the goods or facilities actually furnished or services actually performed, HUD believes that payments must be commensurate with that amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets.[7] If the payment or a portion thereof bears no reasonable relationship to the market value of the goods, facilities or services provided, the excess over the market rate may be used as evidence of a compensated referral or an unearned fee in violation of Section 8(a) or (b) of RESPA. (See 24 CFR 3500.14(g)(2).) Moreover, HUD also believes that the market price used to determine whether a particular payment meets the reasonableness test may not include a referral fee or unearned fee, because such fees are prohibited by RESPA. Congress was clear that for payments to be legal under Section 8, they must bear a reasonable relationship to the value received by the person or company making the payment. (S. Rep. 93–866, at 6551.)

The Department recognizes that some of the goods or facilities actually furnished or services actually performed by the broker in originating a loan are ''for'' the lender and other goods or facilities actually furnished or services actually performed are ''for'' the borrower. HUD does not believe that it is necessary or even feasible to identify or allocate which facilities, goods or services are performed or provided for the lender, for the consumer, or as a function of State or Federal law. All services, goods and facilities inure to the benefit of both the borrower and the lender in the sense that they make the loan transaction possible (e.g., an appraisal is necessary to assure that the

lender has adequate security, as well as to advise the borrower of the value of the property and to complete the borrower's loan).

The consumer is ultimately purchasing the total loan and is ultimately paying for all the services needed to create the loan. All compensation to the broker either is paid by the borrower in the form of fees or points, directly or by addition to principal, or is derived from the interest rate of the loan paid by the borrower. Accordingly, in analyzing whether lender payments to mortgage brokers comport with the requirements of Section 8 of RESPA, HUD believes that the totality of the compensation to the mortgage broker for the loan must be examined. For example, if the lender pays the mortgage broker $600 and the borrower pays the mortgage broker $500, the total compensation of $1,100 would be examined to determine whether it is reasonably related to the goods or facilities actually furnished or services actually performed by the broker.

Therefore, in applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether total compensation is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. All payments, including payments based upon a percentage of the loan amount, are subject to the reasonableness test defined above. In applying this test, the Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed.

In so-called ''no-cost'' loans, borrowers accept a higher interest rate in order to reduce direct fees, and the absence of direct payments to the mortgage broker is made up by higher indirect fees (e.g., yield spread premiums). Higher indirect fees in such arrangements are legal if, and only if, the total compensation is reasonably related to the goods or facilities actually furnished or services actually performed.

In determining whether the compensation paid to a mortgage broker is reasonably related to the goods or facilities actually furnished or services

actually performed, HUD will consider all compensation, including any volume based compensation. In this analysis, there may be no payments merely for referrals of business under Section 8 of RESPA. (See 24 CFR 3500.14.)[8]

Under HUD's rules, when a person in a position to refer settlement service business receives a payment for providing additional settlement services as part of the transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by the person. (24 CFR 3500.14(g)(3).) While mortgage brokers may receive part of their compensation from a lender, where the lender payment duplicates direct compensation paid by the borrower for goods or facilities actually furnished or services actually performed, Section 8 is violated. In light of the fact that the borrower and the lender may both contribute to some items, HUD believes that it is best to evaluate seemingly duplicative fees by analyzing total compensation under the reasonableness test described above.

### E. Information Provided to Borrower

Under current RESPA rules mortgage brokers are required to disclose estimated direct and indirect fees on the Good Faith Estimate (GFE) no later than 3 days after loan application. (See 24 CFR 3500.7(a) and (b).) Such disclosure must also be provided to consumers, as a final exact figure, at closing on the settlement statement. (24 CFR 3500.8; 24 CFR part 3500, Appendix A.) On the GFE and the settlement statement, lender payments to mortgage brokers must be shown as ''Paid Outside of Closing'' (P.O.C.), and are not computed in arriving at totals. (24 CFR 3500.7(a)(2).) The requirement that all fees be disclosed on the GFE is intended to assure that consumers are shown the full amount of compensation to brokers and others early in the transaction.

The Department has always indicated that any fees charged in settlement transactions should be clearly disclosed so that the consumer can understand the nature and recipient of the payment. Code-like abbreviations like ''YSP to DBG, POC'', for instance, have been noted.[9] Also, the Department has seen

---

[7] HUD recognizes that settlement costs may vary in different markets. The cost of a specific service in Omaha, Nebraska, for example, may bear little resemblance to the cost of a similar service in Los Angeles, California.

[8] The Department generally has held that when the payment is based on the volume or value of business transacted, it is evidence of an agreement for the referral of business (unless, for example, it is shown that payments are for legitimate business reasons unrelated to the value of the referrals). (See 24 CFR 3500.14(e).)

