**No. 15-1177**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PHH CORPORATION, PHH MORTGAGE CORPORATION, PHH HOME LOANS, LLC, ATRIUM INSURANCE CORPORATION, AND ATRIUM REINSURANCE CORPORATION,

*Petitioners,*

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

*Respondent.*

---

On Petition for Review of an Order of
the Consumer Financial Protection Bureau

---

## BRIEF OF AMERICAN LAND TITLE ASSOCIATION, AMERICAN ESCROW ASSOCIATION, REAL ESTATE SERVICES PROVIDERS COUNCIL, INC. (RESPRO®), AND U.S. MORTGAGE INSURERS (USMI®) AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

---

Jay N. Varon
*Counsel of Record*
jvaron@foley.com
Jennifer M. Keas
Erik F. Benny
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, D.C.  20007
202.672.5300
*Counsel for Amicus Curiae*

i

## RULE 26 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, *amici curiae* American Land Title Association (ALTA), American Escrow Association (AEA), Real Estate Services Providers Council, Inc. (RESPRO®), and U.S. Mortgage Insurers (USMI®) (collectively, "Diversified Service Provider *Amici*") state:

Diversified Service Provider *Amici* are all non-profit trade associations. Diversified Service Provider *Amici* have no parent corporations, and no publicly held corporations have an ownership stake of 10% or more in ALTA, AEA, RESPRO®, or USMI®, but the six members of USMI®—Arch Mortgage Insurance Company ("Arch"); National Mortgage Insurance Corporation ("NMI"); Genworth Mortgage Insurance Corporation ("Genworth"); Radian Guaranty, Inc., ("Radian"); Essent Guaranty, Inc. (Essent"); and Mortgage Guaranty Insurance Corporation ("MGIC")—each are wholly owned subsidiaries of publicly traded companies.

Some publicly owned corporations are members of Diversified Service Provider *Amici*, but they do not have a financial interest in this litigation.

ii

## TABLE OF CONTENTS

**RULE 26 CORPORATE DISCLOSURE STATEMENT** .................................. ii

**STATEMENT OF COMPLIANCE WITH F.R.A.P. 29(c)(5)** ............................ x

**CERTIFICATE OF COUNSEL REGARDING NECESSITY OF SEPARATE *AMICI CURIAE* BRIEF** ........................................... x

**STATEMENT OF INTEREST** ........................................................ 1

**I.    ARGUMENT** ........................................................................ 4

    **A.    THE COURT SHOULD CONSIDER ADDITIONAL RELEVANT BACKGROUND ON MORTGAGE INSURANCE AND REINSURANCE.** ................................... 4

    **B.    THE ORDER'S §8(c)(2) INTERPRETATION WOULD DISRUPT LONGSTANDING BUSINESS PRACTICES TO THE DETRIMENT OF THE EFFICIENT DELIVERY OF SETTLEMENT SERVICES.** ................................... 7

        **1.    Industry Has Long Relied On §8(c) as a Series of Essential and Beneficial *Exemptions*.** ................................... 7

        **2.    The Order's Sudden Holding that §8(c) Is a Mere "Interpretative Tool" for §8(a) Is Disruptive and Unworkable.** ................................... 10

            **a.    The Order's §8(c) holding would convert §8 into a hopelessly subjective and uncertain landscape.** ................................... 10

            **b.    The Order's distinction between a payment made "in connection with" the referral of a service versus "in exchange for" the referral is also unworkable.** ................................... 12

    **C.    THE BUREAU'S ISSUANCE OF A RADICAL, NEW, AND DISRUPTIVE INTERPRETATION OF §8(c)— WHICH HAS INDUSTRY-WIDE RAMIFICATIONS—IN THE COURSE OF AN ADJUDICATIVE PROCEEDING VIOLATES THE APA.** ................................... 17

        **1.    The Bureau is not permitted to amend or reinterpret RESPA in the course of an adjudicatory proceeding.** ......... 17

        **2.    The §8(c) interpretation is such a radical departure from the statute, former agency interpretations, and**

controlling case law that it is arbitrary and
capricious. .................................................................20

**D.    The Order's Conclusion that the RESPA Statute of
Limitations Begins When Post-Settlement Payments Are
Made, Rather than At Closing, Is Unsupported and
Logically Flawed**..................................................................22

**CONCLUSION** ...............................................................................27

**CERTIFICATE OF COMPLIANCE** .................................................28

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Authorities upon which we chiefly rely are marked with an asterisk.

**CASES**

*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983)................................................................21

*Bush-Quayle '92 Primary Comm., Inc. v. FEC*,
  104 F.3d 448 (D.C. Cir. 1997)................................................21

*Cedeno v. IndyMac Bancorp, Inc.*,
  No. 06 Civ. 6438 (JGK), 2008 U.S. Dist. LEXIS 65337 (S.D.N.Y.
  Aug. 25, 2008) ........................................................................11

*CFPB v. Mortg. Guaranty Ins. Corp.*,
  No. 1:13-cv-21187, Dkt. 4 (S.D. Fl. April 4, 2013) ...............5

*Cohen v. JP. Morgan Chase & Co.*,
  608 F. Supp. 2d 330 (E.D.N.Y. 2009)....................................12

*Culpepper v. Irwin Mortg. Corp.*,
  253 F.3d 1324 (11th Cir. 2001) ..............................................12

*Edwards v. First American Corp.*,
  610 F.3d 514 (9th Cir. 2010) ..................................................13

*FBI v. Abramson*,
  456 U.S. 615 (1982)..................................................................9

*Freeman v. Quicken Loans, Inc.*,
  132 S.Ct. 2034 (2012)...............................................................7

*Gen. Instrument Corp. v. FCC*,
  213 F.3d 724 (D.C. Cir. 2000)................................................21

*Gerhart v. Beazer Homes Holdings Corp.*,
  No. 08-1650, 2009 U.S. Dist. LEXIS 24297 (E.D. Cal. Mar. 23,
  2009) ........................................................................................23

v

*Glover v. Std. Fed. Bank,*
   283 F.3d 953, 963 (8th Cir. 2002) .................................................... 11-12, 15, 20

*Greenfield Mills, Inc. v. Macklin,*
   361 F.3d 934 (7th Cir. 2004) ...................................................................9

*Hamilton v. Smith,*
   773 F.2d 461 (2d Cir. 1985) ..................................................................25

*Heimmerman v. First Union Mortg. Corp.,*
   305 F.3d 1257, 1263-64 (11th Cir. 2002)......................................... 11-12

*Howland v. First Am. Title Ins. Co.,*
   672 F.3d 525, 531 (7th Cir. 2012) .........................................................11

*In re JRHBW Realty, Inc.,*
   No. 2014 CFPB-0005, Dkt. 1 (May 28, 2014) .....................................5

*McCullough v. Hanna,*
   No. 09-cv-2858, 2010 U.S. Dist. LEXIS 29788 (N.D. Ohio Mar.
   26, 2010) ................................................................................................12

*Menichino v. Citibank,*
   No. 12-0058, 2013 WL 3802451 (W.D. Pa. July 19, 2013).............23

*Montgomery Ward & Co. v. Fed. Trade Com.,*
   691 F.2d 1322 (9th Cir. 1982) .............................................................18

*Mullinax v. Radian Guar.,*
   199 F. Supp. 2d 311 (M.D.N.C. 2002) ................................................23

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005)..............................................................................21

*NLRB v. Wyman-Gordon Co.,*
   394 U.S. 759 (1969)..............................................................................18

*O'Sullivan v. Countrywide Home Loans, Inc.,*
   319 F.3d 732 (5th Cir. 2003) ...............................................................11

*Pedraza v. United Guar. Corp.,*
   114 F. Supp. 2d 1347, 1349 (S.D. Ga. 2000) .....................................4

vi

*Ruangswang v. INS*,
 591 F.2d 39 (9th Cir. 1978) ............................................................18

*Shell Offshore Inc. v. Babbitt*,
 238 F.3d 622 (5th Cir. 2001) ..........................................................18

*\*Snow v. First American Title Insurance Co.*,
 332 F.3d 356 (5th Cir. 2003) ..................................................... 23-25

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
 135 S.Ct. 2507 (2015)........................................................................9

*U.S. v. Moore*,
 423 U.S. 122 (1975).........................................................................9

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
 4 F.3d 1049 (2d Cir. 1993) ..............................................................4

*White v. JRHBW Realty, Inc.*,
 No. 14-cv-01436, 2015 U.S. Dist. LEXIS 23887 (N.D. Ala. Feb.
 27, 2015) ..........................................................................................5

