No. 15-1177

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**PHH CORPORATION, ET AL.,**

*Petitioners,*

vs.

**CONSUMER FINANCIAL PROTECTION BUREAU,**

*Respondent.*

---

On Appeal from the Consumer Financial Protection Bureau,
Docket No. 2014-CFPB-002

**BRIEF FOR *AMICI CURIAE* AMERICAN FINANCIAL SERVICES
ASSOCIATION, CONSUMER BANKERS ASSOCIATION, HOUSING POLICY
COUNCIL OF THE FINANCIAL SERVICES ROUNDTABLE, INDEPENDENT
COMMUNITY BANKERS OF AMERICA, LEADING BUILDERS OF
AMERICA, MORTGAGE BANKERS ASSOCIATION, AND NATIONAL
ASSOCIATION OF HOME BUILDERS IN SUPPORT OF PETITIONERS AND
VACATUR**

---

Michael J. Agoglia
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6057

Joseph R. Palmore
Donald C. Lampe
Bryan J. Leitch
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 887-6940
JPalmore@mofo.com

Attorneys for *Amici Curiae*

October 5, 2015

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP AND MONETARY CONTRIBUTIONS

All parties have consented to the filing of this brief. Pursuant to Rule 29(c) of the Federal Rules of Appellate Procedure, Amici Curiae state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than Amici Curiae or their counsel made a monetary contribution to its preparation or submission.

Pursuant to D.C. Circuit Rule 29(d), Amici Curiae certify that no other brief of which they are aware provides their cross-industry perspective on the interdependent nature of the homeownership market, the ways in which that market depends on fair notice as well as stable, consistent enforcement of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601, *et seq.*, or their perspective on the impact of the agency action under review. Amici comprise seven different trade associations that have joined this single brief in order to avoid duplication of arguments.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1 and 29(b), Amici Curiae hereby state that:

1.     American Financial Services Association (AFSA) has no parent corporation, nor does any publicly held corporation hold 10% or more of its stock.

2.     Consumer Bankers Association (CBA) is a non-profit trade group and is not a subsidiary of any other corporation.  CBA has no shares or securities that are publicly traded.

3.     The Housing Policy Council of the Financial Services Roundtable (FSR) is a non-profit industry trade association.  Neither the Housing Policy Council nor The Financial Services Roundtable has any parent corporation, and neither has issued shares of stock to the public.

4.     Independent Community Bankers of America (ICBA) has no parent corporation and has no shares or securities that are publicly traded.

5.     Leading Builders of America (LBA) is a non-profit trade group and is not a subsidiary of any other corporation.  It has no shares or securities that are publicly traded.

6.     Mortgage Bankers Association (MBA) is a non-profit trade association that is not a subsidiary of any other corporation and it does not have shares or securities that are publicly traded.

7.    National Association of Home Builders (NAHB) is a non-profit corporation organized under the laws of Nevada.  NAHB has no parent companies or subsidiaries and has issued no shares of stock to the public.  It is composed of approximately 800 state and local home builders associations with whom it is affiliated, but all of those associations are, to the best of NAHB's knowledge, nonprofit corporations that have not issued stock to the public.

# TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP AND MONETARY CONTRIBUTIONS ................................... i

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF AUTHORITIES ......................................................... v

GLOSSARY ........................................................................ ix

INTEREST OF AMICI CURIAE ...................................................... 1

INTRODUCTION AND BACKGROUND .......................................... 4

SUMMARY OF ARGUMENT .................................................... 9

ARGUMENT ...................................................................... 10

I.    THE ORDER CONFLICTS WITH RESPA, APPLICABLE REGULATIONS, AND LONGSTANDING POLICY GUIDANCE UPON WHICH AMICI'S MEMBERS HAVE RELIED .................................. 10

      A.    The Order Rests On A Misreading Of RESPA ............................. 10

            1.    The Order's construction of Section 8 contravenes the text and structure of the statute................................................. 10

            2.    The Order's construction of Section 8 conflicts with Congress's clearly expressed purposes................................. 14

      B.    The Order Contravened The Bureau's Own Regulations................. 17

      C.    The Order Ignored The Bureau's Longstanding Policy Statements And Public Guidance Materials................................... 18

II.   THE ORDER EXCEEDED THE BUREAU'S STATUTORY AUTHORITY AND VIOLATED FUNDAMENTAL TENETS OF ADMINISTRATIVE LAW AND FAIR NOTICE................................................. 22

CONCLUSION ...................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brock v. Cathedral Bluffs Shale Oil Co.*,
   796 F.2d 533 (D.C. Cir. 1986).................................................................23

*Chem. Mfrs. Ass'n v. EPA*,
   673 F.2d 507 (D.C. Cir. 1982).................................................................12

*Christopher v. SmithKline Beecham Corp.*,
   132 S. Ct. 2156 (2012).............................................................................24

*Duncan v. Walker*,
   533 U.S. 167 (2001) .................................................................................14

*EEOC v. Aramark Corp.*,
   208 F.3d 266 (D.C. Cir. 2000)..................................................................13

*FCC v. Fox Television Stations, Inc.*,
   132 S. Ct. 2307 (2012).......................................................................24, 25

*First Nat. Maint. Corp. v. NLRB*,
   452 U.S. 666 (1981) .................................................................................15

*Freeman v. Quicken Loans, Inc.*,
   132 S. Ct. 2034 (2012).............................................................................22

