**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 15–1177**

# United States Court of Appeals for the D.C. Circuit

———————————

PHH CORPORATION, PHH MORTGAGE CORPORATION, PHH HOME LOANS, LLC, ATRIUM INSURANCE CORPORATION, AND ATRIUM REINSURANCE CORPORATION,

*Petitioners*,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

*Respondent.*

———————————

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

———————————

On Petition For Review Of An Order Of The Consumer Financial Protection Bureau

———————————

Kate Comerford Todd
Steven P. Lehotsky
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5337

Andrew J. Pincus
Stephen C.N. Lilley
Matthew A. Waring
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
*apincus@mayerbrown.com*

*Counsel for The Chamber of Commerce of the United States of America*

## CERTIFICATE OF PARTIES, RULINGS,
## AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

A.  <u>Parties and Amici</u>. All parties and intervenors appearing before the Consumer Financial Protection Bureau ("the Bureau") and in this Court appear in the Brief for Petitioners. It is our understanding that five additional amici intend to file briefs in support of Petitioners.

B.  <u>Ruling Under Review</u>. An accurate reference to the ruling at issue appears in the Brief for Petitioners.

C.  <u>Related Cases</u>. An accurate statement regarding related cases appears in the Brief for Petitioners.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, amicus curiae the Chamber of Commerce of the United States of America hereby submits the following corporate disclosure statement:

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

All parties have consented to the filing of this brief.† The Chamber filed its notice of its intent to participate in this case as *amicus curiae* on October 5, 2015.

Pursuant to Circuit Rule 29(d), the Chamber certifies that a separate brief is necessary to provide the perspective of the businesses that the Chamber represents, including consumer financial services companies regulated by RESPA and businesses subject to the eighteen other statutes enforced by the Bureau, regarding the importance of legal certainty and compliance with basic due process and statutory interpretation principles to the operations of competitive markets.

---

† No counsel for a party authored this brief in whole or in part, and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(c)(5).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS,  AND RELATED
CASES PURSUANT TO CIRCUIT RULE 28(a)(1) ........................ i

CORPORATE DISCLOSURE STATEMENT............................................ ii

STATEMENT REGARDING CONSENT TO FILE AND
SEPARATE BRIEFING ................................................................ iii

TABLE OF AUTHORITIES ..................................................................... vi

GLOSSARY ............................................................................................... ix

STATUTES AND REGULATIONS ........................................................ 1

INTEREST OF THE AMICUS CURIAE ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT........................... 1

ARGUMENT ........................................................................................... 3

I.    BUSINESSES AND CONSUMERS NEED REGULATORY
CERTAINTY................................................................................. 3

II.   THE BUREAU'S ORDER VIOLATES DUE PROCESS AND
BASIC PRINCIPLES OF STATUTORY
INTERPRETATION.................................................................... 5

A.   Overturning Settled Legal Interpretations During An
Enforcement Action Violates Due Process............................. 5

1.   Due process requires "fair notice." ............................... 6

2.   The Bureau penalized Petitioners based on a
novel interpretation of RESPA starkly
inconsistent with past precedent. ............................... 12

## TABLE OF CONTENTS—continued

**Page**

B.  Congress Did Not Intend To Create Endless Legal Uncertainty By Subjecting Consumer Financial Services Companies To The Perpetual Threat Of An Administrative Enforcement Action. ................................... 15

CONCLUSION ........................................................................ 20

CERTIFICATE OF COMPLIANCE ....................................... 21

CERTIFICATE OF SERVICE............................................... 22

# TABLE OF AUTHORITIES*

**Page(s)**

CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................... 16

*Apotex, Inc. v. FDA*,
  449 F.3d 1249 (D.C. Cir. 2006) (per curiam) ....................................... 2

*AT&T Inc. v. FCC*, 452 F.3d 830 (D.C. Cir. 2006) ................................... 3

*BP Am. Production Co. v. Burton*, 549 U.S. 84 (2006) ...................... 16, 17

