ORAL ARGUMENT NOT YET SCHEDULED

No. 15-1177

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

PHH CORPORATION, PHH MORTGAGE CORPORATION, PHH HOME LOANS, LLC,
ATRIUM INSURANCE CORPORATION, AND ATRIUM REINSURANCE CORPORATION,

*Petitioners,*

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU,

*Respondent.*
_____

On Petition for Review Of An Order
Of The Consumer Financial Protection Bureau
_____

REPLY BRIEF FOR PETITIONERS
_____

Mitchel H. Kider
David M. Souders
Sandra B. Vipond
Michael S. Trabon
WEINER BRODSKY KIDER PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C.  20036
(202) 628-2000

Theodore B. Olson
 *Counsel of Record*
Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................1

I.  The Director's Liability Determination Is Unlawful ..........................3

    A.  The Director's Decision Violates Fundamental Principles
        Of Fair Notice ................................................................3

        1.  The Director's New Interpretation Of Section
            8(c)(2) Contradicts Nearly Two Decades Of
            Consistent Agency Guidance.............................................4

        2.  The Director's New Interpretation Of Section 8(a)
            Contradicts The Previously Settled Interpretation ..........9

    B.  The Director's New Interpretations Of RESPA Are
        Contrary To Law ............................................................10

        1.  Section 8(c)(2) Plainly Defines Conduct That
            Section 8(a) Does Not Prohibit.......................................10

        2.  Any Section 8(a) Violation Plainly Occurs At
            Closing...........................................................................15

        3.  The Director's Interpretation Should Not Be
            Accorded Deference .......................................................17

        4.  Administrative Enforcement Actions Are Subject
            To A Statute of Limitations............................................20

    C.  The CFPB Violates The Constitutional Separation of
        Powers...........................................................................22

II.  The Order's Sanctions Are Unlawful.............................................24

    A.  The Injunctive Provisions Exceed The CFPB's Statutory
        Authority And Are Otherwise Invalid .....................................25

    B.  The Disgorgement Order Exceeds The CFPB's Statutory
        Authority And Is Otherwise Invalid .......................................28

IV.  The Decision And Order Should Be Vacated ...................................31

**TABLE OF CONTENTS**
**(continued)**

**Page**

CONCLUSION ......................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

\* Authorities upon which we chiefly rely are marked with an asterisk.

## Cases

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
    515 U.S. 687 (1995)...................................................................19

\**Carter v. Welles-Bowen Realty, Inc.*,
    736 F.3d 722 (6th Cir. 2013) ....................................................19

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012)........................................................7, 8, 10

*City of Arlington v. FCC*,
    133 S. Ct. 1863 (2013) ......................................................17, 18

*Clark-Cowlitz Joint Operating Agency v. FERC*,
    826 F.2d 1074 (D.C. Cir. 1987) .................................................9

*De Niz Robles v. Lynch*,
    803 F.3d 1165 (10th Cir. 2015) .................................................9

*Fabi Const. Co. v. Sec'y of Labor*,
    508 F.3d 1077 (D.C. Cir. 2007)..................................................8

\**FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012).................................................................3

\**Free Enterprise Fund v. PCAOB*,
    561 U.S. 477 (2010).................................................................22

*Freeman v. Quicken Loans, Inc.*,
    132 S. Ct. 2034 (2012).......................................................14, 18

*Freytag v. Comm'r*,
    501 U.S. 868 (1991)................................................................24

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011) ................................................30, 31

\**Gen. Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995)........................3, 5, 7, 8, 9, 31

\**Glover v. Std. Fed. Bank*,
    283 F.3d 953 (8th Cir. 2002) .............................................6, 12, 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck
    Drivers, Local No. 70*,
    415 U.S. 423 (1974)................................................................26

*Hateley v. SEC*,
    8 F.3d 653 (9th Cir. 1993) ...................................................30

*Howland v. First Am. Title Ins. Co.*,
    672 F.3d 525 (7th Cir. 2012) ...........................................6, 14

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935)..............................................................23

*INS v. St. Cyr*,
    533 U.S. 289 (2001)..............................................................19

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
    131 S. Ct. 1325 (2011).........................................................18

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)..................................................................17

*\*Mullinax v. Radian Guar. Corp.*,
    199 F. Supp. 2d 311 (M.D.N.C. 2002) .........................10, 16

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................22

*O'Sullivan v. Countrywide Home Loans, Inc.*,
    319 F.3d 732 (5th Cir. 2003) .................................................6

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015).........................................................20

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987)....................................................1

*Schuetz v. Banc One Mortg. Corp.*,
    292 F.3d 1004 (9th Cir. 2002) .............................................12

*SEC v. Banner Fund Int'l*,
    211 F.3d 602 (D.C. Cir. 2000)..............................................31

*SEC v. First City Fin. Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989)............................................30

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SEC v. Whittemore,*
659 F.3d 1 (D.C. Cir. 2011) ...................................................................31

*\*Snow v. First Am. Title Ins. Co.,*
332 F.3d 356 (5th Cir. 2003) ........................................................10, 15

*\*Trinity Broad. of Fla., Inc. v. FCC,*
211 F.3d 618 (D.C. Cir. 2000) ....................................................4, 7, 8

*United States v. Apel,*
134 S. Ct. 1144 (2014) ...........................................................................19

*United States v. Chrysler Corp.,*
158 F.3d 1350 (D.C. Cir. 1998) ..............................................................7, 9

*United States v. Gannon,*
684 F.2d 433 (7th Cir. 1981) ................................................................18

*\*United States v. McGoff,*
831 F.2d 1071 (D.C. Cir. 1987) .........................................16, 17, 18

*United States v. Philip Morris USA Inc.,*
566 F.3d 1095 (D.C. Cir. 2009) ....................................................25, 26

*United States v. Thompson/Ctr. Arms Co.,*
504 U.S. 510 (1992) ...............................................................................18

*United States v. Wiltberger,*
18 U.S. (5 Wheat.) 76 (1820) ...............................................................19

*Verizon Tel. Cos. v. FCC,*
269 F.3d 1098 (D.C. Cir. 2001) ...............................................................8

