No. 15-1177

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PHH CORPORATION; PHH MORTGAGE CORPORATION; PHH HOME
LOANS, LLC; ATRIUM INSURANCE CORPORATION; and
ATRIUM REINSURANCE CORPORATION,

Petitioners,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

Respondent.

_____

ON PETITION FOR REVIEW OF AN ORDER
OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION
(CFPB FILE NO. 2014-CFPB-0002)

_____

### BRIEF OF RESPONDENT
### CONSUMER FINANCIAL PROTECTION BUREAU

_____

Meredith Fuchs
  *General Counsel*
To-Quyen Truong
  *Deputy General Counsel*
John R. Coleman
  *Assistant General Counsel*
Lawrence DeMille-Wagman
  *Senior Litigation Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7957
lawrence.wagman@cfpb.gov
  *Counsel for Respondent*
  *Consumer Financial Protection Bureau*

(Final version)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

In addition to the parties listed in the Certificate supplied by petitioners, the following parties appeared as intervenors in the administrative proceeding before the Consumer Financial Protection Bureau: United Guaranty Residential Mortgage Co., Genworth Mortgage Insurance Corp., Radian Guaranty Inc., Mortgage Guaranty Insurance Co., and Republic Mortgage Insurance Co. The following parties have appeared as amici before this Court: American Financial Services Association, Consumer Bankers Association, Housing Policy Council of the Financial Services Roundtable, Independent Community Bankers of America, Leading Builders of America, Mortgage Bankers Association, National Association of Home Builders, American Land Title Association, American Escrow Association, Real Estate Services Providers Council, Inc. (RESPRO), U.S. Mortgage Insurers (USMI), Chamber of Commerce of the United States of America, Consumer Mortgage Coalition, National Association of Realtors, State National Bank of Big Spring, The 60 Plus Association, Inc., and Competitive Enterprise Institute.

i

**B. Ruling Under Review**

The ruling under review is listed in the Certificate supplied by petitioners.

The decision and order that are under review are included in the Joint Appendix at JA.1-40. There is no official citation for the decision and order.

**C. Related Cases**

This matter has not been previously before this Court or any other court.

There are no related cases before this Court or any other court.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ....................................................... i

    A. Parties and Amici ..................................................... i

    B. Ruling Under Review ............................................... ii

    C. Related Cases ......................................................... ii

TABLE OF CONTENTS ...................................................... iii

TABLE OF AUTHORITIES ................................................. v

GLOSSARY ........................................................................ xiv

INTRODUCTION ................................................................ 1

ISSUES PRESENTED FOR REVIEW ................................. 4

STATUTES AND REGULATIONS ...................................... 4

STATEMENT OF FACTS ................................................... 4

    A. RESPA ................................................................... 4

    B. PHH, Mortgage Insurance, and Reinsurance ............. 6

    C. Proceedings before the Bureau ................................. 9

STANDARD OF REVIEW ................................................... 13

SUMMARY OF ARGUMENT .............................................. 14

ARGUMENT ...................................................................... 19

I.     PHH'S KICKBACK SCHEME VIOLATED RESPA ................. 19

A. PHH violated section 8(a) every time it accepted an illegal kickback ........................................................................ 20

B. Section 8(c)(2) does not excuse PHH's violations ................. 26

    1. The Director reasonably interpreted section 8(c)(2) to clarify section 8(a) ................................ 26

    2. The Director's interpretation of section 8(c)(2) is entitled to *Chevron* deference ......................................... 33

C. No statute of limitations applies to this administrative proceeding ................................................................................. 38

II.    THIS COURT SHOULD AFFIRM THE RELIEF ORDERED BY THE DIRECTOR ............................................... 40

A. The relief ordered by the Director does not offend fair notice ....................................................................... 40

B. The Director properly ordered disgorgement ......................... 47

C. The injunctive relief ordered by the Director is proper ........... 51

III.    THE BUREAU'S STRUCTURE IS CONSTITUTIONAL ......... 55

CONCLUSION ...................................................................................... 61

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES                                                                  PAGE

*Alden Mgmt. Servs. v. Chao,*
    532 F.3d 578 (7th Cir. 2008) ............................................................. 40

*Am. Fed. of Gov't Emps., AFL-CIO v. FLRA,*
388 F.3d 405 (3d Cir. 2004).................................................................. 59

*Ass'n of Am. RRs v. DOT,*
721 F.3d 666 (D.C. Cir. 2013),*vacated* 135 S. Ct. 1225 (2015)............. 59, 60

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
515 U.S. 687 (1995)................................................................. 34

*Bankamerica Corp. v. United States,*
462 U.S. 122 (1983)................................................................. 44

*Bhd. of Locomotive Eng'rs v. United States,*
101 F.3d 718 (D.C. Cir. 1996) ............................................................. 33

*BP America Prod. Co. v. Burton,*
549 U.S. 84 (2006)................................................................. 39

*Carter v. Welles-Bowen Realty, Inc.,*
736 F.3d 722 (6th Cir. 2013) ............................................................. 35

\* *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.,*
467 U.S. 837 (1984)............................................................. 3, 13, 33, 36

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012)........................................................... 46

\* *Clark-Cowlitz Joint Operating Agency v. FERC,*
826 F.2d 1074 (D.C. Cir. 1987) ........................................................... 42, 43

Authorities upon which we chiefly rely are marked with asterisks.

*Coburn v. McHugh,*
679 F.3d 924 (D.C. Cir. 2012) .................................................................... 22

*CFPB v. ITT Educ. Servs., Inc.,*
2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) .......................................... 55

*CFPB v. Morgan Drexen, Inc.,*
60 F. Supp. 3d 1082 (C.D. Cal. 2014) .................................................. 55, 57

*Coosemans Specialties, Inc. v. Dep't of Agric.,*
482 F.3d 560 (D.C. Cir. 2007) .................................................................... 14

*Culpepper v. Irwin Mortg. Corp.,*
253 F.3d 1324 (11th Cir. 2001) ................................................................ 27

*Edwards v. First Am. Corp.,*
798 F.3d 1172 (9th Cir. 2015) .................................................................. 23

*Fabi Constr. Co. v. Sec. of Labor,*
508 F.3d 1077 (D.C. Cir. 2007) ................................................................ 45

*FCC v. Fox Television Stations, Inc.,*
132 S. Ct. 2307 (2012) ................................................................................ 46

\* *FTC v. Bronson Partners, LLC,*
654 F.3d 359 (2d Cir. 2011) ...................................................................... 50

*FTC v. Direct Mktg. Concepts, Inc.,*
624 F.3d 1 (1st Cir. 2010) .......................................................................... 51

*FTC v. Nat'l Lead Co.,*
352 U.S. 419 (1957) ..................................................................................... 54

*FTC v. Ruberoid Co.,*
343 U.S. 470 (1952) ..................................................................................... 53

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*
561 U.S. 477 (2010) .................................................................................. 57, 59

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) .................................................................. 45

*Glover v. Standard Fed. Bank*,
283 F.3d 953 (8th Cir. 2002) .................................................................. 23

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) .................................................................. 59

*Hateley v. SEC*,
8 F.3d 653 (9th Cir. 1993) .................................................................. 51

*Heimmermann v. First Union Mortg. Corp.*,
305 F.3d 1257 (11th Cir. 2002) .................................................................. 27

\* *Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .................................................................. 55, 56

*INS v. St. Cyr*,
533 U.S. 289 (2001) .................................................................. 35

*In re Aiken Cnty.*
725 F.3d 255 (D.C. Cir. 2013) .................................................................. 59

*In re Sealed Case*,
223 F.3d 775 (D.C. Cir. 2000) .................................................................. 36

*Intercoll. Broad. Sys. v. Copyright Royalty Bd.*,
574 F.3d 748 (D.C. Cir. 2009) .................................................................. 60

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
131 S. Ct. 1325 (2011) .................................................................. 35

*King v. Burwell*,
135 S. Ct. 2480 (2015) .................................................................. 28

*La. Pub. Serv. Comm'n v. FERC*,
772 F.3d 1297 (D.C. Cir. 2014) .................................................................. 14

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994)................................................................ 48

*Landry v. FDIC,*
204 F.3d 1125 (D.C. Cir. 2000) .............................................. 60

*Leocal v. Ashcroft,*
543 U.S. 1 (2004).................................................................... 34

*Menichino v. Citibank, N.A.,*
2013 WL 3802451 (W.D. Pa. July 19, 2013) ......................... 22

*Mistretta v. United States,*
488 U.S. 361 (1989)................................................................ 14

*Morrison v. Olson,*
487 U.S. 654 (1988)........................................................... 56, 57

*Mullinax v. Radian Guar. Inc.,*
199 F. Supp. 2d 311 (M.D.N.C. 2002) ................................ 21, 23, 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005)................................................................ 32

*New Eng. Power Generators Ass'n, Inc. v. FERC,*
707 F.3d 364 (D.C. Cir. 2013) ............................................... 31

*Nitro-Lift Techs. v. Howard,*
133 S. Ct. 500 (2012) ............................................................. 48

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974)................................................................ 42

*Palmer v. Homecomings Fin., LLC,*
677 F. Supp. 2d 233 (D.D.C. 2010) ....................................... 22

*PSEG Energy Resources & Trade LLC v. FERC,*
665 F.3d 203 (D.C. Cir. 2011) ............................................... 13

*Robers v. United States,*
134 S. Ct. 1854 (2014) ............................................................ 27

*Satellite Broad. Co. v. FCC,*
824 F.2d 1 (D.C. Cir. 1987) .................................................... 46

*SEC v. Banner Fund Int'l,*
211 F.3d 602 (D.C. Cir. 2000) ................................................ 50

*SEC v. Teo,*
746 F.3d 90 (3d Cir. 2014)...................................................... 51

*SEC v. Wash. Inv. Network,*
475 F.3d 392 (D.C. Cir. 2007) ................................................ 52

*SEC v. Whittemore,*
659 F.3d 1 (D.C. Cir. 2011) .................................................... 50

*Snow v. First American Title Ins. Co.,*
332 F.3d 356 (5th Cir. 2003) .................................... 21, 22, 23

*TransUnion Corp. v. FTC,*
81 F.3d 228 (D.C. Cir. 1996) .................................................. 61

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) ................................................................. 25

*United States v. Beebe*,
127 U.S. 338, 344 (1888)........................................................ 38

*United States v. DeFries*,
129 F.3d 1293 (D.C. Cir. 1997) .............................................. 51

*United States v. Graham Mortg. Corp.,*
740 F.2d 414 (6th Cir. 1984) ................................................. 34

*United States v. Kanchanalak,*
192 F.3d 1037 (D.C. Cir. 1999)............................................... 36

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) ................................................................ 60

*United States v. Masters*,
924 F.2d 1362 (7th Cir. 1991) ........................................... 51

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ......................................... 52, 53

*United States v. Santos*,
553 U.S. 507 (2008) ............................................................ 34

*United States v. Thompson/Ctr. Arms Co.*,
504 U.S. 505 (1992) ............................................................ 35

*Verizon Tel. Cos. v. FCC*,
269 F.3d 1098 (D.C. Cir. 2001) ......................................... 43, 45

*Whitman v. United States*,
135 S. Ct. 352 (2014) ......................................................... 36

*Wooten v. Quicken Loans, Inc.*,
626 F.3d 1187 (11th Cir. 2010) ......................................... 31

*Zacharias v. SEC*,
569 F.3d 458 (D.C. Cir. 2009) ........................................... 45

**STATUTES**

12 U.S.C. 16 ....................................................................... 59

12 U.S.C. 243 ..................................................................... 59

12 U.S.C. 1755 ................................................................... 59

12 U.S.C. 1817(b) .............................................................. 59

12 U.S.C. 1818(b) .............................................................. 38

Real Estate Settlement Procedures Act

x

12 U.S.C. 2601(a) ................................................................. 5

12 U.S.C. 2601(b)(2) ........................................................... 5

12 U.S.C. 2602................................................................... 37

12 U.S.C. 2607................................................................... 5

12 U.S.C. 2607(a) (section 8(a)).......................2, 5, 14-15, 19-20, 23-27, 33, 49

12 U.S.C. 2607(c)(2) (section 8(c)(2)) ...............................................
...................................................... 6, 11-12, 15-16, 19-20, 26-30, 32-33, 41, 43, 49

12 U.S.C. 2607(d)(1) .......................................................... 33

12 U.S.C. 2607(d)(4) .......................................................... 38

12 U.S.C. 2614 ...................................................... 11, 21, 24, 39, 48

*  12 U.S.C. 2617.................................................................. 36

*  12 U.S.C. 2617(b) (section 19(b))  .................................. 16, 37, 41-42, 45, 47

12 U.S.C. 4516................................................................... 59

Dodd-Frank

12 U.S.C. 5481(12)(M)........................................................ 38

12 U.S.C. 5491(c)(3)........................................................... 56

12 U.S.C. 5497(a) .............................................................. 58

12 U.S.C. 5497(a)(2)(C) ...................................................... 58

12 U.S.C. 5561.................................................................. 48

12 U.S.C. 5563.................................................................. 38, 47

12 U.S.C. 5563(b)(1)(D).......................................................................... 54

12 U.S.C. 5563(b)(4) ............................................................................... 13

12 U.S.C. 5564.......................................................................................... 37

12 U.S.C. 5564(g)..................................................................................... 38

12 U.S.C. 5565(a)(2)(D)........................................................................... 47

12 U.S.C. 5565(a)(2)(G)........................................................................... 54

12 U.S.C. 5581(b)(7) ........................................................................... 11, 39

15 U.S.C. 41.............................................................................................. 56

15 U.S.C. 1639b(c) ................................................................................... 27

18 U.S.C. 1956.......................................................................................... 35

28 U.S.C. 2415(a) ..................................................................................... 39

**REGULATIONS**

12 C.F.R. Part 1024.................................................................................... 5

12 C.F.R. 1024.2(b) (2013)........................................................................ 5

*  12 C.F.R. 1024.4 (2013) ................................................................... 30, 41

*  12 C.F.R. 1024.4(a)(2) (2011) .............................................................. 37

*  12 C.F.R. 1024.4 .................................................................................. 41

12 C.F.R. 1024.14(d) ................................................................................. 6

12 C.F.R. 1024.14(e).................................................................................. 6

12 C.F.R. 1024.14(g)(1)(iv)............................................................... 6, 41, 42

12 C.F.R. 1024.14(g)(2) ................................................................ 19, 29, 31, 41

24 C.F.R. 3500.14(g)(1) (2011) ................................................... 29, 30

24 C.F.R. 3500.14(g)(1)(iv) (2011) ............................................. 30

* 24 C.F.R. 3500.4(b) (2011) ...................................................... 3, 30

24 C.F.R. Part 3500 ...................................................................... 5

* 24 C.F.R. 3500.4 ....................................................................... 31, 41

**MISCELLANEOUS**

61 Fed. Reg. 29264 (June 7, 1996) (June 7, 1996) ...................... 42

66 Fed. Reg. 53052 (Oct. 18, 2001) ............................................. 42

H.R. Rep. No. 105-769 ................................................................. 31

# GLOSSARY

| | |
|---|---|
| AFSA Amicus | Brief for *Amicus Curiae* American Financial Services Ass'n, Consumer Bankers Ass'n, Housing Policy Council of the Financial Services Roundtable, Independent Community Bankers of America, Leading Builders of America, Mortgage Bankers Ass'n, and National Association of Home Builders |
| ALJ | Administrative Law Judge |
| ALTA Amicus | Brief for *Amicus Curiae* American Land Title Ass'n, American Escrow Ass'n, Real Estate Services Providers Council, Inc. (RESPRO), and U.S. Mortgage Insurers (USMI) |
| Atrium | Petitioners Atrium Insurance Corp. and Atrium Reinsurance Corp. |
| Br. | Opening Brief for Petitioners |
| CFPB | Consumer Financial Protection Bureau |
| Chamber Amicus | Brief for *Amicus Curiae* Chamber of Commerce of the United States of America |
| CMC Amicus | Brief for *Amicus Curiae* Consumer Mortgage Coalition |
| Dec. | *In the Matter of PHH Corporation, et al.*, Decision of the Director, File No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) |
| Dkt. | Item filed in the docket of the administrative proceeding before the ALJ |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |

ECX                         Exhibit submitted by enforcement counsel before
                            the ALJ

FTC                         Federal Trade Commission

JA                          Joint Appendix

HUD                         United States Department of Housing and
                            Urban Development

HUD Letter                  Letter from N. Retsinas, Ass't Sec'y for Hous.–
                            Fed. Hous. Comm'r, HUD, to S. Samuels,
                            Countrywide Funding Corp. (Aug. 6. 1997)
                            (JA.251)

NAR Amicus                  Brief for *Amicus Curiae* National Ass'n of
                            Realtors

PHH Stay Mot.               Motion of Petitioners for Stay Pending Judicial
                            Review

Order                       *In the Matter of PHH Corporation, et al.*,
                            Final Order, File No. 2014-CFPB-0002, Dkt. 227
                            (June 4, 2015)

PHH                         Petitioners PHH Corp., PHH Mortgage Corp.,
                            PHH Home Loans, LLC, Atrium Insurance Corp.,
                            and Atrium Reinsurance Corp.