[9] This is an example only. HUD recognizes that current practices may leave borrowers confused. However, the use of any particular terms, including abbreviations, may not, by itself, violate RESPA. Nevertheless, going forward, the Department recommends that

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 3500

[Docket No. FR–4714–N–01]

RIN 2502–AH74

## Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of Policy 2001–1.

**SUMMARY:** This Statement of Policy is being issued to eliminate any ambiguity concerning the Department's position with respect to those lender payments to mortgage brokers characterized as yield spread premiums and to overcharges by settlement service providers as a result of questions raised by two recent court decisions, *Culpepper* v. *Irwin Mortgage Corp.* and *Echevarria* v. *Chicago Title and Trust Co.,* respectively. In issuing this Statement of Policy, the Department clarifies its interpretation of Section 8 of the Real Estate Settlement Procedures Act (RESPA) in Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers (the 1999 Statement of Policy), and reiterates its long-standing interpretation of Section 8(b)'s prohibitions. *Culpepper* v. *Irwin Mortgage Corp.* involved the payment of yield spread premiums from lenders to mortgage brokers. *Echevarria* v. *Chicago Title and Trust Co.* involved the applicability of Section 8(b) to a settlement service provider that overcharged a borrower for the service of another settlement service provider, and then retained the amount of the overcharge.

Today's Statement of Policy reiterates the Department's position that yield spread premiums are not per se legal or illegal, and clarifies the test for the legality of such payments set forth in HUD's 1999 Statement of Policy. As stated there, HUD's position that lender payments to mortgage brokers are not illegal per se does not imply, however, that yield spread premiums are legal in individual cases or classes of transactions. The legality of yield spread premiums turns on the application of HUD's test in the 1999 Statement of Policy as clarified today.

The Department also reiterates its long-standing position that it may violate Section 8(b) and HUD's

implementing regulations: (1) For two or more persons to split a fee for settlement services, any portion of which is unearned; or (2) for one settlement service provider to mark-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) for one settlement service provider to charge the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

This Statement of Policy also reiterates the importance of disclosure so that borrowers can choose the best loan for themselves, and it describes disclosures HUD considers best practices. The Secretary is also announcing that he intends to make full use of his regulatory authority to establish clear requirements for disclosure of mortgage broker fees and to improve the settlement process for lenders, mortgage brokers, and consumers.

**EFFECTIVE DATE:** October 18, 2001.

**FOR FURTHER INFORMATION CONTACT:** Ivy M. Jackson, Acting Director, RESPA/ILS Division, Room 9156, U.S. Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone (202) 708–0502, or (for legal questions) Kenneth A. Markison, Assistant General Counsel for GSE/RESPA, Room 9262, Department of Housing and Urban Development, Washington, DC 20410; telephone (202) 708–3137 (these are not toll-free numbers). Persons who have difficulty hearing or speaking may access this number via TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

## General Background

The Department is issuing this Statement of Policy in accordance with 5 U.S.C. 552 as a formal pronouncement of its interpretation of relevant statutory and regulatory provisions. Section 19(a) (12 U.S.C. 2617(a)) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601–2617) (RESPA) specifically authorizes the Secretary "to prescribe such rules and regulations [and] to make such interpretations * * * as may be necessary to achieve the purposes of [RESPA]."

Section 8(a) of RESPA prohibits any person from giving and any person from accepting "any fee, kickback, or thing of value pursuant to an agreement or

understanding, oral or otherwise" that real estate settlement service business shall be referred to any person. See 12 U.S.C. 2607(a). Section 8(b) prohibits anyone from giving or accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service * * * other than for services actually performed." 12 U.S.C. 2607(b). Section 8(c) of RESPA provides, "Nothing in [Section 8] shall be construed as prohibiting * * * (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed * * *" 12 U.S.C. 2607(c)(2). RESPA also requires the disclosure of settlement costs to consumers at the time of or soon after a borrower applies for a loan and again at the time of real estate settlement. 12 U.S.C. 2603–4. RESPA's requirements apply to transactions involving a "federally related mortgage loan" as that term is defined at 12 U.S.C. 2602(1).

### I. Lender Payments to Mortgage Brokers

The Conference Report on the Department's 1999 Appropriations Act directed HUD to address the issue of lender payments to mortgage brokers under RESPA. The Conference Report stated that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of [Sections 8](a) or (b) (12 U.S.C. sec. 2607) in its enactment of RESPA." H. Rep. 105–769, at 260. As also directed by Congress, HUD worked with industry groups, federal agencies, consumer groups and other interested parties in collectively producing the 1999 Statement of Policy issued on March 1, 1999. 64 FR 10080. Interested members of the public are urged to consult the 1999 Statement of Policy for a more detailed discussion of the background on lender payments to brokers addressed in today's Statement.