**STATUTES**

5 U.S.C. § 551(4)-(5)........................................................................18

5 U.S.C. § 552(b) ..............................................................................9

5 U.S.C. § 704..................................................................................20

5 U.S.C. § 706(2)(a)..........................................................................21

12 U.S.C. § 2601 ...............................................................................7

*12 U.S.C. § 2607 .............................................................................25

*12 U.S.C. § 2607(c)(1)(B) .................................................................7

*12 U.S.C. § 2607(c)(1)(C) .................................................................7

*12 U.S.C. § 2607(c)(2).......................................................................8

*12 U.S.C. § 2607(c)(3)......................................................................15

4839-9833-1176.9

*12 U.S.C. § 2607(c)(3) ..................................................................... 8

*12 U.S.C. § 2607(c)(4) ................................................................ 8, 16

*12 U.S.C. § 2607(c)(5) ..................................................................... 8

12 U.S.C. § 2607(d)(2) ..................................................................... 14

12 U.S.C. § 2607(d)(5) ..................................................................... 14

12 U.S.C. § 2617 ............................................................................. 25

21 U.S.C. § 841 ................................................................................. 9

33 U.S.C. § 1344(f) ........................................................................... 9

**OTHER AUTHORITIES**

12 C.F.R. § 1024 ................................................................................ 5

12 C.F.R. § 1024, App. B ............................................................... 15

12 C.F.R. § 1024, App.B, Ex.7 ......................................................... 9

12 C.F.R. § 1024.14(g)(1)(ii-iv) ..................................................... 10

12 C.F.R. § 1024.14(g)(1)(v) ............................................................ 9

12 C.F.R. § 1024.14(g)(1)(vi) ........................................................... 8

12 C.F.R § 1024.14(g)(1)(vii) ...................................................... 8, 16

24 C.F.R. § 3500, *et seq* ................................................................. 5

53 Fed Reg. 17,428 ......................................................................... 19

61 Fed. Reg. 29,258-59 .................................................................... 9

61 Fed. Reg. 49,398 (Sept. 19, 1996) ............................................ 14

61 Fed. Reg. 49,398-400 ................................................................... 9

64 Fed. Reg. 10,080 (Mar. 1, 1999). Section 8(c)(1)(C) ................. 15

67 Fed. Reg. 49,134 ....................................................................... 19

viii

73 Fed. Reg. 14,030 ........................................................................19

76 Fed Reg 43,569, 43,570 (July 21, 2011)........................................10

78 Fed. Reg. 11,280, 11,419 (Feb. 15, 2013) ........................................24

78 Fed. Reg. 39,901 ........................................................................19

Appleman on Insurance § 1.06 ........................................................5

Brief for the Coalition for Sensible Public Records Access, *et al.* as
    Amicus Curiae, at 9-25, *Spokeo, Inc. v. Robins*, No. 13-1339 (S.
    Ct. July 9, 2015), *available at* http://www.scotusblog.com/wp-
    content/uploads/2015/08/CSPRA-Spokeo-amicus-brief-final.pdf....................26

Fannie Mae *Qualified Mortgage Insurer Approval Requirements*
    (2003), *available at*
    https://www.fanniemae.com/content/eligibility_information/mortg
    age-insurers-approval-requirements.pdf........................................6

H.R. Rep. 94-667, at 9 (1975)........................................................9

H.R. Rep. 98-123, at 75 (1983)........................................................9

Press Release, Genworth, Genworth USMI Statement on Settlement
    with Consumer Financial Protection Bureau of Previously
    Disclosed Review of Arrangement with Lender-Affiliated
    Reinsurance Companies (April 4, 2013),
    http://investor.genworth.com/investors/news-
    releases/archive/archive/2013/Genworth-USMI-Statement-on-
    Settlement-with-Consumer-Financial-Protection-Bureau-of-
    Previously-Disclosed-Review-of-Arrangements-with-Lender-
    Affiliated-Reinsurance-Companies/default.aspx................................6

ix

## STATEMENT OF COMPLIANCE WITH F.R.A.P. 29(c)(5)

No person or entity other than DSP *Amici*, their members, or their counsel made a monetary contribution to this brief's preparation or submission. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.

## CERTIFICATE OF COUNSEL REGARDING NECESSITY OF SEPARATE *AMICI CURIAE* BRIEF

Pursuant to D.C. Cir. R. 29(d), Diversified Service Provider *Amici* hereby certify that they are submitting a separate brief from other *amici* in this case: (i) in USMI®'s case, due to its members' specific role as mortgage insurers, and the previous participation of four of its members (Genworth, Radian, MGIC, and Arch as the successor to CMG Mortgage Insurance Company) in the type of captive reinsurance transactions that are the subject matter of this appeal;[*] and (ii) due to the general reliance by all of DSP *Amici*'s respective members on the Real Estate Settlement Procedure Act ("RESPA") §8(c) and accompanying regulatory exemptions that the Consumer Financial Protection Bureau's (the "Bureau") Order on review ("Order") threatens to abolish. To their knowledge, DSP *Amici* are the

---

[*] USMI® members Essent and NMI are newer entrants to the industry and did not participate in any captive reinsurance arrangements; they take no position on the discussion herein regarding how such arrangements operated or the settlements that occurred.

x

only *amici* focusing on the issues herein from the unique background and perspectives they represent as providers of diversified real estate settlement services and, in USMI®'s case, from the perspective of mortgage insurers and participants in some of the same types of arrangements under review.

DSP *Amici* certify that they have combined to present the views of a broad cross-section of providers and that filing a joint brief with other *amicus curiae*, for the reasons stated above, would not be practicable.

4839-9833-1176.9

## STATEMENT OF INTEREST

Diversified Service Provider *Amici* ("DSP *Amici*") are four national non-profit trade associations that collectively represent thousands of providers from all segments of the residential home buying and financing industry, including real estate brokers, mortgage lenders/brokers, mortgage insurers, title insurers/title agents, escrow agents, and other settlement service providers, which are subject to RESPA and affected by the Order's radical new §8 interpretations.

Throughout the time they have been governed by RESPA, DSP *Amici* and their members have understood the two prohibitions in §§8(a) and 8(b)—as well as the categories of permitted payments and arrangements under §8(c)—based on the statute's plain language, legislative history, regulations, and interpretations and guidance from regulators and the courts. *Within that framework, §8(c) has been consistently described by the U.S. Department of Housing and Urban Development ("HUD") and the Bureau (see n.14 infra), and universally understood, as setting forth **exemptions** to §8 scrutiny.* DSP *Amici* and their members have long relied on this understanding to establish practices and procedures, to efficiently deliver settlement services to consumers, and to assess risk, including for RESPA §8, which presents potential steep civil and even criminal penalties.

The Bureau's interpretation in the Order that §8(c) is a mere interpretative tool to construe §8(a)'s prohibition—and not a series of exemptions—represents a

new and radical departure that contradicts the statute and that would sweep away years of prior case law and HUD guidance, replacing it with an impractical and unworkable standard. DSP *Amici* fully support Petitioners' arguments that the Order is legally flawed and submit this *amicus* brief to supplement the Court's understanding of the mortgage insurance and reinsurance analyzed in the Order.

DSP *Amici* also offer their particular perspective on how the Order's §8(c) interpretation (i) would disrupt long-established business practices to the detriment of consumers, DSP *Amici*'s members, and the economy; and (ii) was improperly announced for the first time in an adjudicative decision, which, under these circumstances, violated the prohibition of the Administrative Procedures Act ("APA") against creating or amending rules through adjudication, and deprived DSP *Amici* of fundamental rights to notice and the opportunity to comment. Finally, DSP *Amici* briefly address how these concerns are compounded by the Order's separate (but equally new and radical) statute of limitations holdings.

DSP *Amici*, who promote their members' services and encourage their compliance with federal law, understand how homes are sold and financed on a day-to-day basis and understand how the Order's RESPA interpretations are incompatible with daily practices.

AEA, formed in 1980, is a national non-profit trade association of real estate settlement agents. Representing a large number of "mom-and-pop" operations in

2

the mortgage closing business, AEA has approximately 3,000 members.

ALTA, founded in 1907, is a non-profit trade association that serves as the voice of the real estate settlement services, abstract and title insurance industry. ALTA's 5,600 member companies include title insurance companies, title agents, independent abstracters, title searchers and attorneys who operate in every county in the nation to search, review and insure land titles to protect home buyers and mortgage lenders who invest in real estate.

RESPRO® is a non-profit trade association comprised of all segments of the residential home buying and financing industry whose common bond is to offer "one-stop-shopping programs" for homebuyers through "affiliated business arrangements" and other strategic alliances under RESPA. RESPRO®'s members consist of real estate brokerage firms, mortgage providers, title agencies, escrow companies, home warranty companies, and other service providers.