*Glover v. Standard Fed. Bank*,
   283 F.3d 953 (8th Cir. 2002)....................................................................11

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010) .................................................................................13

*King v. Burwell*,
   135 S. Ct. 2480 (2015).............................................................................14

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014).................................................................23

*NLRB v. Health Care & Ret. Corp. of Am.*,
511 U.S. 571 (1994) ..............................................................22

*Perez v. Mortg. Bankers Ass'n*,
135 S. Ct. 1199 (2015) ...........................................................23

*Union of Concerned Scientists v. Nuclear Regulatory Comm'n*,
711 F.2d 370 (D.C. Cir. 1983) ...............................................23

## STATUTES

12 U.S.C. § 2601 .......................................................................14

12 U.S.C. § 2607 .........................................................................6

12 U.S.C. § 2607(a) ......................................................... 10, 11, 12

12 U.S.C. § 2607(c)(2) ....................................................... 9, 11, 12

12 U.S.C. § 2607(d) ..................................................................17

12 U.S.C. § 2607(d)(3) ...............................................................13

12 U.S.C. § 2617(b) ...................................................................14

Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801, *et seq*. ..............5

## OTHER AUTHORITIES

12 C.F.R. § 1024.14 ..............................................................18, 23

12 C.F.R. § 1024.14(a)-(b) ..........................................................17

12 C.F.R. § 1024.14(a), (b), (g) ................................................17, 18

12 C.F.R. § 1024.14(b) ...............................................................17

12 C.F.R. § 1024.14(g)(1)(iv) ......................................................17

12 C.F.R. § 1024.14(g)(2) ...........................................................17

Antonin Scalia & Bryan A. Garner, *Reading Law* 183 (2012) ............12

Brief for the Intervenor United States in Support of Reversal, *Carter v. Welles-Bowen Realty, Inc.*,
628 F.3d 790 (6th Cir. 2011), 2011 WL 1554345 ....................................... 20

Brief for the United States as Amicus Curiae, 2011 WL 1979649, *First Am. Fin. Corp. v. Edwards*,
132 S. Ct. 2536 (U.S. May 18, 2011) ....................................................20 n.3

Brief for the United States as Amicus Curiae Supporting Reversal, 2014 WL 3759909, *Santiago v. GMAC Mortgage Grp., Inc.*,
417 F.3d. 384 (3d Cir. Feb. 4, 2004) ....................................................20 n.3

Brief for the United States as Amicus Curiae Supporting Reversal, *Boulware v. Crossland Mortg. Corp.*,
291 F.3d 261 (4th Cir. 2002), 2002 WL 32351432.................................... 20

Economic Research & Data: Mortgage Debt Outstanding, Bd. Of Governors of the Fed. Reserve Syst. (Sept. 2015).................................................. 5 n.1

Home Warranty Companies' Payments to Real Estate Brokers and Agents,
75 Fed. Reg. 36271 (June 25, 2010)........................................................... 19

HUD Statement of Policy 1996-3: Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29264 (June 7, 1996) ......................................... 19

Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569,
(July 21, 2011)............................................................................... 7, 18, 22

Injunction, *Baynham v. PMI Mortg. Ins. Co.*,
No. 1:99-cv-00241-AAA (S.D. Ga. June 25, 2001), Dkt. 176....................... 21

James J. Pannabecker & David Mcf. Stemler, *Lawyers Beware! RESPA Is Not Just a Consumer Disclosure Statute!*, 123 Banking L.J. 454 (2006)....19 n.2

Letter from Nicolas P. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to Sandor Samuels, Gen. Counsel, Countrywide Funding Corp.
(Aug. 6, 1997) ..................................................................................... 8, 21

Real Estate Settlement Procedures, 41 Fed. Reg. 13032 (March 29, 1976).......... 19

RESPA Statement of Policy 1999-1: Statement Regarding Lender Payments,
64 Fed. Reg. 10080 (Mar. 1, 1999) ...........................................................7

RESPA Statement of Policy 2001-1: Clarification of Statement Regarding
    Lender Payments, 66 Fed. Reg. 53052 (Oct. 18, 2001)........................... 7, 19

Robert M. Jaworski, *The RESPA Soap Opera Continues for Another Year*,
    53 Bus. Law. 995 (May 1998).................................................................. 21

S. Rep. No. 93–866 (1974), as reprinted in 1974 U.S.C.C.A.N. 6546...... 11, 14, 16

# GLOSSARY

| Bureau | Consumer Financial Protection Bureau |
|---|---|
| HUD | United States Department of Housing and Urban Development |
| HUD Captive Reinsurance Letter | Letter from N. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to S. Samuels, Countrywide Funding Corp. (Aug. 6. 1997) |
| Order | Decision and Order of the Director, *In re PHH Corp.*, No. 2014-CFPB-00002, Dkts. 226 & 227 (June 4, 2015) |
| PHH | Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC |
| RESPA | Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601, *et seq.* |

Amici Curiae respectfully submit this brief in support of petitioners and vacatur.

## INTEREST OF AMICI CURIAE

Amici represent a wide spectrum of home lending and building industry participants that are subject to the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.* Amici and their members have a strong interest in the proper construction and application of the laws and regulations governing their conduct. They also have a strong interest in ensuring that any changes to regulators' interpretations of these laws and regulations are made with adequate notice, rather than as part of enforcement actions penalizing conduct that conforms to long-settled interpretations.