*\*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012) ...................................................................... 7, 15

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) .................................. 5

*Fabi Construction Co. v. Secretary of Labor*,
  508 F.3d 1077 (D.C. Cir. 2007) ............................................... 10, 11, 15

*\*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ......................................................................... 8, 9

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ............... 6, 7, 9, 14

*Kropp Forge Co. v. Sec'y of Labor*,
  657 F.2d 119 (7th Cir. 1981) ................................................................. 11

*Martin v. Occupational Safety & Health Review Comm'n*,
  499 U.S. 144 (1991) ............................................................................... 11

*Montana v. Clark*,
  749 F.2d 740 (D.C. Cir. 1984) .............................................................. 19

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) ................................................................................. 7

*Phelps Dodge Corp. v. Fed. Mine Safety & Health Review Comm'n*,
  681 F.2d 1189 (9th Cir. 1982) .............................................................. 11

---

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Rollins Envtl. Servs. (NJ) Inc. v. EPA*,
    937 F.2d 649 (D.C. Cir. 1991) ............................................ 6

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987) ........................................ 7, 10

**CONSTITUTIONAL PROVISIONS**

*U.S. Const. amend. V ............................................................. 6

**STATUTES AND REGULATIONS**

Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080 (Mar.
    1, 1999) ...................................................................... 12

Clarification of Statement of Policy Regarding Lender Payments
    to Mortgage Brokers, and Guidance Concerning Unearned Fees
    Under Section 8(b), 66 Fed. Reg. 53,052 (Oct. 18, 2001) ................... 12

Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569
    (July 21, 2011) .............................................................. 13

12 U.S.C. § 2607 ................................................................ 12, 13, 14

12 U.S.C. § 2607(a) ................................................................. 13

12 U.S.C. § 2607(c) ............................................................. 12, 13

*12 U.S.C. § 2614 ....................................................... 15, 16, 17, 18

12 U.S.C. § 5563 ..................................................................... 17

12 U.S.C. § 5564 ..................................................................... 17

12 U.S.C. § 5564(g) .................................................................. 17

12 U.S.C. § 5564(g)(2)(B) ............................................................ 18

12 U.S.C. § 5565 ..................................................................... 17

15 U.S.C. § 1681p .................................................................... 17

15 U.S.C. § 1692k(d) ................................................................. 17

28 U.S.C. § 2415(a) .................................................................. 17

## TABLE OF AUTHORITIES—continued

**Page(s)**

Pub. L. No. 111-203 § 1061(b)(7), 124 Stat. 2038.....................................4

Pub. L. No. 111-203 § 1089, 124 Stat. 2092 ...........................................4

Pub. L. No. 111-203 § 1100A, 124 Stat. 2107..........................................4

**OTHER AUTHORITIES**

Statement by the President on Financial Regulatory Reform (Mar. 22, 2010), https://www.whitehouse.gov/the-press-office/statement-president-financial-regulatory-reform ......................3

# GLOSSARY

| | |
|---|---|
| Bureau | Consumer Financial Protection Bureau |
| Dec. | *In re PHH Corp.*, Decision of the Director, Docket No. 2014-Bureau-0002, Dkt. 226 (June 4, 2015) (JA __-__) |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) |
| FCRA | Fair Credit Reporting Act |
| FDCPA | Fair Debt Collection Practices Act |
| HUD | Department of Housing and Urban Development |
| HUD Letter | Letter from Nicolas P. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to Sandor Samuels, Countrywide Funding Corp. (Aug. 6, 1997) (JA __-__) |
| RESPA | Real Estate Settlement Procedures Act |
| TILA | Truth in Lending Act |

## STATUTES AND REGULATIONS

Pertinent materials are contained in Petitioners' addendum.

## INTEREST OF THE AMICUS CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases that raise issues of concern to the nation's business community.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents for this Court's review an administrative agency decision imposing huge penalties in violation of fundamental principles of constitutional law and statutory interpretation.