## Statutes

12 U.S.C. § 2 ................................................................................................24

12 U.S.C. § 2607(a) .......................................................................12, 15, 26

12 U.S.C. § 2607(c) ............................................................10, 11, 12, 13, 14

12 U.S.C. § 2607(d) ................................................................21, 29, 30

12 U.S.C. § 2614 ...............................................................16, 20, 21, 29

12 U.S.C. § 2617 ...........................................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

12 U.S.C. § 4512(b)(2)...................................................24

12 U.S.C. § 5481(12).....................................................23

12 U.S.C. § 5491(b)(1)..................................................23

12 U.S.C. § 5491(c)..................................................23, 24

12 U.S.C. § 5563..........................................................20

12 U.S.C. § 5563(b).............................................3, 25, 27

12 U.S.C. § 5565(a).................................................25, 29

## Other Authorities

James H. Pannabecker & David Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* (2013)........................................................................6

1 Laurence H. Tribe, *American Constitutional Law* 703 (3d ed. 2000).................22

Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance Activities Through Reciprocal Insurer, 1999 WL 413838 (Mar. 11, 1999)...........................................6

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15 (2010).................................24

S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546 .......................14

## Rules

Fed. R. Civ. P. 65(d)(1)...............................................26

## Regulations

12 C.F.R. § 1024.14(b) ................................................5

12 C.F.R. § 1024.14(g)(1)(iv)........................................5

12 C.F.R. § 1024.14(g)(2)..............................................5

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| Atrium | Petitioners Atrium Insurance Corporation and Atrium Reinsurance Corporation |
| CFPA | Consumer Financial Protection Act |
| CFPB | Consumer Financial Protection Bureau |
| Confirmation Letter | Letter from J. Kennedy, Assoc. Gen. Counsel for Fin. & Regulatory Compliance, HUD, to J. Maher, Am. Land Title Ass'n (Aug. 12, 2004) (JA__) |
| Dec. | *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) (JA__-__) |
| HUD | United States Department of Housing and Urban Development |
| HUD Letter | Letter from N. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to S. Samuels, Countrywide Funding Corp. (Aug. 6. 1997) (JA__-__) |
| Order | *In the Matter of PHH Corporation*, Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 (June 4, 2015) (JA__-__) |
| PHH | Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC |
| RESPA | Real Estate Settlement Procedures Act of 1974 |

## SUMMARY OF ARGUMENT

The CFPB's response is long on allegation and short on law.  In its repeated descriptions of Petitioners as engaged in "kickbacks," the agency simply assumes the Director's astonishing conclusion that Section 8(c)(2) is "irrelevant."  Opp. 12. As both the statute and prior agency interpretations have long made clear, however, payments for services such as mortgage reinsurance that are actually performed and reasonably priced are *lawful*.

The Director's attempt to impose liability on Petitioners for past conduct based on a new, diametrically opposite construction of Section 8 faces a glaring and fatal problem: fair notice.  The Director may try to shrug off the previous agency interpretations, but HUD, other agencies, courts, commentators, and *even the ALJ and Enforcement Counsel* in this proceeding all viewed them as binding. The CFPB's claim that "[n]o official agency pronouncement misled PHH" (Opp. 46) boils down to the extraordinary assertion that the prior interpretations were just "unofficial" enough to fool not only Petitioners but the entire industry, including the numerous *amici*.  This bait-and-switch cannot stand, lest "the practice of administrative law … resemble 'Russian Roulette.'"  *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987).

The existence of a statutory safe harbor for certain agency action, 12 U.S.C. § 2617, does not empower the CFPB to discard well-settled interpretations at will

or to apply newly-minted ones retroactively. Even outside the safe harbor, due process bars an agency from punishing activity undertaken in reliance on its own official interpretation. Here, that interpretation was announced not just in the HUD Letter[1]—which, even if not published in the *Federal Register,* was certainly "official"—but in multiple HUD documents that were so published. And the HUD Letter's two-prong inquiry is embedded in Regulation X *itself*.

The Director's novel constructions of RESPA are unlawful in any event. They read Section 8(c)(2) out of existence, create staggering liability under Section 8(a), and untether administrative enforcement from any time limitations. That outcome cannot be squared with the statutory text or Congress's obvious intent to allow compensation for legitimate services. Because Section 8 is a criminal prohibition, as the CFPB admits, the rule of lenity resolves any possible ambiguity—*without* resort to deference. Contrary to the agency's claim, deference is not a canon of statutory construction that applies at *Chevron*'s first step: It is a standard of review that governs the second step.

The Director's high-handed approach derives from his unprecedented lack of accountability to the political branches. The CFPB's defense of its anomalous structure ignores the Supreme Court's most recent teachings about separation of

---

[1]  Defined terms have the same meaning as in the Opening Brief.

powers, including the presumptive unconstitutionality of restrictions on the President's removal powers.

The CFPB also fails to rehabilitate the Order's injunctive provisions, which it concedes stretch far beyond the scope of mortgage reinsurance and, indeed, RESPA itself, despite the strict limitation of the agency's cease-and-desist powers to conduct "specified in the notice of charges." 12 U.S.C. § 5563(b)(1)(D). Finally, the CFPB does not identify any statutory authority to order disgorgement or, in any event, adduce a proper basis for the amount of the award.

## I.    The Director's Liability Determination Is Unlawful.

### A.    The Director's Decision Violates Fundamental Principles Of Fair Notice.

Due process requires "fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("This requirement has now been thoroughly 'incorporated into administrative law.'") (citation omitted). The CFPB attempts to wish away this constitutional imperative, burying the issue at the back of its brief and arguing that Petitioners "cannot claim a right to fair notice broader than that already provided by Congress." Opp. 42.

But due process is not a matter of legislative grace, and the fact that Petitioners do not seek to avail themselves of RESPA's limited safe harbor is therefore

beside the point.  The relevant issue is whether Petitioners had adequate notice that their conduct, at the time it was undertaken, was unlawful.  They did not.

### 1.    The Director's New Interpretation Of Section 8(c)(2) Contradicts Nearly Two Decades Of Consistent Agency Guidance.

Fair notice depends on whether, "'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform.'"  *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (citation omitted).  Since the 1990s, HUD consistently and repeatedly interpreted Section 8 to permit (1) reasonable compensation (2) for services actually performed, even if referrals were somehow involved.  The CFPB then bound itself to HUD's "official commentary, guidance, and policy statements."  Br. Add. 40.