RCX                         Exhibit submitted by Respondent's counsel before
                            the ALJ

RESPA                       Real Estate Settlement Procedures Act of 1974

SNB Amicus                  Brief for *Amicus Curiae* State National Bank of
                            Big Spring, The 60 Plus Ass'n, Inc., and
                            Competitive Enterprise Institute

xv

## INTRODUCTION

This case is about an illegal kickback scheme that was orchestrated by a mortgage lender, Respondent PHH. The scheme distorted the market for mortgage insurance, a real estate settlement service that PHH required borrowers to purchase when they entered into mortgages.

As housing prices rose in the early 1990s, so did the profits made by mortgage insurers. PHH was a mortgage lender, not a mortgage insurer, so when some of its borrowers needed mortgage insurance, PHH had to refer them to independent mortgage insurers. Thus, PHH could only watch, and not profit from, the growth of the mortgage insurance industry. But by the mid-1990s, PHH figured out a way to tap into mortgage insurance profits. Over the next decade, PHH entered into agreements with four mortgage insurers that worked like this: PHH would refer borrowers needing mortgage insurance to those insurers, and, in exchange for those referrals, the insurers paid kickbacks to PHH. The kickbacks took the form of premiums for *re*insurance, a type of insurance that the mortgage insurers did not otherwise want, but which they nonetheless purchased from PHH's wholly-owned subsidiary, Atrium, so that PHH would continue to send the insurers referrals. As a result, when PHH referred borrowers to mortgage insurers, it referred them to insurers who had kickback agreements, not necessarily those who provided borrowers with the best value. When borrowers who had been referred by

1

PHH pursuant to one of these agreements paid their monthly mortgage insurance premium, the insurer would kickback a portion of that premium to Atrium.

After an administrative hearing and appeal, the Director of the Consumer Financial Protection Bureau (CFPB or Bureau) held that, when PHH accepted these kickbacks from real estate settlement service providers (*i.e.* the mortgage insurers), it violated section 8(a) of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2607(a). In addition, because the record showed that the mortgage insurers made these payments in exchange for referrals, not solely for the reinsurance, the Director held that the payments were not the sort of "bona fide … payment[s] for goods or … for services actually performed," that section 8(a) permits. The Director's Order imposed injunctive relief to prevent future violations and ordered PHH to disgorge all the kickback payments it had illegally received since July 2008, which totaled in excess of $109 million. The Order imposed no civil penalty or other punitive relief.

PHH does not deny that it developed this scheme, that it entered into the agreements with the mortgage insurers, or that it received the kickbacks pursuant to these agreements. Instead, to evade liability, it takes issue with the Director's reasonable interpretation of RESPA, and with the relief he ordered. First, it contends that this Court must forgo giving *Chevron* deference to the Director's interpretation of an ambiguous section of RESPA, but must instead adopt a reading

2

based on the rule of lenity, a reading that, not surprisingly, excuses all of PHH's violations. Second, PHH argues that, even if this Court concludes that it violated RESPA, no relief is appropriate due to considerations of "fair notice" because it undertook its kickback scheme based on what it refers to as a "controlling legal standard" from HUD "expressly approving that conduct." *See* Opening Brief for Petitioners (Br.) at 18, 28. (HUD enforced RESPA before that authority was transferred to the Bureau.) But *Chevron* requires deference to the Director's carefully reasoned interpretation of ambiguity in RESPA: the Supreme Court has never held that the rule of lenity trumps deference to an agency's reasonable interpretation of an ambiguous provision in a civil statute it administers, even if the statute may also have criminal penalties. Nor can HUD's "guidance" – a single unpublished letter sent from a HUD official to a different mortgage lender – excuse PHH's illegal conduct. HUD's rules specifically cautioned that such letters "provide no protection" from liability under RESPA. 24 C.F.R. 3500.4(b) (2011).

PHH also contends that the Bureau's structure is unconstitutional. But PHH challenges features of the Bureau that are common to other administrative agencies, and have been held to be constitutional. Even if the Bureau's structure is not exactly like that of any other agency, PHH cannot show that the Bureau intrudes on the functions of any of the three branches of the government. As a result, PHH's constitutional challenge fails.

## ISSUES PRESENTED FOR REVIEW

1) Whether, when the Bureau held that PHH violated RESPA by accepting kickbacks from mortgage insurers in exchange for referrals, its interpretation of that statute was reasonable and entitled to deference;

2) Whether the Bureau abused its discretion when it enjoined PHH from accepting illegal kickbacks, fenced it in to prevent similar illegal conduct in the future, and required it to disgorge a portion of the kickbacks it accepted in the past, and whether the HUD Letter precludes the Bureau from ordering any relief at all; and

3) Whether the Bureau's structure, crafted by Congress so as not to impede the functions of any of the three branches of government, nonetheless violates the Constitution.

## STATUTES AND REGULATIONS

Pertinent provisions are reproduced in the addendums to this brief and PHH's brief.

## STATEMENT OF FACTS

### A. RESPA

Congress enacted RESPA in 1974 because "significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation … are protected from unnecessarily high settlement charges caused by

4

certain abusive practices that have developed in some areas of the country."

12 U.S.C. 2601(a). Thus, RESPA seeks to "eliminat[e] … kickbacks or referral

fees that tend to increase unnecessarily the costs of certain settlement services[.]"

12 U.S.C. 2601(b)(2). Section 8 of RESPA, 12 U.S.C. 2607, is captioned

"Prohibition against kickbacks and unearned fees," and section 8(a) goes directly

to Congress' goal:

> No person shall give and no person shall accept any fee, kickback, or
> thing of value pursuant to any agreement or understanding, oral or
> otherwise, that business incident to or a part of a real estate settlement
> service involving a federally related mortgage loan shall be referred to
> any person.

12 U.S.C. 2607(a). Regulation X, the regulation that implements RESPA, defines

several of the terms in section 8(a).[1] "Settlement service" means

> any service provided in connection with a prospective or actual
> settlement, including, but not limited to any one or more of the
> following: … (10) Provision of services involving mortgage
> insurance; … (15) Provision of any other services for which a
> settlement service provider requires a borrower or seller to pay.

12 C.F.R. 1024.2(b) (2013). An "agreement or understanding"

> need not be written or verbalized but may be established by a practice,
> pattern or course of conduct. When a thing of value is received
> repeatedly and is connected in any way with the volume or value of
> the business referred, the receipt of the thing of value is evidence that

---

[1] When HUD administered RESPA, the implementing regulations were codified at
24 C.F.R. Part 3500. When Congress transferred RESPA rulemaking authority to
the Bureau, the Bureau republished HUD's rules as its new Regulation X,
12 C.F.R. Part 1024, without substantive change.

it is made pursuant to an agreement or understanding for the referral
of business.

12 C.F.R. 1024.14(e). And a thing of value "includes, without limitation, monies

… credits representing monies that may be paid at a future date … [or] the

opportunity to participate in a money-making program …." 12 C.F.R. 1024.14(d).

Finally, section 8(c)(2) provides that "[n]othing in this section [*i.e.*,

section 8] shall be construed as prohibiting … the payment to any person of a bona

fide salary or compensation or other payment for goods or facilities actually

furnished or for services actually performed." 12 U.S.C. 2607(c)(2); *see also*

12 C.F.R. 1024.14(g)(1)(iv) (restating the statute).

### B. PHH, Mortgage Insurance, and Reinsurance

PHH Corp., through its affiliates, PHH Mortgage Corp. and PHH Home

Loans LLC, originated home mortgages. Dec. at 2 (JA.2). PHH sold virtually all

the mortgages it originated into the secondary mortgage market, primarily to

Fannie Mae and Freddie Mac.[2] *Id.* But if a borrower financed more than 80% of

the value of a home, Fannie Mae and Freddie Mac would only purchase the loan if

the borrower obtained mortgage insurance. Mortgage insurance provides protection

for mortgage lenders (or those who become mortgage creditors) when borrowers

default on mortgage loans. Although mortgage insurance provides protection for

---

[2] In addition to originating mortgages, PHH purchased loans that other lenders
originated. After it purchased loans from these "correspondent lenders," PHH sold
them in the secondary market. Dec. at 3, 4 (JA.3, 4).

6

creditors, it is paid for by borrowers, who thus are paying for insurance that they will never collect. *Id.* at 3 (JA.3).

"Borrowers who are required to get mortgage insurance do not normally shop for it." *Id.* Instead, lenders designate the mortgage insurance company, and borrowers pay for the insurance – usually paying a monthly insurance premium as part of each mortgage payment. Thus, mortgage insurance companies typically depend on lenders to "refer" business to them; they do not market directly to borrowers, and borrowers do not seek them out. *Id.*

Throughout the 1990s, and up until the collapse of housing prices in 2008, mortgage insurance was very lucrative. At first, however, this revenue did not benefit mortgage lenders. *Id.* So PHH established Atrium as a means of capturing a portion of the profits that mortgage insurers had been reaping. *Id.* Atrium was a mortgage *re*insurance company. *Id.* A mortgage reinsurer is supposed to assume some of the risk that would otherwise be borne by a mortgage insurer. *Id.*  In return, it garners a portion of the premiums that borrowers pay to the mortgage insurer. *Id.* Beginning in 1995, Atrium entered into contracts with mortgage insurers to provide them with reinsurance on loans originated by PHH. *Id.* To get this reinsurance, the mortgage insurer had to pay Atrium (or, to use the industry jargon, "cede" to Atrium) a portion of the each monthly mortgage insurance premium paid by the borrower. *Id.* PHH established Atrium as a "captive"

7

reinsurer. That means Atrium provided reinsurance only for mortgage insurers that insured mortgages generated by PHH, and only for mortgages that PHH originated or obtained from its own correspondent lenders.[3] *Id.*

Atrium entered into its first captive reinsurance contract with mortgage insurer United Guaranty Residential Mortgage Co. (UGI) in 1995. *Id.* at 4 (JA.4). The second, in 2001, was with Genworth Mortgage Insurance Corp. (Genworth); the third, in 2004, was with Radian Guaranty Inc. (Radian); and the final contract, in 2006, was with CMG Mortgage Insurance Co. (CMG).[4] *Id.*

PHH linked its borrower referrals to these captive contracts. From 1995 to 2001, when PHH's only captive contract was with UGI, it referred most of its loans that required mortgage insurance to UGI. *Id.* But beginning in 2001, when PHH had captive agreements with more than one mortgage insurer, PHH used an automated process, known as the "dialer," to assign borrowers to the mortgage insurers that had captive contracts. *Id.* If a mortgage insurer was not on the dialer,

---

[3] There were, however, some loans that PHH originated but nonetheless refused to reinsure. In 2006, PHH amended its reinsurance agreements to provide that, even though it was originating loans to subprime borrowers, it would not reinsure those loans. ECX 0153 at 82-84 (JA.421). Thus, with respect to these riskier loans, PHH made sure that it was exposed to no risk ("skin in the game"). *Compare* RCX 0049 (amending agreement with Genworth) *with* Br. at 5, CMC Amicus at 11-14.

[4] After the housing crisis of 2008, mortgage insurance ceased to be profitable, and PHH wound down Atrium's reinsurance business. By 2013, all its reinsurance agreements had been terminated. PHH Stay Mot. at 20.

8

it was unlikely to receive any referrals from PHH. *Id.* As of May 2001, PHH had set its dialer to refer a portion of its loans requiring mortgage insurance to UGI, and the remainder to Genworth. *Id.* In 2003, Genworth announced a new business strategy: it would no longer pay as much for reinsurance as it had been paying to Atrium. *Id.* Within a few weeks of that announcement, PHH reset the dialer so that Genworth would receive only one-third of the referrals that it had previously been receiving and UGI would receive the referrals that Genworth had lost. *Id.* Genworth never implemented its new strategy, but it was several years before PHH modified its dialer to restore Genworth's share. *Id.*

   In February 2008, UGI informed PHH that, as of the end of May, it would no longer purchase reinsurance from Atrium. *Id.* As a result, from the beginning of June through the end of November, PHH's referrals to UGI declined by more than 99%. *Id.* In late November 2008, PHH and UGI entered into a new captive reinsurance agreement. Six minutes after learning of the new agreement, PHH's senior vice president gave instructions to return UGI to the dialer.[5] *Id.*

### C. Proceedings before the Bureau

---

[5] PHH had a different system for loans purchased from its correspondent lenders. If it purchased a loan requiring mortgage insurance (so that the loan could be sold in the secondary market), PHH would provide the correspondent lender with a list of preferred mortgage insurers. *Id.* at 4-5 (JA.4-5). Most of the insurers on the list had captive contracts with PHH. *Id.* at 5. If a lender selected a mortgage insurer that was not on the preferred list, then PHH imposed a surcharge on the loan that, presumably, resulted in a higher interest rate for the borrower. *Id.*

The Bureau initiated the administrative proceeding against PHH on January 29, 2014, by filing its Notice of Charges. *Id.* at 7 (JA.7). The notice alleged that PHH referred borrowers to mortgage insurers based on whether the mortgage insurer had entered into a captive reinsurance arrangement with PHH, and that this violated section 8(a) of RESPA because the reinsurance premiums paid by the mortgage insurers to PHH through Atrium were kickbacks. The notice further alleged that these kickbacks were at borrowers' expense – PHH steered mortgage insurance referrals to mortgage insurers that purchased reinsurance from Atrium even when PHH knew that other mortgage insurers offered lower prices for mortgage insurance. The notice sought a permanent injunction, monetary equitable relief, and civil penalties. Dkt. 1 (JA.41).

After a nine-day hearing, the ALJ issued his recommended decision, and concluded that PHH violated RESPA. Dkt. 205 (JA.104). He based his interpretation of RESPA on an unpublished 1997 letter (addressed to a mortgage originator that is not a party to this proceeding) in which HUD discussed captive reinsurance agreements. (HUD Letter, JA.251). The ALJ also concluded that the Bureau had authority to pursue PHH's RESPA violations only as to loans that closed on or after July 21, 2008. The ALJ recommended that PHH disgorge the reinsurance premiums that Atrium received in connection with those loans – $6.4 million. He also recommended injunctive relief.

10

Both PHH and the Bureau's enforcement counsel appealed to the Bureau's Director, and on June 4, 2015, the Director issued his Decision and Order. The Decision first holds that there is no statute of limitations when the Bureau enforces RESPA administratively. Dec. at 10-12 (JA.10-12). But it also recognizes that there is a presumption against retroactive application of statutes, and this limits the Bureau's authority with respect to conduct that occurred before the effective date of the Bureau's enforcement authority, July 21, 2011. However, HUD enforced RESPA prior to that date, and the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) transferred HUD's enforcement authority to the Bureau. 12 U.S.C. 5581(b)(7). Because, as of the date that authority was transferred to the Bureau, HUD could enforce RESPA as to conduct that occurred on or after July 21, 2008 (RESPA provided a three-year statute of limitations for all HUD enforcement actions, 12 U.S.C. 2614 (2006)), the Decision holds that the Bureau may enforce RESPA as to conduct that occurred on or after that date.