HUD's 1999 Statement of Policy established a two-part test for determining the legality of lender payments to mortgage brokers for table funded transactions and intermediary transactions under RESPA: (1) Whether goods or facilities were actually furnished or services were actually performed for the compensation paid and; (2) whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to the goods,

cash requirements. Borrowers may choose to pay these fees out of pocket, or to pay the origination fees, and possibly all the closing fees, by financing them; *i.e.,* adding the amount of such fees to the principal balance of their mortgage loan. The latter approach, however, is not available to those whose loan-to-value ratio has already reached the maximum permitted by the lender. For those without the available cash, who are at the maximum loan-to-value ratio, or who simply choose to do so, there is a third option. This third option is a yield spread premium.

Yield spread premiums permit homebuyers to pay some or all of the up front settlement costs over the life of the mortgage through a higher interest rate. Because the mortgage carries a higher interest rate, the lender is able to sell it to an investor at a higher price. In turn, the lender pays the broker an amount reflective of this price difference. The payment allows the broker to recoup the up front costs incurred on the borrower's behalf in originating the loan. Payments from lenders to brokers based on the rates of borrowers' loans are characterized as ''indirect'' fees and are referred to as yield spread premiums.[1]

A yield spread premium is calculated based upon the difference between the interest rate at which the broker originates the loan and the par, or market, rate offered by a lender. The Department believes, and industry and consumers agree, that a yield spread premium can be a useful means to pay some or all of a borrower's settlement costs. In these cases, lender payments reduce the up front cash requirements to borrowers. In some cases, borrowers are able to obtain loans without paying any up front cash for the services required in connection with the origination of the loan. Instead, the fees for these services are financed through a higher interest rate on the loan. The yield spread premium thus can be a legitimate tool to assist the borrower. The availability of this option fosters homeownership.

HUD has recognized the utility of yield spread premiums in regulations issued prior to the 1999 Statement of Policy. In a final rule concerning ''Deregulation of Mortgagor Income Requirements,'' HUD indicated that up front costs could be lowered by yield spread premiums.54 FR 38646 (September 20, 1989).

In a 1992 rule concerning RESPA, HUD specifically listed yield spread

premiums as an example of fees that must be disclosed. The example was codified as Illustrations of Requirements of RESPA, Fact Situations 5 and 13 in Appendix B to 24 CFR part 3500. (See also Instructions at Appendix A to 24 CFR part 3500 for Completing HUD–1 and HUD–1A Settlement Statements.) HUD did not by these examples mean that yield spread premiums were *per se* legal, but HUD also did not mean that yield spread premiums were *per se* illegal.

HUD also recognizes, however, that in some cases less scrupulous brokers and lenders take advantage of the complexity of the settlement transaction and use yield spread premiums as a way to enhance the profitability of mortgage transactions without offering the borrower lower up front fees. In these cases, yield spread premiums serve to increase the borrower's interest rate and the broker's overall compensation, without lowering up front cash requirements for the borrower. As set forth in this Statement of Policy, such uses of yield spread premiums may result in total compensation in excess of what is reasonably related to the total value of the origination services provided by the broker, and fail to comply with the second part of HUD's two-part test as enunciated in the 1999 Statement of Policy, and with Section 8.

### The 1999 Statement of Policy's Test for Legality

The Department restates its position that yield spread premiums are not per se illegal. HUD also reiterates that this statement ''does not imply * * * that yield spread premiums are legal in individual cases or classes of transactions.'' 64 FR 10084. The legality of any yield spread premium can only be evaluated in the context of the test HUD established and the specific factual circumstances applicable to each transaction in which a yield spread premium is used.

The 1999 Statement of Policy established a two-part test for determining whether lender payments to mortgage brokers are legal under RESPA. In applying Section 8 and HUD's regulations, the 1999 Statement of Policy stated:

In transactions where lenders make payments to mortgage brokers, HUD does not consider such payments (*i.e.,* yield spread premiums or any other class of named payments) to be illegal *per se.* HUD does not view the name of the payment as the appropriate issue under RESPA. HUD's position that lender payments to mortgage brokers are not illegal *per se* does not imply, however, that yield spread premiums are legal in individual cases or classes of

transactions. The fees in cases and classes of transactions are illegal if they violate the prohibitions of Section 8 of RESPA.

In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets. 64 FR 10084.