USMI® is a non-profit membership corporation organized under the D.C. Code Title 29, Chapter 4, to represent and advance the interests of the United States Mortgage Insurance industry and to promote mortgage insurance within a housing financing system backed by private capital that makes mortgage credit available to borrowers while protecting taxpayers.

Counsel of record for all parties received notice of DSP *Amici*'s intent to file this brief, and they have consented thereto.

3

I.    **ARGUMENT**

A.    **THE COURT SHOULD CONSIDER ADDITIONAL RELEVANT BACKGROUND ON MORTGAGE INSURANCE AND REINSURANCE.**

Mortgage insurance, like all the services provided by DSP *Amici*'s members, "plays a vital role in the smooth functioning of this Nation's market in residential real estate . . . ." *Pedraza v. United Guar. Corp.*, 114 F. Supp. 2d 1347, 1349 (S.D. Ga. 2000). Among other things, mortgage insurance "lower[s] the costs that potential homeowners pay for the credit necessary to purchase their homes." *Id.* Generally required whenever the borrower cannot make a 20% down-payment on the home purchase, mortgage insurance "provides protection to the lender (or the ultimate owner of the loan) in the event of default. Under customary terms between the lender and borrower, the borrower makes the mortgage insurance payments to the lender (typically by paying them into the borrower's escrow account with the mortgage servicer). Because mortgage insurance protects lenders from the risk of default in these highly-leveraged transactions, they can extend credit to purchasers who otherwise would not qualify for credit." *Id.*[1]

Like most forms of insurance, mortgage insurance is often reinsured to spread and diversify the risk assumed. *See Unigard Sec. Ins. Co. v. N. River Ins.*

---

[1] Mortgage insurance also reduces the costs of home mortgages by enhancing the marketability of the loans in the secondary credit markets, because public and

4

*Co.*, 4 F.3d 1049, 1053 (2d Cir. 1993) (reinsurance diversifies the risk of loss, which prevents catastrophic loss from falling upon one insurer); *see also* 1-69 Appleman on Insurance §1.06 (reinsurance increases market competition, and thus benefits the insurance-buying public).[2]   As the four USMI® members who participated in these arrangements can attest,[3] the agreements were structured in accordance with RESPA and Regulation X,[4] as well as the 1997 HUD Letter,[5] a

---

private investors who purchase and securitize loans for re-sale also rely on mortgage insurance to reduce the default risk.

[2] Risk diversification occurs pursuant to an agreement where a reinsurer agrees to assume certain insurance risk for a fee.  Here, because the reinsurer was a lender-affiliate, the reinsurance practice was called captive reinsurance.  There are many types of captive reinsurance programs, and, indeed, analogous examples of the utilization of captive affiliates in other industries (*e.g.*, health care, law).

[3] Genworth, Radian, and MGIC (unlike PHH), settled Bureau RESPA captive reinsurance claims (without admitting liability or wrongdoing).  *E.g., CFPB v. Mortg. Guaranty Ins. Corp.*, No. 1:13-cv-21187, Dkt. 4 (S.D. Fl. April 4, 2013).  Few providers dare to litigate an administrative action with the Bureau because of the tremendous resource expenditure required to reach an impartial arbiter and their potential exposure to significant penalties.  Indeed, a real estate broker member of RESPRO® settled a Bureau RESPA claim last year for $500,000 in light of such considerations; when the same claim was subsequently filed against the broker in a copycat class action, the federal court dismissed it for failure to state a claim.  *Compare In re JRHBW Realty, Inc.*, No. 2014 CFPB-0005, Dkt. 1 (May 28, 2014) (Bureau Consent Order), *with White v. JRHBW Realty, Inc.*, No. 14-cv-01436, 2015 U.S. Dist. LEXIS 23887 (N.D. Ala. Feb. 27, 2015) (dismissal with leave to amend), *and White*, No. 14-cv-01436, 2015 U.S. Dist. LEXIS 123432 (N.D. Ala. Sept. 16, 2015) (dismissal with prejudice).

[4] In 1976, HUD issued Regulation X as RESPA's implementing regulation.  24 C.F.R. § 3500, *et seq*.  When RESPA authority passed to the Bureau in 2011, the Bureau recodified Regulation X, without significant changes, at 12 C.F.R. § 1024.

[5] The "1997 Letter" refers to a letter from Nicolas P. Retsinas, former Federal Housing Authority Commissioner and Assistant Secretary of HUD, to Countrywide Funding Corporation, which set forth HUD's views on application of

federal court injunction that was based on and consistent with that letter, and actuarial opinions required by the injunction. *See* Pet. Br. at 7-10. Moreover, the reinsurance agreements met written guidelines established by Fannie Mae and Freddie Mac, the ultimate investors for most mortgage insurance-covered loans.[6] Although there is often the temptation with insurance (and even reinsurance) to question paying for protection when all is well, the captive reinsurance agreements proved their value to the mortgage insurance industry when they provided the capital for billions of dollars in reinsurance claims, thereby helping to stabilize the mortgage finance system when the financial crisis of 2008 hit.[7]

---

RESPA §8 to captive reinsurance arrangements, and which was relied upon by the Administrative Law Judge in this case. USMI® member Radian succeeded to a mortgage insurer named Amerin, which received a 1997 letter identical to the 1997 HUD Letter to Countrywide. *See* Addendum.

[6] For example, §7(E)(iv) of Fannie Mae's guidelines listed numerous requirements for captive reinsurance agreements, including having actuarial opinions on file confirming there was risk transfer and that the ceded premium was commensurate with the ceded risk. *See* Fannie Mae *Qualified Mortgage Insurer Approval Requirements* (2003), *available at* https://www.fanniemae.com/content/eligibility_information/mortgage-insurers-approval-requirements.pdf.

[7] *See* Press Release, Genworth, Genworth USMI Statement on Settlement with Consumer Financial Protection Bureau of Previously Disclosed Review of Arrangement with Lender-Affiliated Reinsurance Companies (April 4, 2013), http://investor.genworth.com/investors/news-releases/archive/archive/2013/Genworth-USMI-Statement-on-Settlement-with-Consumer-Financial-Protection-Bureau-of-Previously-Disclosed-Review-of-Arrangements-with-Lender-Affiliated-Reinsurance-Companies/default.aspx.

### B.   THE ORDER'S §8(c)(2) INTERPRETATION WOULD DISRUPT LONGSTANDING BUSINESS PRACTICES TO THE DETRIMENT OF THE EFFICIENT DELIVERY OF SETTLEMENT SERVICES.

#### 1.   Industry Has Long Relied On §8(c) as a Series of Essential and Beneficial *Exemptions*.

RESPA §8 established a narrow statutory prohibition of "certain abusive practices" (*i.e.*, giving or receiving referral fees; splitting unearned fees) that may tend to unnecessarily increase settlement costs. 12 U.S.C. § 2601. Congress never intended for RESPA to regulate settlement service pricing generally (*see Freeman v. Quicken Loans, Inc.*, 132 S.Ct. 2034, 2044 (2012)), or to prohibit all referral and services relationships between providers. In fact, Congress specifically ***exempted*** various categories to ensure that §8 did not disrupt longstanding industry practices or innovation.

Thus, RESPA has always provided that nothing in §8 prohibits a title company from paying a title agent for helping issue title policies,[8] or a mortgage provider from paying its appointed agents to generate loans.[9] More broadly, a settlement service provider may pay a bona fide salary, or compensation or other

---

[8] 12 U.S.C. § 2607(c)(1)(B). Generally, a title agent will obtain the business, perform work on the policy, and then send the policy to the title insurance company to underwrite, and the two providers will split the premium. *Inter alia*, this allows a title insurance company to penetrate geographically distant markets.

[9] *Id.*, § 2607(c)(1)(C). This exemption gives additional flexibility to lenders to offer mortgage products and to consumers to shop for those products.

7

payment for goods or facilities actually furnished or services actually performed, but §8(c) makes no mention of, let alone restricts, a payee who also refers consumers to the provider.[10]  Congress later added other exemptions, such as the 1975 amendment to §8 permitting real estate licensees to split real estate commissions and pay one another referral fees.[11]  At the same time, Congress also delegated to HUD (now the Bureau) the authority to specify in regulations "other payments or classes of payments or other transfers" that are permitted under §8. *Id.*, § 2607(c)(5).[12]  And in 1983, Congress created an exemption for affiliated business arrangements that meet certain conditions.[13]

---

[10] *Id.*, § 2607(c)(2).  Settlement service providers achieve countless efficiencies under this exemption, including through subleases, desk rents, joint advertising, and marketing agreements.  For instance, office/desk rentals foster competition by allowing companies to enter geographic markets that otherwise might be prohibitive because of the costs of establishing separate offices and personnel.