The American Financial Services Association (AFSA) is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA's membership ranges from international financial services firms to single-office, independently owned consumer finance companies. The association represents financial services companies that lead their markets and conform to the highest standards of customer service and ethics.

The Consumer Bankers Association (CBA) is the only national financial trade group focused exclusively on retail banking and personal financial services—banking services geared toward consumers and small businesses. As the

recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation on those issues.  CBA members include most of the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the industry's total assets.

The Financial Services Roundtable (FSR) represents 100 of the largest integrated financial services companies providing banking, insurance, and investment products and services to the American consumer.  Roundtable member companies account for $92.7 trillion in managed assets, $1.2 trillion in revenue, and 2.3 million jobs.  The Roundtable's Housing Policy Council comprises thirty-two companies that are among the nation's leaders in mortgage finance.  Member companies originate seventy-five percent of the mortgages for American home buyers and provide mortgage insurance and servicing to the majority of American home owners.

The Independent Community Bankers of America (ICBA), the nation's voice for more than 6,000 community banks of all sizes and charter types, is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. With 52,000 locations nationwide, community banks employ 700,000 Americans, hold $3.6 trillion in assets, $2.9 trillion in deposits, and $2.4 trillion in loans to consumers, small businesses,

and the agricultural community.  Community banks, which hold $576 billion in residential mortgages, are a key access point to mortgage credit for American consumers, many of which are located in rural or underserved areas.

Leading Builders of America (LBA) is a national trade association representing twenty one of the nation's largest public and private homebuilders. LBA members build approximately one-third of all new homes sold in the United States each year.  LBA seeks to preserve home affordability for American families by engaging issues that impact home affordability, availability of credit, or home construction practices.

The Mortgage Bankers Association (MBA) is a national association representing the real estate finance industry.  It has more than 2,200 members comprised of real estate finance companies, mortgage companies, mortgage brokers, commercial banks, thrifts, life insurance companies, and others in the mortgage lending field.  MBA seeks to strengthen the nation's residential and commercial real estate markets, to support sustainable homeownership, and to extend access to affordable housing to all Americans.

The National Association of Home Builders (NAHB) is a trade association whose mission is to enhance the climate for housing and the building industry. NAHB's central goals are providing and expanding opportunities for safe, decent, and affordable housing.  Founded in 1942, NAHB is a federation of more than 800

state and local associations. About one-third of NAHB's more than 140,000 members are home builders or remodelers. The remaining members are associates working in closely related fields within the housing industry, such as mortgage finance. NAHB members rely on a variety of funding sources to provide financial services in the form of home loans and consumer financing for new home construction.

## INTRODUCTION AND BACKGROUND

The home lending market comprises a vast network of interdependent transactions involving a diverse array of services and service providers. The sustainability and continued growth of that market depend on clear, stable, and predictable legal rules. Indeed, legal certainty in home lending arrangements has been a foundation of the multi-trillion-dollar industry that provides housing opportunities to millions of American families.

Since its enactment in 1974, RESPA has regulated this market. As a result, thousands of home lenders and other service providers have endeavored to conform their conduct to RESPA's requirements. The enforcement action by the Consumer Financial Protection Bureau ("Bureau") at issue here has dramatically disrupted long-settled understandings of what RESPA permits and prohibits, caused serious uncertainty, and chilled lawful, economically valuable transactions. *See* Decision and Order of the Director, *In re PHH Corp.*, No. 2014-CFPB-0002,

Dkts. 226 & 227 (June 4, 2015) ("Order").  That the Bureau did so without prior notice—or input from stakeholders—has significantly compounded its negative impact.

Today, the housing market accounts for more than ten percent of gross domestic product, with outstanding home loans totaling nearly ten trillion dollars nationwide.[1]  Likewise, construction and other spending on housing are critical indicators of the economy's health.  Consumers seeking to purchase homes or refinance existing loans enjoy a wide array of products, including varied terms; fixed, adjustable, and hybrid interest rates; and secured lines of credit.  At the other side of the table, homebuilders rely on the market providing buyers efficient availability of mortgage credit, without which few home purchases could take place.

The availability of home loans depends on cooperation among numerous lenders, agents, and institutions.  In 2014 alone, there were more than 7,000 home lenders across the country according to data reported under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801, *et seq*.  Additional lenders, such as some AFSA member companies, some ICBA member community banks, and other

---

[1] *See, e.g.*, Economic Research & Data: Mortgage Debt Outstanding, Bd. Of Governors of the Fed. Reserve Syst., (Sept. 2015), *available at* http://www.federalreserve.gov/econresdata/releases/mortoutstand/current.htm (last visited Oct. 5, 2015).

mortgage originators also provide home loans but are not required to report HMDA data. The ranks of home lenders include state and federally chartered depository institutions, independent mortgage companies, installment lenders, correspondent lenders, and housing finance authorities.

To originate a home loan, it must go through an extensive process, including application, underwriting, and ultimately settlement, commonly called a "closing." The closing process involves extensive due diligence, the execution of legal documents, and numerous other tasks. For those critical functions, home lenders and consumers depend on the millions of specialized settlement service providers around the country, including real estate agents and brokers; mortgage brokers; attorneys; escrow agents; and providers of appraisals, property surveys, credit reports, homeowner's insurance, flood insurance, property inspections, title reviews, and title insurance. To ensure the timely and efficient closing of loans, home lenders, home builders, and settlement service providers have created interdependent and industry-standard relationships that enable lenders of all sizes to serve consumers' credit needs.