The Consumer Financial Protection Bureau was created to provide clear "rules of the road" for all businesses engaged in the provision of financial services to consumers, including payment processors, lenders, and financial advisors, among many other

businesses. Its decision here creates uncertainty and unfairness in two important respects.

First, it violates the most basic requirement of due process—fair notice of what the law requires—by overturning a settled interpretation of law and then imposing a sanction of $109 million for conduct that was lawful under the longstanding prior interpretation.

Second, it claims the authority to ignore clear statutes of limitations applicable to enforcement actions brought in court whenever it exercises its unreviewable discretion to institute an administrative enforcement action.

The combination of these two rulings means that the Bureau has arrogated to itself the ability to change a settled legal interpretation, impose enormous penalties for conduct that complies with that interpretation, and to do so without regard to the limitations periods specified by Congress. That breathtaking assertion of raw administrative power, if permitted to stand, would open the door to similarly unfair and unauthorized sanctions by the Bureau, under its broad enforcement authority, and by other agencies as well. It should be set aside by this Court.

2

**ARGUMENT**

## I.  BUSINESSES AND CONSUMERS NEED REGULATORY CERTAINTY.

This Court has repeatedly recognized that uncertain regulatory standards produce inefficiency and harm competition. *See, e.g.*, *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1252 (D.C. Cir. 2006) (per curiam) (agreeing with FDA's conclusion that a regulatory test that would "undermine marketplace certainty and interfere with business planning and investment" was "ill-advised") (alterations and internal quotation marks omitted); *AT&T Inc. v. FCC*, 452 F.3d 830, 836 (D.C. Cir. 2006) (noting that "even the Commission recognizes that regulatory uncertainty in itself may discourage investment and innovation") (internal quotation marks and ellipsis omitted).

Unsure where legal lines may lie, law-abiding businesses may avoid risk by tightening underwriting requirements, eliminating product features, or exiting a product category. Competition in turn is reduced, resulting in higher prices and reduced product choice for consumers.

Legal uncertainty also may result in unfair enforcement. Vague standards allow regulators to leverage the threat of massive, but

3

uncertain, liability to secure large settlements based on claimed violations of previously unannounced standards.

The CFPB was created to "set and enforce clear rules of the road across the financial marketplace." Statement by the President on Financial Regulatory Reform (Mar. 22, 2010), https://www.whitehouse.gov/the-press-office/statement-president-financial-regulatory-reform. Indeed, Congress conferred extensive rulemaking authority under 18 statutes, including the Real Estate Settlement Procedures Act at issue here. *See* Pub. L. No. 111-203 § 1061(b)(7), 124 Stat. 1376, 2038 (2010); *see also, e.g., id.* § 1089, 124 Stat. at 2092 (Fair Debt Collection Practices Act), § 1100A, 124 Stat. at 2107 (Truth in Lending Act). Together, they permit the Bureau to regulate all segments of the consumer financial services market.

As this case illustrates, however, the Bureau has eschewed the establishment of clear rules in favor of regulation-by-enforcement and the issuance of vague "guidance." Indeed, the Bureau's approach has been criticized by the Bipartisan Policy Center, because it "often does not provide the clarity needed for covered entities to effectively comply, leading to adverse results for both consumers and covered entities."

4

Bipartisan Policy Center, The Consumer Financial Protection Bureau: Measuring the Progress of a New Agency, at 19 (Sept. 2013).

This case presents an example of the undesirable consequences that result from the Bureau's ad hoc reliance on enforcement actions to impose novel regulatory requirements inconsistent with prior precedent.

## II. THE BUREAU'S ORDER VIOLATES DUE PROCESS AND BASIC PRINCIPLES OF STATUTORY INTERPRETATION.

By announcing a new interpretation of RESPA that departed from previous HUD guidance and then applying that new interpretation to impose staggering penalties on Petitioners, the Bureau violated one of the most fundamental guarantees of due process: that a party may not be punished if it has not received fair notice that its conduct was unlawful. The Bureau likewise is wrong in asserting that Congress granted it authority to bring administrative enforcement proceedings even after the statute of limitations has run on an alleged legal violation.