Nonetheless, the Director abruptly "reject[ed]" (Dec. 17) (JA__) that two-part test and retroactively sanctioned Petitioners for affiliated mortgage reinsurance arrangements that HUD expressly blessed.  The CFPB's efforts to justify that fundamentally unfair action fall flat.

**a.**    The CFPB contends that the HUD Letter "hardly represented well-established practice."  Opp. 44.  But *all* the "regulations and other public statements issued by the agency" told Petitioners that what they did was not forbidden.

4

*Gen. Elec.*, 53 F.3d at 1329.  Regulation X provides that "[a]ny referral of a settlement service is not a compensable service, except as set forth in § 1024.14(g)(1)," 12 C.F.R. § 1024.14(b), which explains, in keeping with Section 8(c)(2), that bona fide compensation for services actually performed is "permit[ted]," *id.* § 1024.14(g)(1)(iv).  Regulation X further explains that, "[i]f the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided." *Id.* § 1024.14(g)(2).

The CFPB strains to avoid the obvious import of this language, Opp. 31 n.23, but the word "excess" makes no sense unless there is a "reasonable" value that can be exceeded.  Thus, according to the CFPB's own regulations, settlement services provided upon referral are "compensable," *i.e.*, lawful, provided that the compensation takes the form of (1) reasonable payments (2) for services actually performed.

Moreover, the CFPB ignores voluminous evidence that HUD's two-part test was widely accepted and relied upon, including by:

- Numerous sectors of the real-estate services industry.  *See, e.g.*, AFSA Br. 18-22; NAR Br. 1-25; ALTA Br. 1, 5-6.

- A leading RESPA treatise.  *See* James H. Pannabecker & David Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* § 8.04[6][a] (2013).

- Federal courts.  *See*, *e.g.*, *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 531 (7th Cir. 2012); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 739-41 (5th Cir. 2003); *Glover v. Standard Fed. Bank*, 283 F.3d 953, 963 (8th Cir. 2002); *see also* Br. 27 (collecting cases).

- HUD itself.  *See* Br. Add. 28-39; Confirmation Letter (JA__).

- Other federal agencies.  *See* Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance Activities Through Reciprocal Insurer, 1999 WL 413838, at *2 n.20 (Mar. 11, 1999).

- The ALJ and Enforcement Counsel.  *See* Dkt. 205, at 41 (JA__); Dkt. 1, ¶ 96  (JA__); *see* Dkt. 55, at 34 (JA__).

The CFPB therefore cannot be taken seriously when it belittles Petitioners' longstanding reliance as being based merely on unpublished government documents.  The HUD Letter *specifically* addressed the legality of affiliated mortgage reinsurance.  Enshrined in the *Federal Register* or not, it certainly constituted the government's official position on that question:  It was issued by the Senate-confirmed Federal Housing Commissioner exercising the Secretary's delegated au-

thority.  Br. 7.  Agency pronouncements far less formal than this can deprive regulated parties of fair notice.  *See*, *e.g.*, *Gen. Elec.*, 53 F.3d at 1332 (informal letter from "one EPA regional office"); *United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998) (NHTSA's internal test schematic).  Indeed, agency *silence* can give rise to a lack of fair notice.  *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012).

Yet even if the relevant inquiry were limited to agency statements "published in the Federal Register," Opp. 41, HUD repeatedly published not just Regulation X itself, but numerous applications of Regulation X to other real-estate settlement services, articulating the *same* two-part test.  For example, in the directly analogous context of title insurance, HUD recognized that Section 8(c)(2) permits payments "*reasonably related* to services *actually performed*."  Br. Add. 31 (emphasis added); *see also* Br. 8-9 & n.2 (collecting policy statements).

The CFPB maintains that "[t]hose statements address fact situations that bear no similarity to" affiliated mortgage reinsurance.  Opp. 42.  But they all deal with goods or services subject to Section 8.  Regulated parties may reasonably rely on an agency's consistent interpretation of a statute, even if the agency has not yet applied that interpretation to particular facts.  *See Trinity*, 211 F.3d at 629.  Here, Petitioners did not need to "assume[], quite reasonably" that HUD's two-part test

"applied equally" to affiliated-reinsurance arrangements, *ibid.*, because HUD explicitly said that it did, *see* HUD Letter at 6 (JA__).

In short, at the time Petitioners entered into the arrangements at issue (and even while receiving premiums), *all* of "the regulations and other public statements," *Gen. Elec.*, 53 F.3d at 1329, said the same thing:  Payments for services do not violate Section 8(a) if the services are actually performed and the payments are reasonable.   The CFPB identities *no* agency pronouncement that would have warned a party, "with 'ascertainable certainty,'" that such arrangements were illegal. *Ibid.* (citation omitted).

**b.**      The CFPB nonetheless insists that Petitioners have no right to fair notice because "an agency may interpret ambiguous statutory provisions in adjudicative proceedings and may apply those interpretations retrospectively."  Opp. 42 (citation and footnote omitted).   There are critical limits to that proposition.   An agency may "*not* change an interpretation in an adjudicative proceeding where doing so would impose 'new liability … on individuals for past actions which were taken in good-faith reliance on agency pronouncements.'"  *Christopher*, 132 S. Ct. at 2167 (citation and alterations omitted) (emphasis added); *see Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007).

The CFPB's own cases reinforce the point.  Where, as here, "there is a substitution of new law for old law that was reasonably clear," *Verizon Tel. Cos. v.*

*FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (internal quotation omitted), an agency cannot impose "'new liability'" for "'past actions which were taken in good-faith reliance on agency pronouncements.'" *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1084-85 (D.C. Cir. 1987) (en banc) (citation and alterations omitted).

The CFPB further maintains that the requirement of fair notice applies only to *punitive* sanctions.  Opp. 45 n.36.  But the sanctions here—disgorgement of gross receipts—*are* punitive.  *See* Br. 59-60.  Regardless, the "duty to provide notice is triggered" whenever a "sufficiently grave sanction" "deprives [a regulated party] of property." *Chrysler*, 158 F.3d at 1355.  Absent fair notice, "an agency may not deprive a party of property by imposing civil or criminal *liability*." *Gen. Elec.*, 53 F.3d at 1328-29 (emphasis added).  No one denies that the Director purported to deprive Petitioners of $109 million or that he imposed—in his words— "liability" and "sanctions" on them.  Dec. 31 (JA__) (capitalization omitted).