The Decision then holds that PHH's conduct during the relevant time period satisfied all the elements of a violation of section 8(a) of RESPA – the mortgage reinsurance premiums were payments of "things of value"; PHH agreed to, and did in fact, refer borrowers to mortgage insurers in exchange for these payments; and the borrowers' mortgage loans were federally related mortgage loans. Dec. at 12-14 (JA.12-14). Next, the Decision rejects PHH's contention that section 8(c)(2) of

11

RESPA shields its conduct. *Id.* at 14-17. Section 8(c)(2) does not provide a safe harbor for conduct that violates section 8(a). Instead, it clarifies section 8(a) by providing that the mere existence of a commercial arrangement between a party that refers settlement service business and a party that receives those referrals is not necessarily an agreement to pay kickbacks. But section 8(c)(2) would only be relevant if there were a question as to whether PHH had entered into an agreement to refer settlement service business in exchange for kickbacks. Because there is direct evidence that PHH entered into such agreements, section 8(c)(2) is irrelevant. The Decision also addresses the HUD Letter, which discussed captive reinsurance. *Id.* at 17-18 (JA.17-18). The Decision holds that the Letter is not binding on the Bureau, that its meaning is unclear, and that it does not provide PHH with a defense. The Decision also holds that PHH violated RESPA every time it accepted a reinsurance premium on or after July 21, 2008, because each premium was a kickback, even if the loan that gave rise to the reinsurance closed before July 21, 2008. *Id.* at 22-26 (JA.22-26).

Having concluded that PHH violated RESPA, the Director entered an Order that included both injunctive and monetary equitable relief. Order (JA.39). The Order has four injunctive provisions. The injunctive provisions prohibit PHH from committing the sorts of violations that it committed in the past (Order provision 1), and fence in PHH so that it cannot commit similar violations in the future (Order

12

provisions 2-4). The Order also requires PHH to disgorge all the kickbacks that it received from mortgage insurers on or after July 21, 2008, approximately $109 million.

On August 3, 2015, this Court granted PHH a stay of the Bureau's Order pending appeal.

## STANDARD OF REVIEW

The Bureau's Decision and Order are reviewed pursuant to the Administrative Procedure Act. *See* 12 U.S.C. 5563(b)(4) ("[r]eview of such proceedings shall be had as provided in chapter 7 of Title 5."). That is, this Court must determine whether "they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *PSEG Energy Resources & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (internal quotation marks omitted).

The Bureau's interpretation of RESPA is reviewed pursuant to the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Under this framework, the Court first assesses whether the text of RESPA unambiguously addresses the issues. If it does not, then the Court must "defer to the [Bureau's] construction of the provision at issue so long as that construction is reasonable." *PSEG Energy*, 665 F. 3d at 208 (internal quotation marks omitted).

13

"When a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing, the scope of judicial review is particularly narrow." *La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1302 (D.C. Cir. 2014). Accordingly, this Court should not overturn the relief imposed by the Bureau "unless it is unwarranted in law or without justification in fact." *Coosemans Specialties, Inc. v. Dep't of Agric.*, 482 F.3d 560, 566 (D.C. Cir. 2007) (internal quotation marks omitted).

With respect to PHH's constitutional challenge, when a court "is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384 (1989) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

PHH violated section 8(a): it entered into agreements with mortgage insurers so that whenever an insurer received a referral from PHH, the insurer paid PHH a kickback in the form of premiums for mortgage reinsurance. PHH thus committed a separate violation every time it "accept[ed]" a kickback payment. But PHH wants this Court to interpret section 8(a) so that its violations occurred not when it accepted kickback payments, but much earlier when it entered into loans with

14

borrowers that might (or might not) subsequently result in kickbacks. This would land most of PHH's violations outside of the Bureau's authority, but it is not what section 8(a) provides. Accepting a kickback is an element of a section 8(a) violation, and because PHH set up its scheme so that it received kickbacks after the loans closed, that is when it violated section 8(a). (Part 1.A, *infra*.)

PHH asks this Court to treat section 8(c)(2) as a defense to its violations. RESPA contains some exemptions (*see*, *e.g.*, section 8(c)(1)(B) permitting title insurance companies to pay for referrals), but section 8(c)(2) is not among them. Instead, section 8(c)(2) clarifies that there is no violation of section 8(a) when a party making referrals is paid by a party receiving referrals so long as those payments are for services actually performed and are not given in exchange for the referrals. If, as PHH urges, section 8(c)(2) permits a party to operate the sort of scheme PHH used and to condition referrals on the purchase of goods or services from a subsidiary of the party, this would flout the text, structure, and goals of RESPA. Nor does the HUD Letter shield PHH. That letter is neither a model of clarity, nor does it express any sort of "well-settled" interpretation of section 8(c)(2). In fact, HUD regulations explain that the Letter is an unofficial staff interpretation that provides no protection from RESPA liability. (Part I.B.1, *infra*.)

Because the Bureau administers RESPA, and because the Director recognized that section 8(c)(2) is ambiguous, his reasonable interpretation of that

section is entitled to *Chevron* deference. PHH argues, however, that, because RESPA may be criminally enforced, this Court should apply the rule of lenity and interpret every ambiguity in PHH's favor. But when a court is interpreting a civil statute that may be criminally enforced, the rule of lenity is an interpretive tool of last resort. Here, there is no need for the last resort, since the Director's reasonable interpretation has resolved section 8(c)(2)'s ambiguity. Further, application of the rule of lenity would be particularly inappropriate because it would thwart section 19, which specifically authorizes the Bureau to interpret RESPA to achieve the statute's purposes. (Part I.B.2, *infra*.)

RESPA's three-year statute of limitations does not apply here because the Bureau's enforcement authority comes not from RESPA but from Dodd-Frank, which imposes no limit on the Bureau's administrative proceedings. Further, Dodd-Frank transferred to the Bureau HUD's enforcement authority as of July 21, 2011. Accordingly, the Bureau may challenge PHH's RESPA violations that occurred on or after July 21, 2008. (Part I.C, *infra*.)

PHH contends that, even if it violated RESPA, it should not be sanctioned because it lacked fair notice that its conduct violated the law. But RESPA has a fair notice defense, section 19(b), and PHH does not qualify because it cannot show that it relied on any formal rule, regulation or interpretation of RESPA. Instead, it took its chances by relying on the HUD Letter, which provided no shield from

16

liability. So PHH attempts to invoke a right that is broader than the one allowed by Congress. But this Court has explained that an agency may interpret an ambiguous statute in an administrative enforcement proceeding, and may apply that interpretation retroactively, unless doing so would violate notions of equity and fairness. No such problem here because PHH did not base its reinsurance scheme on any formal interpretation of RESPA, and because, in addition to injunctive relief, the Order imposes no damages or civil penalties but merely requires PHH to disgorge illegally obtained proceeds. (Part II.A, *infra*.)

PHH contends that RESPA does not authorize disgorgement. But the Bureau's enforcement authority comes from Dodd-Frank, not from RESPA, and Dodd-Frank specifically authorizes the Bureau to award disgorgement. Nor is disgorgement limited to PHH's net profits. PHH cites several SEC cases, but in those cases, ill-gotten proceeds and net profits are often one and the same. In this proceeding, the two are not the same. The Director ordered PHH to disgorge all the illegal kickbacks it had received since July 2008, and PHH is not entitled to any sort of credit for amounts that it paid out (including payments to mortgage insurers) to operate its scheme. (Part II.B, *infra*.)

The injunctions seek to prevent PHH from committing the sorts of violations it committed in the past, and to fence it in so that it will not commit similar violations in the future. The first injunctive provision, which prohibits violations of

17

section 8, is not an inappropriate obey-the-law injunction since it relates the

prohibited conduct to the context of PHH's violations. The second provision,

which prohibits PHH from entering into any captive reinsurance agreements, is not

overbroad because it would be all too easy for PHH to use such agreements as a

means for extracting payments for referrals. Similarly, the third injunctive

provision fences in PHH by enjoining it from receiving payments for services, if

the sale of those services is triggered by referrals. That is, the provision forbids the

very sort of arrangement challenged here. And the fourth injunctive provision

requires PHH to keep records of payments that it receives from any settlement

service provider to which it refers borrowers. This record-keeping provision is not

overbroad because it may be the only means by which the Bureau can monitor

PHH to make sure that it does not engage in similar violations in the future. (Part

II.C, *infra*.)

Finally, PHH argues that the Bureau is unconstitutional because the

President can remove the Bureau's director only for cause. But it is well settled

that for-cause removal for the heads of agencies such as the Bureau is

constitutional because it does not impede the Presidents' ability to assure that the

laws are faithfully executed. Nor has Congress ceded its power of the purse merely

because Congress funded the Bureau with Federal Reserve funds, not through the

annual appropriations process. No separation-of-powers requirement limits

18

Congress to funding agencies through annual appropriations. In any event, if Congress wants to modify the Bureau's source of funding, nothing prevents it from doing so using the ordinary legislative process. Nor does the combination of both features challenged by the PHH render the Bureau unconstitutional. For-cause removal has no impact on Congress' power of the purse, and the Bureau's funding mechanism has no impact on the President's ability to faithfully execute the laws.

## ARGUMENT

## I.     PHH'S KICKBACK SCHEME VIOLATED RESPA

PHH does not dispute that its conduct satisfied all the elements of a violation of section 8(a) of RESPA: it referred borrowers to mortgage insurers, those mortgage insurers were providers of a real estate settlement service, the mortgage insurers agreed to pay kickbacks to PHH in exchange for the referrals, and those kickbacks came in the form of payments for mortgage reinsurance.[6] Rather, throughout this proceeding, PHH has argued that section 8(c)(2) excused its

---

[6] PHH contends that the market for settlement services is not distorted when mortgage insurers pay a "commensurate" price for mortgage reinsurance. *See* Br. at 36; *see also* NAR Amicus at 5-6, and examples cited at *id.* 19-25. It may be that, if the mortgage insurers paid fair market value for the mortgage reinsurance, they did not distort the market for mortgage reinsurance (assuming there is such a market). But the kickback payments most certainly distorted the market for mortgage insurance (a settlement service) because, as a result of the kickbacks, PHH had little incentive to refer borrowers to the lowest cost mortgage insurers. Further, "[t]he fact that the transfer of the thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited." 12 C.F.R. 1024.14(g)(2).

violations and permitted its kickback scheme. Under PHH's theory, RESPA allowed it to condition referrals on kickbacks so long as it could demonstrate that the reinsurance premiums it received bore a reasonable relationship to the value of the reinsurance. The Director rejected PHH's interpretation. He concluded that section 8(c)(2) was ambiguous, and that PHH's interpretation of the section was contrary to the text, structure, and goals of RESPA. Thus, he held that section 8(c)(2) did not excuse PHH's conduct. PHH now urges this Court to eschew *Chevron* deference (as well as the Director's interpretation of section 8(c)(2)), and argues that the statute either unambiguously compels its reading or, alternatively, is so ambiguous that the rule of lenity requires all ambiguity to be resolved in its favor. But the rule of lenity, which normally applies to criminal statutes that are grievously ambiguous, does not displace the Director's reasonable interpretation of section 8(c)(2).

## A. PHH violated section 8(a) every time it accepted an illegal kickback

PHH does not dispute that it violated section 8(a). Instead, it disputes the number and timing of its violations. It contends that it violated the section only upon the closing of mortgage loans that involved mortgage insurance, not when it actually received the kickbacks from the mortgage insurers. Br. at 31, 37-39. But this argument comes up against a roadblock – the plain language of section 8(a). That section states that "[n]o person shall … accept any … kickback …." And as

20

the Director explained, PHH consummated its violations of section 8(a) when it "accept[ed]" kickbacks, not when it entered into loans as to which the mortgage insurers subsequently paid kickbacks. Dec. at 22-23 (JA.22-23).

Neither of the cases that PHH primarily relies on, *Snow v. First American Title Ins. Co.*, 332 F.3d 356 (5th Cir. 2003), and *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311 (M.D.N.C. 2002), advances its cause. As the Director explained, *Snow* does not apply because the facts of that case are different. Further, dicta in *Snow* conflicts with RESPA's plain language, as does the reasoning in *Mullinax*. Dec. 22-26 (JA.22-26).

*Snow* involved title insurance, not mortgage insurance, and the borrowers in *Snow* paid for their title insurance policies in full, with one payment, when their loans closed. Also at closing, the agents who referred the borrowers to the title insurance companies received a kickback in the form of a "credit toward future payment." 332 F.3d at 358. The plaintiffs conceded that the defendants violated section 8(a) upon closing, but closing was outside the statute of limitations period. *See* 12 U.S.C. 2614. So they tried to argue that the violations also occurred when, at a later date, the agents collected on the credits they received at closing (akin to suggesting that a payment by check happens at two separate times – once when the check is received, and once when it is cashed). The court rejected this argument because the agents earned their credits upon closing, not at a later date. 332 F.3d at

21

358. Thus, *Snow* does not apply because its facts are different. Unlike here, the

settlement service provider in *Snow* paid the kickback in full at closing, and, as the

plaintiffs in *Snow* recognized, that is when RESPA was violated. Here, as the

Director explained, no violation occurred at closing because PHH received no

kickback at closing. Dec. at 22 (JA.22). Moreover, unlike the agents in *Snow*, PHH

cannot be said to have "earned" the future payments at closing.

However, PHH contends that, at closing, it received a "contractual right" for

future payments, and that this right was a "thing of value." *See* Br. at 38. But that

right was at best contingent because PHH only received subsequent payments if

and when consumers paid for mortgage insurance.[7] *See* ECX 0584 (contract

between UGI and Atrium). Indeed, if the borrower refinanced the mortgage shortly

after closing, or paid down the mortgage so that mortgage insurance was no longer

required, PHH might receive little, if any, kickback.[8] PHH did not violate Section

---

[7] Because PHH has failed to argue in the proceedings before the Bureau that its
"contractual right" constituted a "thing of value," PHH has waived this argument.
*See*, *e.g.*, *Coburn v. McHugh,* 679 F.3d 924, 929 (D.C. Cir. 2012). The argument is
also illogical. To the extent that PHH received a "contractual right," it did so when
it entered into the reinsurance agreements with the mortgage insurers, which, for
many borrowers, occurred years before they received loans from PHH.

[8] PHH also cites *Menichino v. Citibank, N.A.*, No 12-0058, 2013 WL 3802451
(W.D. Pa. July 19, 2013), and *Palmer v. Homecomings Fin., LLC*, 677 F. Supp. 2d
233 (D.D.C. 2010). Br. at 37-38. In both of those cases the timing of RESPA
violations was not at issue because the plaintiffs conceded that the violations of
section 8(a) occurred upon closing.

8(a) merely because it entered into agreements with the mortgage insurers. It satisfied all the elements of a section 8(a) violation only when its right to receive kickback payments vested pursuant to those agreements, *i.e.*, when borrowers paid for mortgage insurance.[9] Thus, there is no risk that the limitations period for private plaintiffs will be indefinitely extended, *see* Br. at 38 – each separate violation gives rise to a separate limitations period.

Although the outcome of *Snow* is not inconsistent with the Director's Decision, the court in that case, in dicta, seemed to interpret section 8(a) to provide that violations occur not when kickbacks are paid but when borrowers pay for settlement services. 332 F.3d at 359 n.3. *Mullinax* relied on similar reasoning. The plaintiffs alleged that their mortgage lender had referred them to a mortgage insurance company, and that the mortgage insurance company violated section 8 by making kickback payments to the lender pursuant to, among other things, a captive reinsurance agreement. *See* 199 F. Supp. 2d at 314-15. The defendants in

---

[9] Amicus AFSA's arguments go off track because it misunderstands the breadth of section 8(a) – it contends that the section prohibits "every payment connected in any way to a referral." AFSA Amicus at 12; *see also* CMC Amicus at 14-22. But as the Director concluded, that section does not prohibit every payment in connection with a referral, only those payments that are a quid pro quo for the referral. *See* Dec. at 18-19 (explaining why the Decision is not at odds with *Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir. 2002) (JA.18-19)). Similarly, although *Edwards v. First American Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015), noted that a payment made "simultaneously with a referral" would not violate RESPA, *see* NAR Amicus at 1, and cases cited at 11-13, *Edwards* never said that a payment made in exchange for a referral would survive a RESPA challenge.