### Culpepper

The need for further clarification of HUD's position, as set forth in the 1999 Statement of Policy, on the treatment of lender payments to mortgage brokers under Section 8 of RESPA (12 U.S.C. 2607), is evident from the recent decision of the Court of Appeals for the Eleventh Circuit in *Culpepper.*

In upholding class certification in *Culpepper,* the court only applied the first part of the HUD test, and then further narrowed its examination of whether the lender's yield spread payments were ''for services'' by focusing exclusively on the presumed intent of the lender in making the payments. The crux of the court's decision is that Section 8 liability for the payment of unlawful referral fees could be established under the first part of the HUD test alone, based on the facts that the lender's payments to mortgage brokers were calculated solely on the difference between the par interest rate and the higher rate at which the mortgage brokers delivered loans, and that the lender had no knowledge of what services, if any, the brokers had performed.

HUD was not a party to the case and disagrees with the judicial interpretation regarding Section 8 of

---

[1] Indirect fees from lenders are also known as ''back funded payments,'' ''overages,'' or ''servicing release premiums.''

Dated: June 16, 2010.

**Deborah S. Merkle,**

*Chairman.*

[FR Doc. 2010–15317 Filed 6–24–10; 8:45 am]

**BILLING CODE P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 3500

**[Docket No. FR–5425–IA–01]**

## Real Estate Settlement Procedures Act (RESPA): Home Warranty Companies' Payments to Real Estate Brokers and Agents

**AGENCY:** Office of General Counsel, HUD.

**ACTION:** Interpretive rule.

**SUMMARY:** Under section 8 of RESPA and HUD's implementing RESPA regulations, services performed by real estate brokers and agents as additional settlement services in a real estate transaction are compensable if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent, the services are not nominal, and the payment is not a duplicative charge. A referral is not a compensable service for which a broker or agent may receive compensation. This rule interprets section 8 of RESPA and HUD's regulations as they apply to the compensation provided by home warranty companies to real estate brokers and agents. Although interpretive rules are exempt from public comment under the Administrative Procedure Act, HUD nevertheless welcomes public comment on this interpretation.

**DATES:** *Effective date:* June 25, 2010. *Comment Due Date:* July 26, 2010.

**ADDRESSES:** Interested persons are invited to submit comments regarding this interpretive rule to the Regulations Division, Office of General Counsel, 451 7th Street, SW., Room 10276, Department of Housing and Urban Development, Washington, DC 20410–0500. Communications must refer to the above docket number and title. There are two methods for submitting public comments. All submissions must refer to the above docket number and title.

1. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street, SW., Room 10276, Washington, DC 20410–0500.

2. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *www.regulations.gov* Web site can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable.

Public Inspection of Public Comments. All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at 800–877–8339. Copies of all comments submitted are available for inspection and downloading at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For legal questions, contact Paul S. Ceja, Assistant General Counsel for RESPA/SAFE, telephone number 202–708–3137; or Peter S. Race, Assistant General Counsel for Compliance, telephone number 202–708–2350; Department of Housing and Urban Development, 451 7th Street, SW., Room 9262, Washington, DC 20410. For other questions, contact Barton Shapiro, Director, or Mary Jo Sullivan, Deputy Director, Office of RESPA and Interstate Land Sales, Office of Housing, Department of Housing and Urban Development, 451 7th Street, SW., Room 9158, Washington, DC 20410; telephone number 202–708–0502. These telephone numbers are not toll-free. Persons with hearing or speech impairments may access this number via TTY by calling the toll-free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### I. Background

A homeowner's warranty is covered as a "settlement service" under HUD's RESPA regulations at 24 CFR 3500.2. Accordingly, the framework for compensation of real estate brokers and agents for services performed on behalf of home warranty companies (HWCs) is established in RESPA and HUD's regulations, as discussed in an unofficial staff interpretation letter dated February 21, 2008, issued by the Office of General Counsel. In brief, services performed by real estate brokers and agents on behalf of HWCs are compensable as additional settlement services if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent. (*See* 24 CFR 3500.14(g)(3).) The real estate broker or agent may accept a portion of the charge for the homeowner warranty only if the broker or agent provides services that are not nominal and for which there is not a duplicative charge. (*See* 24 CFR 3500.14(c).)

HUD has received inquiries regarding the application of this framework to the compensation provided by HWCs to real estate brokers and agents for the selling of home warranties in connection with the sale or purchase of a home. In particular, interested parties have inquired about the legality of the HWCs providing compensation to real estate brokers and agents on a per transaction basis and about the scope of services provided on behalf of the HWC for which real estate brokers and agents can be compensated by the HWC.

### II. This Interpretive Rule

This interpretive rule clarifies the legality under section 8 of RESPA and HUD's implementing regulations of the compensation provided by HWCs to real estate brokers and agents, and it is provided in accordance with Secretary of HUD's delegation of authority to the General Counsel to interpret the authority of the Secretary. (*See* 74 FR 62801, at 62802.)