[11] *Id.*, § 2607(c)(3).  This exemption protects practices that occur in countless home purchase transactions every day.  For example, it permits individual agents to split commissions between listing and buyer broker agents, to refer business to and among agents and brokers, and permits relocation companies licensed as brokers to receive referral fees when they refer business throughout the country.

[12] HUD exempted two additional categories under its §8(c)(5) authority:  certain promotional expenditures, and payments by an employer to its bona fide employees for settlement service referrals.  *Id.*, § 1024.14(g)(1)(vi), (vii).

[13] *Id.*, § 2607(c)(4).  An affiliated business arrangement exists where one settlement service provider has a whole or partial ownership interest in another, not unlike when an auto company owns a parts company.  For example, a real estate broker may have mortgage or title affiliates to help assure that its real estate customers close on time.  Because affiliated providers are under common control, they can demand better communication and accountability if service issues arise.  Affiliated business arrangements offer cost efficiencies from the sharing of facilities, technology, equipment, and marketing expenditures.  Their formation may also

8

Each of these §8(c) provisions enables payments and other arrangements that exist between providers to facilitate the efficient delivery of services and/or to foster a healthy market, and ***they have been consistently described by HUD and the Bureau, and universally understood, as exemptions*** for the reasons detailed by Petitioners, among others.[14]   Yet now the Order announces that the §8(c) provisions are not exemptions and threatens to upend RESPA compliance.

---

permit small, family owned companies to raise capital, add needed business expertise, and solve business succession issues.

[14] There is so much support for the principle that §8(c) sets forth a series of exemptions that it cannot be readily recounted.  DSP *Amici* offer these additional points:  ***First,*** Congress need not use the magic words "exempt" or "safe harbor" to create statutory exemptions.  Federal courts recognize exemptions based on diversity of language indicating that certain actions are not prohibited by the statute.  *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507, 2520 (2015) (construing language that "nothing in [the FHA] shall prohibit..." as creating an exemption); *FBI v. Abramson*, 456 U.S. 615, 626 (1982) (interpreting "this section does not apply to matters that are…" in 5 U.S.C. §552(b) as signifying exemptions to FOIA); *U.S. v. Moore*, 423 U.S. 122, 131 (1975) (indicating that language in 21 U.S.C. §841 stating that certain conduct is unlawful "except as provided" elsewhere in the chapter creates an exemption to the Controlled Substances Act); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 951-52 (7th Cir. 2004) (interpreting the phrase "non-prohibited discharge" in 33 U.S.C. §1344(f) as creating exemptions to the statutory prohibitions in the Clean Water Act).  ***Second,*** the legislative history makes clear that §8(c)'s provisions are exemptions.  *See* H.R. Rep. 94-667, at 9 (1975)(discussing proposed §8 amendment "to make clear that cooperative brokerage and referral arrangements of real estate agents are ***exempt***"); H.R. Rep. 98-123, at 75 (1983)(discussing amendment "to ***exempt*** [Affiliated Business Arrangements]").   ***Third,*** HUD consistently regarded the §8(c) provisions as exemptions.  *E.g.*, 61 Fed. Reg. 49,398-400 (RESPA Policy Statement discussing legislative intent behind §8(c)(1) "***exemption***" and describing §8(c)(2) as exempting payments); 12 C.F.R. § 1024.14(g)(1)(v) (Regulation X referencing §8(c)(3) as a "***statutory exemption***."); 61 Fed. Reg. 29,258-59 (RESPA Policy Statement discussing §8(c)(4) "***exemption***"); 12 C.F.R. § 1024, App.B, Ex.7 (appendix illustrating HUD view of §8(c)(4) "***exemption***")(all emphases supplied).  The Bureau adopted HUD's

9

### 2. The Order's Sudden Holding that §8(c) Is a Mere "Interpretative Tool" for §8(a) Is Disruptive and Unworkable.

DSP *Amici* agree with Petitioners' position that the Order's §8(c) interpretation is irreconcilable with the statute, and further urge the Court that it is unsupportable from a practical perspective.

### a. The Order's §8(c) holding would convert §8 into a hopelessly subjective and uncertain landscape.

Consistent with §8's language, structure and intent, Congress established, and HUD and the courts have employed, an ***objective*** approach to analyzing whether a given referral arrangement or payment program violates §8. Section 8 contains no intent standard. Thus, under §8(c)(2), it is well-established that if a payment is reasonably related to (and/or does not exceed) the value of the services, goods or facilities provided, there is no §8 violation. *E.g.*, 12 C.F.R. § 1024.14(g)(1)(ii-iv). HUD's policy statement on mortgage broker compensation, as explained by the Eleventh Circuit, adopted the same objective approach:

> [T]he first step is to determine whether the broker has provided goods or services of the kind typically associated with a mortgage transaction. Contrary to the conclusion in *Culpepper III,* the lender and broker need not be able to tie the [payment] to specific services provided. If the first step is satisfied, the second step [is] determining whether the compensation paid . . . is reasonably related to the total value of the goods and services actually provided.

---

statements. *See* 76 Fed Reg 43,569, 43,570 (July 21, 2011). Moreover, the case law also adopted this approach.

*Heimmerman v. First Union Mortg. Corp.*, 305 F.3d 1257, 1263-64 (11th Cir. 2002) (discussing test as set forth in HUD 2001 policy statement); *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 531 (7th Cir. 2012) (applying same two-part test to title practices); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003) (applying same test to document preparation).

By contrast, the Bureau's §8(c) interpretation would convert §8 into a hopelessly ***subjective*** inquiry into whether a payment was made or an arrangement entered into with the intent of obtaining referrals.  Over a dozen years ago, the Eighth Circuit considered and rejected a similar position in an §8(c)(2) case—*i.e.*, that if a payment was "for" a prohibited referral rather than "for" goods or services, then it was automatically illegal under §8(a).  *See Glover v. Std. Fed. Bank*, 283 F.3d 953, 963 (8th Cir. 2002).  That court held that such an interpretation would impermissibly read §8(c) out of the statute.  Specifically, it held:

> [§8(c)] clearly states that reasonable payments for goods, facilities or services actually furnished are *not prohibited* by RESPA, even when done in connection with the referral of a particular loan to a particular lender. [Plaintiffs'] approach tends to turn the interrelated sections upside down, putting total emphasis on the prohibitory language of [§8(a)] and no emphasis on the permissive language of [§8(c)].

*Id.* (emphasis in original).  As *Glover* recognized, §8(c) exempts payments made for fair value, regardless of intent or whether they accompany a referral.[15]

---

[15] *See also Cedeno v. IndyMac Bancorp, Inc.*, No. 06 Civ. 6438(JGK), 2008 U.S. Dist. LEXIS 65337, at *10 (S.D.N.Y. Aug. 25, 2008) ("Even assuming that

4839-9833-1176.9

The Order's interpretation, however, is precisely the opposite.[16]  Under its reasoning, where it can be contended that a payment was for referrals (as opposed to for a service, good, or facility provided)—even where the payment is reasonably related to the value of what was provided—each of the supposedly permissible §8(c) categories could become automatic §8(a) violations, yielding exposure to severe civil sanctions and other consequences, including potential criminal liability.  This interpretation is unworkable.

> **b.    The Order's distinction between a payment made "in connection with" the referral of a service versus "in exchange for" the referral is also unworkable.**

As a practical matter, the Order's reasoning that a payment is permissible under §8(c) if it is merely made "in connection with" a referral, but is impermissible under §8 if made "in exchange for" a referral, is a distinction without a difference.  This reasoning is wholly inconsistent with the statute itself, and would obliterate the current §8(c) protections.

---

IndyMac received a 'thing of value' . . . and that IndyMac promised and provided business in return, the plaintiff has not stated a claim under RESPA because the [§8(c)(2)] 'safe harbor' provision of RESPA applies."); *Cohen v. JP. Morgan Chase & Co.*, 608 F. Supp. 2d 330, 342 (E.D.N.Y. 2009) ("[§8(c)] clearly states that if a service is actually performed, then RESPA does not prohibit the fee."); *McCullough v. Hanna*, No. 09-cv-2858, 2010 U.S. Dist. LEXIS 29788 (N.D. Ohio Mar. 26, 2010) (in applying employer-employee exemption, the court did not consider the purpose for the claimed payments).