RESPA Section 8 regulates relationships among settlement service providers. These market participants have for decades ordered their affairs around a settled understanding of Section 8 long shared by government regulators:

although the law prohibits kickbacks and referral fees, it *permits* arrangements to provide goods and services for reasonable compensation. *See* 12 U.S.C. § 2607.

That objective standard was the construction of RESPA repeatedly emphasized by the Department of Housing and Urban Development (HUD). HUD's relevant regulations and policy statements were the product of notice-and-comment rulemaking or other processes involving significant stakeholder input. After Dodd-Frank transferred RESPA authority from HUD to the Bureau, the Bureau adopted not only HUD's regulations, but also its "official commentary, guidance, and policy statements." *See* Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569, 43570 (July 21, 2011).

The Bureau's adopted commentaries and policy statements included a number of published declarations addressing Section 8 of RESPA and the meaning of its interrelated subsections. According to those official statements, HUD viewed Section 8(c)(2) (permitting "bona fide" payments "for services actually performed") as an exemption to Section 8(a)'s general prohibition that would be applicable where "the price paid for the . . . services is truly a market price"—*i.e.*, when "a purchaser would buy the services at or near the amount charged" "in an arm's length transaction." *See, e.g.*, RESPA Statement of Policy 1999-1: Statement Regarding Lender Payments, 64 Fed. Reg. 10080, 10084–85, 10087 (Mar. 1, 1999) ("1999 Policy Statement"); *see also* RESPA Statement of Policy

2001-1: Clarification of Statement Regarding Lender Payments, 66 Fed. Reg. 53052, 53054, 53059 (Oct. 18, 2001) ("2001 Policy Statement") (same).

Additionally, HUD issued "official . . . guidance" providing the agency's considered judgment on captive reinsurance arrangements. *See* Letter from Nicolas P. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to Sandor Samuels, Gen. Counsel, Countrywide Funding Corp. (Aug. 6, 1997). That guidance—which has come to be known throughout the industry as "the HUD Captive Reinsurance Letter"—stated the government's view that RESPA allowed captive reinsurance under certain conditions similar to those later articulated in the 1999 and 2001 Policy Statements. *See id.* at 3, 6–7. Industry and others relied on such guidance to establish and maintain a housing finance system that, based on MBA's survey data, today facilitates homeownership for approximately 48 million families in this country.

The penalty imposed in this case renounces the government's longstanding (and correct) understanding of what RESPA requires. In doing so, the Bureau has severely undermined deeply settled reliance interests, to the detriment of Amici, their members, and the customers they serve. The Bureau's action suffers from numerous legal defects and should be vacated.

## SUMMARY OF ARGUMENT

I.      The Order cannot be reconciled with RESPA, the Bureau's governing regulations, or longstanding policy guidance.

A.      The Order contravenes the text, structure, and purpose of RESPA. Section 8(c)(2) of the statute provides that "[n]othing in [Section 8] shall be construed as prohibiting" (1) "bona fide" payments (2) "for services actually performed."    12 U.S.C. § 2607(c)(2).    The Order contravenes the text by erroneously relegating Section 8(c)(2) to a mere rule of construction, rather than treating that provision as the exemption to liability that it is.   The Order also conflicts with the statute's structure by mistakenly equating "bona fide" with subjective "purpose," when the language of RESPA as a whole shows that Congress intended the term "bona fide" to mean "reasonable" in an objective, market-value sense.

B.      The Order is likewise inconsistent with the Bureau's binding regulations.   Those regulations permit precisely the sorts of payments involved in captive reinsurance arrangements.

C.      The Order also rejected the agency's longstanding positions on Section 8(c)(2) generally and captive reinsurance arrangements specifically.   In policy statements and amicus briefs, the government routinely defined Section 8(c)(2) in terms of objective, economic reasonableness—not the subjective

purposes of industry participants. Similarly, in the HUD Captive Reinsurance Letter, the government explained the ways in which captive reinsurance arrangements could comply with RESPA.

II.     In abandoning or rejecting the statutory, regulatory, and policy materials on which the industry had relied for decades, the Order exceeded the Bureau's statutory authority and violated fundamental tenets of administrative law and fair notice. The Order has also raised the troubling specter of further changes without notice, deeply unsettling a market built on predicable legal rules.

## ARGUMENT

### I.  THE ORDER CONFLICTS WITH RESPA, APPLICABLE REGULATIONS, AND LONGSTANDING POLICY GUIDANCE UPON WHICH AMICI'S MEMBERS HAVE RELIED

#### A.  The Order Rests On A Misreading Of RESPA

##### 1. *The Order's construction of Section 8 contravenes the text and structure of the statute*

The Order's interpretation of Section 8 of RESPA cannot be reconciled with the statute's plain terms—on which Amici and other market participants have relied for decades. In full, Section 8(a) of RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).

10

To mitigate the breadth of this provision, Congress enumerated a set of exemptions to liability in Section 8(c). *See id.* § 2607(c); *see also* S. Rep. No. 93–866, at 7 (1974), as *reprinted in* 1974 U.S.C.C.A.N. 6546, 6552 (Section 8(c) "sets forth the types of legitimate payments that would not be proscribed"). As relevant here, Section 8(c)(2) provides that:

> Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.