### A. Overturning Settled Legal Interpretations During An Enforcement Action Violates Due Process.

## 1.   **Due process requires "fair notice."**

The Fifth Amendment to the Constitution guarantees that no one may "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The essence of due process is fair notice: a law must put parties on notice of the conduct it prohibits before anyone may be punished for violating it. *See, e.g.*, *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.").

As this court has long recognized, the fair-notice requirement of due process has been "thoroughly incorporated into administrative law." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (internal quotation marks omitted); *see also, e.g.*, *Rollins Envtl. Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 655 (D.C. Cir. 1991) (Edwards, J., dissenting in part and concurring in part) (noting the "cardinal rule of administrative law" that "a party cannot be found to have violated a regulatory provision absent 'fair warning' that the allegedly violative conduct was prohibited").

6

Indeed, fair notice is *especially* important in the administrative context, where agencies such as the Bureau may establish binding rules of conduct through adjudications rather than through forward-looking rulemaking procedures. If an agency could announce a new rule of law in an adjudication and then penalize a party in the very same adjudication for violating that new rule, "the practice of administrative law would come to resemble 'Russian Roulette'": even a party that had scrupulously complied with the law could be haled before an administrative tribunal and sanctioned. *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) ("[A]n agency should not change an interpretation in an adjudicative proceeding where doing so would impose 'new liability . . . on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements' or in a case involving 'fines or damages.'") (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)).

An agency therefore must give private parties clear and "adequate notice of the substance of [its] rule[s]" before it may penalize them for violating those rules. *Satellite Broad.*, 824 F.2d at 3. Adequate notice, in

7

the administrative context, requires that "a regulated party acting in good faith" be able to "identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Gen. Elec.*, 53 F.3d at 1329 (internal quotation marks omitted). And if a party's actions were permissible under a reasonable reading of agency "regulations and other [nonbinding] public statements," *id.*, in effect at the time the party acted, due process bars the agency from imposing penalties.

Federal courts have repeatedly struck down agency orders imposing penalties on parties that did not have fair notice of the legal interpretation that the agency applied. For example, in *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2320 (2012), the Supreme Court set aside FCC orders that found certain ABC and Fox television broadcasts containing fleeting expletives or nudity to be indecent. A nonbinding FCC policy statement in effect at the time the broadcasts aired had indicated that such fleeting content was not likely to be found indecent, but the FCC found the broadcasts sanctionable based on its "Golden Globes Order," issued *after* the broadcasts aired, which

8

announced for the first time that even fleeting expletives or nudity could be indecent. *Id.* at 2313-15.

The Court explained that the "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause" and held that the FCC had violated that requirement. *Id.* at 2317. By "chang[ing] course" in its interpretation of what constituted indecency and then sanctioning Fox and ABC for broadcasts that aired before the new interpretation was announced, the FCC had failed to provide Fox and ABC with "constitutionally sufficient notice" of the law "*prior to* [their] being sanctioned." *Id.* at 2318, 2320 (emphasis added).

In *General Electric*, this Court vacated a fine imposed by EPA on General Electric on fair-notice grounds. EPA interpreted its regulations to prohibit the manner in which General Electric disposed of certain chemicals, but this Court held that although EPA's interpretation was permissible, the regulations did not clearly indicate to a person of "good faith" that they barred the actions taken by General Electric, which precluded the agency from penalizing the company. *Gen. Elec.*, 53 F.3d at 366-67. This Court explained that "[w]here, as here, the regulations and other policy statements are unclear, [and] where the petitioner's

9

interpretation is reasonable," "a regulated party is not on notice of the agency's ultimate interpretation of the regulations, and may not be punished." *Id.* at 369-70 (internal quotation marks omitted).