## 2.    The Director's New Interpretation Of Section 8(a) Contradicts The Previously Settled Interpretation.

The CFPB does not advance any argument that Petitioners had fair warning that the Director would reject more than a decade of judicial precedent holding that a Section 8(a) violation occurs, if at all, when a loan closes.  Regulated entities may reasonably rely on settled judicial statutory constructions even when an agency has not expressly agreed with those decisions. *De Niz Robles v. Lynch*, 803

F.3d 1165, 1177-79 (10th Cir. 2015); *cf. Christopher*, 132 S. Ct. at 2167-68. That is precisely what Petitioners (and numerous other parties) did.

The CFPB concedes that the Director's interpretation is irreconcilable with *Mullinax v. Radian Guaranty Corp.*, 199 F. Supp. 2d 311, 325 (M.D.N.C. 2002), and essentially admits the same regarding *Snow v. First American Title Insurance Co.*, 332 F.3d 356 (5th Cir. 2003). Opp. 23-24. Nor were those the only cases holding that a Section 8 violation occurs at settlement, *i.e.* the closing: As the ALJ recognized, "the *Snow* doctrine is authoritative." Dkt. 152, at 11-12 (JA__) (collecting cases).

The Director's new theory of Section 8(a)—that one improper referral can subsequently generate hundreds of separate violations—allowed him to reach back in time to loans that closed years ago, even before July 21, 2008. This had the undeniably colossal effect, *cf.* Opp. 25 n.12, of increasing Petitioners' liability by more than $100 million. Due process precludes that result.

## B.    The Director's New Interpretations Of RESPA Are Contrary To Law.

The Director's new interpretations of RESPA are, in any event, unlawful.

### 1.    Section 8(c)(2) Plainly Defines Conduct That Section 8(a) Does Not Prohibit.

As the plain language of Section 8(c)(2) shows, Congress obviously intended to carve out certain referrals from liability under Section 8. The CFPB doubles

down on the Director's astonishing conclusion that this key piece of the statutory scheme is "irrelevant" when a referral agreement exists. Opp. 12, 29. That approach would reduce Section 8(c)(2) to a mere triviality and, in turn, vastly expand the scope of conduct prohibited under RESPA.

**a.** The CFPB contends that Section 8(c)(2) is simply an "interpretive tool," suggesting that the word "construed" tells courts not to infer a secret referral agreement when one settlement-service provider sells another provider actual services at a reasonable price. Opp. 28-29. But the statute says nothing about inferences, agreements, rules of evidence, or conditional referrals. Rather, it uses broad and unqualified language —"[n]othing in this section shall be construed as prohibiting"—to define permissible conduct. Whether Section 8(c)(2) is called a safe harbor, exemption, or even "interpretive tool," the point is that, if a payment satisfies Section 8(c)(2), it is categorically *lawful*.

The CFPB cannot "construe[]" Section 8(a) to prohibit payments that Section 8(c)(2) unambiguously allows. Indeed, Section 8(c)'s list of exceptions makes no sense unless it allows payments that Section 8(a) would otherwise prohibit. Section 8(c)(3), for example, exempts "payments pursuant to … referral arrangements between real estate agents and brokers." 12 U.S.C. § 2607(c)(3).

The CFPB fatally undermines its own theory when it admits that "RESPA contains some exemptions," including Section 8(c)(1)(B). Opp. 15. It then asserts

that "section 8(c)(2) is not among them," *ibid.*, but that is textually impossible. The exemptive language "[n]othing … shall be construed as prohibiting" appears in the common verbiage of Section 8(c); it cannot mean one thing in Section 8(c)(2) and another thing in the other subsections. The Director cannot interpret Section 8(c) in a way that gives a single phrase different meanings in the course of a single sentence.

Nor can he toss Section 8(c) into the dustbin of history by deeming it "irrelevant" whenever a referral agreement exists. Section 8(a) applies *only* if there is an *actual* "agreement or understanding." 12 U.S.C. § 2607(a). This Court should decline the invitation to turn Section 8's "interrelated sections upside down" by "putting total emphasis on the prohibitory language of Section 8(a) and no emphasis on the permissive language of Section 8(c)." *Glover*, 283 F.3d at 964.

**b.** The CFPB also contends that the phrase "bona fide" in Section 8(c)(2) requires a court to determine the subjective motives underlying a settlement-service provider's purchase of goods or services. Opp. 29. Even assuming that "bona fide" modifies "other payment," 12 U.S.C. § 2607(c)(2), rather than just "salary or compensation," that means that the *payment* must be "bona fide," not the buyer's motives. And a payment is "bona fide" if it bears a reasonable relation to the value of the services actually provided in return: Otherwise, the payment might actually be compensation for a referral. *See Schuetz v. Banc One Mortg.*

*Corp.*, 292 F.3d 1004, 1013 (9th Cir. 2002). But the provider's subjective motives are irrelevant to the question whether the payment is legitimate.

Nor would it make sense for the legitimacy of a payment to turn on such motives. People purchase goods and services for many reasons. *See* ALTA Br. at 7-8 & n.10. A transaction's legality should not depend on which reason a judge, a jury, or the Director thinks was most important. Yet under the Director's version of Section 8, "inventive minds making clever arguments can turn virtually *any* payment … into a purported payment for the unlawful referral of business." *Glover*, 283 F.3d at 964. Section 8(c)(2) forecloses those arguments because it "clearly states that reasonable payments for goods, facilities or services actually furnished are *not prohibited* by RESPA, even when done in connection with [a] referral." *Ibid.*

    **c.**    The CFPB contends that Petitioners' reading of Section 8(c)(2) makes Section 8(c)(1) superfluous. Opp. 28. Section 8(c)(1) states that "the payment of a fee" to attorneys, title insurers, or loan agents for performing particular services is not prohibited. 12 U.S.C. § 2607(c)(1). Section 8(c)(2), meanwhile, applies to anyone who performs any kind of service (or furnishes goods or facilities). *Id.* § 2607(c)(2). And, unlike Section 8(c)(2), Section 8(c)(1) does not contain the phrase "bona fide." *Id.* § 2607(c)(1). Section 8(c)(2) is thus "at once broader" because it applies to all services "and narrower" because it contains an additional

13

substantive requirement, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2043 (2012), as HUD recognized, Br. Add. 31.  To be sure, some services—say, legal services actually provided at a market price—will qualify for both exemptions.  *See Howland*, 672 F.3d at 533.  But each clause has independent meaning.  *See ibid.*  That some conduct is legal for two reasons rather than one does not make Section 8(c)(1) superfluous.