23

*Mullinax* argued that the plaintiffs' complaint was not timely. The court looked to RESPA's statute of limitations (12 U.S.C. 2614), which refers to "the violation" in the singular, and held that "the violation occurs when the borrower is overcharged by a provider of settlement services," i.e., "at the closing settlement." *Id.* at 324-25.

But, as the Director explained, section 8(a), not RESPA's statute of limitations provision, defines the violation. Dec. at 24 (JA.24). Section 8(a) prohibits the "giv[ing]" or the "accept[ing]" of an illegal payment by a settlement service provider, not the overcharging of the consumer (although kickbacks may result in overcharges), so the violation occurred each time PHH received a kickback. That is, each payment was a separate violation.[10]

PHH contends that this plain reading of section 8(a) renders RESPA's statute of limitations "unworkable" because, in PHH's opinion, it would be better if all violations occur on closing, "an objective date the borrower knows."[11] *See* Br.

---

[10] PHH notes that the court in *Mullinax* was concerned that, if the limitations period began when payments were made, this would produce "disparate results" – if the borrower paid for mortgage insurance in full at closing (and, presumably, the insurer paid a large kickback at that time), the statute of limitations would begin to run at closing, but if the borrower made monthly payments, the statute of limitations would not begin to run until later. Yet as the Director noted, the timing of liability was totally within the control of PHH and the mortgage insurers, because they decided when kickback payments would be made. Dec. at 25 (JA.25).

[11] Amicus ALTA contends that if the statute of limitation always runs from closing (regardless of when payments are made), this benefits settlement service providers because it permits them to determine when their exposure to liability will end. *See*

24

at 39. But statutes are not "unworkable" merely because a plaintiff may not be immediately aware that a violation has occurred. *See TRW Inc. v. Andrews*, 534 U.S. 19 (2001) (holding that, in an action alleging violations of the Fair Credit Reporting Act, the statute of limitations began to run when the credit bureau issued the inaccurate credit reports, not when the consumer learned of the violations). Further, PHH's misreading of section 8(a) does not assure that borrowers know when violations occur because neither kickback agreements nor kickback payments are necessarily disclosed to borrowers. In any event, RESPA's text, not PHH's view of workability, controls when violations occur.

Finally, PHH contends that the Director's application of section 8(a) could produce a "shocking multiplier effect" with respect to the statutory penalties. *See* Br. at 39. But there is no "multiplier effect" at all. Each time PHH accepted a kickback payment a violation occurred, the statute of limitations with respect to that violation began to run, and PHH was exposed to liability with respect to that specific violation. This is the result dictated by section 8(a).[12]

---

ALTA Amicus at 26. Of course, settlement service providers can limit their potential liability for RESPA violations by complying with the law.

[12] PHH suggests that the Director "multiplied" the ALJ's disgorgement award. *See* Br. at 39. In fact, however, the ALJ limited PHH's liability based on his belief that he was bound by *Snow*'s interpretation of section 8(a). Dkt. 152 at 11-12 (JA.91-92.) The Director held that *Snow* did not apply and imposed liability based on all the kickback payments accepted by PHH during the limitations period.

## B. Section 8(c)(2) does not excuse PHH's violations

PHH claims section 8(c)(2) as an affirmative defense.[13] But the "defense" PHH contemplates is so large that it swallows much of the consumer protections of section 8(a). In particular, PHH argues that section 8(c)(2) permits it to receive kickbacks in exchange for referrals so long as it cloaks the kickbacks as a payments for services, *i.e.*, "I'll send customers (*i.e.*, referrals) to you if you send very profitable business to me." The Director rejected this defense, although he recognized that the meaning of section 8(c)(2) "is perhaps not entirely clear when read in isolation." Dec. at 15 (JA.15). Because the provision is ambiguous, he then interpreted it, and rejected PHH's reading as inconsistent with "the text, structure, and goals of RESPA." Dec. at 20. (JA.20). He explained why the section does not provide an exemption for PHH's violations, but instead serves to clarify the meaning of section 8(a). The Director's reasonable interpretation of section 8(c)(2) is entitled to deference.

### 1.      The Director reasonably interpreted section 8(c)(2) to clarify section 8(a)

Section 8(c)(2) provides that "[n]othing in this section [*i.e.*, section 8] shall be construed as prohibiting … the payment to any person of a bona fide salary or

---

[13] PHH suggests that, during the hearing before the ALJ, the Bureau's enforcement counsel understood that section 8(c)(2) provided PHH with a defense. In fact, enforcement counsel interpreted section 8(c)(2) exactly as the Director did (while also recognizing that the ALJ interpreted the section as a defense). *See* Enforcement Counsel's Motion for Summary Disposition (Dkt. 102) at 22-25.

compensation or other payment for goods or facilities actually furnished or for services actually performed." To PHH's eye, section 8(c)(2) is a model of "particular clarity" that "unambiguously permits" it to receive kickbacks for referrals so long as those kickbacks take the form of payments for services.[14] Br. at 33. But its argument regarding the section goes astray right from the start when it contends that the section "plainly states that it applies *notwithstanding* any other provision of RESPA ...." *See* Br. at 19. In fact, the Director specifically rejected PHH's interpretation of section 8(c)(2) because the section does *not* use the word "notwithstanding." Dec. at 15 (JA.15). Instead, the section begins with the verb "construe." As the Director explained, the use of that verb indicates that the section serves to "clarify the application of section 8(a)." Dec. at 17 (JA.17).[15] The

---

[14] But as discussed *infra*, PHH also takes the opposite approach and argues that this Court should employ the rule of lenity to interpret section 8(c)(2), a rule that is triggered when a statute is grievously ambiguous. *See Robers v. United States*, 134 S. Ct. 1854, 1859 (2014).

[15] In reaching this interpretation, the Director relied on *Culpepper v. Irwin Mortgage Corp.* 253 F.3d 1324, 1330 (11th Cir. 2001), a case discussing the applicability of section 8(c)(2) to certain payments paid by mortgage lenders to mortgage brokers known as "yield spread premiums" (YSP). (YSPs are very different from the kickbacks received by PHH. Just as a lender may offer a borrower a lower interest rate if the borrower pays points, a lender may offer to pay a YSP if the borrower agrees to pay a higher interest rate for a loan. YSPs may be used to pay other closing costs that the borrower might not want to pay out of pocket. Dodd-Frank amended the Truth in Lending Act to limit the use of YSPs. *See* 15 U.S.C. 1639b(c).) PHH contends that, in *Heimmermann v. First Union Mort. Corp.*, 305 F.3d 1257 (11th Cir. 2002), the Eleventh Circuit rejected *Culpepper*'s interpretation of section 8(c)(2). Br.at 36 n.5. But a later panel of the

27

Director noted that section 7 of RESPA "uses the word 'exempt' to create an exemption," but section 8(c)(2) does not, thereby indicating that the section is intended as an interpretive tool. Dec. at 15 (JA.15). The Director also explained how PHH's reading of the section, which would permit any agreement to pay kickbacks for referrals so long as the payments take the form of a payment for services, renders surplusage other portions of section 8(c) (including sections 8(c)(1)(B), 8(c)(1)(C)),[16] and is at odds with the stated goals of RESPA. Dec. at 16, 19 (JA.16, 19). *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (a court's "duty … is to construe statutes, not isolated provisions.").

Thus, the Director explained the role of section 8(c)(2). Dec. at 16 (JA.16). Parties to illegal kickback agreements are unlikely to put those agreements into writing.[17] So those agreements may have to be identified based on circumstantial

---

Eleventh Circuit would not have the authority to reject the decision of an earlier panel. Rather, *Heimmermann* merely recognized that the result reached in *Culpepper* was superseded by an intervening HUD policy statement, a statement that never addressed whether section 8(c)(2) excuses violations of section 8(a). *See* 305 F.3d at 1259-60.

[16] Amicus ALTA contends that the Director's Decision would nullify sections 8(c)(1)(A)-(C). ALTA Amicus at 12-15. In fact, the Director recognized that those subsections, unlike section 8(c)(2), describe exemptions that would become surplusage under PHH's interpretation of section 8(c)(2). *See* Dec. at 19 (JA.19).

[17] Amici AFSA and ALTA contend that, under the Director's interpretation, application of section 8(c)(2) turns on the mental state of settlement service providers. *See* AFSA Amicus at 15-16; ALTA Amicus at 11. Not so. Section

28

evidence and inference. But section 8(c)(2) clarifies when it is not proper to infer an illegal agreement. Illegality cannot be inferred merely because a party that received referrals makes payments to a party that made the referrals. Moreover, such an arrangement is not illegal if the payments are for services actually provided, and if the purchase of those services (by the party that received the referrals) is bona fide, *i.e.*, in good faith,[18] rather than a quid pro quo for referrals.[19] In this proceeding, section 8(c)(2) is irrelevant because there is ample direct evidence, evidence PHH does not dispute, that it entered into agreements with mortgage insurers pursuant to which it made referrals to the insurers, and in exchange, the insurers purchased reinsurance from PHH's subsidiary (Atrium).

PHH also claims that HUD has "repeatedly interpreted" section 8(c)(2) so as to exempt its conduct from liability. *See* Br. at 34. PHH finds these "repeated" interpretations in Regulation X (24 C.F.R. 3500.14(g)(1) (2011)), in the HUD Letter (JA.251), and in a 2004 letter written by a HUD associate general counsel

---

8(c)(2) turns not on the mental state of the parties, but on whether they entered into agreements to pay kickbacks for referrals.

[18] Apparently not conversant in legal Latin, Amicus AFSA argues that "bona fide" should *not* be equated with "in good faith." *See* AFSA Amicus at 13. AFSA is also mistaken when it contends that the Reg. X defines "bona fide." *See* AFSA Amicus at 17-18, citing 12 C.F.R. 1024.14(g)(2).

[19] PHH contends that the Director has "declared *per se* illegal" affiliated mortgage reinsurance. No. Such arrangements violate RESPA only if, as here, the purchase of the reinsurance is the price for receiving referrals.

(which PHH refers to as the "Confirmation Letter") (JA.259). But 3500.14(g)(1)

doesn't interpret section 8(c)(2) – it merely restates it. *See* 24 C.F.R.

3500.14(g)(1)(iv) (2011). Therefore, it does nothing to support PHH's argument

that payments for referrals, even when cloaked as payments for a service, could

ever be "bona fide."

Nor does the HUD Letter help PHH. As the Director explained, the HUD

Letter contains statements that appear to be internally inconsistent.[20] Dec. at 18.

Even more important, pursuant to HUD regulations that were in effect at the time

the Letter was written, and that remained in effect throughout the events in this

proceeding, documents not published in the Federal Register (the Letter was never

published) do not constitute a "rule, regulation or interpretation." 24 C.F.R.

3500.4(b) (1997). *See* Dec. at 17.[21] And, as HUD further cautioned in its

---

[20] Although PHH claims that the HUD Letter supports its interpretation of the section 8(c)(2), *see* Br. at 7-8, 26-27, as the Director noted, the Letter cautions that payments for captive reinsurance will pass muster under RESPA only if the payments are "solely" for reinsurance, *i.e.*, not the price for referrals. Dec. at 18, quoting HUD Letter at 1 (JA.18). When a mortgage insurer purchases reinsurance that it does not otherwise want, *see* Dec. at 13 (JA.18), but that it nonetheless purchases as a condition of receiving referrals, that purchase is not "solely" for reinsurance.

[21] It is telling that neither PHH nor any of its amici even mentions this rule, which was discussed by the Director, and which was republished by the Bureau when HUD's RESPA rulemaking authority was transferred. *See* 12 C.F.R. 1024.4 (2013).

regulations, such letters "provide no protection" from liability under RESPA.[22] *Id.*

at 3500.4(b)(2). PHH has provided no reason why this Court should give the Letter

a status that HUD did not accord it.[23] And as to the so-called Confirmation Letter,

which merely states that HUD would evaluate captive title reinsurance

arrangements the same way that it evaluates captive mortgage reinsurance

arrangements, that letter also was not published in the Federal Register, and also

provides no protection.[24]

---

[22] Despite HUD's cautionary statement, PHH refers to the HUD Letter as "the controlling standard." Br. at 28. However, in *Munoz v. PHH Corp.*, No. 1:08-cv-759 (E.D. Cal.), PHH advised the court that the HUD Letter "does not constitute formal agency guidance and, as such, it is not entitled to any deference." Defendants Objections to Magistrate Judge's Findings and Recommendations at 17, ECF No. 233 (May 30, 2013). *See also Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1195 (11th Cir. 2010) (based on § 3500.4, according no deference to HUD booklet).

[23] PHH mistakenly contends that the Bureau's regulations contain the same test as the HUD Letter. *See* Br. at 28-29, citing 12 C.F.R. 1024.14(g)(2). PHH interprets that regulation to "expressly 'permit' qualifying payments." *Id.* But this argument stems from a logical fallacy (denying the antecedent, *see New Eng. Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370 (D.C. Cir. 2013) (*P* implies *Q* does not mean that *not P* implies *not Q*)). Section 1024.14(g)(2) states that, if a payment bears no reasonable relationship to the value of the services provided, then the excess may be a payment for a referral. However, this does not mean that, if the payment *does* bear a reasonable relationship to the value of the services provided, then those payments are never for referrals.

[24] PHH notes that, in connection with appropriations legislation, the House Conference Report stated that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed" to violate section 8(a). H.R. Rep. No. 105-769, at 260 (1998) (Conf. Rep.). *See* Br.at 9. At that time, the conferees were concerned that HUD had not

PHH claims that courts have interpreted section 8(c)(2) as "an exemption from liability." Although the cases cited by PHH refer to section 8(c)(2) as a "safe harbor," *see* Br. at 35 n.3, none suggests that paying for services as a quid pro quo for referrals, even if the services are fairly priced, would pass muster under RESPA. *See also* cases cited at Br. at 27. Moreover, even if those cases did support PHH, they do not preclude the Director from applying a reasonable interpretation to the meaning of section 8(c)(2). *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (an agency's interpretation of an ambiguous statute trumps prior inconsistent court interpretations). PHH also relies on an administrative consent order, entered into by the Bureau, that refers to section 8(c)(2) as an "exemption." *See* Br. at 35 n.4. But PHH fails to note that, several paragraphs later, the same consent order includes the same interpretation applied by the Director in this matter: a party violates section 8(a) when it enters a contract with the understanding that, in exchange, the counterparty will refer settlement service business, even if the fees paid under the contract are fair market

---

issued a policy statement regarding YSPs. But the statement had nothing to do with the sort of captive reinsurance agreements that are at issue here, nor does it address payments that are kickbacks for referrals.

value for the goods or services provided. Consent Order ¶¶ 20-21 *In the Matter of Lighthouse Title, Inc.*, No. 2014-CFPB-0015 (Sept. 30, 2014).[25]

### 2.     The Director's interpretation of section 8(c)(2) is entitled to *Chevron* deference

PHH recognizes that, pursuant to *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842-43 (1984), an agency's reasonable interpretation of an ambiguous statute that it administers is entitled to deference. *See* Br. at 17; *see also Bhd. of Locomotive Eng'rs v. United States*, 101 F.3d 718, 726 (D.C. Cir. 1996) (applying *Chevron* in administrative adjudication). As explained, the Director held that section 8(c)(2)'s meaning is "not entirely clear," but he reasonably interpreted that provision. Nonetheless, PHH contends that, because RESPA provides for criminal penalties for a violation of section 8, 12 U.S.C. 2607(d)(1), this Court should apply the rule of lenity, and flip the traditional *Chevron* analysis by accepting PHH's construction unless the Director can demonstrate that the statute unambiguously favors his. *See* Br. at 41.