#### A. Unlawful Compensation for Referrals

RESPA does not prohibit a real estate broker or agent from referring business to an HWC. Rather, RESPA prohibits a real estate broker or agent from receiving a fee for such a referral, as a referral is not a compensable service. (*See* 24 CFR 3500.14(b).) HUD's regulations, at 24 CFR 3500.14(f), defines referral, in relevant part, as follows:

A referral includes any oral or written action directed to a person which has the effect of *affirmatively influencing the selection by any person of a provider of a settlement service* or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business. (Emphasis added.)

To evaluate whether a payment from an HWC is an unlawful kickback for a referral, HUD may look in the first instance to whether, among other things:

• The compensation for the HWC services provided by the real estate broker or agent is contingent on an arrangement that prohibits the real estate broker or agent from performing services for other HWC companies; *e.g.* if a real estate broker or agent is compensated for performing HWC services for only one company, this is evidence that the compensation may be contingent on such an arrangements; and

• Payments to real estate brokers or agents by the HWC are based on, or adjusted in future agreements according to, the number of transactions referred.

If it is subsequently determined, however, that the payment at issue is for only compensable services,[1] the existence of such arrangements and agreements would not be an indicator of an unlawful referral arrangement, and would be permissible. (*See* discussion in Sections C and D below.)

*B. Marketing by a Real Estate Broker or Agent Directed to Particular Homebuyers or Sellers*

In some circumstances, marketing services performed on behalf of an HWC are not compensable services. In particular, a real estate broker or agent is in a unique position to refer settlement service business and through marketing can affirmatively influence a homebuyer's or seller's selection of an HWC. As a real estate broker and agent hold positions of influence in the real estate transaction, a homebuyer or seller is more likely to accept the broker's or agent's promotion or recommendation of a settlement service provider. Therefore, marketing performed by a real estate broker or agent on behalf of an HWC to sell a homeowner warranty to particular homebuyers or sellers is a "referral" to a settlement service provider.

Accordingly, in a transaction involving a federally related mortgage loan, an HWC's compensation of a real estate broker or agent for marketing services that are directed to particular homebuyers or sellers would be a payment that violates section 8 of RESPA as an illegal kickback for a referral of settlement service business. For example, a real estate broker or agent actively promoting an HWC and its products to sellers or prospective homebuyers by providing HWC verbal "sales pitches" about the benefits of a particular HWC product or by distributing the HWC's promotional material at the broker's or agent's office or at an open house is considered to be a referral. Thus, compensating the real estate broker or agent for such promotion would result in a violation of section 8 of RESPA.

Nothing precludes a real estate broker or agent from performing services to aid the seller or buyer, or to increase the possibility that the real estate transaction will occur and thereby benefit the broker or agent. However, the broker or agent may not be compensated by the HWC for marketing services directed to particular homebuyers or sellers.

*C. Bona Fide Compensation for Services Performed*

Section 8(c) of RESPA and HUD's regulations allow payment of bona fide compensation for services actually performed. (*See* 24 CFR 3500.14(g)(1)(iv).) HUD's regulations also allow persons in a position to refer settlement service business to receive payments for providing additional compensable services as part of a transaction. (*See* 24 CFR 3500.14(g)(3).) Services performed by real estate brokers and agents on behalf of HWCs would be compensable as additional settlement services only if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent. Further, the real estate broker or agent may accept, and an HWC may pay to the broker or agent, a portion of the charge for the homeowner warranty only for services that are not nominal and for which there is not a duplicative charge. (*See* 24 CFR 3500.14(c).) HUD looks at the actual services provided to determine in a particular case whether compensable services have been performed by the real estate broker or agent.[2]

A determination that compensable services have been performed by the real estate broker or agent will be based on a review of the particular facts of each case. Evidence in support of such a determination may include:

• Services—other than referrals—to be performed are specified in a contract between the HWC and the real estate broker or agent, and the real estate broker or agent has documented the services provided to the HWC;

• The services actually performed are not duplicative of those typically provided by a real estate broker or agent;

• The real estate broker or agent is by contract the legal agent of the HWC, and the HWC assumes responsibility for any representations made by the broker or agent about the warranty product; and

• The real estate broker or agent has fully disclosed to the consumer the compensable services that will be provided and the compensation arrangement with the HWC, and has made clear that the consumer may purchase a home warranty from other vendors or may choose not to purchase any home warranty.

HUD will review evidence on a case-by-case basis to determine whether compensation provided was a kickback for a referral or a legal payment for the compensable services. If it is factually determined that only actual compensable services have been performed by a real estate broker or agent in a transaction, it follows that transaction-based compensation of that broker or agent that is reasonable would not be an indicator of an unlawful referral arrangement and would be permissible.