[16] The Order's reliance on *Culpepper v. Irwin Mortg. Corp.*, 253 F.3d 1324 (11th Cir. 2001), for this proposition is misplaced.  HUD and Courts of Appeal,

12

The flaws in the Order's reasoning are well-illustrated as applied to §8(c)(1). The Order states that it would not upset existing §8(c)(1) title and mortgage compensation arrangements, under which title agents and mortgage brokers often obtain a percentage of the fees charged for title/mortgage services that they respectively perform and refer to title insurers/lenders. The Order posits that such compensation is paid "in connection with" the referral rather than "in exchange for" it. But what that means is unclear, at best, and does not jibe with how title agents and mortgage brokers work and are paid. While a title agent performs valuable services in reviewing and evaluating the chain of title and issuing a commitment, the agent does not get paid by the title insurer *unless* it refers the borrower to that insurer. Indeed, title agents are the entities that most often produce title business for their insurers based on their position in the marketplace and their relationships with real estate brokers/agents and lenders[17] and title agents are routinely paid 80%, if not more, of the title insurance premium. However, title insurance (unlike most insurance) is not issued and underwritten on a casualty basis, and payment to the agents certainly corresponds to the valuable up-front

---

including the Eleventh Circuit itself, have rejected *Culpepper's* reasoning, which is no longer good law. *Glover*, 283 F.3d at 965; *Heimmerman*, 305 F.3d at 1263-64.

[17] For example, in *Edwards v. First American Corp.*, which has involved multiple appeals to the Ninth Circuit and one to the U.S. Supreme Court, the allegation is that First American purchased interests in title agencies for more than the interests were worth to get referrals from those agencies. 610 F.3d 514, 516 (9th Cir. 2010).

13

services performed by the agent, including assessing/clearing title issues, which substantially reduces the potential for any future claims. But given the agents' frequent role of producing the business and referring it to the title insurance company, under the Order's interpretation, an allegation that the payment was also for the referral could nullify the work performed by the agent.

Thus, Director Cordray's statement that such payments are only made *in connection with* the referrals, not *in exchange for* referrals, affords little comfort to industry (particularly where the Order simultaneously regarded the similar payments made to reinsurers for their assumption of risk to be payments *in exchange for* referrals). Even if the Bureau, for now, purports to discern a difference between these situations, there is certainly no assurance that the active plaintiffs' class action bar[18] will accept that distinction. The very purpose of the §8(c) exemptions is to remove doubt, which the Order injects back into the process. Under §8(c), if payment is for the reasonable value of the services rendered, then it is exempt, period.[19] This makes perfect sense because if the

---

[18] The high volume of RESPA §8 lawsuits stems primarily from the statute's provisions allowing treble damages and attorney's fees for prevailing plaintiffs. 12 U.S.C. § 2607(d)(2), (5).

[19] Indeed, HUD went so far as to say that if core title services (the maximum panoply of services) were provided, HUD would simply presume (and not question) the fairness of the fee received by the title agent. 61 Fed. Reg. 49,398 (Sept. 19, 1996); *see also* 12 C.F.R. § 1024 App. B, Ill.4 (HUD stated that an attorney could permissibly "collect a fee as a title agent *in exchange for referrals*

14

payments are commensurate with the services, then there is no value left to serve as consideration for the referral.

The same concern exists with mortgage brokers.  While mortgage brokers perform some loan origination services, one of their primary functions is to help consumers choose among different lenders/loans.  *See* 64 Fed. Reg. 10,080 (Mar. 1, 1999).  Section 8(c)(1)(C) permits payments to brokers that are reasonably related to the services they provide, and traditionally range from 1- 3% of the loan amount.  *See id*.  Yet the Order's interpretation that a payment made *in exchange for* a referral automatically violates of §8(a), without regard to §8(c), undermines reliable protection for broker payments.  *See Glover*, 283 F.3d at 964 ("inventive minds making clever arguments can turn virtually *any* payment flowing from a lender to a broker, in connection with the placement of a mortgage loan, into a purported payment for [referrals].").

With regard to real estate broker practices, there is no doubt that the Order would nullify §8(c)(3), which unconditionally permits "payments pursuant to cooperative brokerage **and referral arrangements or agreements between real estate agents and brokers**."  12 U.S.C. § 2607(c)(3)(emphasis added).  Pursuant to this exemption, real estate brokers and agents regularly pay each other referral

---

***of title insurance business***" provided the attorney performed certain work) (emphasis added).

fees, such as where an agent or broker in one geographic area refers a customer who wants to buy a house in a distant area in which the first agent/broker does not practice, or when an independent contractor real estate agent refers a listing or a buyer to its broker.  Under the Order's interpretation, those practices would be impermissible, potentially even criminal, notwithstanding the clear purpose of the 1975 RESPA amendment to exempt them.    Similarly, Regulation X unconditionally permits "[a]n employer's **payment** to its own employees **for any referral activities**," 12 C.F.R § 1024.14(g)(1)(vii) (emphasis added), but the Order would eliminate that protection as well.

Finally, there can be no dispute that returns on ownership interests under an affiliated business arrangement are immune from §8(a) attack provided that three enumerated conditions are met, notwithstanding the fact that—by definition—such returns flow (albeit indirectly) from the referral of business between affiliates.  12 U.S.C. § 2607(c)(4).[20]

The Order's §8(c) interpretation would seriously disrupt the country's home purchasing and financing process, oft regarded as the envy of the world. Consumers would lose the efficiency of retaining mortgage brokers to help them

---

[20] Without belaboring the analysis, DSP *Amici* simply note that homeowner's insurance and home warranty providers, escrow agents, mortgage insurers, and other settlement service providers rely on the §8(c) exemptions in similar ways, and all are threatened by the Order's sudden and radical departure from the statute, case law, and basic logic.

16

find lenders or loans whose rates change by the hour. The process for assuring consumers/lenders of the soundness of the title to the homes they purchase and finance would be impaired. The independent contractor agent/broker foundation on which the real estate brokerage and the employee relocation industries are predicated would be undermined. And the various business arrangements and one-stop-shopping alliances that permit consumers to conveniently obtain multiple settlement services from one accountable source would be threatened. In short, the Order's §8(c) interpretation is not only inconsistent with the statute and case law and regulatory interpretations, but it also would nullify numerous statutory and regulatory exemptions with staggering consequences for the real estate home buying process, consumers, and the economy.

### C. THE BUREAU'S ISSUANCE OF A RADICAL, NEW, AND DISRUPTIVE INTERPRETATION OF §8(c)—WHICH HAS INDUSTRY-WIDE RAMIFICATIONS—IN THE COURSE OF AN ADJUDICATIVE PROCEEDING VIOLATES THE APA.

DSP *Amici* are dismayed that the Bureau would attempt to announce such sweeping change without fully understanding the consequences and without notice to affected persons or the opportunity to be heard. They respectfully urge the Court to address this important defect in the Bureau's Order and procedures.

### 1. The Bureau is not permitted to amend or reinterpret RESPA in the course of an adjudicatory proceeding.

4839-9833-1176.9

If the plain language of RESPA §8 is to be changed, it must be by an Act of Congress. Yet even if some ambiguity exists here regarding §8(c)—and DSP *Amici* respectfully submit there is none—then the Bureau, at a minimum, should have followed notice-and-comment rulemaking if it wished to reinterpret that ambiguity and re-write Regulation X to conform to its view of the statute.

The APA prohibits an agency from creating, altering, or amending an administrative rule through an adjudicatory proceeding. 5 U.S.C. § 551(4)-(5); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) ("[the rulemaking provisions] may not be avoided by the process of making rules in the course of adjudicatory proceedings"). Instead, changes to the way generally applicable rules are interpreted must be made through the rulemaking process, which gives affected industry participants notice and the opportunity to be heard. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627-28 (5th Cir. 2001) (holding that a rule was improperly created during adjudication because it established and applied a new policy rather than applying the rule, as generally accepted, to the specific facts of the case); *see also Montgomery Ward & Co. v. Fed. Trade Com.*, 691 F.2d 1322, 1328 (9th Cir. 1982) ("an amendment is proper only when adequate notice is provided to affected parties pursuant to appropriate rule-making procedures"); *Ruangswang v. INS*, 591 F.2d 39, 45 (9th Cir. 1978) (adjudication of a new requirement into a regulation held to be an abuse of discretion because of lack of notice).