12 U.S.C. § 2607(c)(2).

As explained below, governing regulations, policy statements, and judicial decisions have interpreted this provision according to its plain terms to permit payments (1) for goods or services actually provided, whose amounts are (2) reasonably related to market value of those goods or services. *See, e.g.*, *Glover v. Standard Fed. Bank*, 283 F.3d 953, 964 (8th Cir. 2002) (stressing that Section 8(c) "clearly states that reasonable payments" for actual goods or services "are *not prohibited* by RESPA, even when done in connection with [a] referral of a particular loan to a particular lender").

Here, the Order rests on a misreading of RESPA in at least two respects. **First**, according to the Order, the word "construed" in Section 8(c)(2) means that the provision is not "an exemption" to liability. Order 15–16. Rather, relying on repudiated case law, *see* PHH Br. 36 n.5, the Order read the term "construed" as

limiting Section 8(c)(2) to a mere clarifying (and virtually meaningless) "gloss" on Section 8(a).  Order 15–16.

That interpretation is wrong and unworkable for the organizations represented by Amici.  As its plain language and legislative history make clear, Section 8(c)(2) can *only* be read as an exemption to Section 8(a).  As noted, Section 8(a) enacts a general prohibition on any payment made "*pursuant to*" a referral agreement, thus sweeping up every payment connected in any way to a referral.  12 U.S.C. § 2607(a) (emphasis added).  At the same time, Section 8(c)(2) specifically allows payments made "*for*" actual services, which obviously connotes a narrower class of payments involving a direct exchange.  *Id.* § 2607(c)(2) (emphasis added).

But because a lawful payment "for" actual services might also be made "pursuant to" a referral agreement, Section 8(c)(2) can only be read to permit conduct that Section 8(a) would otherwise prohibit.  And when, as here, "a general prohibition" is "contradicted by a specific permission," the "specific provision is treated as an exception to the general rule."  Antonin Scalia & Bryan A. Garner, *Reading Law* 183 (2012).  In other words, because Sections 8(a) and 8(c)(2) "provide mutually exclusive results," "the more specific statute"— Section 8(c)(2)—must carve out "an exception to the more general one."  *Chem. Mfrs. Ass'n v. EPA*, 673 F.2d 507, 512 (D.C. Cir. 1982).

*Second*, the Order also misinterpreted Section 8(c)(2) by reading atextual requirements into the statute.  Under the Order, no payment is "bona fide" unless it is made "solely for the service actually being provided *on its own merits*."  Order 17 (emphasis added).  The Order thus construed the phrase "bona fide payment" as a pretext-revealing condition designed to scrutinize "the *purpose* of the payment"—*i.e.*, a payment is "bona fide" only if "made for the services themselves, not as a *pretext* to provide compensation for a referral."  *Id.* (emphases added).  According to the Order, "even a reasonable payment may not be 'bona fide' if it is not made solely for the services but also for a referral."  *Id.*

The Order clearly erred in conflating "bona fide payment" with a payment having a "good faith" "purpose."  *Id.*  In a variety of contexts, Congress does not use "bona fide" to denote good faith or any other form of intent.  Indeed, RESPA itself includes a provision treating "intent[]" and "bona fide" as separate elements. 12 U.S.C. § 2607(d)(3); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 591–93 & n.13 (2010) (defining a "bona fide error" in terms of the *type* of error rather than the intent of the actor—and relying on HUD's construction of "bona fide error" in RESPA (citing 12 U.S.C. § 2607(d)(3))); *EEOC v. Aramark Corp.*, 208 F.3d 266, 269–73 (D.C. Cir. 2000) (noting that a "benefit plan" is "bona fide" under the ADA if "it exists and pays benefits," without regard to intent (citing 42 U.S.C. § 12201(c)(3))).

13

When Congress wanted to create a purpose-based exemption in RESPA, it expressly used the term "good faith." *See, e.g.*, 12 U.S.C. § 2617(b). But Congress did not do so in Section 8. *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) ("Congress acts intentionally" when, as here, it "includes particular language in one section of a statute but omits it in another section").

## 2. *The Order's construction of Section 8 conflicts with Congress's clearly expressed purposes*

The Order's reading of Section 8 is inconsistent with the statute's purposes. *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan.").

Congress designed RESPA to strengthen the homeownership market by targeting certain conduct that impaired the market's stability and growth and caused unnecessary costs. *See, e.g.*, 12 U.S.C. § 2601; *see also* S. Rep. No. 93–866, at 2, 13 (addressing "unreasonable practices" that had "depressed the housing market"). But here, by inventing a new "purpose" standard for Section 8(a) and prohibiting economically reasonable agreements, the Order harms the very markets Congress sought to bolster.

*First*, the Order undermines the purposes of RESPA by clouding the standard for liability and thus chilling reasonable, efficient transactions. A "free market for settlement services" cannot "function at maximum efficiency" as Congress intended, *see* S. Rep. No. 93–866, at 2, unless regulated entities "have

some degree of certainty beforehand as to when" they may engage in economically reasonable transactions "without fear of later evaluations labeling [their] conduct" unlawful, *cf. First Nat. Maint. Corp. v. NLRB*, 452 U.S. 666, 679 (1981).

Here, the Order failed to articulate a discernable rule distinguishing a proper "purpose" from an improper one—and there is none. In particular, the Order noted that an "unreasonably high" payment "may suggest" an improper purpose, but said little about how regulated entities can structure their transactions to avoid RESPA liability when their payments *are* "reasonable." Order 17.