Similarly, in *Satellite Broadcasting*, this Court held that the FCC had violated the fair-notice requirement in dismissing a party's applications to operate radio stations. The applications had been filed with the FCC in Washington, DC, but the agency determined after the fact that the applications should have been filed in Gettysburg, Pennsylvania, and dismissed them as untimely. *Satellite Broad.*, 824 F.2d at 1-2. This Court held that the applicant's decision to file the applications in Washington was reasonable because it had not received fair notice of the FCC's expectation that such applications would be filed in Gettysburg. *Id.* at 3. This Court thus vacated the dismissal of the applications, holding that due process prohibited the FCC from "punish[ing] a member of the regulated class for reasonably interpreting Commission rules." *Id.* at 4.

Finally, in *Fabi Construction Co. v. Secretary of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007), this Court vacated a citation imposed by the Occupational Safety and Health Review Commission for lack of fair

10

notice. After a deadly construction accident, the agency sanctioned the project's general contractor for violating regulations requiring all "formwork" used in a construction project to be capable of supporting the loads placed on it. The contractor argued, however, that it did not have fair notice that *permanent* portions of the structure—which were the basis of the sanctions order—were considered "formwork" under the regulation. This Court agreed, explaining that announcing that interpretation of the law "for the first time in the context of this adjudication deprives Petitioners of fair notice." *Id.* (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 158 (1991)). The court noted that the agency "made no announcement or any other indication of [its] intention to define formwork" as including permanent features and that "the overwhelming agreement among industry manuals and codes" was that only temporary features were covered. *Id.* at 1088-89. This lack of notice made it impossible for the contractor to have conformed its conduct to the agency's expectations and required vacatur of the sanctions. *Id.* at 1089.[1]

---

[1] *See also, e.g.*, *Phelps Dodge Corp. v. Fed. Mine Safety & Health Review Comm'n*, 681 F.2d 1189, 1192 (9th Cir. 1982); *Kropp Forge Co. v. Sec'y of Labor*, 657 F.2d 119, 123-24 (7th Cir. 1981).

11

### 2.  The Bureau penalized Petitioners based on a novel interpretation of RESPA starkly inconsistent with past precedent.

The Bureau here punished Petitioners without fair notice by announcing a novel interpretation of Section 8 of RESPA (12 U.S.C. § 2607) and then sanctioning Petitioners for violating it—even though Petitioners' conduct was reasonable under longstanding agency guidance in effect at the time they acted.

HUD, the agency that enforced RESPA prior to the Bureau's creation, interpreted Section 8(c) of RESPA to *permit* captive reinsurance agreements of the type employed by Petitioners. HUD first expressed that view in 1997, when it sent a letter explaining that captive reinsurance agreements are "permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are *bona fide* compensation that does not exceed the value of such services." HUD Letter at 3 (quoting 12 U.S.C. § 2607(c)). The letter assured its audience that "this guidance will assist you to conduct your business in accordance with RESPA." *Id.* at 8. HUD reaffirmed its interpretation of Section 8(c) several times over the years—in policy statements published in the

12

Federal Register. *See* Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080, 10,085–86 (Mar. 1, 1999); Clarification of Statement of Policy Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53,052, 53,052, 53,054 (Oct. 18, 2001).

When the Bureau took over authority for enforcing RESPA in 2011, it announced that HUD's "official commentary, guidance, and policy statements" concerning RESPA would "be applied by the Bureau until further notice." Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569, 43570 (July 21, 2011).

The Director's decision in this matter, however, overturned HUD's longstanding interpretation of Section 8. Whereas HUD had consistently deemed Section 8(c)(2) to be an "exemption[]" that excepted captive reinsurance agreements from Section 8(a)'s ban on kickbacks as long as they involved no more than fair-value payments for services rendered, *see, e.g.*, HUD Letter at 3, the Director concluded that Section 8(c)(2) was *not* an exemption from liability and that captive reinsurance agreements violate Section 8(a) "[r]egardless of whether the price that the mortgage insurers paid [for reinsurance] was inflated or was set at

13

the fair market value of the reinsurance they received." Dec. at 16-17.