Nor does interpreting Section 8(c)(2) to mean what it says undermine RESPA.  Opp. 28.  Congress wrote an exception into the statute precisely because "[r]easonable payments in return for services actually performed or goods actually furnished are not intended to be prohibited."  S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551.[2]  In any event, "[v]ague notions of statutory purpose provide no warrant for expanding" RESPA "beyond the field to which it is unambiguously limited."  *Freeman*, 132 S. Ct. at 2044.

**d.**     Finally, the CFPB is wrong to contend—repeatedly—that Petitioners have admitted accepting kickbacks.  *E.g.*, Opp. 19, 20.  Petitioners have done no

---

[2]     The CFPB (Opp. 19 n.6) and its *amicus* (AARP Br. 11) cast this as a matter of consumer protection, claiming that borrowers paid $109 million more in mortgage insurance due to the reinsurance at issue.  But as the ALJ found and the Director confirmed, "there is generally little variation among rates charged by different mortgage insurers" because they "must file their rates with state insurance regulators."  Dec. 3 (JA__).  Thus, it is unsurprising that the Bureau never proved, and the Director never found, that a single consumer paid more because their loan was reinsured.

such thing.  *See*, *e.g.*, Br. 40-41; Dec. 12 (JA___).  Section 8(c)(2) defines what is *not* a kickback, and the agency simply assumes its own (erroneous) conclusion.

## 2.    Any Section 8(a) Violation Plainly Occurs At Closing.

The Director's decision to treat each mortgage-reinsurance payment as a separate violation is likewise unambiguously foreclosed by RESPA's text.  As noted above, *supra* at 9-10, federal courts have uniformly held that a Section 8 violation occurs at closing.  The CFPB's principal argument is that those cases are wrong because Section 8(a) says that a violation occurs when a settlement-service provider "accept[s]" an illegal payment.  Opp. 24.  That theory of Section 8(a) may be correct, as far as it goes, but it begs the key questions of what the alleged "thing of value" is and when it was received.

Here, according to the CFPB, the relevant consideration was the mortgage insurers' monthly payments for reinsurance.  But Petitioners reinsured each mortgage-insurance policy on the day each loan closed, at which time the allegedly improper referral had already occurred.  Thus, Petitioners acquired the right to monthly payments—the "thing of value pursuant to" an allegedly improper referral "agreement"—at closing.  12 U.S.C. § 2607(a); *see Snow*, 332 F.3d at 359.  This reading makes practical sense because each referral corresponds to one allegedly improper "thing of value."  In contrast, under the Director's interpretation, each referral could correspond to hundreds of "kickbacks," sometimes over a period of

decades. *But see Mullinax*, 199 F. Supp. 2d at 325 ("Congress knew how to specify when a plaintiff's right to bring an action would be linked to a monthly payment."). The CFPB responds that, because particular borrowers might later fail to pay their bills, Petitioners received nothing at closing. Opp. 24. But a right to a future stream of payments is not worthless just because the stream might dry up.

Indeed, Enforcement Counsel below maintained that the "kickback" here was the mortgage insurers' agreement to buy reinsurance from Petitioners—*i.e.*, Petitioners' right to a stream of future profits contingent on monthly mortgage-insurance payments. *See* Dec. 15 (JA__). Thus, the CFPB's contention that Petitioners have forfeited this argument, Opp. 22 n.7, is passing strange. The CFPB has maintained all along that Petitioners violated RESPA by selling reinsurance, and Petitioners have maintained all along that the violations occurred, if at all, at closing. *See*, *e.g.*, Dkt. 18, at 29-30 (JA__); Dkt. 217, at 6 (JA__).

The Director's interpretation also has profoundly problematic effects on RESPA's one-year limitations period for private suits. 12 U.S.C. § 2614. The CFPB insists that RESPA's limitations period has nothing to do with when a violation occurs. Opp. 24. But when a court is faced with two interpretations of a statute, one of which would dramatically extend the limitations period, the court should choose the other. *United States v. McGoff*, 831 F.2d 1071, 1094 (D.C. Cir.

16

1987).  Here, the Director's reading of Section 8(a) would allow plaintiffs to sit on their rights for years—even decades—after an allegedly illegal referral.

The CFPB blithely answers that settlement-service providers have nothing to fear so long as they obey the law (an argument that conflicts with Congress's choice to provide a statute of limitations at all).  Opp. 24 n.11.  That is ironic, to say the least, as Petitioners in this very case reasonably believed their mortgage-reinsurance arrangements were in full compliance with RESPA, until the Director decided to change the law.

### 3.    The Director's Interpretation Should Not Be Accorded Deference.

**a.**    Even if the text of Section 8 did not make its meaning clear, the rule of lenity resolves any doubt in Petitioners' favor.  *Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004).  The CFPB argues that *Chevron* trumps the rule of lenity.  But because "the law of crimes must be clear," the interpretation of statutes that involve criminal liability is "far outside *Chevron* territory."  *McGoff*, 831 F.2d at 1077.  That is so for at least two reasons.

*First*, courts apply *all* of "the ordinary tools of statutory construction" *before* considering the reasonableness of an agency's interpretation under *Chevron*.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).  The CFPB argues that deference is *itself* a "tool[] of statutory construction."  Opp. 34.  But deference is a standard of review that applies only at step two, not a means of interpretation at

17

step one; otherwise, *every Chevron* case would end at step one. By contrast, the rule of lenity "is a rule of statutory construction," *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (plurality opinion), that does apply at step one. The analysis in this case thus should never proceed to the question whether the Director's interpretation was reasonable. *See McGoff*, 831 F.2d at 1084 & n.22.