This Court has never held that an agency is stripped of deference with respect to a statute it administers merely because provisions of the statute may be

---

[25] Similarly, although the consent order in *In the Matter of Fidelity Mortgage Corp.*, No. 2014-CFPB-0001, refers to section 8(c)(2) as an exemption, *see* Br. at 35 n.4, the same paragraph notes that, when a thing of value is connected in any way to the volume of business referred, it is evidence of a violation of section 8(a).

criminally enforced.[26] Indeed, the Supreme Court has deferred to an agency's interpretation of a civil statute in exactly that situation. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703-704 (1995) (deferring to the agency's interpretation of a provision of the Endangered Species Act, which can be criminally enforced). PHH relies on several cases, but those cases merely demonstrate that 1) the rule of lenity applies when a court interprets a criminal statute, and 2) a court may also apply the rule of lenity when it interprets a provision of a civil statute that has criminal sanctions, but only as a tool of last resort if the court is unable to resolve ambiguity using ordinary tools of statutory construction, which include according appropriate deference to the views of the administering agency.

PHH leans heavily on *Leocal v. Ashcroft*, 543 U.S. 1 (2004), *see* Br. at 40. But what that case demonstrates is that *Chevron* deference is not appropriate with respect to *criminal* statutes, even when those criminal statutes have application outside a criminal context. (*Leocal* was an immigration case that required the Court to interpret the meaning of "crime of violence" in Title 18 of the United States Code.) And *United States v. Santos*, 553 U.S. 507 (2008), *see* Br. at 40, also

---

[26] Although RESPA may be criminally enforced, the Bureau has located only one published opinion relating to a criminal prosecution in the 41 years since it was enacted. *See United States v. Graham Mortgage Corp.*, 740 F.2d 414 (6th Cir. 1984).

involved the interpretation of a criminal statute (prohibiting money laundering, 18 U.S.C. 1956).

However, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011), *see* Br. at 40, shows that the Court normally does not apply the rule of lenity when interpreting a civil statute – the Court gave deference to agency views when it interpreted provisions of the Fair Labor Standards Act, even though those who violate those provisions could be subject to criminal sanctions. 131 S. Ct. at 1335. The Court noted that it could apply the rule of lenity to the interpretation of civil statutes with criminal sanctions, but only if it had first engaged in traditional methods of statutory interpretation, which, in that case, included according deference to the views of the agencies that enforced the statute. *Id.* at 1336. And in *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992), Br. at 40, the Court applied the rule of lenity when it interpreted the National Firearms Act, a tax statute with criminal applications, but it also noted that no agency interpretations addressed the issue that confronted the Court. 504 U.S. at 518 n.9. Additionally, *INS v. St. Cyr*, 533 U.S. 289 (2001), Br. at 41, which makes no mention of the rule of lenity, states that a deportation statute is to be construed in the alien's favor only in the event of "lingering ambiguity." *Id.* at 320.

Finally, PHH cites the concurring statement of Judge Sutton in *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729 (6th Cir. 2013), and the statement of

35

Justice Scalia (joined by Justice Thomas) concurring in the denial of certiorari in

*Whitman v. United States*, 135 S. Ct. 352 (2014). Both of these statements urge

application of the rule of lenity, not *Chevron*, when a court interprets a civil statute

that may be criminally enforced. But no case has adopted Justice Scalia's views or

those of Judge Sutton. To the contrary, as Justice Scalia noted, this Court has

accorded deference to agency interpretations of statutes they administer, even

when those statutes include criminal sanctions. 135 S. Ct. at 352, citing, *inter alia*,

*In re Sealed Case*, 223 F.3d 775 (D.C. Cir. 2000) (interpreting the Federal Election

Campaign Act); *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999)

(same). Because RESPA is a civil statute, the Director's reasonable interpretation

is entitled to deference.

It would be particularly inappropriate for this Court to apply the rule of

lenity to the Bureau's interpretations of RESPA. Section 19 of RESPA, 12 U.S.C.

2617, authorizes the Bureau (and, prior to the creation of the Bureau, HUD) to

"prescribe such rules and regulations, to make such interpretations, and to grant

such reasonable exemptions for classes of transactions, as may be necessary

to achieve the purposes of [RESPA]." If, as PHH urges, the Bureau were precluded

from interpreting ambiguities in section 8, unless those interpretations worked to

the advantage of those who give and accept kickbacks for referrals, it would

undercut section 8, one of RESPA's primary consumer protections. Further,

36

application of the rule of lenity would spill over to other sections of RESPA that
cannot be criminally enforced because the rule would also limit the Bureau's
ability to interpret section 3 of RESPA, 12 U.S.C. 2602, RESPA's definition
provision. That provision contains definitions of terms such as "federally related
mortgage loan," "thing of value," settlement services," and "affiliated business
arrangement." These terms are used in section 8, but they also appear in other
sections of RESPA.

Finally, section 19(b), 12 U.S.C. 2617(b), already defines the level of
leniency that Congress thought appropriate for violators of RESPA. That section
states that no provision of RESPA

> imposing any liability shall apply to any act done or omitted in good
> faith conformity with any rule, regulation, or interpretation thereof by
> the Bureau [formerly HUD] … notwithstanding that after such act or
> omission has occurred, such rule, regulation, or interpretation is
> amended, rescinded, or determined by judicial or other authority to be
> invalid for any reason.

PHH has never attempted to invoke this safe harbor. Nor could it, because, as
explained above, the HUD Letter on which PHH claims to have relied was neither
a rule, regulation, nor an interpretation, *see* 12 C.F.R. 1024.4(a)(2) (2011).[27] This
Court should not permit it to invoke the rule of lenity to evade the limits
established by Congress.

---

[27] Although Amicus AFSA refers to the Letter as "official … guidance," AFSA
Amicus at 8 (ellipsis in original), HUD never referred to it that way.

### C. No statute of limitations applies to this administrative proceeding

Separate provisions of Dodd-Frank authorize the Bureau to enforce any "enumerated consumer law" (including, *inter alia*, RESPA, *see* 12 U.S.C. 5481(12)(M)) either through an administrative proceeding, 12 U.S.C. 5563, or through a civil action in district court, 12 U.S.C. 5564. The provision that authorizes court actions includes a statute of limitations. 12 U.S.C. 5564(g). The provision authorizing administrative enforcement does not. The Bureau brought an administrative proceeding to challenge PHH's RESPA violations. Accordingly, no statute of limitations applies.[28]

PHH mistakenly contends that RESPA's three-year statute of limitations applies to this administrative proceeding. It bases this on its belief that the Bureau had "invoked" RESPA's enforcement provision, section 8(d) (12 U.S.C. 2607(d)(4)), as the source of its authority in this proceeding. Br. at 44-45. In fact,

---

[28] PHH complains that, if Bureau administrative proceedings are not subject to any statute of limitations, the Bureau might, 100 years from now, challenge conduct occurring presently. *See* Br. at 43. Although the doctrine of laches does not routinely apply to the government, presumably a court would look askance at a proceeding that was so stale. *But see United States v. Beebe*, 127 U.S. 338, 344 (1888) (the United States is not bound "by any laches of [its] officers, however gross"). In any event, the Bureau's administrative enforcement authority was modeled after similar authority of the federal banking agencies. *Compare* 12 U.S.C. 5563 *with* 12 U.S.C. 1818(b). No statute of limitations applies when the banking agencies use administrative proceedings to challenge violations of the laws they enforce.

38

the Bureau's Notice of Charges never "invoked" section 8(d) because that provision does not authorize administrative proceedings.

The Director explained why RESPA's statute of limitations provision does not apply – that provision refers only to "actions," and, as cases such as *BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006), explain, the word "action" normally refers to court actions, not administrative proceedings. Dec. 10 (JA.10) PHH tries to distinguish *BP America* – it claims that the statute at issue in that case, 28 U.S.C. 2415(a), not only used the word "action," but also had other indicia limiting its application to court actions. *See* Br. at 43-44; *see also* Chamber Amicus at 17 n.2. But so does RESPA's statute of limitations. It limits when actions "may be brought in the United States district court or in any other court of competent jurisdiction …." 12 U.S.C. 2614. This provision could not apply to an administrative proceeding, which would never be brought in district court. Accordingly, the Director correctly held that RESPA's statute of limitations does not apply here.[29] While PHH maintains that this outcome is "illogical," Br. at 43, in fact, as the Director noted, "[u]nless a federal statute directly sets a time limit,

---

[29] The Director also explained that, because Congress transferred to the Bureau HUD's enforcement authority as it existed the day before the Bureau's enforcement authority became effective (July 21, 2011), 12 U.S.C. 5581(b)(7), the Bureau may enforce RESPA against violations occurring on or after July 21, 2008. Dec. at 11-12. PHH has not challenged the Bureau's use of this authority to enforce RESPA.

39

there is no period of limitations for administrative enforcement actions." Dec. at 11

(JA.11) (quoting *Alden Mgmt. Servs. v. Chao*, 532 F.3d 578, 582 (7th Cir. 2008)).

## II.     THIS COURT SHOULD AFFIRM THE RELIEF ORDERED BY THE DIRECTOR

The Director's Order enjoins PHH from accepting kickbacks, and fences it

in so that it will not commit similar violations in the future. It also requires PHH to

disgorge all the illegal kickbacks it received on or after July 21, 2008.[30] As to the

relief, PHH mounts a two-pronged attack. First, even though HUD cautioned that

the HUD Letter would provide "no protection" from liability, PHH invokes the

Letter for exactly that purpose – it contends that no relief is appropriate because it

lacked fair notice that the Bureau would alter HUD's "long-standing"

interpretation of section 8(c)(2) as expressed in the Letter. *See* Br. at 26. Second,

PHH contends that each of the relief provisions is "unlawful." *See* Br. at 51-52. In

fact, each of the provisions is consistent with the Bureau's authority, and each is

tailored to the extensive, and long-term, violations PHH committed.

### A. The relief ordered by the Director does not offend fair notice

---

[30] These kickbacks amounted to more than $109 million. Although there were a few years where Atrium paid out more in claims than it received in premiums, *see* Br. at 12, overall its captive arrangements were very profitable. From 1995 through 2013, Atrium received reinsurance premiums totaling more than $450 million, which resulted in profits in excess of $150 million. *See* Respondents' Compilation of Material in Support of Their Appeal at tabs B and C.

PHH repeatedly invokes the Due Process Clause contending that it prohibits any relief because PHH did not have fair notice that its conduct was illegal. *See* Br. at 18, 24, 32. But Congress has already provided a defense to liability for those who lack fair notice of what RESPA requires. Specifically, section 19(b) of RESPA provides that those who "act … in good faith in conformity with any rule, regulation, or interpretation" issued by the Secretary of HUD (or, since 2011, issued by the Bureau) shall not be liable, even if such rule, regulation, or interpretation is later amended or rescinded. 12 U.S.C. 2617(b). HUD issued 24 C.F.R. 3500.4 (which was republished by the Bureau as 12 C.F.R. 1024.4) to implement section 19(b). That rule provides that a person may invoke section 19(b) only if the person relied on either a portion of Regulation X published in the Code of Federal Regulations, or a document that had been published in the Federal Register and that was designated as an "interpretation," "interpretive rule," "commentary," or "statement of policy."

Again, PHH makes no attempt to invoke section 19(b), since the HUD Letter, the primary basis of its fair notice defense, does not measure up under the standard of section 3500.4. PHH also relies on sections 1024.14(g)(1), (2) of Regulation X. *See* Br. at 26. But as explained above, section 1024.14(g)(1)(iv) merely restates section 8(c)(2), and PHH's interpretation of section 1024.14(g)(2) is based on a logical fallacy. *See* n.23, *supra*. Nor can PHH rely on other HUD

41

policy statements that it contends apply the same analysis as the HUD Letter. *See*

Br. at 8 & n.2, 9, 29; *see also* NAR Amicus at 6-10. Those statements address fact

situations that bear no similarity to PHH's captive reinsurance scheme, such as

rental of office space, lock-outs, 61 Fed. Reg. 29264 (June 7, 1996), and yield

spread premiums, 66 Fed. Reg. 53052 (Oct. 18, 2001). Each of those statements is

very fact-specific. Nor do any of the statements suggest that a lender may

condition referrals to a settlement service provider on payments by the settlement

service provider, even if those payments are in the guise of a fair-market-value

purchase of services. Because section 19(b) establishes the conditions that PHH

must meet to qualify for a fair notice defense, and because PHH cannot meet those

conditions, this Court should reject this defense.

 PHH cannot claim a right to fair notice broader than that already provided by

Congress. Indeed, it is well-settled that an agency may interpret ambiguous

statutory provisions in adjudicative proceedings,[31] *see NLRB v. Bell Aerospace*

*Co.*, 416 U.S. 267, 294 (1974), and may apply those interpretations retrospectively,

*Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081-85 (D.C.

Cir. 1987) (en banc). Further, there is a presumption in favor of retroactive

---

[31] Amicus ALTA's argument that the Bureau may not alter regulations in an
administrative adjudication, *see* ALTA Amicus at 17-20, is irrelevant because the
Bureau has not altered its regulations. Rather, this proceeding involves the
interpretation of an ambiguous statutory provision, and, by extension, the verbatim
text of 12 C.F.R. 1024.14(g)(1)(iv).

application. *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001). In

*Clark-Cowlitz*, this Court sitting en banc laid out a five-part test for identifying

those situations where the presumption should not apply:

> (1) whether the particular case is one of first impression, (2) whether
> the new rule represents an abrupt departure from well established
> practice or merely attempts to fill a void in an unsettled area of law,
> (3) the extent to which the party against whom the new rule is applied
> relied on the former rule, (4) the degree of the burden which a
> retroactive order imposes on a party, and (5) the statutory interest in
> applying a new rule despite the reliance of a party on the old standard.

826 F.2d at 1081. As this Court further explained, the last four factors "boil down

… to a question of concerns grounded in notions of equity and fairness." *Id.* at

1082 n.6; *see also Verizon Tel. Cos*. *v. FCC*, 269 F.3d at 1109 (holding that

retroactive application is appropriate when a decision imposes a new application of

existing law, a clarification, or an addition).

None of the five factors favors overturning the relief ordered by the Director.

This Court explained that "the first factor points in favor of retroactive application

of a rule in the adjudication in which the new rule or principle is announced."

*Clark-Cowlitz*, 826 F.2d at 1082 n.6. That is the situation here: the Decision

announced a clarification of section 8(c)(2) of RESPA that had never been

addressed in HUD's (or the Bureau's) official guidance. Nor does the second factor

favor PHH. That factor considers whether the agency's prior interpretation was

well-established, and whether the party has reasonably relied on that view. *Id.* at

43

1082-83. Although PHH claims it relied on the HUD Letter, that Letter was

Delphic in content, and hardly represented well-established practice since HUD's

rules cautioned that documents such as the Letter provided no defense to liability.[32]

Nor is it relevant that HUD had not previously challenged PHH's conduct.[33] *But*

*see* RCX 816 (press release from mortgage insurer Mortgage Guaranty Insurance

Corp. explaining that, by 2008, HUD had commenced an industry-wide

investigation of captive reinsurance arrangements); *see also Bankamerica Corp. v.*

*United States*, 462 U.S. 122, 131 (1983) ("[T]he mere failure of administrative

agencies to act is in no sense a binding administrative interpretation that the

Government lacks the authority to act.") (internal quotation marks omitted).

  The third factor assesses whether the party reasonably relied on the agency's

prior interpretation. Any reliance that PHH placed on the HUD Letter was, at best,

at its own risk, because HUD's rules cautioned that such unpublished letters

---

[32] Thus, the Decision is hardly a departure from an "established understanding" of section 8(c)(2). *See* ALTA Amicus at 20-22.