*Reasonableness of Compensation*

As the final step in assessing the legality of the compensation for these services, HUD will also assess whether the value of the payment by the HWC is reasonably related to the value of the services actually performed by the real estate broker or agent. In the context of loan origination, for example, HUD has stated that the mere taking of an application is not sufficient work to justify a fee under RESPA. In its Statement of Policy 1999–1, entitled "Regarding Lender Payments to Mortgage Brokers" (64 FR 10080, March 1, 1999), HUD stated:

Although RESPA is not a rate-making statute, HUD is authorized to ensure that payments from lenders to mortgage brokers are reasonably related to the value of the goods or facilities actually furnished or services actually performed, and are not

---

[1] Compensable services are services that are actual, necessary and distinct from the primary services provided by the real estate broker or agent, that are not nominal, and for which duplicative fees are not charged.

[2] For example, conducting actual inspections of the items to be covered by the warranty to identify pre-existing conditions that could affect home warranty coverage, recording serial numbers of the items to be covered, documenting the condition of the covered items by taking pictures and reporting

to the HWC regarding inspections may be compensable services.

Add. 38

(columns A and B) and Line 11 (column B), any successor form issued by the FFIEC, and any other fiduciary and related assets defined in the "Notice of Comptroller of the Currency Fees."

### § 8.7 [Amended]

■ 44. Amend § 8.7. paragraph (a) by:
■ a. Removing "and" after "Federal branch," and adding ", and each Federal savings association" after "each Federal agency" in the first sentence; and
■ b. Adding ", each Federal savings association," after "each national bank" in the second sentence.

## PART 28—INTERNATIONAL BANKING ACTIVITIES

■ 45. The authority citation for part 28 continues to read as follows:

**Authority:** 12 U.S.C. 1 *et seq.*, 24 (Seventh), 93a, 161, 602, 1818, 3101 *et seq.*, and 3901 *et seq.*

### § 28.16 [Amended]

■ 46. Section 28.16 is amended by removing in paragraph (b) introductory text the term "$100,000" and adding in its place "the standard maximum deposit insurance amount as defined in 12 U.S.C. 1821(a)(1)(E)".

## PART 34—REAL ESTATE LENDING AND APPRAISALS

■ 47. The authority citation for part 34 is revised to read as follows:

**Authority:** 12 U.S.C. 1 *et seq.*, 25b, 29, 93a, 371, 1465, 1701j–3, 1828(o), 3331 *et seq.*, 5101 *et seq.*, and 5412(b)(2)(B).

### Subpart A—General

■ 48. Amend § 34.4 by:
■ a. Revising paragraph (a) introductory text;
■ b. Revising paragraph (b) introductory text;
■ c. Revising footnote 2 in paragraph (b)(3); and
■ d. Revising paragraph (b)(9).
The revisions read as follows:

### § 34.4 Applicability of state law.

(a) A national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning:

\*    \*    \*    \*    \*

(b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A.* v. *Nelson, Florida Insurance Commissioner, et al.,* 517 U.S. 25 (1996):

\*    \*    \*    \*    \*

(3) Criminal law; [2]

[2] *But see* the distinction drawn by the Supreme Court in *Easton* v. *Iowa,* 188 U.S. 220, 238 (1903), where the Court stated that "[u]ndoubtedly a state has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction \* \* \*. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States." *Id.* at 239 (holding that Federal law governing the operations of national banks preempted a state criminal law prohibiting insolvent banks from accepting deposits).

\*    \*    \*    \*    \*

(9) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A.* v. *Nelson, Florida Insurance Commissioner, et al.,* 517 U.S. 25 (1996), or that is made applicable by Federal law.

■ 49. Add § 34.6 to subpart A to read as follows:

### § 34.6 Applicability of state law to Federal savings associations and subsidiaries.

In accordance with section 1046 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 25b), Federal savings associations and their subsidiaries shall be subject to the same laws and legal standards, including regulations of the OCC, as are applicable to national banks and their subsidiaries, regarding the preemption of state law.

Dated: July 14, 2011.

**John Walsh,**

*Acting Comptroller of the Currency.*

[FR Doc. 2011–18231 Filed 7–20–11; 8:45 am]

**BILLING CODE 4810–33–P**

## BUREAU OF CONSUMER FINANCIAL PROTECTION

**[Docket No. CFPB–HQ–2011–1]**

### 12 CFR Chapter X

### Identification of Enforceable Rules and Orders

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final list.

**SUMMARY:** Section 1063(i) of the Consumer Financial Protection Act of 2010 ("Act")[1] requires the Bureau of Consumer Financial Protection ("CFPB") to publish in the Federal Register not later than the designated transfer date a list of the rules and orders that will be enforced by the CFPB. This document sets forth that list.