18

DSP *Amici* are active in terms of legislative, rulemaking, and legal matters of interest to their members.  They participate in the rulemaking process, they regularly testify, write letters, and otherwise weigh in on congressional and federal and state regulatory proposed action, and have also participated in various *amicus* briefs concerning RESPA issues of importance to their members.  Until now, material changes to Regulation X or HUD's RESPA interpretations have been consistent with the statute and have occurred with the benefit of notice-and-comment procedures, such that industry and consumer groups have had an opportunity to be heard and then, if change occurred, better understand and conform to the changing legal landscape.[21]

However, the interpretations contained in the Order—issued by an unelected head of an executive agency and in a sudden departure from prior agency interpretations—came with no notice and have left industry searching to understand the law.[22]  The sense of dislocation and exposure is acute for DSP

---

[21] Examples include the proposed affiliated business arrangement rules published in 1988 (53 Fed. Reg. 17,428); 2002 proposed rules relating to disclosure requirements (67 Fed. Reg. 49,134); 2013 proposed "ability to repay" rule (78 Fed. Reg. 39,901); and the 2008 proposed rules to more closely tie the good faith estimate with HUD-1 (73 Fed. Reg. 14,030.)  The importance of this process has only deepened in today's challenging marketplace and regulatory environment, which has seen a flurry of new federal rules/requirements under Dodd Frank, including, for example, a recent Bureau RESPA/TILA rule that was over 1,000 pages long as proposed, and which took final effect only days ago.

[22] The lack of notice to industry is particularly troubling because RESPA provides both civil and criminal liability for the same course of conduct.  Moreover, §8

*Amici's* members, from small entities (for whom it can be challenging to absorb regulatory changes and uncertainty into their regular work flow) to large companies (who often make a material investment in legal advice and/or well-developed systems, procedures, training)—each of whom is now contemplating a new and very different legal and business risk calculus. Given the opportunity, DSP *Amici* and their members (along with consumer groups) would have offered, their collective and unique comments on the effect of the §8(c) interpretation on their business models, strategic affiliations, and practices.[23]

> **2.      The §8(c) interpretation is such a radical departure from the statute, former agency interpretations, and controlling case law that it is arbitrary and capricious.**

Courts reviewing final agency actions must "hold unlawful and set aside agency action, finding, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 704, 706(2)(a).  Such review considers whether "an agency's actions under a statute are unreasonable," *Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000), including where the agency's actions are inconsistent with prior agency actions and

---

criminal sanctions are based on strict liability.  *See Glover*, 283 F.3d at 964-65. Thus, based on the Order, DSP *Amici*'s members can be civilly and criminally liable for practices that were widely accepted in the industry just a few months ago.

[23] DSP *Amici*'s concerns here occur under the APA, and they concur with Petitioner's related argument that the Order's §8(c) interpretation also raises serious due process concerns.

interpretations. *See e.g.*, *Bankamerica Corp. v. U.S.*, 462 U.S. 122, 130-32 (1983) (agencies' interpretation of a statute that reversed their longstanding prior interpretation was not entitled to deference).[24]   This is particularly true where, as here, the agency provides no explanation for the inconsistency. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA]."); *Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (remanding Federal Election Commission order requiring petitioners to repay federal matching funds made pursuant to statute because the FEC's decision was a break with its precedent and the FEC failed to justify its departure from precedent).[25]

The Bureau fails to justify its sudden departure from the established understanding of §8(c).  Instead, it simply stated, "PHH has failed to present any

---

[24] *See also id.* ("[T]he Government does not come to this case with a consistent history of enforcing or attempting to enforce [the Clayton Act] in accord with what it urges now. . . We find it difficult to believe that the [agencies that share authority for enforcement of the Clayton Act], and the Congress, which oversees those agencies, would have overlooked or ignored the [relevant practice] had it been thought contrary to the law . . . ").

[25] *See also id.* (noting that "[a]n agency interpretation that would otherwise be permissible is, nevertheless, prohibited when the agency has failed to explain its departure from prior precedent…and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute").

21

'official interpretations' or 'policy statements' that support its view" of §8(c)(2).
Yet as shown by Petitioners and *amici*, the legal landscape is littered with
regulations and policy statements that show §8(c)'s exemptive purpose.   The
Order's failure to acknowledge them or to explain why a deviation was warranted
was arbitrary and capricious and should not be upheld.

<blockquote>

**D.     THE ORDER'S CONCLUSION THAT THE RESPA STATUTE OF LIMITATIONS BEGINS WHEN POST-SETTLEMENT PAYMENTS ARE MADE, RATHER THAN AT CLOSING, IS UNSUPPORTED AND LOGICALLY FLAWED.**

</blockquote>

The Order also disregarded many years' of case law measuring the RESPA
§8 statute of limitations as accruing on the date of the transaction's closing,[26]
holding instead that each subsequent payment to an insurer essentially starts the
limitations period again.   Moreover, the Order held that if the Bureau chooses to
bring a RESPA enforcement action administratively (as opposed to in court), there
is ***no*** statute of limitations.   DSP *Amici* agree with Petitioners that these rulings are
legally flawed, and wish to briefly add their reasoning and to comment on their
profound implications.

It is troubling that the Bureau purports to disregard precedent ***on a
retroactive basis*** simply because it disagrees with the result.   The case law is
uniform that §8 violations run from the time of closing, with *Mullinax v. Radian*

---

[26] Prior case law measured the statute of limitations as one year (for civil actions)
or three years (for a government enforcement action) from the date of closing.

22

*Guar.*, 199 F. Supp. 2d 311 (M.D.N.C. 2002), squarely on point.[27]  Further, the distinctions the Order tries to draw between this case and *Snow v. First American Title Insurance Co.*, 332 F.3d 356 (5th Cir. 2003), do not comport with §8 and are falsely premised.  The Order makes much of the fact that the *Snow* plaintiffs paid for the entire cost of title insurance at closing and at that point title agents received credit for their title referral that was later converted into money, while here the mortgage insurance (and PHH's claimed referral fee) was paid in installments and in connection with the borrowers' monthly mortgage payment.  These differences are meaningless and do not affect the analysis.

The theory driving RESPA §8(a) is that if kickbacks are made to obtain business, they will drive up the price of settlement services such that the price quoted and paid at closing will be higher than it otherwise would have been.  *See* Order at 23 (RESPA's purpose was to prevent unnecessarily high settlement costs, which the Order posits occur when they are paid).  But that effect is factored into the price and born by the consumer at closing regardless of whether the referral fee

---

[27] It is noteworthy that in all the private RESPA class actions that have sought to equitably toll the RESPA statute of limitations (including many cases challenging captive reinsurance arrangements), not even the Plaintiffs' bar has advanced the position the Bureau takes here.  *See e.g.*, *Menichino v. Citibank*, No. 12-0058, 2013 WL 3802451 (W.D. Pa. July 19, 2013); *Gerhart v. Beazer Homes Holdings Corp.*, No. 08-1650, 2009 U.S. Dist. LEXIS 24297 (E.D. Cal. Mar. 23, 2009).

23

is paid over time or all at once.[28]  Indeed, since §8(a) has no *de minimis* thing of value, the violation occurs with the first payment at closing, regardless of whether other payments follow.  Therefore, *Snow*'s concern about double recoveries and multiple payments (332 F.3d at 359-60) applies here.  The Order does nothing to displace such concerns.[29]  Moreover, the Order fails to take account of the way these arrangements were traditionally structured—*i.e.*, the lender obtained mortgage insurance protection and the mortgage insurer committed to reinsure the loan on the agreed terms with the licensed lender-affiliate, which had to maintain required ratings and risk-to-asset ratios;  the agreement had to be fully collateralized using a segregated trust and/or a letter of credit, and the ceded premium could only be paid to the reinsurer after it was received by the mortgage

---

[28] The Order's argument is akin to saying that if referral fees were impermissible in car sales, a consumer who paid for his car in full upon receipt, where a single large referral fee was paid, would constitute a single injury/violation, but a consumer who financed her car where the referral fee was paid out over time as the car payments were made would constitute multiple injuries/violations, any one of which would trigger a new limitations period.  This makes no sense because the car purchase, like a settlement service or home purchase, is one transaction with one referral, regardless of whether the fees are financed on an installment basis or paid at once.

[29] The Bureau also improperly dismisses *Snow*'s concerns that this interpretation means that similarly situated plaintiffs/defendants would face different limitations periods depending on the form of payment that is challenged.  That concern is critical here and in other settlement service provider situations.  Mortgage originators get paid at closing—and often again later, depending on how the loans they originated performed or on other post settlement factors, including overall loan production.  *E.g.*, 78 Fed. Reg. 11,280, 11,419 (Feb. 15, 2013) (loan

24

insurer.  *See* n.6.   Thus,  the  entire  arrangement  was  complete  at  closing  and

generally was disclosed to the consumer.  Pet. Br. at 11.  While premiums were to

be ceded as mortgage payments were made, and future claims were to be paid from

the trust as required, the notion that new referral fee payments and agreements to

refer were being made with each ceded premium bears no resemblance to reality of

the agreement any more than in *Snow*.