***Second***, even if the standard were clear, the Order's focus on "purpose" is not consistent with RESPA's underlying aims. Because markets function or fail based on the *behavior* of market actors—not their *purposes*—the mental state of service providers was undoubtedly irrelevant to Congress. As noted, the home-loan industry involves interdependent, multi-party agreements involving firms that typically comprise numerous, independent decisionmakers. Such complicated, multi-actor financial transactions do not lend themselves to discrete, all-encompassing purposes. The Order, therefore, did not present a plausible construction of Congress's legislative plan in holding that RESPA liability should turn on the subjective "purpose" of a payment or the Bureau's whole-cloth speculation about "pretext."

15

A simple hypothetical example highlights the problem with the Bureau's "sole purpose" approach: A home builder has a lending affiliate that hires a well-regarded local property inspector to review a tract of homes before sale so that they can identify and remedy any issues. Assume that the pricing for those property inspection services is fair and reasonable. Apart from being delighted to do that work, the property inspector hopes that in the course of that engagement she will impress the home builder and its lender with her subject matter expertise, customer service, and professionalism. Even more specifically, she plans for the builder and lender to refer her to consumers looking for property inspections in connection with a home purchase because of her good work. In fact, the property inspector does such a good job that the builder and its lender refer several consumers looking to purchase one of their homes to the property inspector, and those consumers hire her to do the needed property inspections. She does not pay for the referrals.

Amici respectfully submit that such arrangements were precisely what Congress intended to insulate from RESPA liability. *See* S. Rep. No. 93-866 (stressing that "[r]easonable payments in return for services actually performed . . . are not intended to be prohibited"). But under the Order, even if the property inspector's compensation for the separate pre-sale review was "reasonable," Order 17, her hope that it would lead to the referral of customers for settlement service business (property inspections) could incur RESPA liability—

including *criminal* sanctions of up to one year in prison, *see* 12 U.S.C. § 2607(d). Congress could not have intended such a result.

### B.    The Order Contravened The Bureau's Own Regulations

Not only does the Order conflict with RESPA, but it also contravenes the Bureau's own rules implementing the statute.

The Bureau's binding regulations provide that bona fide compensation payments for goods or services, such as reasonable reinsurance premiums, are exempt from liability under Section 8(c)(2). Specifically, under 12 C.F.R. § 1024.14(b), "referral[s] of a settlement service" that are "set forth in § 1024.14(g)(1)" constitute legitimate "compensable service[s]" and will not therefore be considered "a violation of section 8." *Id.* § 1024.14(a)–(b). Section 1024.14(g)(1), in turn, provides that "Section 8 of RESPA *permits*" "bona fide . . . payment[s] for . . . services actually performed." *Id.* § 1024.14(g)(1)(iv) (emphasis added). And, under governing regulations, a payment is "bona fide" when it "bears [a] reasonable relationship to the market value of the goods or services provided." *See id.* § 1024.14(g)(2).

Thus, payments bearing a "reasonable relationship to the market value of the goods or services provided" are not "a violation of section 8"—even if characterized as "referral[s] of a settlement service." *Id.* § 1024.14(a), (b), (g). Because such payments are "set forth in § 1024.14(g)(1)," the Bureau's regulations

place them within a class of "compensable" "referral[s] of a settlement service" that "Section 8 of RESPA *permits*." *See id.* (emphasis added). The upshot of the Bureau's own regulations is that captive reinsurance premiums and other payments are lawful under Section 8(a) when "reasonabl[y] relat[ed] to the market value" of the goods or services provided. *See id.*

The Order, however, virtually ignored these regulations and instead adopted a construction of the statute in conflict with them. Whereas the regulations "permit[]" "bona fide" referral payments that would otherwise be prohibited, *see* 12 C.F.R. § 1024.14, the Order held that a payment can never be "bona fide" if it "is tied in *any way* to a referral of business," *see* Order 16–17 (emphasis added). Thus, in direct conflict with the regulations, the Order provides that "Section 8 of RESPA [does not] permit" *any* referral payment—*regardless* of whether it satisfies the criteria "set forth in § 1024.14(g)(1)." *But see* 12 C.F.R. § 1024.14.

## C.    The Order Ignored The Bureau's Longstanding Policy Statements And Public Guidance Materials

When the Bureau assumed HUD's enforcement mandate in July 2011, it pledged to "appl[y]" its predecessor's "official commentary, guidance, and policy statements" until further notice. *See* 76 Fed. Reg. 43569, 43570. The Bureau also assured Amici and the public that it would "give due consideration to the application of other written guidance, interpretations, and policy statements issued" by HUD. *Id.*

18

HUD's "official commentary, guidance, and policy statements" included a number of detailed policy statements addressing Section 8. HUD consistently instructed that payments need only be "reasonably related to the value of the . . . services that were actually performed" in order to avoid Section 8 liability. *See, e.g.*, 2001 Policy Statement, 66 Fed. Reg. 53052, 53054; *see also* Home Warranty Companies' Payments to Real Estate Brokers and Agents, 75 Fed. Reg. 36271, 36272 n.1 (June 25, 2010) (same). Indeed, beginning with its first RESPA rulemaking, and continuing throughout the 1990s, HUD explained that "a fee would not be in violation of RESPA Section 8" if it "b[ore] a reasonable relationship to the value of [the] services." *See* Real Estate Settlement Procedures, 41 Fed. Reg. 13032, 13036–38 (March 29, 1976); *see also* HUD Statement of Policy 1996-3: Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29264, 29265 (June 7, 1996) (interpreting "Section 8 of RESPA and its implementing regulations to allow payments" that "are reasonably related to the general market value of the . . . services actually furnished"). That understanding of RESPA took firm roots in the home lending industry.[2]