The Director dismissed HUD's previous guidance as "not binding" and "simply inconsistent with RESPA" as he interpreted it. *Id.* at 18. He went on to conclude that Petitioners had violated his new interpretation of Section 8(a) and to impose staggering penalties upon them, ordering $109 million in disgorgement and enjoining them from entering into any captive reinsurance agreements—even agreements wholly unrelated to the mortgage market—for fifteen years. *Id.* at 32-33.

The Bureau's decision to jettison HUD's interpretation of Section 8 and then to punish Petitioners under the Bureau's new construction of the law plainly violates due process. Petitioners could not possibly have had fair notice that their captive reinsurance agreements with mortgage insurers violated RESPA; HUD had repeatedly blessed such agreements as permissible as long as insurers paid fair value for the reinsurance they received, and the Bureau had done nothing prior to its decision in this case to repudiate HUD's guidance.

In light of HUD's and the Bureau's consistent public statements approving of captive reinsurance arrangements, any "regulated party

14

acting in good faith" prior to this case would have concluded that those arrangements were permissible. *Gen Elec. Co.*, 53 F.3d at 1329. Imposing "massive liability" on Petitioners for their captive reinsurance agreements causes "precisely the kind of unfair surprise against which [due process] cases have long warned." *Christopher*, 132 S. Ct at 2167.

Even if the Bureau's new interpretation of RESPA to prohibit captive reinsurance agreements were permissible, the Bureau cannot announce that interpretation "for the first time in the context of this adjudication" and immediately impose crippling sanctions on Petitioners without giving them a chance to adjust to the agency's new rule. *See Fabi Constr. Co.*, 508 F.3d at 1088. As the Supreme Court has stated, "[i]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding.") *Christopher*, 132 S. Ct. at 2168. Due process demands that the Bureau's decision be vacated.

**B.    Congress Did Not Intend To Create Endless Legal Uncertainty By Subjecting Consumer Financial**

15

**Services Companies To The Perpetual Threat Of An Administrative Enforcement Action.**

The Bureau's decision is unlawful for a second and independent reason: it imposed liability for violations as to which RESPA's three-year statute of limitations, 12 U.S.C. § 2614, had expired years before.

The Director determined that the statute of limitations applies only to lawsuits, not to the agency's administrative proceedings. He noted that Section 2614 refers to "actions" and stated that the Supreme Court has held that the "plain meaning" of that term is "an action brought in a court." Dec. at 10-11 (citing *BP Am. Production Co. v. Burton*, 549 U.S. 84 (2006)). The Director concluded that "no statute of limitations applies when the Bureau challenges a RESPA violation in an administrative proceeding." *Id.* at 10.

This reading of the statute is plainly wrong. It simply is not true that the term "action" refers only to litigation in court. Common usage describes an administrative proceeding to impose penalties for claimed legal violations as an "enforcement action." *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (referring to an agency's decision to terminate funding to a program for regulatory violations as an "enforcement action"). The only logical reading of Section 2614 is that

16

any proceeding to punish violations of RESPA—whether the Bureau chooses to bring it in court or before its own tribunal—is an "action brought by the Bureau" under RESPA. 12 U.S.C. § 2614.[2]

The Bureau has complete discretion to decide whether to institute enforcement actions in court or through its administrative process. 12 U.S.C. §§ 5563-5564. And it can obtain administratively all of the remedies that would be available in court. 12 U.S.C. § 5565. It is inconceivable that Congress intended to allow the Bureau to circumvent a statute of limitations that expressly applies to government enforcement actions simply by bringing the enforcement action in a nonjudicial forum.

---

[2] *BP America* did not categorically hold that the "plain meaning of 'action' is an action brought in a court," as the Director claims. Dec. at 10-11. In *BP America*, the Supreme Court held that administrative payment orders issued by the Minerals Management Service were not "actions" covered by the six-year statute of limitations on government contract actions in 28 U.S.C. § 2415(a). *BP Am.*, 549 U.S. at 101. Section 2415 is quite different from the statute of limitations at issue in this case; it refers to "*action[s] for money damages*" founded on "contract[s]" and initiated by the filing of a "*complaint.*" *Id.* at 89. The Court relied heavily on those additional terms, which usually refer to judicial proceedings, in reaching its conclusion that an "action" under Section 2415(a) could only be an action in court. *Id.* at 92. Because RESPA's statute of limitations lacks those additional terms, *BP America*'s holding is inapposite here.