*Second*, in the interpretation of a criminal statute, *Chevron*'s rationale crumbles. *Chevron* is based on a theory of implicit delegation—namely, that Congress sometimes intends to give agencies flexibility to fill in the gaps of ambiguous statutes. *City of Arlington*, 133 S. Ct. at 1868. But *only* Congress may create federal crimes. Br. 41. The CFPB suggests that the criminal penalties for violating RESPA are of little import because criminal prosecutions under RESPA are rare. Opp. 34 n.26. Even if that were true, *but see*, *e.g.*, *United States v. Gannon*, 684 F.2d 433, 437 & n.2 (7th Cir. 1981) (en banc), "'prosecutorial discretion'" is no reason to take RESPA's criminal provisions less seriously. *Freeman*, 132 S. Ct. at 2041 (citation omitted).

None of the cases discussed by the CFPB requires deference here. Opp. 34-35. In *Kasten v. Saint-Gobain Performance Plastics Corp.*, the Supreme Court simply noted that the agency's opinion "add[ed] force to" the Court's independent conclusion that a statute was unambiguous. 131 S. Ct. 1325, 1335-36 (2011). And

18

although *INS v. St. Cyr* does not use the word "lenity," the Court based its ruling in part on the "'longstanding principle'" of interpreting ambiguous immigration statutes in the alien's favor.  533 U.S. 289, 321 (2001) (citation omitted).

The CFPB also relies on a footnote in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, but there the Supreme Court simply observed that the rule of lenity might not apply to "facial challenges to administrative regulations." 515 U.S. 687, 704 n.18 (1995).  The Court added that, "[e]ven if" the rule of lenity applied, it did not require invalidating the regulation at issue.  *Ibid.*; *see Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 734-35 (6th Cir. 2013) (Sutton, J., concurring).  Later, the Court made clear that it has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 134 S. Ct. 1144, 1151 (2014).

Finally, the CFPB contends that RESPA itself tells courts not to apply lenity. Opp. 36.  According to the agency, because Congress gave it the authority to interpret RESPA and provided a statutory safe harbor, Congress implicitly sought to foreclose the rule of lenity and allow the Director to make criminal law.  Nothing in RESPA says that, and Congress would not silently overturn a doctrine that is "perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).

**b.**     Even if this Court concludes that it could theoretically be appropriate to defer, no such deference is warranted because the Decision is arbitrary and capricious.  The CFPB does not bother refuting this argument, nor could it, considering that the Director never offered a "substantial justification" for reversing the long-standing interpretation of Section 8 in light of the "'serious reliance interests'" at issue.  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (citation omitted).  Petitioners and their many *amici* have vividly illustrated the magnitude of those interests.

### 4.     Administrative Enforcement Actions Are Subject To A Statute of Limitations.

The CFPB reiterates the Director's remarkable position that "no statute of limitations applies."  Opp. 38.  According to the CFPB, it pursued this enforcement action under 12 U.S.C. § 5563, which purportedly has no statute of limitations, rather than under Section 16 of RESPA, 12 U.S.C. § 2614, which contains a three-year limitations period.  Opp. 38.  This misstates the source of the CFPB's authority.

The Director acknowledged that it would be "inappropriate[ly] retroactive" for the Bureau "to seek civil money penalties for violations that occurred before the Bureau was created" because "RESPA did not authorize HUD to seek a civil money penalty."  Dec. 12 (JA__).  That is, the remedies available to the CFPB under RESPA for conduct before July 21, 2011 depend on what remedies were avail-

able to HUD.  Although the Director erred in concluding that disgorgement was one of those remedies, *see infra* at 29-30, the fact remains that the *authority* for HUD's remedies was Section 8(d), 12 U.S.C. § 2607(d)(4) (2006), which authorized "an action to enjoin violations."  Those remedies, in turn, were governed by the three-year statute of limitations applicable to such "actions" in Section 16.  *Id.* § 2614.  Although the CFPB now argues that Sections 8 and 16 do not authorize enforcement actions, it cannot simultaneously advance that argument while pursuing sanctions against Petitioners that could be authorized only by Section 8, subject to Section 16's limitations period.

To be sure, Section 16 refers to "[a]ny action … brought in the United States district court or in any other court of competent jurisdiction."  12 U.S.C. § 2614.  But the clause governing "actions brought by the Bureau" does not contain any similar limitations.  *Ibid.*  And "action" (or "actions") in Sections 8 and 16 cannot be read as limited to "court actions," Opp. 39, or else the CFPB would lack the only source of authority that it could conceivably have for adjudicating violations that occurred before its creation.

Nor is there any comfort in the assurance that "a court would look askance" at any administrative proceeding brought "100 years from now" to "challenge conduct occurring presently."  Opp. 38 n.28.  The CFPB states in the same breath that

"the United States is not bound 'by any laches of its officers, however gross.'" *Ibid.* (citation and alteration omitted).

### C.    The CFPB Violates The Constitutional Separation of Powers.

The CFPB is the first and only federal agency to amass such broad and unchecked power in the hands of a single person.  Br. 45-51.  The CFPB attempts to defend its constitutionality without even discussing the Supreme Court's most recent instructions on separation-of-powers questions, *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), instead trying to distinguish the case on its facts. Opp. 55-57.

Before *Free Enterprise Fund*, the Supreme Court's removal-power jurisprudence was a "conundrum," 1 Laurence H. Tribe, *American Constitutional Law* 703 (3d ed. 2000), with the leading cases using different tests.  *Free Enterprise Fund* clarified the doctrine:  "Since 1789, the Constitution has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary."  561 U.S. at 483 (citing *Myers v. United States*, 272 U.S. 52 (1926)).

Thus, the baseline rule is that statutes that interfere with the President's ability to remove officers are presumptively unconstitutional.  Where, as here, a court "consider[s] a new situation not yet encountered," the court must determine if spe-

22

cial "circumstances" justify "restrict[ing the President] in his ability to remove" an officer. *Id.* at 483-84. The CFPB has not even tried to meet this test.