[33] Although HUD may not have challenged captive mortgage reinsurance, it did challenge captive title reinsurance. In a 2007 settlement with Beazer Homes USA, Inc., HUD stated that "it is HUD's position that it is a violation of Section 8(a) of RESPA to accept a thing of value in the form of an opportunity to participate in money-making captive title reinsurance arrangements in return for the referral of settlement service business to primary title insurance companies." http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_19718.pdf, at 3.

provided no defense to liability.[34] The fourth factor considers the degree of burden

that retroactive enforcement will impose on the party. Although the Order requires

PHH to disgorge $109 million, that amount is a small fraction of the kickbacks that

PHH received through Atrium,[35] and is merely a *disgorgement* of funds PHH

should have never received in the first place.[36] Finally, the fifth factor, the statutory

interest in applying the standard set forth in the Decision, favors retrospective

relief. Eliminating kickbacks is a primary goal of RESPA. If PHH is permitted to

keep the fruits of its kickback scheme merely because it claims it believed its

scheme was legal, this will encourage others to take advantage of areas of statutory

---

[34] PHH did not rely on the HUD Letter when it entered into its first captive reinsurance agreement because that agreement predated the Letter by nearly two years. *See* Dec. at 4 (JA.4) (PHH entered its first agreement in November 1995).

[35] The fourth injunctive provision also has some retrospective impact because it requires PHH to compile a record of all things of value that its employees have received since July 21, 2008, from any real estate settlement service provider. In connection with the motion for a stay that PHH filed in this Court, PHH estimated the cost of complying with this portion of the Order, *see* Motion of Petitioners for a Stay Pending Judicial Review, Ex. F at ¶ 24, and that cost is minuscule relative to the magnitude of PHH's kickback scheme, and to PHH's size.

[36] Amicus Chamber cites *Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995), and *Fabi Constr. Co. v. Sec. of Labor*, 508 F.3d 1077 (D.C. Cir. 2007), in support of its contention that PHH may not be penalized because it was not given fair notice. Chamber Amicus at 6-11. But those cases involved punitive sanctions, not disgorgement. *See Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009) (recognizing that disgorgement is not a punitive measure); *see also Verizon v. FCC*, 269 F.3d at 1112 (in a challenge to retroactive application of a new interpretation, distinguishing damages from equitable restitution). In any event, section 19(b) describes RESPA's fair notice defense, and, as explained above, PHH does not qualify.

uncertainty. Thus, none of the factors rebuts the presumption in favor of retrospective relief. *See Verizon v. FCC*, *supra* (permitting disgorgement of charges even when the charges were, at the time imposed, approved, or even required by the FCC).

None of the cases cited by PHH is to the contrary. In *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), *see* Br. at 24, the so-called fleeting expletives case, the Court overturned orders that the FCC had entered against two broadcasters. Both broadcasters had based their conduct on a formal published FCC policy statement, but the FCC based its orders against the two broadcasters on a revised policy issued by the FCC *after* the challenged broadcasts. Here, PHH relied on an unpublished letter, not on any sort of formal agency policy. *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987), *see* Br. at 24, is irrelevant because it involves a party's reasonable interpretation of an agency rule. Thus, the appellant was misled by the agency's official pronouncement. No official agency pronouncement misled PHH. Finally, in *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012), *see* Br. at 24-25, the Court refused to impose liability on the drug company in a private action. The Court refused to accord any deference to an agency interpretation of its own ambiguous regulation where that interpretation was expressed in a series of somewhat inconsistent amicus briefs, and where that interpretation was also unpersuasive. The Court noted that

46

deference was particularly inappropriate in a case where the plaintiffs had sought a massive damage liability. Here, as explained above, the Bureau is entitled to deference because it is interpreting an ambiguous statutory provision (not one of its own regulations), and it is not seeking any damages from PHH.

Section 19(b) sets forth the conditions that PHH must meet to rebut the presumption in favor of retroactive application, and PHH's reliance on the HUD letter does not meet those conditions. Accordingly, the relief ordered by the Director does not violate fair notice.

## B. The Director properly ordered disgorgement

PHH contends that the Director lacked authority to order disgorgement, and that he did not correctly calculate the amount. Br. at 56-61. There is no merit to either argument.

1. PHH mistakenly contends that the Bureau's remedial authority in this proceeding is limited by RESPA. *See* Br. at 57. In fact, Dodd-Frank specifically authorizes the Bureau to obtain disgorgement in an administrative proceeding, *see* 12 U.S.C. 5565(a)(2)(D), and also authorizes the Bureau to use administrative proceedings to enforce RESPA, *see* 12 U.S.C. 5563.[37] Thus, the Bureau's remedial

---

[37] PHH contends that "[a]gencies, unlike courts, have no inherent equitable authority." *See* Br. at 57. But when it imposed disgorgement, the Bureau relied on express statutory, not inherent, authority.

47

authority in this proceeding is controlled by Dodd-Frank, not RESPA.[38] Although

PHH claims it cannot find any "clear intention" that Congress intended the Bureau

to seek disgorgement in an administrative proceeding to enforce RESPA, *see* Br. at

57, it need look no further than those two sections of Dodd-Frank.

     PHH also contends that, even if the Bureau can obtain disgorgement for

RESPA violations that occurred after July 21, 2011 (the date the Bureau's

enforcement authority became effective, 12 U.S.C. 5561 note), it can only obtain

disgorgement for violations that occurred before that date if it does so in a court

action because HUD could only enforce RESPA in court. *See* Br. at 58. PHH

provides no explanation as to why the Bureau is so limited. But as the Director

explained, because HUD had authority to obtain disgorgement for PHH's RESPA

violations that occurred between July 21, 2008, and July 21, 2011, the Bureau may

do so as well. Dec. at 12 (JA.12). And the Bureau's decision to challenge PHH's

pre- and post- 2011 violations in one administrative proceeding raises no concerns

about retroactivity. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994).

That is, because PHH concedes that the Bureau can obtain disgorgement for pre-

---

[38] PHH argues that section 16 of RESPA, 12 U.S.C. 2614, should limit the Bureau's enforcement authority because that provision is more specific than the provisions of Dodd-Frank. *See* Br. at 57. That canon of statutory construction (the specific controls the general) applies only when two provisions conflict. *Nitro-Lift Techs. v. Howard*, 133 S. Ct. 500, 504 (2012). There is no conflict here because section 16 does not address administrative enforcement proceedings.

2011 violations in a court action, it has no grounds for objecting that the Bureau chose to proceed administratively.

2. PHH raises two arguments regarding the amount of disgorgement the Director imposed. First, PHH complains that the Director required it to disgorge kickback payments that derived from "book years" that the ALJ did not analyze.[39] Br. at 58-59. But the ALJ analyzed individual book years to determine whether PHH could show that Atrium's reinsurance assumed risk and was fairly priced only because he mistakenly believed that section 8(c)(2) provided an exemption for PHH's violations of section 8(a).[40] As the Director explained, PHH violated section 8(a) every time it accepted a kickback payment from a mortgage insurer in exchange for a referral, regardless of whether the reinsurance (which the mortgage insurers would not have purchased but for its link to referrals) was fairly priced.

PHH also mistakenly contends that disgorgement must be limited to net profits, and that any disgorgement award should be reduced by payments it made to mortgage insurers. *See* Br. at 59-61. "Although courts sometimes say that

---

[39] Atrium provided reinsurance coverage for blocks of loans, known as "book years." A book year consisted of all the mortgage insurance policies written by a particular mortgage insurer on mortgages originated by PHH during a specific year. Dec. at 3 (JA. 3).

[40] Although the ALJ's analysis of the pricing of Atrium's reinsurance was irrelevant to the Director's Decision, the Director nonetheless agreed with the ALJ that PHH had failed to show that it had fairly priced the reinsurance for book years that closed on or after July 21, 2008. *See* Dec. at 20-22 (JA. 20-22).

disgorgement requires wrongdoers to disgorge illegally obtained *profits*, the proper measure is ill-gotten gains. That is, the wrongdoer must disgorge the 'total billings that [it] received ..., without deducting monies paid by [it] to other parties.'" Dec. at 34, quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011). In *Bronson Partners*, the defendants marketed bogus diet products, and the court rejected their argument that any award of disgorgement should be reduced by the costs of producing the bogus products. *Id.* at 375. Similarly, this Court should reject PHH's contention that any award of disgorgement should be reduced by the costs of the reinsurance, since those were payments made by PHH to participants in its illegal conduct. *See also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (holding that it would be a "monstrous doctrine" if "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets [was] immune from an order of disgorgement").

PHH cites several SEC cases in which the court refers to disgorgement of "net profits." *See* Br. at 59. But those cases are not analogous. For example, in *SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011), the defendants took illegal actions to increase the price of a stock they owned, and once the price increased, they sold the stock. This Court observed that the proper measure of disgorgement would be the "profits causally connected to the violation," *id.* at 7. That is, to the extent the stock had value prior to the price increase caused by the defendants' illegal

50

conduct, defendants would not be required to disgorge that pre-existing value. Here, there is no pre-existing value because PHH received all the kickback payments as a result of its illegal conduct. Thus, the proper measure of disgorgement is the total of the kickback payments that PHH received.[41]

Finally, PHH complains that, because it paid certain amounts to two of the mortgage insurers, disgorgement would require it to pay those amounts twice.[42] *See* Br. at 61. But again, those payments were a cost of the operation of PHH's scheme. As the court explained in *Bronson Partners*, a wrongdoer is not entitled to credit for such payments.[43]

### C. The injunctive relief ordered by the Director is proper

---

[41] Although the court in *SEC v. Teo*, 746 F.3d 90, 106 n.29 (3d Cir. 2014), *see* Br. at 60, stated that disgorgement of gross profits would not be appropriate, the court was referring to profits derived not from defendants' wrongdoing but from intervening causes. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 14-15 (1st Cir. 2010) (gross receipts were the appropriate measure of equitable disgorgement). *United States v. Masters*, 924 F.2d 1362, 1369-70 (7th Cir. 1991), *see* Br. at 60, is irrelevant because it addresses statutory disgorgement under RICO, not equitable disgorgement. *See United States v. DeFries*, 129 F.3d 1293, 1314 (D.C. Cir. 1997) (questioning *Masters*).

[42] PHH contends that it is required to disgorge $2.1 million in reinsurance premiums that it never received because the mortgage insurers paid those premiums into trusts. Br. at 61. But the trust agreements show that PHH could control the assets in the trusts. *See*, *e.g.*, ECX 203.

[43] PHH's situation bears no similarity to *Hateley v. SEC*, 8 F.3d 653 (9th Cir. 1993), *see* Br. at 61. In that case, the petitioners had received $55,000 in illegal commissions, and had paid 90% of that amount to another violator. The court held that the petitioners could not be required to disgorge the entire amount since the other violator was separately required to disgorge the 90% that he had received.

PHH challenges each of the injunctive provisions ordered by the Director, but there is no merit to any of the challenges.

The first provision requires PHH "in connection with the referral of any borrower to a provider of mortgage insurance [to] cease and desist from violating section 8" of RESPA. Order at 1 (JA.39). PHH complains that the provision is not sufficiently detailed and is not connected to the Notice of Charges. *See* Br. at 53. But as this Court explained in *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009), "[e]ven if it tracks statutory language, a general injunction is not too vague if it relates the enjoined violation to the context of the case." The first provision does just that because it prohibits violations of section 8 "in connection with the referral of any borrower to a provider of mortgage insurance," the conduct at issue in this proceeding. This is very different from the orders in the cases cited by PHH, *see* Br. at 53, which do not relate the injunction to the violation. See, *e.g.*, *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (overturning injunctive provision that enjoined defendants from any future violations of certain provisions of the Advisers Act).

Nor is there any merit to PHH's contention that it does not know what acts are enjoined because the injunction refers to RESPA section 8. Section 8 contains two prohibitions – kickbacks for referrals (section 8(a)) and splits of charges for

52

real estate settlement services (section 8(b)). There is no other conduct prohibited by section 8.

The second provision enjoins PHH, for 15 years, from entering into any captive reinsurance agreement. PHH complains that this provision is overbroad because it would prohibit PHH from entering into reinsurance agreements regarding life or property insurance. *See* Br. at 55. There is, however, no evidence that PHH has ever reinsured life or property insurance, but if it did, there is a risk that it could use those reinsurance agreements as compensation for referrals. As the Director explained, once the Bureau concluded that PHH had violated RESPA, it "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." Dec. at 32 (JA.32), quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). Further, because PHH has a "record of continuing and persistent violations" of a statute (PHH's captive reinsurance scheme lasted more than 18 years), "a general decree [is] wholly warranted." *Philip Morris*, 566 F.3d at 1137-1138.

The third injunction prohibits PHH for 15 years from referring any borrower to a settlement service provider if that provider has agreed to purchase any service from PHH and that purchase is triggered by the referral. PHH complains that this provision is too broad because it applies not just to referrals for mortgage insurance, but also to referrals for other settlement services. This provision is

53

hardly broad because the only acts it prohibits are those that are similar to PHH's

violations – conditioning referrals on the purchase of services. Indeed, a party that

has been held to have violated the law "must expect some fencing in." *FTC v. Nat'l*

*Lead Co.*, 352 U.S. 419, 431 (1957). PHH mistakenly believes that Dodd-Frank

limits the Bureau to enjoining only the specific acts mentioned in the Notice of

Charges. *See* Br. at 54, citing 12 U.S.C. 5563(b)(1)(D). But PHH has overlooked

the more general authority that comes from Dodd-Frank, which authorizes

injunctions that impose "limits on the activities or functions of the person."

12 U.S.C. 5565(a)(2)(G).

 PHH also complains that the provision is flawed because it does not define

the term "triggered." *See* Br. at 55. In the context of the Bureau's decision, PHH

should have no trouble figuring out what "triggered" means – the decision

discusses in great detail how PHH's referral of borrowers to mortgage insurers

caused, *i.e.*, triggered, the mortgage insurers to purchase reinsurance.

 The fourth provision requires PHH to maintain records of any payment of a

thing of value that it receives from a settlement service provider to which it refers

borrowers. Again, PHH complains that this provision is not tied to the Notice of

Charges and is too broad. *See* Br. at 55-56. But this is appropriate fencing-in relief

since for many years PHH engaged in a scheme to receive things of value in

exchange for referrals of settlement service business, and such schemes may be

hard to monitor. Thus, this provision will permit the Bureau to detect any future violations PHH may commit. Moreover, the "burden" PHH describes, *see also* PHH Stay Mot. at 16, is hardly "massive" given PHH's size. PHH contends that it will have to monitor 10,700 current and former employees. Br. at 56. But if it is possible that all these employees may have accepted things of value from settlement service providers to whom PHH referred borrowers, this graphically demonstrates the need for this provision.

## III.    THE BUREAU'S STRUCTURE IS CONSTITUTIONAL

PHH makes a sweeping challenge to the Bureau's constitutionality, Br. at 51, but its arguments have been tried before, and have never succeeded. *See CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014); *CFPB v. ITT Educ. Servs., Inc.*, No. 1:14-cv-00292-SEB-TAB, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015). It contends that Dodd-Frank unconstitutionally limits the President's power to remove the Bureau's Director. But that argument is foreclosed by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). It also claims that Dodd-Frank unconstitutionally limits Congress' appropriations power, but ignores that Congress retains its full authority to increase, decrease, or even eliminate the Bureau's funding.