**FOR FURTHER INFORMATION CONTACT:** Monica Jackson, Office of the Executive Secretary, Bureau of Consumer Financial Protection, 1801 L Street, NW., Washington, DC 20036, 202–435–7275.

**SUPPLEMENTARY INFORMATION:**

### I. Background

Under the Act, on the designated transfer date, July 21, 2011,[2] certain consumer financial protection authorities will transfer from seven transferor agencies[3] to the CFPB, and the CFPB will also assume certain new authorities. Subject to the limitations and other provisions of the Act, the CFPB will be authorized to enforce, *inter alia,* rules and orders issued by the transferor agencies under the enumerated consumer laws.[4] The CFPB will also have authority to enforce in some circumstances the Federal Trade Commission's Telemarketing Sales Rule and its rules under the Federal Trade Commission Act, although the Federal Trade Commission will retain full authority over these rules.[5]

Section 1063(i) of the Act provides that, not later than the designated transfer date, the CFPB "(1) shall, after consultation with the head of each transferor agency, identify the rules and orders that will be enforced by the [CFPB]; and (2) shall publish a list of such rules and orders in the **Federal Register**." The CFPB consulted with each transferor agency pursuant to section 1063(i) and developed an initial list of rules. After consultation, neither the transferor agencies nor the CFPB identified any orders for inclusion in the list.[6]

---

[1] The Act is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203.

[2] The Secretary of the Treasury designated this date pursuant to section 1062 of the Act. *See* 75 FR 57252–02, Sept. 20, 2010.

[3] Section 1061(a)(2) of the Act defines the terms "transferor agency" and "transferor agencies" to mean, respectively, "(A) the Board of Governors (and any Federal reserve bank, as context requires), the Federal Deposit Insurance Corporation, the Federal Trade Commission, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Department of Housing and Urban Development, and the heads of those agencies, and (B) the agencies listed in subparagraph (A) collectively."

[4] "Enumerated consumer laws" is defined in section 1002(12) of the Act and section 1400(b) of the Mortgage Reform and Anti-Predatory Lending Act, Tit. XIV, Public Law 111–203.

[5] These rules are listed as items 1 and 6 through 12 in section F ("Federal Trade Commission") of the list below.

[6] Section 1063(i) requires the CFPB to list only the rules and orders issued by transferor agencies that will be enforceable by the CFPB. The list
Continued

Because the list under section 1063(i) reflects the CFPB's interpretation of its authority under the Act and relates to agency organization, procedure, or practice, the list is not subject to the notice-and-comment requirements of the Administrative Procedure Act ("APA") (5 U.S.C. 551 *et seq.*).[7] Nevertheless, on May 31, 2011, the CFPB published a Notice containing an initial list in the **Federal Register** ("May 31 Notice") and requested public comment.[8]

As noted in the May 31 Notice, the CFPB's authority is defined by the Act and other applicable law. As a result, the CFPB's publication of the list called for by section 1063(i) will not have a substantive effect on any rules or orders or the parties who may be subject to them; it merely provides a convenient reference source. Accordingly, the inclusion or exclusion of any rule or order does not alter the CFPB's authority.[9] In addition, section 1063(i) does not require the CFPB to update, correct, or otherwise maintain the final list.

## II. Discussion of Comments and Clarifications

In response to the May 31 Notice, the CFPB received 12 comments from regulated entities, trade associations, and consumer groups, among others. None of the comments recommended that any items be added to or removed from the list. The list contained in this document is identical to the list published in the May 31 Notice, except that the final list contains a technical correction to the ordering of the Department of Housing and Urban Development ("HUD") rules and reflects the addition of two rules issued after the May 31 Notice: the FTC's Mortgage Acts and Practices—Advertising rule, and HUD's rule implementing the Secure and Fair Enforcement for Mortgage Licensing Act of 2008.[10]

Some comments inquired about the CFPB's application of guidance issued by the transferor agencies in connection with the rules contained on the list. The CFPB does not consider guidance or similar documents as falling within the meaning of enforceable "rules and orders" that are required to be listed pursuant to section 1063(i). However, by way of clarification, the CFPB notes that for laws with respect to which rulemaking authority will transfer to the CFPB, the official commentary, guidance, and policy statements issued prior to July 21, 2011, by a transferor agency with exclusive rulemaking authority for the law in question (or similar documents that were jointly agreed to by all relevant agencies in the case of shared rulemaking authority) will be applied by the CFPB pending further CFPB action. The CFPB will give due consideration to the application of other written guidance, interpretations, and policy statements issued prior to July 21, 2011, by a transferor agency in light of all relevant factors, including: whether the agency had rulemaking authority for the law in question; the formality of the document in question and the weight afforded it by the issuing agency; the persuasiveness of the document; and whether the document conflicts with guidance or interpretations issued by another agency. The CFPB will seek over time to improve the clarity and uniformity of guidance regarding the laws it will administer as necessary in order to facilitate compliance with the Federal consumer financial laws.