Ultimately,  the  Order's  holding  promotes  confusion  and  uncertainty  as  to

when suit must be filed, even though the entire purpose of a statute of limitations is

to provide a clear time by which a claim must be made.  *See Hamilton v. Smith*,

773 F.2d 461, 465 (2d Cir. 1985) ("the basic purpose of the statute of limitations is

to  encourage  promptness  in  instituting  claims  and  to  avoid  prejudice  to

defendants…").   Given Congress's decision to provide private and governmental

§8 actions with short statutes of limitations running from the occurrence of the

violation (12 U.S.C. §§ 2607, 2617), potentially extending each limitations period

to coincide with the term of a 30-year mortgage is particularly concerning.  Under

the Order, neither consumers nor providers would have clarity.

---

originators  may  receive  additional  compensation  based  on,  for  example,  the
accuracy and completeness of the loan documentation submitted to the creditor).

Knowing the window of vulnerability to a RESPA claim helps settlement service providers understand and prepare for potential exposure.[30]  Certainty about the statute of limitations —or lack thereof—affects a provider's ability to plan for its ongoing operations, such as planning potential ownership transitions (*i.e.*, through merger, acquisition or dissolution) or making informed decisions on insurance protection or document retention policies.  Uncertainty about the rules makes providers less willing to innovate, invest, or even provide the services that they offer in anything but a no-risk situation.  The country recently saw the effects of such uncertainty during the last mortgage crisis.  The Order's statute of limitations ruling is legally and logically flawed and should be reversed.[31]

---

[30] This includes meritless §8 claims, which crop up frequently and can force a provider to incur potentially steep defense costs to prevail, or settle the case to avoid the outlay and uncertainty. This concern is discussed in detail in an *amicus* brief that several of the DSP *Amici* filed in the *Spokeo* case pending before the United States Supreme Court.  Brief for the Coalition for Sensible Public Records Access, *et al.* as Amicus Curiae, at 9-25, *Spokeo, Inc. v. Robins*, No. 13-1339 (S. Ct. July 9, 2015), *available at* http://www.scotusblog.com/wp-content/uploads/2015/08/CSPRA-Spokeo-amicus-brief-final.pdf.

[31] DSP *Amici* agree with Petitioner's arguments against the interpretation that no statute of limitation exists when the Bureau enforces RESPA administratively. DSP *Amici* also express disbelief at the notion that Congress provided a one-year period for private suits, a three-year period for government injunctive relief actions, changed none of the substantive provisions when transferring RESPA authority to the Bureau, and yet gave the Bureau automatic fiat to disregard the statute of limitations altogether in administrative proceedings.

26

## CONCLUSION

To operate effectively, settlement service providers need clarity regarding their federal legal obligations and risks.  The Order's ill-considered interpretation of RESPA §8(c) and the statute of limitations would disrupt the ability of realtors, title insurers/agents, mortgage lenders/brokers, mortgage insurers, and other providers to manage risk, compete, develop best practices, and ultimately to efficiently deliver quality real estate settlement services to consumers.

October 5, 2015                               Respectfully submitted,


                                   /s/ Jay N. Varon
                                   Jay N. Varon
                                        *Counsel of Record*
                                   Jennifer M. Keas
                                   Erik F. Benny
                                   FOLEY & LARDNER LLP
                                   3000 K Street, N.W.
                                   Washington, D.C.  20007
                                   202.672.5300
                                   jvaron@foley.com
                                   *Counsel for Amicus Curiae*

27

4839-9833-1176.9

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 6,983 words. This certificate was prepared in reliance on the word-count function of Microsoft Word 2010.


        /s/ Jay N. Varon
Jay N. Varon

4839-9833-1176.9

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 5th day of October 2015, the foregoing Brief of American Land Title Association, American Escrow Association, Real Estate Services Providers Council, Inc. (RESPRO®), And U.S. Mortgage Insurers (USMI®) as *Amici Curiae* in Support of Petitioners was served on all parties, or their counsel of record, through the CM/ECF system:

Theodore B. Olson
*Counsel of Record*
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

Mitchel H. Kider
David M. Souders
WEINER BRODSKY KIDER PC
1300 19th Street, NW 5th Floor
Washington, DC 20036-1609

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001-4413

*Counsel for Petitioners*

Lawrence DeMille-Wagman
*Enforcement Attorney*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street, N.W.
Washington, D.C. 20552
*Counsel for Respondent*

   /s/ Jay N. Varon
Jay N. Varon

29

# Addendum

## TABLE OF CONTENTS

**Page**

Letter from Nicolas P. Retsinas, Federal Housing Commissioner and
Assistant Secretary of HUD, to Randolph C. Sailer II, Senior Vice
President and General Counsel, Amerin Guaranty Corporation (Aug.
6, 1997). …………………………………………………………..……    1



U. S. Department of Housing and Urban Development
Washington, D. C. 20410-8000

August 6, 1997

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Mr. Randolph C. Sailer II
Senior Vice President and General Counsel
Amerin Guaranty Corporation
200 East Randolph Drive, 49th Floor
Chicago, IL  60601-7125

Dear Mr. Sailer:

Last year the Department of Housing and Urban Development
(the Department) sought from you information on the captive
reinsurance program of Amerin Guaranty Corporation (Amerin) with
Countrywide Home Loans (Countrywide) and its affiliated
reinsurer, Charter Reinsurance (Charter). You then requested
that the Department clarify the applicability of Section 8 of the
Real Estate Settlement Procedures Act (RESPA) to captive
reinsurance programs. For the reasons set forth below, we have
concluded that, so long as payments for reinsurance under captive
reinsurance arrangements are solely "payment for goods or
facilities actually furnished or for services actually
performed," these arrangements are permissible under RESPA.  See
paragraph 8(c)(2) of RESPA, 12 U.S.C. § 2607(c)(2). The
following details the facts concerning captive reinsurance
programs as we understand them, relevant law, and how the
Department will scrutinize these arrangements to determine
whether any specific captive reinsurance program is permissible
under RESPA.

## I.   BACKGROUND

A typical captive reinsurance arrangement involves a
mortgage lender acting in concert with a fully licensed
reinsurance affiliate of the mortgage lender and an unaffiliated
primary mortgage insurer. The sole purpose of the reinsurance
affiliate is to reinsure loans which the affiliated mortgage
lender originates and which the unaffiliated, primary mortgage
insurance company insures. The primary mortgage insurer and the
reinsurer enter into a contract under which the primary insurer
agrees to pay the reinsurer an agreed upon portion of the
mortgage insurance premiums for loans originated by the lender
and insured by the primary insurer. The lender, therefore, has a
financial interest in having the primary insurer in the captive
reinsurance program selected to provide the mortgage insurance.

2

Premiums paid for the reinsurance may be net of an agreed upon "ceding commission," which represents the reinsurer's share of the costs of administering the book of insured business.

Under the contract between the primary insurer and the reinsurer, the reinsurer posts capital and reserves satisfying the laws of the state in which it is chartered and may also establish an additional security fund to ensure that, when a claim against the reinsurer is made, funds will exist to satisfy the claim.  In exchange for a portion of mortgage insurance premiums (minus a ceding commission, if applicable) to be paid by the primary insurer, the reinsurer obligates itself to reimburse the primary insurer for an agreed portion of claims that may require payment under the contract.  Under different reinsurance arrangements, the reinsurance obligations generally take one of two forms.  The first is an "excess loss" arrangement, under which the primary insurer pays, and is solely responsible for, claims arising out of a given book of business up to a predetermined amount, after which the reinsurer is obligated to reimburse the primary insurer's claims up to another predetermined amount.  Thereafter, the primary insurer is solely responsible for claims in excess of the reinsurer's tier of losses on a given book.  A second type of contract is the "quota share" contract, under which the reinsurer would bear a portion of all insured losses.

Under captive arrangements of which the Department is aware, some degree of disclosure is provided to the consumer about the arrangement and some opportunity is accorded to the consumer to choose whether or not to have the loan insured through a captive reinsurance program.

## II.  LEGAL ANALYSIS

Subsection 8(a) of RESPA provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).  "Thing of value" is further described in the Department's regulations as including "without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a

future date, the opportunity to participate in a money-making program...." 24 C.F.R. § 3500.14(d). In addition, subsection 8(b) prohibits the giving or receipt of any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service "other than for services actually performed." 12 U.S.C. § 2607(b). These prohibitions against paying for referrals and against splitting fees are very broad and cover a variety of activities.

Subsection 8(c) of RESPA sets forth various exemptions from these prohibitions. It provides, in relevant part, that nothing in section 8 shall be construed as prohibiting "(2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2).

The Department's view of captive reinsurance is that the arrangements are permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services "actually furnished or for services performed" and (2) are bona fide compensation that does not exceed the value of such services.