---

[2] *See, e.g.*, James J. Pannabecker & David Mcf. Stemler, *Lawyers Beware! RESPA Is Not Just a Consumer Disclosure Statute!*, 123 Banking L.J. 454, 463 (2006) (articulating the "basic rule" that "anyone" participating "in the residential mortgage loan settlement process should follow: Be sure all fees paid or received are being paid and received for services actually rendered, and are reasonable compensation for those services").

Likewise, HUD and the Bureau consistently represented to the judiciary that, under Section 8(c)(2)'s "*exception*," the "prohibition of kickbacks and unearned fees does not apply to 'bona fide . . . payment[s] . . . for services actually performed.'" *See, e.g.*, Brief for the Intervenor United States in Support of Reversal, *Carter v. Welles-Bowen Realty, Inc.*, 628 F.3d 790 (6th Cir. 2011) (No. 10-3922), 2011 WL 1554345, at *4 (emphasis added). Moreover, the government suggested that the phrase "*bona fide*" payment "*for services actually performed*" turns on the "correlation between the cost of a settlement service and the work that is actually performed." Brief for the United States as Amicus Curiae Supporting Reversal, *Boulware v. Crossland Mortg. Corp.*, 291 F.3d 261 (4th Cir. 2002) (No. 01-2318), 2002 WL 32351432, at *8 (emphases in original).[3]

Consistent with the settled understanding of Section 8, the HUD Captive Reinsurance Letter provided that captive reinsurance arrangements were "permissible under RESPA" when "the payments to the reinsurer"—

---

[3] *See also, e.g.*, Brief for the United States as Amicus Curiae, 2011 WL 1979649, at *2, *First Am. Fin. Corp. v. Edwards*, 132 S. Ct. 2536 (U.S. May 18, 2011) (No. 10-708) (explaining that Section 8(c) provides "exceptions"); Brief for the United States as Amicus Curiae Supporting Reversal, 2004 WL 3759909, at *28, *Santiago v. GMAC Mortgage Grp., Inc.*, 417 F.3d 384 (3d Cir. Feb. 4, 2004) (No. 03-4273) ("Congress was clear that for payments to be legal under Section 8, they must bear a reasonable relationship to the value received by the person or company making the payment.").

(1) were "for reinsurance services 'actually furnished or for services performed'" (which the Letter explained turned on the existence of "a real transfer of risk"); and

(2) were "<u>bona fide</u> compensation . . . not exceed[ing] the value of such services."

*See* HUD Captive Reinsurance Letter at 3, 6–7.  Reliance on the Letter was immediate.  *See, e.g.*, Robert M. Jaworski, *The RESPA Soap Opera Continues for Another Year*, 53 Bus. Law. 995, 1008–09 (May 1998).

Indeed, the HUD Captive Reinsurance Letter's construction of Section 8(c)(2) was later implemented in a series of nationwide injunctions.  Those injunctions provided that captive reinsurance arrangements would be deemed RESPA-compliant if the parties obtained in advance an actuarial opinion certifying that (1) the arrangements transferred real risk to the captive reinsurer, and (2) the premiums paid were commensurate with that risk.  *See, e.g.*, Injunction, ¶¶ 2, 7, *Baynham v. PMI Mortg. Ins. Co.*, No. 1:99-cv-00241-AAA (S.D. Ga. June 25, 2001), Dkt. 176.  Industry participants that did not already meet the injunction's requirements modified their behavior accordingly.

The Order, however, dismissed the HUD Captive Reinsurance Letter as "not binding" and the reliance interests of the industry as "not particularly germane." *See* Order 17–19.  Instead, the Order focused on the letter's "form" and the fact that it was not "published in the Federal Register." *Id.*  But in doing so, the Order failed to "give due consideration" to the Letter's "written guidance" and

21

"interpretations" of Section 8(c)(2), *cf.* 76 Fed. Reg. 43569, 43570—which, as noted, had engendered substantial, justifiable reliance from the courts and the public.

## II.   THE ORDER EXCEEDED THE BUREAU'S STATUTORY AUTHORITY AND VIOLATED FUNDAMENTAL TENETS OF ADMINISTRATIVE LAW AND FAIR NOTICE

As discussed above, the Order is fundamentally inconsistent with RESPA, the Bureau's own regulations, and the government's longstanding policy statements. Each of these sources of authority presents an independent reason for vacating the Order.

*RESPA.*   No agency possesses authority to deviate from the plain language of its governing statutes.  *See, e.g.*, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2039–44 (2012) (denying deference to the Bureau's interpretation of RESPA Section 8(b)).  And because Section 8(c)(2) can only fairly be read as an exemption to Section 8(a), *see supra* at 10–17, this Court should vacate the Order's contrary holding.  *See, e.g.*, *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 580 (1994) ("Whether the [agency] proceeds through adjudication or rulemaking, the statute must control the [agency's] decision, not the other way around.").