17

The expansive authority that would be conferred on the Bureau is staggering. RESPA is only one of the *nineteen* consumer protection laws enforced by the Bureau. Many of these statutes, including the Consumer Financial Protection Act (CFPA), subject enforcement actions to a statute of limitations. *See, e.g.*, 12 U.S.C. § 2614 (RESPA); *id.* § 5564(g) (CFPA); 15 U.S.C. § 1681p (FCRA); 15 U.S.C. § 1692k(d) (FDCPA). On the Bureau's reasoning in this case, *none* of these statutes of limitations applies to proceedings before its internal tribunal. It could bring an administrative action under any of these consumer protection laws years or even decades after the limitations period had expired, and seek all of the same remedies it could in court. The Bureau's enforcement actions might never be subject to any limitations period.

Nothing in the text or legislative history of Dodd-Frank suggests that in addition to centralizing enforcement of these consumer protection laws within the Bureau, Congress also intended to render all of the statutes of limitations contained in those laws meaningless by authorizing the Bureau to bring administrative actions long after an enforcement action in court would be time-barred. On the contrary, the text of Dodd-Frank suggests that Congress intended that the statutes'

18

limitations periods would continue to apply as they did before: Dodd-Frank specifies that "[i]n an[] action arising . . . under an enumerated consumer law," such as RESPA, "the Bureau may commence, defend, or intervene in the action *in accordance with the requirements of that provision of law*." 12 U.S.C. § 5564(g)(2)(B).

Allowing the Bureau to bring administrative proceedings long after expiration of the applicable statute of limitations also contradicts Congress's intent in enacting the statute of limitations in the first place. A statute of limitations reflects a "congressional concern for finality." *Montana v. Clark*, 749 F.2d 740, 744 (D.C. Cir. 1984). By enacting such a provision, Congress intends that after the limitations period has run, a matter should no longer be actionable. The assurance of finality provided by a statute of limitations benefits both parties—which can enjoy the assurance that long-past events will not give rise to new litigation—and the legal system as a whole. These benefits would be lost if, by proceeding administratively rather than in court, the Bureau could avoid statutes of limitations altogether.

\* \* \*

19

The Bureau's interpretation of its own authority here conflicts with fundamental principles of fairness and violates clear congressional intent. If permitted to stand, the Bureau's decision would inject tremendous uncertainty into every segment of the consumer financial services marketplace, making compliance a guessing game as companies are forced to imagine what the many statutes and regulations enforced by the Bureau might require, and then to hope those rules are not changed further down the road.

## CONCLUSION

The petition for review should be granted and the Bureau's Decision and Order vacated.

Dated: October 5, 2015                          Respectfully submitted,

Kate Comerford Todd                             s/ Andrew J. Pincus
Steven P. Lehotsky                              Andrew J. Pincus
U.S. CHAMBER LITIGATION CENTER,                 Stephen C.N. Lilley
INC.                                            Matthew A. Waring
1615 H Street, N.W.                             MAYER BROWN LLP
Washington, DC 20062                            1999 K Street, N.W.
(202) 463-5337                                  Washington, DC 20006
                                                (202) 263-3000
                                                *apincus@mayerbrown.com*

*Counsel for The Chamber of Commerce of the United States of America*

20

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 3,741 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Century Schoolbook font using Microsoft Word.


Dated: October 5, 2015                    /s/ Andrew J. Pincus
                                          Andrew J. Pincus

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(a), that on October 5, 2015, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.


Dated: October 5, 2015                    /s/ Andrew J. Pincus
                                          Andrew J. Pincus

22