Instead, the CFPB attempts to shrink its several structural problems down to two: the limitation on the President's removal power and the agency's independent funding. Opp. 55. This ignores several *other* anomalous features of the CFPB. The CFPB is headed, not by a multimember commission, but by a single, unaccountable Director. 12 U.S.C. § 5491(b)(1). The Director wields an unprecedented amount of unchecked authority to enforce *eighteen* consumer-financial statutes previously administered by other agencies. *Id.* § 5481(12). And he serves a lengthy term of at least five years, which can be extended indefinitely. *Id.* § 5491(c)(1)-(2). The CFPB argues the Director's functions are materially identical to those in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Opp. 56-57, but no FTC Commissioner, standing alone, has any power whatsoever. Moreover, the FTC "is to be non-partisan," 295 U.S. at 624, while the Director has no such constraints, and, unlike the FTC, possesses independent budgetary authority.

The CFPB also argues that the limitations on the President's removal authority and Congress's appropriations authority do not impact the same constitutional power. Opp. 59-60. But agencies depend on the President's help to obtain funding from Congress; thus, the Director's ability to fund himself diminishes the Presi-

dent's leverage too.  Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 42-43 (2010).  In any event, *all* of the CFPB's structural defects impact the Director's accountability, shielding him from democratic control.  Br. 48-50.[3]

The public, however, must be able to "ensure that those who wiel[d]" power are "accountable to political force and the will of the people," *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991).  The CFPA, which gives the Director vast powers while exempting his decisions from every traditional political check, fails that fundamental standard.

## II.    The Order's Sanctions Are Unlawful.

The CFPB does not dispute that, if this Court sets aside the Director's liability determinations, it must also set aside the sanctions that he imposed.  In any event, the CFPB's defenses of the sanctions are meritless.

---

[3]    The CFPB is governed by stricter removal provisions than the Office of the Comptroller of the Currency and the Federal Housing Finance Agency.  *Contra* AARP Br. 24.  *Compare* 12 U.S.C. § 5491(c) (removal only for "inefficiency, neglect of duty, or malfeasance in office") *with* 12 U.S.C. § 2 (removal for any "reasons" "communicated" "to the Senate"); *and* 12 U.S.C. § 4512(b)(2) (removal "for cause").

### A.    The Injunctive Provisions Exceed The CFPB's Statutory Authority And Are Otherwise Invalid.

The injunctive relief ordered by the Director is not tied to the Notice of Charges, and thus exceeds the CFPB's statutory authority.  The CFPB's effort to rehabilitate that relief does not discuss the Notice of Charges, let alone explain how it relates to that Notice.

Instead, the CFPB claims it can ignore the Notice of Charges under 12 U.S.C. § 5565(a)(2)(G), which permits "limits on the activities or functions of the person."  But the "special rules for cease-and-desist proceedings" provide a more limited list of "orders authorized," *id.* § 5563(b)(1) (capitalization omitted), permitting only "an order to cease and desist from the violation or practice" "specified in the notice of charges," *id.* § 5563(b)(1)(D).  The Director relied on Section 5563, *not* Section 5565, as the source of his authority to order injunctive relief.  Dec. 32 (JA__).  The CFPB cannot now rely on a different and inapplicable basis of authority to sustain that relief.

**1.**    The CFPB does not meaningfully dispute that Provision I, which vaguely prohibits Petitioners from "violating section 8," Order at 1 (JA__), is unconnected to the Notice of Charges, lacks reasonable detail, and does not provide fair notice of the enjoined actions.  The CFPB argues that, "'[e]ven if it tracks statutory language, a general injunction is not too vague if it relates the enjoined violations to the context of the case.'"  Opp. 52 (quoting *United States v. Philip Morris*

*USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (per curiam)).  But *Philip Morris*

provides no support for Provision I.

   *Philip Morris* upheld an injunction where the district court "specified the

matters about which Defendants are to avoid making false statements or commit-

ting racketeering acts."  566 F.3d at 1137.  But this Court also recognized that "in-

junctions [are] too vague when they enjoin all violations of a statute in the abstract

without any further specification."  *Ibid.*  That is precisely the case here.

   The CFPB notes that the relief applies only "'in connection with the referral

of any borrower to a provider of mortgage insurance,'" Opp. 52 (citation omitted),

rather than any "real estate settlement service," 12 U.S.C. § 2607(a).  But the fact

that the injunction applies only to one type of settlement service does not make

Provision I any more specific within that realm.  Nor does it matter that Section 8

"contains two prohibitions," and "[t]here is no other conduct prohibited by section

8."  Opp. 52-53.  An injunction must "specif[y]" in "reasonable detail," Fed. R.

Civ. P. 65(d)(1), and in "fair and precisely drawn" terms what it "actually prohib-

its," *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local

No. 70*, 415 U.S. 423, 444 (1974).  It is no answer that RESPA prohibits some acts

but not others, or that the Order might have covered an even wider swath of con-

duct.

**2.**     The CFPB admits that Provision III prohibits referrals that are unrelated to mortgage reinsurance, but claims that Petitioners should "'expect some fencing in.'"  Opp. 53-54 (citation omitted).  But "fencing in" Petitioners to an area not connected to the Notice of Charges exceeds the agency's authority, and that argument just confirms Provision III's invalidity.

The CFPB has no real answer to Petitioners' argument that the critical term "triggered" is undefined.  The CFPB flippantly asserts the Petitioners "should have no trouble figuring out what 'triggered' means," Opp. 54, but does not point to any portion of the Decision or Order to illuminate what that meaning might be.  Rather, the CFPB offers a new definition on appeal, suggesting that "triggered" means "caused."  *Ibid.*  Counsel cannot put words in the Director's mouth.

**3.**     The CFPB does not deny that Provision II covers reinsurance agreements outside the scope of the Notice of Charges (and indeed RESPA itself) because the Provision is not limited to mortgage reinsurance.  It reasons, instead, that the Director "'is not limited to prohibiting the illegal practice in the precise form'" at issue.  Opp. 53 (citation omitted).  Again, this just concedes that the Order is ultra vires:  Even if Provision II is not aimed at the "precise form" of the conduct described in the Notice, it must at least be aimed at the *same* "violation or practice" "specified" there.  12 U.S.C. § 5563(b)(1)(D).