1. In *Humphrey's Executor*, the Court upheld the constitutionality of the provision of the FTC Act that limited the President's removal authority over FTC

commissioners to for-cause removal. 295 U.S. at 632. As the Court later explained, it is "not essential to the President's proper execution of his Article II powers" that agencies like the FTC be headed by someone who is removable at will." *See Morrison v. Olson*, 487 U.S. 654, 691 (1988). So long as the officials who head such an agency may be terminated for cause, the President "retains ample authority to assure that the [official] is competently performing his or her statutory responsibilities in a manner that comports" with the statute, *id.* at 692, and to "ensure that the laws are 'faithfully executed,'" *id.* at 696.[44]

The for-cause removal provision upheld in the FTC Act is identical to the for-cause removal provision in Dodd-Frank that applies to the Director. *Compare* 15 U.S.C. 41 *with* 12 U.S.C. 5491(c)(3). So PHH tries to draw a distinction. It contends that the FTC is different because it is "non-partisan," it "acts with impartiality," and it is "called upon to exercise the trained judgment of a body of experts appointed by law and informed by experience." *See* Br. at 47, citing *Humphrey's Ex'r*, 295 U.S. at 624. But *Humphrey's Executor* did not suggest that the constitutionality of for-cause removal depended on those features. Rather, what was important was the functions that commissioners performed. Given the nature of those functions, for-cause removal was permissible because it did not impede

---

[44] Amicus SNB is troubled by several sections of Dodd-Frank that address the Bureau's autonomy, *see* SNB Amicus at 10-11, but never explains why these provisions unduly insulate the Director from the President's control.

the President's ability to assure that the laws are faithfully executed. *Morrison*, 487 U.S. at 691. Because the Director's functions are materially similar to those of FTC commissioners, *compare* 12 U.S.C. 5491-93 (describing the Bureau's functions) *with Morrison*, 487 U.S. at 690 n.28 (describing the relevant functions of the FTC), identical restrictions on his removal are likewise constitutional.

PHH complains that the Bureau is not headed by "a multi-member commission." *See* Br. at 47. But no court has ever held that otherwise-permissible for-cause removal restrictions become unconstitutional if applied to an agency headed by a single individual.[45] Indeed, the FTC's status as a multimember body had no bearing on the Court's conclusion that for-cause removal was consistent with the Constitution. *See* 295 U.S. at 626-32. Moreover, the President's oversight capability is not diminished when Congress structures an agency to be headed by a single director. If anything, the President can more easily exercise control over a single-member agency head removable for "inefficiency, neglect of duty, or malfeasance" than over a multi-member commission. *Morgan Drexen, Inc.*, 60 F. Supp. 3d at 1088.

---

[45] Amicus SNB makes a similar complaint, contending that the Bureau lacks "internal checks and balances." *See* SNB Amicus at 15-17. But constitutional checks and balances derive from "giving *each branch* the necessary constitutional means, and personal motives to resist encroachments of the others," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) (internal quotation marks omitted, emphasis added), not from the internal structure of an executive branch agency.

2. PHH also contends that Congress has given up its "exclusive control over the power of the purse" by funding the Bureau outside of the annual appropriations process. Br. at 48. But far from ceding any of its power of the purse, Congress retains full legislative authority over the Bureau's funding. Congress authorized the Bureau to obtain the funds that it reasonably needs to carry out its mission from the Federal Reserve, up to specified annual limits. 12 U.S.C. 5497(a). Thus, when the Bureau requests those funds, it acts in accordance with Congress' express instructions. And if Congress wants to change the Bureau's funding, it has full power to do so pursuant to the ordinary legislative process.[46]

No separation-of-powers principle requires Congress to fund agencies through annual appropriations. PHH cites the Appropriations Clause, *see* Br. at

---

[46] Amicus SNB misreads 12 U.S.C. 5497(a)(2)(C) and contends that Dodd-Frank prohibits Congress from reviewing the Bureau's budget. *See* SNB Amicus at 18. But that section says nothing about Congress, and merely states that funds the Bureau derives from the Federal Reserve are not subject to review by the House and Senate Appropriations Committees. The Constitution does not prohibit Congress from imposing such limits on the authority of its committees. SNB also misreads the Bureau's strategic plan to suggest that the Bureau is "fully independen[t]" of Congress. *See* SNB Amicus at 25. In fact, the plan notes that Congress provided the Bureau with funding that is structured similarly to the funding it has provided to the other banking supervisors. *See* CFPB Strategic Plan: 2013-17, http://www.consumerfinance.gov/ f/strategic-plan.pdf, at 36-37 (April 2013). Indeed, the blog and the out-of-context Youtube video cited by SNB, SNB Amicus at 27 & n.15, demonstrate that Congress can exercise its authority over the Bureau's budget.

58

48,[47] but that clause is a limit on the Executive, not on Congress. *In re Aiken Cnty.*, 725 F.3d 255, 262 n.3 (D.C. Cir. 2013). "Congress has plenary power to give meaning to" the Appropriations Clause, *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977), and the Constitution does not limit it to funding agencies through the annual appropriations process, *see Am. Fed'n of Gov't Emps., AFL-CIO v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress may … decide not to finance a federal entity with appropriations," but rather through some other funding mechanism).[48]

     3. Perhaps recognizing that neither of the features it challenges renders the Bureau unconstitutional, PHH argues that when both are taken together, the Bureau sinks. *See* Br. at 49. PHH cites *Free Enterprise Fund*, *supra*, and *Association of American Railroads v. DOT*, 721 F.3d 666 (D.C. Cir. 2013), *vacated*, 135 S. Ct. 1225 (2015), but neither case is analogous. Both cases concerned structural features that, taken separately, raised no constitutional problem, but that in combination became problematic because they undermined the same constitutional protection. *Free Enterprise Fund* concerned two distinct removal protections for

---

[47] It also cites the Origination Clause and the Taxing and Spending Clause, but neither has anything to do with the Bureau's funding.

[48] Congress has funded other financial regulators outside the annual appropriations process. *See*, *e.g.*, 12 U.S.C. 16 (Office of the Comptroller of the Currency); 12 U.S.C. 243 (Federal Reserve Board); 12 U.S.C. 1755 (National Credit Union Administration); 12 U.S.C. 1817(b) (Federal Deposit Insurance Corporation); 12 U.S.C. 4516 (Federal Housing Finance Agency).

members of the Public Company Accounting Oversight Board. Neither protection

taken separately raised a constitutional problem, but taken together, they violated

Article II because they limited the President's power to faithfully execute the laws.

561 U.S. at 496. In *Association of American Railroads*, this Court overturned a

delegation of regulatory authority. This Court focused on two aspects of the

delegation (whether Congress had sufficiently limited the delegation, and whether

a private entity played too great a role in the development of regulations), each of

which on its own might not have raised concern, but which, taken together,

violated Article I. 721 F.3d at 671-73. Even when combined, the features of the

Bureau that PHH challenges do not raise constitutional concern because each

branch retains its full constitutional powers. For-cause removal for the Bureau's

Director has no impact on Congress' Article I power to oversee the Bureau, and the

Bureau's funding mechanism has no impact on the President's Article II authority

to faithfully execute the laws.[49]

---

[49] PHH also contends that the Director's Decision is unconstitutional because the ALJ is an inferior officer, and was not properly appointed. Br. at 50. As PHH recognizes, this argument is foreclosed by *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000). PHH seeks to preserve this argument for further review, *see* Br. at 51 n.8, but it never raised the argument before the ALJ or before the Director, and the argument is, accordingly, waived. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (challenge to the hearing examiner's authority was waived because it was not raised before the agency); *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009) (explaining that "only in rare cases is it proper to" consider untimely Appointments Clause challenge) (internal quotation marks omitted).

## CONCLUSION

For the reasons set forth above, this Court should affirm the Bureau's

Decision and Order.[50]


Respectfully submitted,

Meredith Fuchs
   *General Counsel*
To-Quyen Truong
   *Deputy General Counsel*
John R. Coleman
   *Assistant General Counsel*


/s/Lawrence DeMille-Wagman
Lawrence DeMille-Wagman
   *Senior Litigation Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7957 (telephone)
(202) 435-7024 (facsimile)
lawrence.wagman@cfpb.gov

*Counsel for Respondent*
*Consumer Financial Protection*

---

[50] PHH contends that if this Court rejects the Director's interpretation of RESPA, it should vacate his Decision. Br. at 61-62. It cites three cases in which this Court vacated agency rules, not administrative adjudications. If this Court were to agree with PHH, the appropriate remedy would be to reverse and remand the matter to the Bureau for further proceedings consistent with this Court's instructions. *See*, *e.g.*, *TransUnion Corp. v. FTC*, 81 F.3d 228, 235 (D.C. Cir. 1996).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of this Court's Order of October 23, 2015, because it contains 15, 977 words, as determined by the word count function of the Microsoft Word 2010 word processing program, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2010 word processing program in 14-point Times New Roman font.

/s/Lawrence DeMille-Wagman
Lawrence DeMille-Wagman

# ADDENDUM

## TABLE OF CONTENTS

**PAGE**

12 U.S.C. 2617 (2012) ............................................................. Add. 1

24 C.F.R. 3500.4 (2011) ........................................................ Add. 3

12 C.F.R. 1024.4 (2013) ....................................................... Add. 5

(in connection with such loan) by sections 2603 and 2609(c) of this title or by the Truth in Lending Act [15 U.S.C. 1601 et seq.].

(Pub. L. 93–533, § 12, Dec. 22, 1974, 88 Stat. 1729; Pub. L. 101–625, title IX, § 942(b), Nov. 28, 1990, 104 Stat. 4412.)

### REFERENCES IN TEXT

Truth in Lending Act, referred to in text, is title I of Pub. L. 90–321, May 29, 1968, 82 Stat. 146, as amended, which is classified generally to subchapter I (§ 1601 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

### AMENDMENTS

1990—Pub. L. 101–625 substituted present section catchline for "Fee for preparation of truth-in-lending and uniform settlement statements", inserted after first comma "or by a servicer (as the term is defined under section 2605(i) of this title),", and substituted "lender or servicer" for second reference to "lender" and "2609(c)" for "2605".

### §§ 2611 to 2613. Repealed. Pub. L. 104–208, div. A, title II, § 2103(h), Sept. 30, 1996, 110 Stat. 3009–401

Section 2611, Pub. L. 93–533, § 13, Dec. 22, 1974, 88 Stat. 1730, related to establishment of land parcel recordation system on demonstration basis.

Section 2612, Pub. L. 93–533, § 14, Dec. 22, 1974, 88 Stat. 1730, directed Secretary of Housing and Urban Development to report on necessity for further legislation involving real estate settlements.

Section 2613, Pub. L. 93–533, § 15, Dec. 22, 1974, 88 Stat. 1730, directed Secretary of Housing and Urban Development to determine, and report to Congress on, feasibility of including statements of settlement costs in special information booklets.

### § 2614. Jurisdiction of courts; limitations

Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation, except that actions brought by the Bureau, the Secretary, the Attorney General of any State, or the insurance commissioner of any State may be brought within 3 years from the date of the occurrence of the violation.

(Pub. L. 93–533, § 16, Dec. 22, 1974, 88 Stat. 1731; Pub. L. 98–181, title I [title IV, § 461(d)], Nov. 30, 1983, 97 Stat. 1232; Pub. L. 104–208, div. A, title II, § 2103(e), Sept. 30, 1996, 110 Stat. 3009–400; Pub. L. 111–203, title X, § 1098(9), July 21, 2010, 124 Stat. 2104.)

### AMENDMENTS

2010—Pub. L. 111–203 inserted "the Bureau," before "the Secretary".

1996—Pub. L. 104–208 substituted "section 2605, 2607, or 2608 of this title" for "section 2607 or 2608 of this title" and "within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title" for "within one year".

1983—Pub. L. 98–181 amended section generally, striking out a reference to section 2605 of this title, and inserting provision allowing action in district where violation is alleged to have occurred, and provision relating to time limitations in actions brought by the Secretary, the Attorney General of any State, or the insurance commissioner of any State.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 98–181 effective Jan. 1, 1984, see section 461(f) of Pub. L. 98–181, set out as a note under section 2602 of this title.

### § 2615. Contracts and liens; validity

Nothing in this chapter shall affect the validity or enforceability of any sale or contract for the sale of real property or any loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan.

(Pub. L. 93–533, § 17, Dec. 22, 1974, 88 Stat. 1731.)

### § 2616. State laws unaffected; inconsistent Federal and State provisions

This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency. The Bureau is authorized to determine whether such inconsistencies exist. The Bureau may not determine that any State law is inconsistent with any provision of this chapter if the Bureau determines that such law gives greater protection to the consumer. In making these determinations the Bureau shall consult with the appropriate Federal agencies.

(Pub. L. 93–533, § 18, Dec. 22, 1974, 88 Stat. 1731; Pub. L. 94–205, § 9, Jan. 2, 1976, 89 Stat. 1159; Pub. L. 111–203, title X, § 1098(10), July 21, 2010, 124 Stat. 2104.)

### AMENDMENTS

2010—Pub. L. 111–203 substituted "Bureau" for "Secretary" wherever appearing.

1976—Pub. L. 94–205 struck out "(a)" before "This chapter" and struck out subsec. (b) which provided for Federal protection against liability for acts done or omitted in good faith in accordance with the rules, regulations, or interpretations issued by the Secretary. See section 2617(b) of this title.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–205 effective Jan. 2, 1976, see section 12 of Pub. L. 94–205, set out as a note under section 2602 of this title.

### § 2617. Authority of Bureau

#### (a) Issuance of regulations; exemptions

The Bureau is authorized to prescribe such rules and regulations, to make such interpreta-

tions, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter.

**(b) Liability for acts done in good faith in conformity with rule, regulation, or interpretation**

No provision of this chapter or the laws of any State imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Attorney General, notwithstanding that after such act or omission has occurred, such rule, regulation, or interpretation is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**(c) Investigations; hearings; failure to obey order; contempt**

(1) The Secretary[1] may investigate any facts, conditions, practices, or matters that may be deemed necessary or proper to aid in the enforcement of the provisions of this chapter, in prescribing of rules and regulations thereunder, or in securing information to serve as a basis for recommending further legislation concerning real estate settlement practices. To aid in the investigations, the Bureau is authorized to hold such hearings, administer such oaths, and require by subpena the attendance and testimony of such witnesses and production of such documents as the Bureau deems advisable.

(2) Any district court of the United States within the jurisdiction of which an inquiry is carried on may, in the case of contumacy or refusal to obey a subpena of the Bureau issued under this section, issue an order requiring compliance therewith; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(d) Delay of effectiveness of recent final regulation relating to payments to employees**

**(1) In general**

The amendment to part 3500 of title 24 of the Code of Federal Regulations contained in the final regulation prescribed by the Secretary and published in the Federal Register on June 7, 1996, which will, as of the effective date of such amendment—

(A) eliminate the exemption for payments by an employer to employees of such employer for referral activities which is currently codified as section 3500.14(g)(1)(vii) of such title 24; and

(B) replace such exemption with a more limited exemption in new clauses (vii), (viii), and (ix) of section 3500.14 of such title 24,

shall not take effect before July 31, 1997.

**(2) Continuation of prior rule**

The regulation codified as section 3500.14(g)(1)(vii) of title 24 of the Code of Federal Regulations, relating to employer-employee payments, as in effect on May 1, 1996, shall remain in effect until the date the amendment referred to in paragraph (1) takes effect in accordance with such paragraph.

**(3) Public notice of effective date**

The Secretary shall provide public notice of the date on which the amendment referred to in paragraph (1) will take effect in accordance with such paragraph not less than 90 days and not more than 180 days before such effective date.

(Pub. L. 93–533, §19, as added Pub. L. 94–205, §10, Jan. 2, 1976, 89 Stat. 1159; amended Pub. L. 98–181, title I [title IV, §461(e)], Nov. 30, 1983, 97 Stat. 1232; Pub. L. 104–208, div. A, title II, §2103(f), Sept. 30, 1996, 110 Stat. 3009–401; Pub. L. 111–203, title X, §1098(11), July 21, 2010, 124 Stat. 2104.)

AMENDMENTS

2010—Pub. L. 111–203, §1098(11)(A), substituted "Bureau" for "Secretary" in section catchline.

Subsec. (a). Pub. L. 111–203, §1098(11)(B), substituted "Bureau" for "Secretary".

Subsecs. (b), (c). Pub. L. 111–203, §1098(11)(C), substituted "the Bureau" for "the Secretary" wherever appearing.

1996—Subsec. (d). Pub. L. 104–208 added subsec. (d).

1983—Subsec. (c). Pub. L. 98–181 added subsec. (c).

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 98–181 effective Jan. 1, 1984, see section 461(f) of Pub. L. 98–181, set out as a note under section 2602 of this title.