Several other comments addressed policy issues that are outside the scope of the list called for by section 1063(i), such as specific recommendations regarding the CFPB's exercise of its rulemaking authority.[11] The CFPB values this input, but has determined that this document is not the appropriate forum in which to address the issues raised.

Finally, it bears noting that, later this year, the CFPB intends to publish in

chapter X of title 12 of the Code of Federal Regulations the rules for which rulemaking authority transfers to the CFPB. These rules will contain conforming amendments to reflect both the transfer of authority to the CFPB under the Act and certain other changes made by the Act to the underlying statutes.[12] In the interim, the existing rules will continue in effect and the changes made by the Act to transfer authority to the CFPB will be effective as of the designated transfer date by operation of law.[13]

## III. Final List

Accordingly, pursuant to section 1063(i) of the Act, the CFPB sets forth the following list of rules that will be enforceable by the CFPB subject to the limitations and other provisions of the Act:[14]

### A. Board of Governors of the Federal Reserve

1. 12 CFR part 202—Equal Credit Opportunity Act (Regulation B)
2. 12 CFR part 203—Home Mortgage Disclosure (Regulation C)
3. 12 CFR part 205—Electronic Fund Transfers (Regulation E)
4. 12 CFR 208.101–.105 & Appendix A to Subpart I—Registration of Residential Mortgage Loan Originators (Regulation H, Subpart I)
5. 12 CFR part 213—Consumer Leasing (Regulation M)
6. 12 CFR part 216—Privacy of Consumer Financial Information (Regulation P)
7. 12 CFR part 222—Fair Credit Reporting (Regulation V), except with respect to §§ 222.1(c) (effective dates), 222.83 (Disposal of consumer information), 222.90 (Duties regarding the detection, prevention, and mitigation of identity theft), 222.91 (Duties of card issuers regarding changes of address), & Appendix J (Interagency Guidelines on Identity Theft Detection, Prevention, and Mitigation)
8. 12 CFR part 226—Truth in Lending (Regulation Z)
9. 12 CFR part 230—Truth in Savings (Regulation DD)

### B. Federal Deposit Insurance Corporation

1. 12 CFR part 332—Privacy of Consumer Financial Information
2. 12 CFR part 334—Fair Credit Reporting, except with respect to §§ 334.83

---

contained in this notice therefore does not include any rules and orders issued by non-transferor agencies that will be enforceable by the CFPB.

[7] Because publication of the list under section 1063(i) is not subject to the APA's notice-and-comment requirements, a regulatory flexibility analysis is not required under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*).

[8] 76 FR 31222, May 31, 2011. Section 1066 of the Act grants the Secretary of the Treasury interim authority to perform certain functions of the CFPB. Pursuant to that authority, Treasury published the May 31 Notice and is publishing this document on behalf of the CFPB.

[9] For example, the inclusion of rules relating to HUD administrative enforcement procedures does not detract from the CFPB's authority to bring lawsuits and administrative enforcement actions under subtitle E of the Act.

[10] This rule will become effective on August 29, 2011. See 76 FR 34864, June 30, 2011. The list

contained in this notice does not include proposed rules that are currently pending.

[11] For example, these comments included: requests that CFPB take or refrain from taking regulatory action with respect to certain entities or industries; requests that the CFPB not impose new or duplicative regulatory burdens; and requests that the CFPB appropriately take into account differences between regulated entities (e.g., differences between credit unions and banks). Some comments indicated support for the Act's consolidation of certain consumer financial protection functions into a single federal agency, while others expressed concern about such consolidation. Other comments emphasized the importance of involving stakeholders in the rulemaking process and requested information on the CFPB's plans for doing so.

[12] Rulemaking authority for all the rules contained on the list below, except items 1 and 6 through 12 in section F ("Federal Trade Commission"), will transfer to the CFPB on the designated transfer date.

[13] During this interim period, the CFPB may from time to time provide guidance on its Web site, *http://www.consumerfinance.gov,* regarding procedural matters (e.g. how to make certain filings with the CFPB) relating to compliance with the existing regulations in light of the transfer of authority to the CFPB.

[14] Unless otherwise noted, all references to a Part include accompanying appendices and supplements.

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 28, 2015, an electronic copy of the foregoing Brief for Petitioners was filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon the following counsel for respondent Consumer Financial Protection Bureau, who is a registered CM/ECF user:

Larry DeMille-Wagman
  *Enforcement Attorney*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street, N.W.
Washington, D.C.  20552

  /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500