The rationale behind this two-step analysis is that in instances in which a lender selects the mortgage insurer, including under a captive reinsurance arrangement, the lender's actions would constitute a referral of loans to a mortgage insurer, by influencing the borrower's selection of his or her mortgage insurer. See 24 C.F.R. § 3500.14(f) (definition of "referral"). If the lender or its reinsurance affiliate is merely given a thing of value by the primary insurer in return for this referral, in monies or the opportunity to participate in a money-making program, then section 8 would be violated; the payment would be regarded as payment for the referral of business or a split of fees for settlement services. If, however, the lender's reinsurance affiliate actually performs reinsurance services and compensation from the primary insurer is bona fide and does not exceed the value of the reinsurance, then such payments would be permissible under subsection 8(c). Conversely, any captive reinsurance arrangement in which reinsurance services are not actually performed or in which the payments to the reinsurer are not bona fide and exceed the value of the reinsurance would violate section 8 as an impermissible referral fee.

4

## A.    Analysis of Specific Captive Reinsurance Arrangements

The Department will analyze captive reinsurance arrangements to determine if the arrangements comply with RESPA.  Factors which may cause the Department to give particular scrutiny to an arrangement and cause it to apply the test set forth in Part II(B) of this analysis include, but are not limited to, the following:

1.    The amount charged directly or indirectly to the consumer for mortgage insurance in a captive program is greater than the amount charged to the consumer for mortgage insurance not involving reinsurance for a similar risk.

2.    The costs (premiums minus a ceding commission, if applicable) paid to the captive reinsurer are greater than the cost for comparable non-captive reinsurance available in the market.

3.    The lender restricts its mortgage insurance business in whole or to a large extent to a primary mortgage insurer that has a reinsurance agreement with the lender's captive reinsurer.

4.    Any major secondary market institution refuses to purchase mortgages insured under a particular captive reinsurance agreement or places special conditions on such purchases.

5.    Any credit rating agency reduces the rating of the primary mortgage insurer in whole or in part because of agreements with captive reinsurers.

6.    Any State regulatory body questions the adequacy of the reserves maintained by the primary mortgage insurer or the captive reinsurer.

7.    The primary insurer's agreement to reinsure is conditioned on the affiliated lender's agreement to refer all of or a predetermined volume of its mortgage insurance business to the primary insurer, or the terms of the agreement (such as the percentage of the premium per loan reinsured that is paid to the reinsurer by the primary insurer) fluctuate depending on the volume of the primary insurance business referred by the lender to the primary insurer.  The presence of either of these conditions makes it more likely that at least a portion of the compensation paid to the reinsurer is for the referral of mortgage insurance business.

5

8. Adequate consumer disclosure is not provided. The Department believes that consumers would be well served by a meaningful disclosure[1] and a meaningful choice[2] for consumers about having their loans included in a captive reinsurance program. A demonstrated willingness to provide such a disclosure may indicate that the arrangement is designed to provide real reinsurance.

The Department does not consider any of these eight factors to be determinative of whether an arrangement merits scrutiny by the Department, nor does it regard the absence of any of these factors to be determinative that further scrutiny is not merited. In addition, as noted in Part II(B), the Department may consider these eight factors in applying the test in Part II(B), to the extent applicable.

## B. Test for Whether a Captive Reinsurance Arrangement Violates RESPA

Where the Department scrutinizes a captive reinsurance arrangement, it will apply a two-part test for determining whether the arrangement violates RESPA. The Department will first determine whether the reinsurance arrangement meets three requirements that establish that reinsurance is actually being provided in return for the compensation. If one or more of the requirements is not met, the inquiry will end, and the arrangement will be regarded as an impermissible captive reinsurance arrangement under RESPA. If all of the requirements are met, the Department will determine whether the compensation exceeds the value of the reinsurance. To facilitate its analysis, the Department may use information obtained from the lender, the primary insurer, the captive reinsurer, or other sources, including data on the rate, magnitude, and timing of default losses and mortgage insurance payments and any other

---

[1]    A meaningful disclosure would reveal that the captive reinsurance arrangement exists, that the lender stands to gain financially under the arrangement, and that the consumer may choose not to have his or her insurance provided by an insurer in such an arrangement.

[2]    A meaningful choice whether to participate would provide the consumer an easy, non-burdensome opportunity to opt out by, for example, indicating a preference one way or the other on a form.

6

information necessary to undertake the analysis and may exercise
its subpoena authority pursuant to 24 C.F.R. part 3800 to obtain
such information.

1.    <u>Determining that Reinsurance is Actually Being Provided in
      Return for the Compensation</u>

      To determine that a real service--reinsurance--is performed
by the reinsurer for which it may legally be compensated, the
following requirements must be satisfied:

      a.    <u>There must be a legally binding contract for
reinsurance with terms and conditions conforming to industry
standards.</u>

      b.    <u>The reinsurer must post capital and reserves satisfying
the laws of the state in which it is chartered and the
reinsurance contract between the primary insurer and the
reinsurer must provide for the establishment of adequate reserves
to ensure that, when a claim against the reinsurer is made, funds
will exist to satisfy the claim.</u>  Unless the reinsurer is
adequately capitalized and adequate reserves (which may include
letters of credit or guarantee arrangements) and funds are
available to pay claims, real services are not being provided.

      c.    <u>There must be a real transfer of risk.</u>  The reinsurance
transaction cannot be a sham under which premium payments (minus
a ceding commission, if applicable) are given to the reinsurer
even though there is no reasonable expectation that the reinsurer
will ever have to pay claims.  This requirement for a real
transfer of risk would clearly be satisfied by a quota share
arrangement, under which the reinsurer is bound to participate
<u>pro rata</u> in every claim.  The requirement could also be met by
excess loss arrangements, if the band of the reinsurer's
potential exposure is such that a reasonable business
justification would motivate a decision to reinsure that band.
Unless there is a real transfer of risk, no real reinsurance
services are actually being provided.  In either case, the
premiums paid (minus a ceding commission, if applicable) must be
commensurate to the risk, as discussed in Part II(B)(2).

      In evaluating these requirements, the Department may also
consider the factors in Part II(A), to the extent relevant.  If
any of the requirements in this Part II(B)(1) is not met, the
arrangement will be regarded as an impermissible reinsurance
arrangement under RESPA.  If any of the requirements is not met,
the "service" being compensated would appear to be the lender's
referral of business to the mortgage insurer, which RESPA
prohibits.

## 2.   Determining that the Compensation Paid for Reinsurance Does Not Exceed the Value of the Reinsurance

If the requirements in Part II(B)(1) for determining that reinsurance is actually being provided in return for the compensation are met, the Department will then determine whether the compensation paid for reinsurance does not exceed the value of the reinsurance.  The Department will evaluate whether the compensation is commensurate with the risk and, where warranted, administrative costs.  The Department's evaluation of this requirement may:

--   Compare, using relevant mathematical models, the risk borne by the captive reinsurer with the payments provided by the primary insurer.

--   Analyze the likelihood of losses occurring, the magnitude and volatility of possible losses, the amount of payments received, the timing of the payments and potential losses, current market discount rates, and other relevant factors.

--   Take into account the relative risk exposure of the primary lender and the captive reinsurer.

--   Consider the extent to which the lender or the firm controlling the captive reinsurer is shielded from potential losses by inadequate reserves and a corporate structure that segregates risks.

--   Examine other financial transactions between the lender, primary insurer, and captive reinsurer to determine whether they are related to the reinsurance agreement.

--   Examine whether the ceding commission is commensurate with the administrative costs assumed by the primary insurer.

In making this evaluation,  the Department may also consider the factors in Part II(A), to the extent relevant.  If the Department concludes that the compensation paid for the reinsurance exceeds the value of the reinsurance pursuant to the analysis in this Part II(B)(2), the arrangement will be regarded as an impermissible reinsurance arrangement under RESPA and the payments exceeding the value of the reinsurance will be considered a referral fee or unearned fee.

### III. CONCLUSION

In setting forth this analysis, the Department notes the trend in the mortgage market toward increased diversification of risk.  The Department welcomes such trends to the extent that

8

such arrangements increase the availability of mortgage credit.
Where RESPA would not preclude such arrangements, the Department
would generally support them.

The Department believes the system of mortgage insurance and
reinsurance is not necessarily comparable to other types of
settlement services.  Thus, the Department could analyze other
settlement service programs differently, depending on the facts
of the particular program.

I trust that this guidance will assist you to conduct your
business in accordance with RESPA.

Sincerely,

Nicolas P. Kelor

Nicolas P. Retsinas
Assistant Secretary for
Housing-Federal Housing
Commissioner

cc:  Mr. Sander Samuels
     General Counsel
     Countrywide Funding Corporation
     155 N. Lake Avenue
     Pasadena, California  91109