*Regulations.*   Because the Order cannot be reconciled with the binding language of the Bureau's regulations, *see supra* at 17–18, the regulations must prevail and the Order must be vacated.  *See, e.g.*, *Brock v. Cathedral Bluffs Shale*

*Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.) ("It is axiomatic that an agency must adhere to its own regulations."); *Union of Concerned Scientists v. Nuclear Regulatory Comm'n*, 711 F.2d 370, 381 (D.C. Cir. 1983) ("[T]he agency is bound by its own rules.").

Regulations promulgated through notice-and-comment procedures can be repealed or amended only through the same procedures "used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015). Agencies therefore may not construe such rules unreasonably or alter them through ad-hoc adjudication. *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1020–25 (D.C. Cir. 2014).

Here, the practical import of the Order is to abandon the relevant RESPA regulation, 12 C.F.R. § 1024.14—which "permits" the very practices that subjected PHH to a $109 million penalty. But the Bureau cannot abandon such regulations without issuing a notice of proposed rulemaking and soliciting comments on its proposed amendments. The notice-and-comment process produces better rules than ad-hoc enforcement, since the rulemaking process necessarily requires the Bureau to consider the informed views of industry and consumers. Moreover, because the changes adopted through that process would be prospective only, affected parties could order their affairs with full notice of governing law.

*Fair notice*.  The Bureau failed to provide fair notice in departing from binding regulations and justifiably relied-upon policy materials and then imposing penalties based on the new interpretation.  This provides another basis for vacating the Order.

"[R]egulated parties" are entitled to "fair warning of the conduct [a regulation] prohibits or requires."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012).  Thus, an agency may not "change[] course" and sanction private parties under a "new principle" without first giving notice "that its interpretation ha[s] changed."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2318 (2012).  That rule is particularly important here, given the strength of reliance by Amici's members on well-established legal principles to organize and facilitate the multi-trillion dollar homeownership market.  Such reliance on long-established RESPA principles is far from a mere technical reading of a federal statute.  RESPA's purpose was to impose market discipline, and the statute, regulations, policy statements, interpretations, and guidance are far more than just "do's and don'ts" for market participants.

As demonstrated above, the Order admittedly "reject[ed]" the settled interpretation of Section 8 of RESPA, the Bureau's governing regulations, and other longstanding regulatory guidance.  *See supra* at 10–22; Order 16–18.  And the Bureau did so in an enforcement proceeding imposing a $109 million penalty

on a party that had relied on the now-rejected interpretation.  The Order therefore fails to honor "the protections provided by the Due Process Clause of the Fifth Amendment."  *See Fox Television*, 132 S. Ct. at 2317.

By altering the Bureau's rules through an enforcement action and without notice to affected parties, the Order harms the industry and consumers.  The industry, for example, can no longer focus simply on creating objectively reasonable transactions.  It must instead now attempt to decipher and satisfy the Order's new test.  But given the practical impossibility of knowing how the Bureau will—with the benefit of hindsight—choose to characterize the "purpose" of a fairly priced transaction, the Order's new standard is unworkably vague.

Indeed, the Order has already caused some of Amici's members to abandon economically reasonable, historically permissible practices.  After all, like any rational business, a participant in the home loan industry invariably hopes that everything it does will improve its business relationships and strives to fully comply with the law.  The risk that economically reasonable transactions with garden-variety commercial motivation will now be subject to RESPA penalties will drastically chill the productive arrangements that ultimately reduce the cost of home loans for consumers.  Other members of Amici's organizations may perceive the risks generated by the Order more narrowly and not change their practices.

The result is an uneven playing field, with different market participants effectively following different legal rules.

The Order, and its regulation-through-enforcement approach, will produce an unfair, unbalanced playing field in other ways as well. Many lenders simply cannot afford the compliance costs necessary to glean the Bureau's legal rules through piecemeal analysis of every enforcement action, consent decree, and decision issued by the Bureau. Given the cost of such regulatory uncertainty, smaller entities may simply exit the marketplace—thus reducing the choices of, and increasing the costs to, the very consumers the Bureau is charged with protecting.

In sum, the Order's imposition of a $109 million penalty without fair notice is not only grossly unfair to petitioners, but is also deeply unsettling for participants in the home lending market. The Bureau has demonstrated a willingness to impose massive liability on a party that acted in reliance on governing regulations and the government's longstanding policy guidance. If the Order is permitted to stand, participants in the home lending market will understandably ask what currently permissible conduct will be next to incur punitive fines and penalties—and who will be the next target of such unforeseen, retroactive lawmaking. The fair notice rule of the Due Process Clause prohibits just such outcomes.

**CONCLUSION**

For the foregoing reasons, Amici Curiae support petitioners' request that the

Order be vacated.

Respectfully submitted,


Dated: October 5, 2015

Michael J. Agoglia
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-6057

By:    /s/ Joseph R. Palmore
     Joseph R. Palmore
     Donald C. Lampe
     Bryan J. Leitch
     MORRISON & FOERSTER LLP
     2000 Pennsylvania Avenue, NW
     Washington, DC  20006
     Telephone: (202) 887-6940
     JPalmore@mofo.com

     Attorneys    for    *Amici    Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a) and Circuit Rule 32(a), I hereby certify that this Brief has been prepared in proportionally-spaced Times New Roman 14-point typeface, and contains 5,751 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(2).


/s/ Joseph R. Palmore
Joseph R. Palmore

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on October 5, 2015.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Joseph R. Palmore
Joseph R. Palmore