**4.**    The CFPB similarly acknowledges that Provision IV, which covers 10,700 current and former employees and their receipt of anything of value for a period of 22 years, is unlawfully overbroad by characterizing it as "appropriate fencing-in relief."  Opp. 54.  Moreover, while the agency believes that Provision IV "will permit the Bureau to detect any future violations PHH may commit," *id.* at 55, that says nothing about whether the injunction complies with applicable law, let alone whether a narrower version could achieve the same result.  Although the CFPB tries to deny the "massive" burden imposed by Provision IV, *ibid.*, the scope of the requirement speaks for itself.

### B.    The Disgorgement Order Exceeds The CFPB's Statutory Authority And Is Otherwise Invalid.

The CFPB does not deny that, of the $109 million in disgorgement ordered by the Director, approximately $102.6 million was from reinsurance business for book years that were not at issue before the ALJ.  Instead, the CFPB simply identifies the source of the problem:   "[The ALJ] mistakenly believed that section 8(c)(2) provided an exemption for PHH's violations of section 8(a)," and "PHH violated section 8(a) every time it accepted a kickback payment."  Opp. 49.  Those premises are legally incorrect, and, regardless, identifying the *reasons* for the problem does not fix it.  There can be no real dispute that the overwhelming bulk of the disgorgement award cannot be sustained.

**1.**    Disgorgement is categorically unavailable because RESPA expressly addresses the penalties that violators face, and disgorgement is not among them. *See* 12 U.S.C. § 2607(d).  Although the CFPB generally may seek disgorgement in an administrative action brought pursuant to the CFPA, the administrative proceeding here is governed by the specific provisions of RESPA, including Section 8(d).

The CFPB says that Petitioners claim that "section 16 of RESPA, 12 U.S.C. § 2614, should limit the Bureau's enforcement authority because that provision is more specific than the provisions of Dodd-Frank," and then rebuts that claim on the basis that "section 16 does not address administrative enforcement proceedings."  Opp. 48 n.38.  This is a straw man.  Petitioners never mentioned Section 16 in arguing that disgorgement is unavailable.  Br. 57-58.  The more specific statute that governs here is 12 U.S.C. § 2607(d), which does not include disgorgement in the list of sanctions available for RESPA violations and would be nullified if the more general statute, 12 U.S.C. § 5565(a)(2)(D), were applied to permit disgorgement here.

At a minimum, the CFPB cannot contend that it can obtain disgorgement in this administrative proceeding for RESPA violations that occurred before July 21, 2011.  Br. 58.  The CFPB states that HUD had "authority to obtain [such] disgorgement," and that "the Bureau may do so as well."  Opp. 48.  But that is incorrect.  The Director relied on the proposition that, when an agency has been author-

29

ized to seek injunctive relief, "a *court* may award the full range of equitable relief, including disgorgement."  Dec. 12 (JA__) (citing *FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011)) (emphasis added).  That is true because a disgorgement order "'may be considered an *equitable adjunct* to an injunction decree,'" and thus falls within "'the *equitable jurisdiction* of the court.'"  *Bronson Partners*, 654 F.3d at 365-66 (emphasis added) (citation omitted).  Unlike courts, agencies have no inherent equitable authority.  Br. 57.  Accordingly, HUD was limited to—and the CFPB inherited only—the authority "to *enjoin* violations" of Section 8.  12 U.S.C. § 2607(d)(4) (emphasis added).

    **2.**    Even if disgorgement were otherwise proper, the amount should be reduced to avoid "punitiv[e]" disgorgement of anything other than "ill-gotten gains."  *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).

    The CFPB agrees that the Order requires Petitioners to "pay [certain] amounts twice."  Opp. 51.  It nonetheless maintains that double payments are acceptable because Petitioners are "wrongdoer[s]."  *Ibid.*  Although untrue, this essentially concedes that the disgorgement is punitive.  And it does nothing to salvage this portion of the Order: "[D]uplicati[ve]" disgorgements are necessarily "unreasonable and excessive."  *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993).

    Moreover, the Director erred in calculating disgorgement based on the total premiums received, without subtracting reinsurance claims and commutation pay-

ments.  Br. 59-60.  *SEC v. Whittemore* requires disgorgement to be based on "prof-its," not gross receipts.  659 F.3d 1, 7 (D.C. Cir. 2011).  The CFPB, however, again points to *Bronson Partners*, where the Second Circuit held that disgorgement need not be reduced by the costs associated with producing fraudulent diet products. *See* Opp. 50.  Unlike in *Bronson Partners*, Petitioners provided real services that had real value.  Similarly unavailing is the CFPB's reliance on *SEC v. Banner Fund International*:  Paying reinsurance claims and commutation payments is readily distinguishable from "a defendant … spend[ing] all the proceeds of his fraudulent scheme."  211 F.3d 602, 618 (D.C. Cir. 2000).

## IV.    The Decision And Order Should Be Vacated.

In light of these grave and numerous legal errors, the Decision and Order, which this Court previously stayed, should now be vacated.  The CFPB's sugges-tion that vacatur does not apply to adjudications, Opp. 61 n.50, is meritless.  *See*, *e.g.*, *Gen. Elec.*, 53 F.3d at 1334 (vacating finding of liability in EPA enforcement proceeding).

## CONCLUSION

For these reasons, the Decision and Order should be vacated.

Dated:  November 23, 2015                    Respectfully submitted,

                                               /s/ Theodore B. Olson           
Mitchel H. Kider                             Theodore B. Olson
David M. Souders                               *Counsel of Record*
Sandra B. Vipond                             Helgi C. Walker
Michael S. Trabon                            Scott P. Martin
WEINER BRODSKY KIDER PC                       GIBSON, DUNN & CRUTCHER LLP
1300 19th Street, N.W., Fifth Floor          1050 Connecticut Avenue, N.W.
Washington, D.C.  20036                      Washington, D.C.  20036
(202) 628-2000                               (202) 955-8500

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000

*Counsel for Petitioners*

32

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 7000 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

  /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that, on November 23, 2015, an electronic copy of the fore-going Brief for Petitioners was filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon the following counsel for respondent Consumer Financial Protection Bureau, who is a registered CM/ECF user:

Larry DeMille-Wagman
   *Enforcement Attorney*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street, N.W.
Washington, D.C.  20552

  /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500