EFFECTIVE DATE

Section effective Jan. 2, 1976, see section 12 of Pub. L. 94–205, set out as an Effective Date of 1976 Amendment note under section 2602 of this title.

## CHAPTER 28—EMERGENCY MORTGAGE RELIEF

| Sec. | |
|---|---|
| 2701. | Congressional findings and declaration of purpose. |
| 2702. | Mortgages eligible for assistance. |
| 2703. | Manner of assistance and repayment. |
| 2704. | Insurance for emergency mortgage loans and advances. |
| 2705. | Emergency mortgage relief payments. |
| 2706. | Emergency Homeowners' Relief Fund. |
| 2707. | Authority of Secretary. |
| 2708. | Expiration date. |
| 2709, 2710. | Repealed |
| 2711. | Nonapplicability of other laws. |
| 2712. | Repealed. |

### § 2701. Congressional findings and declaration of purpose

(a) The Congress finds that—

(1) the Nation is in a severe recession and that the sharp downturn in economic activity has driven large numbers of workers into unemployment and has reduced the incomes of many others;

(2) as a result of these adverse economic conditions the capacity of many homeowners to continue to make mortgage payments has deteriorated and may further deteriorate in the months ahead, leading to the possibility of widespread mortgage foreclosures and distress sales of homes; and

---

[1] Probably should be "The Bureau".

**ADD. 2**

(9) Conducting of settlement by a settlement agent and any related services;

(10) Provision of services involving mortgage insurance;

(11) Provision of services involving hazard, flood, or other casualty insurance or homeowner's warranties;

(12) Provision of services involving mortgage life, disability, or similar insurance designed to pay a mortgage loan upon disability or death of a borrower, but only if such insurance is required by the lender as a condition of the loan;

(13) Provision of services involving real property taxes or any other assessments or charges on the real property;

(14) Rendering of services by a real estate agent or real estate broker; and

(15) Provision of any other services for which a settlement service provider requires a borrower or seller to pay.

*Special information booklet* means the booklet prepared by the Secretary pursuant to section 5 of RESPA (12 U.S.C. 2604) to help persons understand the nature and costs of settlement services. The Secretary publishes the form of the special information booklet in the FEDERAL REGISTER. The Secretary may issue or approve additional booklets or alternative booklets by publication of a Notice in the FEDERAL REGISTER.

*State* means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

*Table funding* means a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds. A table-funded transaction is not a secondary market transaction (see § 3500.5(b)(7)).

*Third party* means a settlement service provider other than a loan originator.

*Title company* means any institution, or its duly authorized agent, that is qualified to issue title insurance.

*Title service* means any service involved in the provision of title insurance (lender's or owner's policy), including but not limited to: title examination and evaluation; preparation and issuance of title commitment; clearance of underwriting objections; preparation and issuance of a title insurance policy or policies; and the processing and administrative services required to perform these functions. The term also includes the service of conducting a settlement.

*Tolerance* means the maximum amount by which the charge for a category or categories of settlement costs may exceed the amount of the estimate for such category or categories on a GFE.

[61 FR 13233, Mar. 26, 1996, as amended at 61 FR 29252, June 7, 1996; 61 FR 58475, Nov. 15, 1996; 62 FR 20088, Apr. 24, 1997; 73 FR 68239, Nov. 17, 2008; 74 FR 22826, May 15, 2009]

EFFECTIVE DATE NOTE: At 61 FR 29252, June 7, 1996, § 3500.2(b) was amended by adding a definition of "managerial employee", effective Oct. 7, 1996. At 61 FR 51782, Oct. 4, 1996, the effective date was delayed until further notice.

## § 3500.3 Questions or suggestions from public and copies of public guidance documents.

Any questions or suggestions from the public regarding RESPA, or requests for copies of HUD Public Guidance Documents, should be directed to the Director, Office of Consumer and Regulatory Affairs, Department of Housing and Urban Development, 451 Seventh Street SW., Washington, DC 20410–8000, rather than to HUD field offices. Legal questions may be directed to the Assistant General Counsel, GSE/RESPA Division, at this address.

## § 3500.4 Reliance upon rule, regulation or interpretation by HUD.

(a) *Rule, regulation or interpretation.* (1) For purposes of sections 19 (a) and (b) of RESPA (12 U.S.C. 2617 (a) and (b)) only the following constitute a rule, regulation or interpretation of the Secretary:

(i) All provisions, including appendices, of this part. Any other document referred to in this part is not incorporated in this part unless it is specifically set out in this part;

(ii) Any other document that is published in the FEDERAL REGISTER by the Secretary and states that it is an "interpretation," "interpretive rule," "commentary," or a "statement of policy" for purposes of section 19(a) of RESPA. Such documents will be prepared by HUD staff and counsel. Such

documents may be revoked or amended by a subsequent document published in the FEDERAL REGISTER by the Secretary.

(2) A ''rule, regulation, or interpretation thereof by the Secretary'' for purposes of section 19(b) of RESPA (12 U.S.C. 2617(b)) shall not include the special information booklet prescribed by the Secretary or any other statement or issuance, whether oral or written, by an officer or representative of the Department of Housing and Urban Development (HUD), letter or memorandum by the Secretary, General Counsel, any Assistant Secretary or other officer or employee of HUD, preamble to a regulation or other issuance of HUD, Public Guidance Document, report to Congress, pleading, affidavit or other document in litigation, pamphlet, handbook, guide, telegraphic communication, explanation, instructions to forms, speech or other material of any nature which is not specifically included in paragraph (a)(1) of this section.

(b) *Unofficial interpretations; staff discretion.* In response to requests for interpretation of matters not adequately covered by this part or by an official interpretation issued under paragraph (a)(1)(ii) of this section, unofficial staff interpretations may be provided at the discretion of HUD staff or counsel. Written requests for such interpretations should be directed to the address indicated in §3500.3. Such interpretations provide no protection under section 19(b) of RESPA (12 U.S.C. 2617(b)). Ordinarily, staff or counsel will not issue unofficial interpretations on matters adequately covered by this part or by official interpretations or commentaries issued under paragraph (a)(1)(ii) of this section.

(c) All informal counsel's opinions and staff interpretations issued before November 2, 1992, were withdrawn as of that date. Courts and administrative agencies, however, may use previous opinions to determine the validity of conduct under the previous Regulation X.

## §3500.5  Coverage of RESPA.

(a) *Applicability.* RESPA and this part apply to all federally related mortgage loans, except for the exemptions provided in paragraph (b) of this section.

(b) *Exemptions.* (1) A loan on property of 25 acres or more.

(2) *Business purpose loans.* An extension of credit primarily for a business, commercial, or agricultural purpose, as defined by Regulation Z, 12 CFR 226.3(a)(1). Persons may rely on Regulation Z in determining whether the exemption applies.

(3) *Temporary financing.* Temporary financing, such as a construction loan. The exemption for temporary financing does not apply to a loan made to finance construction of 1- to 4-family residential property if the loan is used as, or may be converted to, permanent financing by the same lender or is used to finance transfer of title to the first user. If a lender issues a commitment for permanent financing, with or without conditions, the loan is covered by this part. Any construction loan for new or rehabilitated 1- to 4-family residential property, other than a loan to a *bona fide* builder (a person who regularly constructs 1- to 4-family residential structures for sale or lease), is subject to this part if its term is for two years or more. A ''bridge loan'' or ''swing loan'' in which a lender takes a security interest in otherwise covered 1- to 4-family residential property is not covered by RESPA and this part.

(4) *Vacant land.* Any loan secured by vacant or unimproved property, unless within two years from the date of the settlement of the loan, a structure or a manufactured home will be constructed or placed on the real property using the loan proceeds. If a loan for a structure or manufactured home to be placed on vacant or unimproved property will be secured by a lien on that property, the transaction is covered by this part.

(5) *Assumption without lender approval.* Any assumption in which the lender does not have the right expressly to approve a subsequent person as the borrower on an existing federally related mortgage loan. Any assumption in which the lender's permission is both required and obtained is covered by RESPA and this part, whether or not the lender charges a fee for the assumption.

**ADD. 4**

any territory or possession of the United States.

*Table funding* means a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds. A table-funded transaction is not a secondary market transaction (see §1024.5(b)(7)).

*Third party* means a settlement service provider other than a loan originator.

*Title company* means any institution, or its duly authorized agent, that is qualified to issue title insurance.

*Title service* means any service involved in the provision of title insurance (lender's or owner's policy), including but not limited to: Title examination and evaluation; preparation and issuance of title commitment; clearance of underwriting objections; preparation and issuance of a title insurance policy or policies; and the processing and administrative services required to perform these functions. The term also includes the service of conducting a settlement.

*Tolerance* means the maximum amount by which the charge for a category or categories of settlement costs may exceed the amount of the estimate for such category or categories on a GFE.

### §1024.3 Questions or suggestions from public and copies of public guidance documents.

Any questions or suggestions from the public regarding RESPA, or requests for copies of Public Guidance Documents, should be directed to the Associate Director, Research, Markets, and Regulations, Bureau of Consumer Financial Protection, 1700 G Street NW., Washington, DC 20006. Legal questions concerning the interpretation of this part may be directed to the same address.

### §1024.4 Reliance upon rule, regulation or interpretation by the Bureau.

(a) *Rule, regulation or interpretation.* (1) For purposes of sections 19(a) and (b) of RESPA (12 U.S.C. 2617(a) and (b)), only the following constitute a rule, regulation or interpretation of the Bureau:

(i) All provisions, including appendices, of this part. Any other document referred to in this part is not incorporated in this part unless it is specifically set out in this part;

(ii) Any other document that is published in the FEDERAL REGISTER by the Bureau and states that it is an "interpretation," "interpretive rule," "commentary," or a "statement of policy" for purposes of section 19(a) of RESPA. Such documents will be prepared by Bureau staff and counsel. Such documents may be revoked or amended by a subsequent document published in the FEDERAL REGISTER by the Bureau.

(2) A "rule, regulation, or interpretation thereof by the Bureau" for purposes of section 19(b) of RESPA (12 U.S.C. 2617(b)) shall not include the special information booklet prescribed by the Bureau or any other statement or issuance, whether oral or written, by an officer or representative of the Bureau, letter or memorandum by the Director, General Counsel, or other officer or employee of the Bureau, preamble to a regulation or other issuance of the Bureau, Public Guidance Document, report to Congress, pleading, affidavit or other document in litigation, pamphlet, handbook, guide, telegraphic communication, explanation, instructions to forms, speech or other material of any nature which is not specifically included in paragraph (a)(1) of this section.

(b) *Unofficial interpretations; staff discretion.* In response to requests for interpretation of matters not adequately covered by this part or by an official interpretation issued under paragraph (a)(1)(ii) of this section, unofficial staff interpretations may be provided at the discretion of Bureau staff or counsel. Written requests for such interpretations should be directed to the address indicated in §1024.3. Such interpretations provide no protection under section 19(b) of RESPA (12 U.S.C. 2617(b)). Ordinarily, staff or counsel will not issue unofficial interpretations on matters adequately covered by this part or by official interpretations or commentaries issued under paragraph (a)(1)(ii) of this section.

(c) All informal counsel's opinions and staff interpretations issued by HUD before November 2, 1992, were

545

**ADD. 5**

withdrawn as of that date. Courts and administrative agencies, however, may use previous opinions to determine the validity of conduct under the previous Regulation X.

## § 1024.5  Coverage of RESPA.

(a) *Applicability.* RESPA and this part apply to all federally related mortgage loans, except for the exemptions provided in paragraph (b) of this section.

(b) *Exemptions.* (1) A loan on property of 25 acres or more.

(2) *Business purpose loans.* An extension of credit primarily for a business, commercial, or agricultural purpose, as defined by 12 CFR 1026.3(a)(1) of Regulation Z. Persons may rely on Regulation Z in determining whether the exemption applies.

(3) *Temporary financing.* Temporary financing, such as a construction loan. The exemption for temporary financing does not apply to a loan made to finance construction of 1- to 4-family residential property if the loan is used as, or may be converted to, permanent financing by the same lender or is used to finance transfer of title to the first user. If a lender issues a commitment for permanent financing, with or without conditions, the loan is covered by this part. Any construction loan for new or rehabilitated 1- to 4-family residential property, other than a loan to a *bona fide* builder (a person who regularly constructs 1- to 4-family residential structures for sale or lease), is subject to this part if its term is for two years or more. A "bridge loan" or "swing loan" in which a lender takes a security interest in otherwise covered 1- to 4-family residential property is not covered by RESPA and this part.

(4) *Vacant land.* Any loan secured by vacant or unimproved property, unless within two years from the date of the settlement of the loan, a structure or a manufactured home will be constructed or placed on the real property using the loan proceeds. If a loan for a structure or manufactured home to be placed on vacant or unimproved property will be secured by a lien on that property, the transaction is covered by this part.

(5) *Assumption without lender approval.* Any assumption in which the lender does not have the right expressly to approve a subsequent person as the borrower on an existing federally related mortgage loan. Any assumption in which the lender's permission is both required and obtained is covered by RESPA and this part, whether or not the lender charges a fee for the assumption.

(6) *Loan conversions.* Any conversion of a federally related mortgage loan to different terms that are consistent with provisions of the original mortgage instrument, as long as a new note is not required, even if the lender charges an additional fee for the conversion.

(7) *Secondary market transactions.* A *bona fide* transfer of a loan obligation in the secondary market is not covered by RESPA and this part, except as set forth in section 6 of RESPA (12 U.S.C. 2605) and § 1024.21. In determining what constitutes a *bona fide* transfer, the Bureau will consider the real source of funding and the real interest of the funding lender. Mortgage broker transactions that are table-funded are not secondary market transactions. Neither the creation of a dealer loan or dealer consumer credit contract, nor the first assignment of such loan or contract to a lender, is a secondary market transaction (see § 1024.2).

## § 1024.6  Special information booklet at time of loan application.

(a) *Lender to provide special information booklet.* Subject to the exceptions set forth in this paragraph, the lender shall provide a copy of the special information booklet to a person from whom the lender receives, or for whom the lender prepares, a written application for a federally related mortgage loan. When two or more persons apply together for a loan, the lender is in compliance if the lender provides a copy of the booklet to one of the persons applying.

(1) The lender shall provide the special information booklet by delivering it or placing it in the mail to the applicant not later than three business days (as that term is defined in § 1024.2) after the application is received or prepared. However, if the lender denies the borrower's application for credit before the end of the three-business-day period, then the lender need not provide

546

**ADD. 6**

# CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2015, I electronically filed the Brief of Respondent Consumer Financial Protection Bureau (final version) with the Clerk of the Court of the United States Court of Appeals for the District Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case (listed below) are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. In addition, pursuant to this Court's Rule 31, eight copies of this Brief will be filed with the Clerk of this Court.

/s/ Lawrence DeMille-Wagman

Theodore B. Olson
Helgi C. Walker
Scott P. Martin
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036

Mitchel Kider
David M. Souders
Sandra B. Vipond
Michael S. Trabon
Weiner Brodsky Kider PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C. 20036

Thomas M. Hefferon
William M. Jay
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C. 20001

Kathryn L. Comerford Todd
Steven Paul Lehotsky
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

Jay N. Varon
Jennifer Matilda Keas,
Foley & Lardner LLP
3000 K Street, NW
Washington, DC 20007-5143

Gregory F. Jacob, Esquire
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Joseph R. Palmore
Morrison & Foerster LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888

David T. Case
K&L Gates, LLP
1601 K Street, NW
Washington, DC 20006-1600

Andrew John Pincus,
Mayer Brown, LLP
1999 K Street, NW
Washington, DC 20006-1101

C. Boyden Gray
Adam Jeffrey White
Boyden Gray & Associates
1627 I Street NW, Suite 950
Washington, DC 20006

Sam Kazman
Hans Frank Bader
Competitive Enterprise Institute
1899 L Street, NW, 12th Floor
Washington, DC 20036

Kirk Jensen
Alexander S. Leonhardt
BuckleySandler LLP
1250 24th Street, NW, Ste. 700
Washington, DC 20037