ORAL ARGUMENT NOT YET SCHEDULED

No. 15-1177

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

PHH CORPORATION, PHH MORTGAGE CORPORATION, PHH HOME LOANS, LLC,
ATRIUM INSURANCE CORPORATION, AND ATRIUM REINSURANCE CORPORATION,

*Petitioners,*

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU,

*Respondent.*

———————————————————————————

On Petition For Review Of An Order
Of The Consumer Financial Protection Bureau

———————————————————————————

**OPENING BRIEF FOR PETITIONERS**

———————————————————————————

Mitchel H. Kider
David M. Souders
Sandra B. Vipond
Michael S. Trabon
WEINER BRODSKY KIDER PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C. 20036
(202) 628-2000

Theodore B. Olson
 *Counsel of Record*
Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 346-4000

*Counsel for Petitioners*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

**(A)    Parties**

The parties that appeared before the Consumer Financial Protection Bureau ("CFPB") are PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation.  These parties appear before this Court as Petitioners.  The CFPB appears as Respondent.

There are currently no *amici* and no intervenors.

**(B)    Ruling Under Review**

The ruling under review is the final agency action of the CFPB, captioned *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) (JA1–38), and Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 (June 4, 2015) (JA39–40).

**(C)    Related Cases**

This matter has not previously been before this Court.  Counsel is aware of no related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Petitioner PHH Corporation is a publicly traded company (NYSE: PHH). It has no parent company and no publicly held corporation owns 10% or more of its stock. Petitioners Atrium Insurance Corporation, Atrium Reinsurance Corporation, and PHH Mortgage Corporation are wholly-owned subsidiaries of PHH Corporation, and no other company or publicly held corporation owns 10% or more of their stock. Petitioner PHH Home Loans, LLC is owned in part by subsidiaries of PHH Corporation and in part by affiliates of Realogy Holdings Corporation, a publicly traded company (NYSE: RLGY).

**TABLE OF CONTENTS**

                                                                              **Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION...........................................................2

STATEMENT OF ISSUES ......................................................................3

CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS
AT ISSUE ............................................................................................4

STATEMENT OF THE CASE..................................................................4

      A.    Mortgage Insurance And Reinsurance.......................................4

      B.    The Real Estate Settlement Procedures Act ...............................6

      C.    Petitioners' Affiliated Mortgage Reinsurance
            Relationship ...........................................................................10

      D.    Proceedings Before The CFPB ................................................12

            1.    The ALJ's Decisions .....................................................13

            2.    The Director's Decision...................................................15

STANDARD OF REVIEW ......................................................................17

SUMMARY OF ARGUMENT ..................................................................18

STANDING ..........................................................................................23

ARGUMENT .........................................................................................23

    I.    The Director's Liability Determination Is Unlawful ..........................23

      A.    The Director's Decision Violates Fundamental Principles
            Of Fair Notice ........................................................................24

            1.    The Director's New Interpretation Of Section
                8(c)(2) Contradicts Nearly Two Decades Of
                Consistent Agency Guidance..........................................25

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.    The Director's New Interpretation Of Section 8(a)
Contradicts The Previously Settled Interpretation
Of That Provision ............................................................31

B.    The Director's New Interpretations Of RESPA Are
Contrary To Law ..............................................................32

1.    The Director's New Interpretation Of Section
8(c)(2) Contravenes The Plain Statutory Text And
Guts Its Purpose ..............................................................33

2.    The Director's New Interpretation Of Section 8(a)
Contravenes The Plain Statutory Text And
Structure ..........................................................................37

3.    Even If Sections 8(a) Or 8(c)(2) Were Ambiguous,
Those Provisions Must Be Interpreted In
Petitioners' Favor ...........................................................40

4.    The Director Erred In Concluding That
Administrative Enforcement Actions Under
RESPA Are Not Subject To Any Limitations
Period ..............................................................................43

C.    The CFPB Violates The Constitutional Separation Of
Powers ..............................................................................45

II.    The Order's Sanctions Are Unlawful ........................................52

A.    The Injunctive Provisions Exceed The CFPB's Statutory
Authority And Are Otherwise Invalid ...........................52

B.    The Disgorgement Order Exceeds The CFPB's Statutory
Authority And Is Otherwise Invalid ..............................57

III.    The Decision And Order Should Be Vacated ...........................61

CONCLUSION ........................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

\* Authorities upon which we chiefly rely are marked with an asterisk.

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ...............................................................61

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) ...........................................................62

*Am. Library Ass'n v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005) ..............................................................57

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.,*
  721 F.3d 666 (D.C. Cir. 2013) ..............................................................50

*BP Am. Prod. Co. v. Burton,*
  549 U.S. 84 (2006) ............................................................... 43, 44, 45

*Capell v. Pulte Mortg. L.L.C.,*
  Civ. A. No. 07-1901, 2007 WL 3342389 (E.D. Pa. Nov. 7, 2007).....................37

*\*Carter v. Welles-Bowen Realty, Inc.,*
  736 F.3d 722 (6th Cir. 2013)................................ 24, 25, 33, 40, 41, 42

*CFPB v. Morgan Drexen, Inc.,*
  60 F. Supp. 3d 1082 (C.D. Cal. 2014)....................................................49

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ................................................................... 17, 41

*Christopher v. SmithKline Beecham Corp.,*
  132 S. Ct. 2156 (2012) ............................................................ 2, 24, 30

*Clark v. Martinez,*
  543 U.S. 371 (2005) ...........................................................................40

*Crandon v. United States,*
  494 U.S. 152 (1990) ...........................................................................42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
  482 U.S. 437 (1987) ......................................................57

*Culpepper v. Irwin Mortg. Corp.*,
  253 F.3d 1324 (11th Cir. 2001) ...................................9, 36

*Duka v. SEC*,
  No. 15-CIV-357, 2015 WL 4940083 (S.D.N.Y. Aug. 12, 2015)........................51

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................... 18, 42, 43

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ..................................................24

*Franks v. Bowman Transp., Co.*,
  424 U.S. 747 (1976) ......................................................37

*\*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) .................................. 46, 47, 49, 50, 51

*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ......................................................51

*\*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ............................... 17, 25, 30

*Geraci v. Homestead Bank*,
  347 F.3d 749 (9th Cir. 2003) .............................................35

*Glover v. Standard Fed. Bank*,
  283 F.3d 953 (8th Cir. 2002) ....................................... 26, 35

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,
  Local No. 70 of Alameda Cnty.*,
  415 U.S. 423 (1974) ......................................................53

*Gray Fin. Grp. v. SEC*,
  15-CV-492, Dkt. 56 (N.D. Ga. Aug. 4, 2015).......................................51

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hardin v. City Title & Escrow Co.*,
797 F.2d 1037 (D.C. Cir. 1986) ................................................. 34, 36

*Hateley v. SEC*,
8 F.3d 653 (9th Cir. 1993) .........................................................61

*Heimmermann v. First Union Mortg. Corp.*,
305 F.3d 1257 (11th Cir. 2002) ..................................................36

*Hill v. SEC*,
No. 1:15-CV-1801, 2015 WL 4307088 (N.D. Ga. June 8, 2015)......................51

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) ............................................................. 47, 48

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011) ...................................................47

*INS v. St. Cyr*,
533 U.S. 289 (2001) ..............................................................41

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ...............................................................54

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
131 S. Ct. 1325 (2011) ...........................................................40

*Landry v. Fed. Deposit Ins. Corp.*,
204 F.3d 1125 (D.C. Cir. 2000) ..................................................51

*\*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ........................................................... 17, 33, 40

*Menichino v. Citibank, N.A.*,
No. 12-0058, 2013 WL 3802451 (W.D. Pa. July 19, 2013) ..............................37

*Morrison v. Olson*,
487 U.S. 654 (1988) ......................................................... 47, 48, 50

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Mullinax v. Radian Guar. Inc.,*
  199 F. Supp. 2d 311 (M.D.N.C. 2002)..................................................... 31, 38, 39

*Munoz v. PHH Corp.,*
  No. 08-cv-759, 2013 WL 2146925 (E.D. Cal. May 15, 2013) .................... 27, 42

*Myers v. United States,*
  272 U.S. 52 (1926) ..........................................................................................47

*Nat. Res. Def. Council v. EPA,*
  489 F.3d 1364 (D.C. Cir. 2007) ......................................................................62

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) ........................................................................................41

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974) ........................................................................................25

*NLRB v. Express Publ'g Co.,*
  312 U.S. 426 (1941) ................................................................................. 53, 54

*Noel Canning v. NLRB,*
  705 F.3d 490 (D.C. Cir. 2013) ......................................................................46

*Office of Personnel Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ........................................................................................49

*Palmer v. Homecomings Fin., LLC,*
  677 F. Supp. 2d 233 (D.D.C. 2010) ................................................................38

*Pedraza v. United Guar. Corp.,*
  No. 99-239, Dkt. 172 (S.D. Ga. June 25, 2001).............................................27

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) ......................................................................... 17, 33, 42

*Pharm. Research & Mfrs. of Am. v. Thompson,*
  251 F.3d 219 (D.C. Cir. 2001) ......................................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Price v. Landsafe Credit, Inc.*,
No. CIV.A.CV205-156, 2006 WL 3791391 (S.D. Ga. Dec. 22, 2006)..............35

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ...................................................................................57

*Reich v. Sea Sprite Boat Co.*,
50 F.3d 413 (7th Cir. 1995).......................................................................52

*Reyes v. Premier Home Funding, Inc.*,
640 F. Supp. 2d 1147 (N.D. Cal. 2009) ..................................................27

*Satellite Broad. Co. v. FCC*,
824 F.2d 1 (D.C. Cir. 1987)................................................................. 24, 32

*Schuetz v. Banc One Mortg. Corp.*,
292 F.3d 1004 (9th Cir. 2002)...............................................................8, 27

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ..............................................................60

*SEC v. Savoy Indus., Inc.*,
665 F.2d 1310 (D.C. Cir. 1981) ..............................................................55

*SEC v. Teo*,
746 F.3d 90 (3d Cir. 2014)......................................................................60

*SEC v. Wash. Inv. Network*,
475 F.3d 392 (D.C. Cir. 2007) ...............................................................53

*SEC v. Whittemore*,
659 F.3d 1 (D.C. Cir. 2011)............................................................... 59, 60

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) ...............................................................23

*Snow v. First Am. Title Ins. Co.*,
332 F.3d 356 (5th Cir. 2003)...................................................... 15, 31, 37, 38

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
 665 F.3d 1339 (D.C. Cir. 2012) ...........................................................49

*United States v. Bajakajian*,
 524 U.S. 321 (1998) ...........................................................................39

*United States v. Bass*,
 404 U.S. 336 (1971) ...........................................................................41

*United States v. Masters*,
 924 F.2d 1362 (7th Cir. 1991) ............................................................60

*United States v. Philip Morris USA Inc.*,
 566 F.3d 1095 (D.C. Cir. 2009) ..........................................................55

*United States v. Santos*,
 553 U.S. 507 (2008) ...........................................................................40

*United States v. Thompson/Ctr. Arms Co.*,
 504 U.S. 505 (1992) ..................................................................... 40, 41

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) ...........................................................................50

*Whitman v. United States*,
 135 S. Ct. 352 (2014) .........................................................................41

**Constitutional Provisions**

U.S. Const. art. I, § 7, cl. 1 .......................................................................49

U.S. Const. art. I, § 8, cl. 1 .......................................................................49

U.S. Const. art. I, § 9, cl. 7 .......................................................................49

U.S. Const. art. II, § 2, cl. 2 ......................................................................50

U.S. Const. art. II, § 3 ...............................................................................47

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

5 U.S.C. § 706(2) ................................................................61

12 U.S.C. § 1454(a)(2) .........................................................4

12 U.S.C. § 1717(b) ..............................................................4

12 U.S.C. § 2601 ...............................................................36

*12 U.S.C. § 2607(a) ............................ 6, 19, 20, 26, 37, 53, 56

12 U.S.C. § 2607(b) ..............................................................6

*12 U.S.C. § 2607(c) ............................... 6, 7, 19, 33, 37

*12 U.S.C. § 2607(d) ............................ 6, 39, 44, 45, 57, 58

*12 U.S.C. § 2614 ......................... 13, 16, 20, 31, 37, 43, 59

12 U.S.C. § 5481(12)(M) .....................................................10

12 U.S.C. § 5491(a) ............................................................51

12 U.S.C. § 5491(c) ..................................................... 45, 46

12 U.S.C. § 5497(a) ................................................. 45, 46, 48

12 U.S.C. § 5563(a) ..................................................... 10, 45

12 U.S.C. § 5563(b) .............................................. 3, 23, 52, 54

12 U.S.C. § 5565(a)(2)(D) ...................................................57

12 U.S.C. § 5581(b)(7)(B) ...................................................58

28 U.S.C. § 2415(a) ..................................................... 43, 44

**Rules**

*12 C.F.R. § 1024.14(g) ............................... 10, 26, 29, 34, 55

# TABLE OF AUTHORITIES
## (continued)

Page(s)

12 C.F.R. pt. 1024 .................................................................................10

24 C.F.R. § 3500.14(g) ................................................................. 7, 26, 34

Fed. R. Civ. P. 65(d)(1).........................................................................52

## Other Authorities

Amy Friedman, Standard & Poor's, *Lender Captives Benefit Both
    Lenders and Mortgage Insurers, for a Price* (2007).................................5

Brief for the United States as Amicus Curiae, *Freeman v. Quicken Loans,
    Inc.*, 132 S. Ct. 2034 (2012) (No. 10-1042) ........................................35

Clarification of Statement of Policy Regarding Lender Payments to
    Mortgage Brokers, and Guidance Concerning Unearned Fees Under
    Section 8(b), 66 Fed. Reg. 53,052 (Oct. 18, 2001) ................................9

Consent Order, *In re Fidelity Mortg. Corp.*, No. 2014-CFPB-0001
    (Jan. 16, 2014) ............................................................................35

Consent Order, *In re Lighthouse Title, Inc.*, No. 2014-CFPB-0015
    (Sept. 30, 2014) ..........................................................................35

Consolidated Delegations of Authority for Housing, 54 Fed. Reg. 22,033
    (May 22, 1989) ............................................................................7

Consumer Financial Protection Bureau, *The CFPB Strategic Plan,
    Budget, and Performance Plan and Report* (2015), *available at*
    http://files.consumerfinance.gov/f/201502_cfpb_report_ strategic-plan-
    budget-and-performance-plan_FY2014-2016.pdf ...............................48

Fannie Mae, *Qualified Mortgage Insurer Approval Requirements* (2003),
    *available at* https://www.fanniemae.com/content/eligibility_
    information/mortgage-insurers-approval-requirements.pdf...................5

Freddie Mac, *Private Mortgage Insurer Eligibility Requirements* (2015),
    *available at* http://www.freddiemac.com/singlefamily/pdf/PMIERs.pdf..............5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

H.R. Rep. No. 105-769 (1998) (Conf. Rep.) ............................................................9

Home Warranty Companies' Payments to Real Estate Brokers and
    Agents, 75 Fed. Reg. 36,271 (June 25, 2010) ........................................9

Identification of Enforceable Rules and Orders,
    76 Fed. Reg. 43,569 (July 21, 2011) ........................................... 10, 29

James H. Pannabecker & David Stemler, *The RESPA Manual: A
    Complete Guide to the Real Estate Settlement Procedures Act* (2013) ..............27

Lender Payments to Mortgage Brokers,
    64 Fed. Reg. 10,080 (Mar. 1, 1999) ......................................................9

Mark P. Goodman & Daniel J. Fetterman, *Defending Corporations and
    Individuals in Government Investigations* (2014)................................46

Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance
    Activities Through Reciprocal Insurer, 1999 WL 413838 (Mar. 11,
    1999)..................................................................................................10

Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29,264
    (June 7, 1996) ....................................................................................8

*The Federalist No. 47* (Clinton Rossiter ed., 1961)................................45

*The Federalist No. 58* (James Madison) (Clinton Rossiter ed., 1961) ....................49

*The Federalist No. 70* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ............50

Title Insurance Practices in Florida, 61 Fed. Reg. 49,398 (Sept. 19, 1996)..............8

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| Atrium | Petitioners Atrium Insurance Corporation and Atrium Reinsurance Corporation |
| CFPA | Consumer Financial Protection Act |
| CFPB | Consumer Financial Protection Bureau |
| Confirmation Letter | Letter from J. Kennedy, Assoc. Gen. Counsel for Fin. & Regulatory Compliance, HUD, to J. Maher, Am. Land Title Ass'n (Aug. 12, 2004) (JA259) |
| Dec. | *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 (June 4, 2015) (JA1–38) |
| HUD | United States Department of Housing and Urban Development |
| HUD Letter | Letter from N. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to S. Samuels, Countrywide Funding Corp. (Aug. 6. 1997) (JA251–58) |
| Order | *In the Matter of PHH Corporation*, Final Order, Docket No. 2014-CFPB-0002, Dkt. 227 (June 4, 2015) (JA39–40) |
| PHH | Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC |
| RESPA | Real Estate Settlement Procedures Act of 1974 |

## INTRODUCTION

In this enforcement proceeding against Petitioners PHH Corporation, PHH Mortgage Corporation, and PHH Home Loans, LLC (collectively, "PHH"), and Atrium Insurance Corporation and Atrium Reinsurance Corporation (collectively, "Atrium"), the Consumer Financial Protection Bureau ("CFPB") declared *per se* illegal a legitimate business arrangement—affiliated mortgage reinsurance—that federal agencies had explicitly approved for nearly two decades.  Not content with upending the settled interpretation of the Real Estate Settlement Procedures Act ("RESPA"), the Director sought to apply his newly-minted standard retroactively to punish Petitioners for conduct they engaged in years ago.  In another dramatic departure from precedent, the Director concluded that each mortgage reinsurance payment—rather than each mortgage settled, as the Administrative Law Judge ("ALJ") had previously determined—constituted a separate statutory violation, and applied that new standard retroactively as well.

Consequently, the Director increased *by a multiple of 18* the "disgorgement" recommended by the ALJ—from $6 million to $109 million.  The Director also imposed sweeping injunctions that forbid Petitioners from "violating Section 8" of RESPA, ban conduct expressly permitted under RESPA or not covered by RESPA at all, and require Petitioners to record the receipt of *any* "thing of value" received by *any* of them from *any* real estate settlement service provider to which *any*

Petitioner has referred borrowers since July 21, 2008, and for the next fifteen years.

Neither the liability determination nor the sanctions imposed can survive judicial review. The Director's acknowledged "reject[ion]," Dec. 17 (JA17), of well-established RESPA precedent is "precisely the kind of 'unfair surprise' against which [the Supreme Court's] cases have long warned." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (citation omitted). Even if his interpretation were otherwise permissible, which it is not, it cannot under any circumstances be applied to conduct dating back to and before 2013—the last time Petitioners received any mortgage reinsurance premiums. The Director's autocratic approach is the all-too-predictable result of his unprecedented lack of democratic accountability, which violates the constitutional separation of powers. The sanctions imposed are also invalid because the injunctive provisions are vague, overbroad, and outside the CFPB's authority.

This Court previously stayed the Director's action pending appeal, finding that Petitioners met the stringent requirements for such relief. This Court should now vacate the Director's action.

## STATEMENT OF JURISDICTION

The CFPB action on review, *In the Matter of PHH Corporation*, Decision of the Director, Docket No. 2014-CFPB-0002, Dkt. 226 ("Dec.") (JA1–38), and Final

2

Order, Docket No. 2014-CFPB-0002, Dkt. 227 ("Order") (JA39–40), was issued on June 4, 2015 ("Decision and Order"). Petitioners filed a timely petition for review on June 19, 2015. This Court has jurisdiction pursuant to 12 U.S.C. § 5563(b)(4).

## STATEMENT OF ISSUES

1. Whether the Decision and Order impermissibly apply new interpretations of RESPA retroactively to punish past conduct that was expressly permitted by agency guidance and regulations.

2. Whether the Decision's interpretation of RESPA's Section 8 is contrary to the statute, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

3. Whether the unprecedented structure of the CFPB, conferring legislative, executive, *and* judicial power on the democratically unaccountable Director, violates the separation of powers.

4. Whether the injunctions and $109 million "disgorgement" order are overbroad, vague, unduly burdensome, *ultra vires*, unsupported by evidentiary foundation, or otherwise invalid.

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS AT ISSUE

Pertinent constitutional provisions, statutes, regulations, and administrative materials are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Mortgage Insurance And Reinsurance.

Mortgage lenders typically require borrowers who make a down payment of less than 20% to obtain mortgage insurance.  Dec. 3 (JA3).[1]  Mortgage insurance protects the lender against default.  The borrower pays monthly premiums to the mortgage insurer; if the borrower defaults, the insurer covers part of the lender's loss.  *Ibid.*

Historically, many insurers have obtained *re*insurance.  Whereas mortgage insurance protects lenders, mortgage reinsurance protects the mortgage insurers themselves.  Dec. 3 (JA3).  Under a typical mortgage-reinsurance arrangement, the mortgage reinsurer assumes some of the risk of insuring the mortgages; in exchange, the mortgage insurer pays, or "cedes" to, the mortgage reinsurer a portion of the monthly premiums paid by the borrower.  *Ibid.*  Rather than insuring

---

[1]    Fannie Mae and Freddie Mac, which purchase many U.S. mortgages, are required to ensure that higher-risk borrowers secure "credit enhancement."  12 U.S.C. §§ 1454(a)(2), 1717(b)(2)(C), (b)(5)(C).  Loan originators thus generally require such borrowers to obtain mortgage insurance.  Dec. 3 (JA3).

particular loans, a mortgage reinsurer insures pools of loans originated over a given "book year." *Ibid*. Although given a choice, borrowers typically rely on lenders to recommend a mortgage insurer. *Ibid*.

The only mortgage reinsurers that existed during the relevant period were "affiliated" or so-called "captive" reinsurers, meaning that they provided reinsurance only for loans originated by their related lender. Dec. 13 (JA13). Affiliated reinsurance relationships are common and well-accepted in and outside the mortgage industry. Dkt. 205, at 4 (JA110); Admin. Hr'g Tr. 1141–45 (JA271–75).

Affiliated reinsurance emerged in the mortgage lending industry in 1993. Enforcement Ex. 586, at 4 (JA426). By 2007, it was "an integral component of the mortgage insurance industry." Amy Friedman, Standard & Poor's, *Lender Captives Benefit Both Lenders and Mortgage Insurers, for a Price* 1 (2007); *see* Enforcement Ex. 682 (JA340). Affiliated reinsurance ensures that the originator of the mortgage loan continues to have "skin in the game," even after it has sold the mortgage on the secondary mortgage market. Enforcement Ex. 653, at 6 (JA316). Fannie Mae and Freddie Mac have recognized affiliated mortgage reinsurance as a permissible form of risk mitigation. *See* Freddie Mac, *Private Mortgage Insurer Eligibility Requirements* § 707 (2015), *available at* http://www.freddiemac.com/singlefamily/pdf/PMIERs.pdf; Fannie Mae, *Qualified Mortgage Insurer Approval*

5

*Requirements* § 7(E)(iii), (iv) (2003), *available at* https://www.fanniemae.com/ content/eligibility_information/mortgage-insurers-approval-requirements.pdf.

### B.   The Real Estate Settlement Procedures Act

In 1974, Congress enacted RESPA, 12 U.S.C. § 2601 *et seq.*, which prohibits kickbacks and certain unearned fees in connection with home mortgage-related services.  Sections 8(a) and (b) of RESPA generally prohibit two distinct practices: giving or accepting any "thing of value" "pursuant to any agreement or understanding" to "refe[r]" business "incident to or part of a real estate settlement service," 12 U.S.C. § 2607(a), or giving or accepting any portion of a charge for settlement services "other than for services actually performed," *id.* § 2607(b). Violation of these prohibitions is a federal crime as well as a basis for civil liability.  *Id.* § 2607(d)(1)–(2).  Section 8(c), in turn, creates several exemptions from these prohibitions.  *Id.* § 2607(c).  Section 8(c)(2) provides:  "Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed[.]"  *Id.* § 2607(c)(2).

The Department of Housing and Urban Development ("HUD") was originally charged with enforcing RESPA.  *See* 12 U.S.C. § 2607(d)(4) (2006). HUD's implementing regulations were known as "Regulation X."  In 1996, HUD amended Regulation X to provide:

> If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided.

24 C.F.R. § 3500.14(g)(2) (2011). It also clarified that "Section 8 . . . permits" payments covered by Section 8(c)(2). *Id.* § 3500.14(g) (2011).

In 1997, the Federal Housing Commissioner, exercising the Secretary's delegated authority, 54 Fed. Reg. 22,033, 22,035 (May 22, 1989), explained how HUD would apply Section 8 to affiliated-reinsurance programs. *See* Letter from Nicholas P. Retsinas, Ass't Sec'y for Hous.-Fed. Hous. Comm'r, HUD, to Sandor Samuels, Gen. Counsel, Countrywide Funding Corp. (Aug. 6. 1997) ("HUD Letter") (JA251–58). Countrywide, a residential mortgage lender, had established precisely the type of reinsurance relationship at issue here. *See id.* at 1 (JA251). In response to Countrywide's request for clarification regarding the lawfulness of its programs, HUD issued a letter ruling stating:

> [HUD's] view of captive reinsurance is that the arrangements are permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services "actually furnished or for services performed" and (2) are *bona fide* compensation that does not exceed the value of such services.

*Id.* at 3 (JA253). When this test is satisfied, "such payments would be permissible under [Section] 8(c)." *Ibid.* In crafting that test, HUD relied primarily on Section 8(c)(2) as an "exemption" from Sections 8(a) and (b). *Ibid.*

The HUD Letter detailed how its two-part test should be applied. *First*, for "a real service—reinsurance—[to be] performed by the reinsurer," the following criteria must be satisfied: (a) there must be an industry-standard "legally binding contract for reinsurance"; (b) "[t]he reinsurer must post capital and reserves satisfying [relevant state law] and the reinsurance contract . . . must provide for the establishment of adequate reserves"; and (c) "[t]here must be a real transfer of risk." HUD Letter at 6 (JA256). *Second*, in determining "whether the compensation paid for reinsurance does not exceed the value of the reinsurance," the agency would consider "the risk borne by the" affiliated reinsurer, "the likelihood of losses occurring," and "the relative risk exposure." *Id.* at 7 (JA257).[2]

Subsequently, HUD frequently relied upon its two-part test as the governing standard under Section 8. For example, in the yield-spread premiums context, there had been "legal uncertainty" about Section 8's application to lender payments to mortgage brokers for services performed. *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1009 (9th Cir. 2002). This uncertainty "generated a considerable amount of litigation." *Ibid.* Thus, in 1998, Congress directed HUD to "clarify its position on lender payments to mortgage brokers," pointedly observing that

---

[2]  The HUD Letter mirrored HUD's earlier interpretations of Section 8(c)(2) in other contexts. *See* Title Insurance Practices in Florida, 61 Fed. Reg. 49,398, 49,399 (Sept. 19, 1996); Rental of Office Space, Lock-outs, and Retaliation, 61 Fed. Reg. 29,264, 29,265 (June 7, 1996).

"Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of subsections (a) or (b) (12 U.S.C. Sec. 2607) in its enactment of RESPA."  H.R. Rep. No. 105-769, at 260 (1998) (Conf. Rep.).  HUD responded by publishing a policy statement reaffirming that Section 8(c)(2) exempts settlement services that satisfy the two-part analysis.  *See* Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080, 10,085–86 (Mar. 1, 1999).

In 2001, HUD published another policy statement, this time in response to *Culpepper v. Irwin Mortgage Corp.*, 253 F.3d 1324 (11th Cir. 2001), again reiterating its interpretation in order to "eliminate any ambiguity."  Clarification of Statement of Policy Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53,052, 53,052, 53,054 (Oct. 18, 2001).

For the rest of its time administering RESPA, HUD continued to confirm both the validity of the HUD Letter and the applicability of its two-part test.  *See* Home Warranty Companies' Payments to Real Estate Brokers and Agents, 75 Fed. Reg. 36,271, 36,272 (June 25, 2010).  In 2004, HUD reiterated that the "1997 guidance" is "useful" in determining the "legality of captive mortgage reinsurance programs."  Letter from John P. Kennedy, Assoc. Gen. Counsel for Fin. & Regulatory Compliance, HUD, to James Maher, Am. Land Title Ass'n (Aug. 12,

9

2004) ("Confirmation Letter") (JA259).  Other federal agencies relied on it, too. *See* Office of Thrift Supervision, Proposed Mortgage Guaranty Reinsurance Activities Through Reciprocal Insurer, 1999 WL 413838, at *2 n.20 (Mar. 11, 1999) ("[The 1997 HUD Letter] will assist you in meeting your responsibility to comply with RESPA.").

On July 21, 2011, HUD's enforcement mandate was transferred to the CFPB by the Consumer Financial Protection Act ("CFPA").  *See* 12 U.S.C. §§ 5563(a)(2), 5481(12)(M).  That same day, the CFPB announced that "the official commentary, guidance, and policy statements issued prior to July 21, 2011, by a transferor agency with exclusive rulemaking authority for the law in question . . . will be applied by the CFPB pending further CFPB action."  Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43,569, 43,570 (July 21, 2011). Subsequently, the CFPB codified Regulation X in its own regulations, making no substantive change to the provisions relevant here.  *See* 12 C.F.R. pt. 1024; *see also id.* § 1024.14(g)(2).  Until this matter arose, the CFPB took no further substantive administrative action regarding Section 8.

### C.    Petitioners' Affiliated Mortgage Reinsurance Relationship.

During the relevant period, PHH Mortgage Corporation and PHH Home Loans, LLC, originated home mortgage loans.  Dec. 2 (JA2).  PHH generally sold its loans to secondary-market investors, primarily Fannie Mae and Freddie Mac,

but retained the right to service those loans. *Ibid.* PHH also purchased and resold loans originated by other lenders. *Id.* at 3 (JA3). Like other mortgage lenders, PHH required certain borrowers to secure mortgage insurance, if required by the investor. *Ibid*.

In 1994, PHH created Atrium Insurance Corporation as a wholly-owned subsidiary to provide reinsurance services to mortgage insurers. Dec. 2 (JA2). The subsidiary's functions were transferred to Atrium Reinsurance Corporation in 2010. *Ibid.* Atrium provided reinsurance only for mortgages originated by PHH or underwritten to its guidelines. PHH disclosed those affiliated-reinsurance arrangements in writing to its borrowers, giving them the choice to secure a different mortgage insurer or to request that the policy not be reinsured. Admin. Hr'g Tr. 119 (JA266). Borrowers were not assessed any additional fees or premiums if the policy on the loan was reinsured; the rates assessed by mortgage insurers are approved by state insurance regulators and remain the same regardless of any reinsurance arrangements. Dec. 3 (JA3).

PHH used a variety of mortgage-insurance providers, some of which did not enter into reinsurance agreements with Atrium. Enforcement Ex. 653, at 9 (JA319). Four of those insurers did: AIG United Guaranty Mortgage Insurance Company ("UGI"), Genworth Mortgage Insurance Company ("Genworth"),

11

Radian Guaranty, Inc. ("Radian"), and CMG Mortgage Insurance Company ("CMG"). *Ibid*; Enforcement Ex. 153, at 38 (JA419).

Atrium began to assume risk on behalf of UGI, Genworth, Radian, and CMG on January 1, 1997, October 9, 2000, July 26, 2004, and December 1, 2006, respectively. Enforcement Ex. 653, at 12–13 (JA322–23). Atrium paid substantial reinsurance claims filed by several of those entities. Indeed, between 2005 and 2009, the amount of claims that Atrium paid out to UGI and Genworth far exceeded the premiums received from them: projected ultimate loss ratios for these years ranged from 153.5% to 201.7%. Respondents' Compilation of Material in Support of Their Appeal (Mar. 2, 2015), supplemental filing to Dkts. 210, 220 (JA214, 221). As of January 1, 2010, all reinsurance agreements involving Atrium were in "run-off" (*i.e.*, Atrium continued to receive premiums from insurers on existing loans but reinsured no new loans). Dkt. 205, at 28–31 (JA134–37). As of May 2013, the last of the agreements had been "commuted" (*i.e.*, Atrium and the insurer agreed to a final payment to terminate their relationship). *Id.* at 28–35 (JA134–41).

### D.     Proceedings Before The CFPB.

On January 19, 2014, the CFPB filed a Notice of Charges against Petitioners, alleging violations of Sections 8(a) and 8(b) of RESPA "relating to their use of captive mortgage reinsurance arrangements." Dkt. 1, at 1 (JA41). The

Notice of Charges applied the legal standard articulated in the HUD Letter, contending that "[t]he premiums ceded by the [mortgage insurers] to PHH through Atrium: (a) were not for services actually furnished or performed, or (b) grossly exceeded the value of any such services." *Id.* ¶ 96 (JA57).  The document further charged that the alleged violations "commenced in 1995 (at the latest) and continued until at least May of 2013." *Id.* ¶ 103 (JA58).

### 1.    The ALJ's Decisions

To adjudicate this matter, the CFPB borrowed an Administrative Law Judge ("ALJ") from the Securities and Exchange Commission ("SEC").  *See* Order Assigning Administrative Law Judge, Dkt. 20 ("*Order Assigning ALJ*") (JA75).

On May 22, 2014, the ALJ issued an order resolving the parties' dispositive motions.  *See* Dkt. 152 (JA81).  Expressly relying on HUD's "regulations and interpretive guidance," including the HUD Letter, the ALJ found that "captive reinsurance is permissible under RESPA if the payments to the reinsurer are for reinsurance services actually furnished or for services performed, and are bona fide compensation that does not exceed the value of such services." *Id.* at 5, 6 (JA85, 86).

The ALJ also determined that the CFPB could not pursue any alleged violations that HUD could not have challenged before the CFPB's creation on July 21, 2011.  He therefore barred any claims arising before July 21, 2008, under

RESPA's three-year statute of limitations.  Dkt. 152, at 10 (citing 12 U.S.C. § 2614) (JA90).  Consequently, the ALJ analyzed only "book years" that included loans that closed on or after July 21, 2008—namely, the 2009 book year for insurer UGI ("UGI 2009"), the 2008-B book year for Genworth ("Genworth 2008-B"), the 2008 book year for Radian ("Radian 2008"), and the 2008 book year for CMG ("CMG 2008").  *See* Dec. 21 (JA21).

The evidence before the ALJ showed that Petitioners satisfied the standard set forth in the HUD Letter:  that Atrium performed actual reinsurance services (*i.e.*, insurance "risk transfer" from the insurers) and received bona fide compensation for those services (*i.e.*, price commensurability).  For example, Milliman, an actuarial consulting firm, evaluated "risk transfer and price commensurability with risk" for several of the book years at issue to support that conclusion.  Dkt. 205, at 41 (JA147).

On November 25, 2014, the ALJ issued a recommended decision finding that Petitioners violated Sections 8(a) and 8(b) for the book years at issue.  Applying the HUD Letter's test, the ALJ concluded that Section 8(c)(2) did not apply because he was not convinced "that Atrium's premiums in their entirety were bona fide."  Dkt. 205, at 75 (JA181).  The ALJ recommended injunctions and disgorgement of $6,442,399, or all premiums received by Atrium on the Genworth 2008-B and UGI 2009 books.  *Id.* at 102 (JA208).  Consistent with the ALJ's

finding that alleged violations before July 21, 2008 were not actionable, the amount included only book years containing loans closed after that date. *Id.* at 88–93 (JA194–99).

### 2.    The Director's Decision

Petitioners and Enforcement Counsel cross-appealed the ALJ's recommended decision to Director Richard Cordray. Dec. 2 (JA2). On June 4, 2015, the Director upheld the ALJ's Recommended Decision in part and reversed in part, to dramatically increase the amount of disgorgement to $109 million and impose additional injunctions. *See* Dec. 33–37 (JA33–37).

The Director expressly "reject[ed]" the HUD Letter and held that Section 8(c)(2) is not a "substantive exemption" from liability and instead becomes relevant only "if there is a question as to whether the parties actually did enter into an agreement to refer settlement service business." Dec. 16–17 (JA16–17). By so disregarding Section 8(c)(2), the Director was able to conclude that Petitioners violated Section 8(a); he declined to address Section 8(b). *Id.* at 14, 17 (JA14, 17).

As to the accrual of a violation, the Director again departed drastically from precedent. The ALJ, relying on *Snow v. First American Title Insurance Co.*, 332 F.3d 356 (5th Cir. 2003), had determined that Petitioners violated Section 8 at the moment each reinsured loan closed, *see* Dec. 22 (JA22). The Director disagreed, determining that *each payment* to Atrium by the mortgage insurers amounted to a

15

separate violation.  *Ibid.*  Moreover, while acknowledging that RESPA "contains a three-year statute of limitations for 'actions brought by the [CFPB],'" the Director concluded that this provision applies *only* to suits brought in court.  Dec. 10 (quoting 12 U.S.C. § 2614) (JA10).

Thus, while the Director agreed with the ALJ that the CFPB could not pursue claims before July 21, 2008, Dec. 11–12 (JA11–12), he nonetheless reached back to earlier book years for which any premium payment was made on or after July 21, 2008, even where the relevant loan closed before that date.  On the basis of these novel interpretations of RESPA, the Director ordered Petitioners to disgorge $109,188,618.  Order at 2 ("Provision V") (JA40).

As additional sanctions, the Director enjoined Petitioners "from violating Section 8" of RESPA, Order at 1 ("Provision I") (JA39); entering into any affiliated reinsurance agreement for the next 15 years, *ibid.* ("Provision II"); and "referring any borrower to any provider of a real estate settlement service if that provider has agreed to purchase or pay for any service" from Petitioners and "the provider's purchase of or payment for that service is triggered by those referrals," *id.* at 2 ("Provision III") (JA40).  He also ordered that Petitioners "maintain records of all things of value that [Petitioners] receiv[e] or ha[ve] received from any real estate settlement service provider to which [Petitioners] ha[ve] referred borrowers since July 21, 2008, and for the next 15 years."  *Ibid.* ("Provision IV").

Petitioners timely sought review in this Court, as well as a stay. This Court granted the stay, finding that PHH "satisfied the stringent requirements" for such relief. Order (Aug. 3, 2015).

## STANDARD OF REVIEW

The question whether an agency has provided fair notice is reviewed *de novo*. *See*, *e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995) ("The due process clause . . . prevents deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.") (internal quotation marks and ellipsis omitted).

An agency's statutory interpretation is addressed under *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). At *Chevron*'s first step, courts apply the "traditional tools of statutory interpretation—text, structure, purpose, and legislative history"—to determine if Congress has spoken directly to the question at issue. *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001). These "tools" include the rule of lenity, which requires courts to interpret any ambiguity in statutes with criminal applications against the government. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). Furthermore, "the APA requires an agency to provide more substantial justification . . . 'when its prior policy has engendered serious reliance interests.'" *Perez v.*

17

*Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

## SUMMARY OF ARGUMENT

**I.**    The Director's interpretations of RESPA's Sections 8(a) and 8(c)(2) break with nearly two decades of prior authority.  Even if those interpretations were permissible readings of the statute, which they are not, they most certainly cannot be applied retroactively to punish conduct undertaken by Petitioners based on explicit agency advice expressly approving that conduct.

**A.**    The Due Process Clause prohibits the government from retroactively imposing punishment based on conduct that, at the time it was undertaken, was recognized as lawful.  In this case, however, the Director has read Section 8(c)(2)'s express authorization of affiliated-reinsurance arrangements—where reinsurance services are actually provided and the compensation is consistent with the services provided—out of existence, contravening the operative regulations and repeated interpretative guidance from HUD and the CFPB itself.  Those novel interpretations cannot be applied retroactively to punish Petitioners for affiliated-reinsurance relationships created when the relevant agencies had expressly authorized them.  Principles of fair notice alone require vacating the Decision and Order.

**B.**    In any event, the Director's interpretations of RESPA cannot remotely be squared with the text of the statute and would gut its purpose.

**1.**    Section 8(c)(2) exempts from liability under RESPA any "payment to any person of . . . compensation . . . for services actually performed."  12 U.S.C. § 2607(c)(2).  The Director interpreted this provision as providing a mere gloss on Section 8(a)'s general prohibition against "accept[ing] any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person," *id.* § 2607(a), effectively limiting Section 8(c)(2) to cases where there is some ambiguity whether an "agreement or understanding" has actually been reached.  But Section 8(c) plainly states that it applies *notwithstanding* any other provision of RESPA, and the Director's reading nullifies Congress's obvious intent to protect certain referrals from liability under Sections 8(a) and (b).

**2.**    The Director also erred in interpreting Section 8(a).  According to the Director, that provision gives rise to liability every time a mortgage-reinsurance premium is received for a loan reinsured pursuant to an unlawful referral.  This interpretation, however, ignores the uniform view of the federal courts, which have recognized that Section 8(a) is violated (if at all) at the time the relevant loan closes; at that point, the "referral" and "agreement" have already occurred and the

19

"thing of value" (12 U.S.C. § 2607(a)) has been transferred; any later payments are simply an exchange of a contractual right for an equivalent amount of currency. Moreover, RESPA's statute of limitations runs from "*the* date of *the* occurrence of *the* violation," 12 U.S.C. § 2614 (emphases added), which—consistent with Section 8(a)—does not envision multiple violations occurring whenever a premium is received.

3.     Even if Sections 8(a) or 8(c)(2) were ambiguous, they must be interpreted in favor of Petitioners.  Violation of RESPA carries criminal penalties, and the rule of lenity requires all ambiguities in criminal statutes to be construed against the government.  Because a single statute can have only one valid interpretation, RESPA must be interpreted the same way in this civil case as well. The Director failed to show that Sections 8(a) or 8(c)(2) unambiguously require *his* interpretation, or even to consider the serious reliance interests at stake.

4.     Compounding the Director's interpretive errors, he concluded that the CFPB can pursue administrative enforcement proceedings based on those provisions without *any* statute of limitations.  He did so by claiming that the relevant provision regarding the statute of limitations—requiring "[a]ny action" by the CFPB to be brought within three years of the alleged violations—applies only to judicial cases.  Yet the very statute that the CFPB invoked to bring this proceeding (*see* 12 U.S.C. § 2614) refers to "actions" brought by the agency.  The

20

term "action" must be understood to include administrative proceedings, and accordingly the three-year statute of limitations applies.

C.     The Decision and Order are invalid for the independent reason that the agency's structure violates the Constitution.  No previous agency has ever given one person—here, the Director—sole decision-making authority, lengthy tenure, independence from the President, and unfettered access to a half-billion-dollar budget.  The Director is insulated from presidential control because the President may not remove him except for cause.  And he is shielded from congressional control because he has sole authority to dictate the CFPB's budget from the Federal Reserve without any congressional oversight.  He is answerable to nobody in the federal government (save the courts).   Together, these unique and unprecedented features of the CFPB violate the separation of powers, and thus invalidate any action taken by this unconstitutional agency.

II.     The CFPB's Order is also invalid because the injunctions and disgorgement provisions required by the Order exceed the CFPB's authority.

A.     Each of the injunctive provisions is unlawful.  Provision I purports to bar Petitioners from violating RESPA, but it is well-settled that so-called "obey-the-law injunctions" are invalid.  Provision III purports to prohibit Petitioners from any referrals involving any "real estate settlement service," and Provision II limits Petitioners' involvement in any "captive" reinsurance arrangement, not just

21

mortgage insurance.  Those prohibitions sweep far beyond the charges in this proceeding and, thus, beyond what the CFPB can permissibly impose.  And Provision IV imposes onerous record-keeping requirements that not only extend far beyond the issues in this case, but also would impose massive—and unreasonable—burdens on Petitioners for 22 years.

**B.**     The CFPB's disgorgement order is invalid.

**1.**     Disgorgement is categorically unavailable to the CFPB under RESPA, which permits the "full range of equitable relief" to be ordered only by a court— not, as here, in an administrative proceeding.  It is irrelevant that the CFPA permits broader relief:  The relevant statute governing the scope of relief under RESPA is RESPA itself.  In any event, even if the CFPA's remedial provisions applied in lieu of RESPA's, they cannot be applied to conduct that occurred before the statute was enacted because HUD—which was previously charged with administering RESPA—had authority only to pursue injunctions.

**2.**     The $109 million disgorgement amount assessed by the Director lacks any evidentiary foundation because it is based on "book years" that the ALJ specifically excluded from consideration.  The ALJ determined that he would not consider any loans closed before July 21, 2008.  The Director disagreed with this conclusion based on his reading of Section 8(a) as imposing liability based on the receipt of premiums well after the relevant loan closed, and he thus required

disgorgement of premiums related to book years that were never considered by the ALJ.

**3.** The Director improperly assessed the amount of disgorgement based on the gross receipts supposedly received by Petitioners. But it is settled law that disgorgement requires the affected party to repay only the *profits* that it received from the relevant transactions, not the entire amount received.

**III.** For all of these reasons, the Director's Decision and Order should be vacated. The CFPB's actions in this proceeding are patently and incurably unlawful. In addition, because this Court granted a stay pending this appeal, vacatur would simply maintain the status quo and not produce any disruptive consequences.

## STANDING

Petitioners have Article III standing because they are the objects of the Decision and Order on review. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Petitioners have statutory standing because each of them participated in, and was a party to, the agency proceedings. *See* 12 U.S.C. § 5563(b)(4).

## ARGUMENT

## I. The Director's Liability Determination Is Unlawful.

For at least three independent reasons, the Director's determination that Petitioners violated Section 8 must be set aside. *First*, the determination rests on

23

radical new interpretations of Sections 8(a) and 8(c) that cannot, consistent with fundamental principles of fair notice, be applied retroactively to punish Petitioners for conduct undertaken in reliance on prior agency precedent.    *Second*, the Director's new interpretations of Sections 8(a) and 8(c) cannot be squared with the plain text of RESPA.    *Third*, the Director had no valid authority to render the Decision and Order:  The separation of powers prohibits giving such enormous, unchecked, multi-branch authority to a single, democratically unaccountable individual.

### A.    The Director's Decision Violates Fundamental Principles Of Fair Notice.

The Due Process Clause prevents the government from retroactively imposing liability without giving "fair notice of conduct that is forbidden."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  This "bedrock principle of American law," *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013), "preclude[s] an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule," *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987).

Accordingly, "an agency should not change an interpretation in an adjudicative proceeding where doing so would impose 'new liability . . . on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements' or in a case involving 'fines or damages.'"    *Christopher v.*

*SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)). This "fair notice" requirement is particularly critical for statutes, such as Section 8, that impose criminal as well as civil liability. *See Carter*, 736 F.3d at 727.

The CFPB violated these basic constitutional requirements by imposing massive, nine-figure liability on Petitioners based on two radical new interpretations of RESPA that abruptly "reject," Dec. 17 (JA17), almost two decades of agency and judicial interpretation and application. It was entirely impossible for Petitioners to have "identif[ied]" at the time of the challenged conduct, let alone with the requisite "ascertainable certainty," "the standards with which the [CFPB] [now] expects parties to conform." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). Thus, whether or not the Director's interpretations of RESPA are permissible going forward—and they are not, *see infra* Section I.B—they *certainly* cannot be retroactively applied to punish Petitioners.

### 1. The Director's New Interpretation Of Section 8(c)(2) Contradicts Nearly Two Decades Of Consistent Agency Guidance.

Section 8(a) provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement

service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). But it is subject to a critical caveat: "Section 8(c) . . . specifically excludes [payments for services actually furnished or performed] from the Section 8(a) proscription." *Glover v. Standard Fed. Bank*, 283 F.3d 953, 965 (8th Cir. 2002).

   *a.*    As relevant here, HUD's long-standing interpretation of RESPA established the prevailing standard for evaluating whether affiliated-reinsurance agreements complied with Section 8.

   Regulation X, promulgated by HUD and expressly adopted by the CFPB, unambiguously provides that "Section 8 of RESPA permits . . . [a] payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 24 C.F.R. § 3500.14(g) (2011); 12 C.F.R. § 1024.14(g)(2). Only "if the payment of a thing of value bears no reasonable relationship to the market value of the . . . services provided" could the "excess" amount possibly represent an improper payment "not for services . . . actually performed or provided." 24 C.F.R. § 3500.14(g) (2011); 12 C.F.R. § 1024.14(g)(2).

   Applying that interpretation, the HUD Secretary's designee stated in the HUD Letter that affiliated-reinsurance arrangements are permissible under RESPA if the payments "(1) are for reinsurance services 'actually furnished or for services

26

performed' and (2) are *bona fide* compensation that does not exceed the value of such services."  HUD Letter at 3 (JA253).  HUD (and other agencies) repeatedly held to that legal interpretation.  *See* Confirmation Letter (JA259); *see also supra* at 6–10 (collecting examples).

Before the Director issued his novel interpretation in this proceeding, HUD's interpretation of Section 8 as applied to reinsurance arrangements was universally understood to be the governing standard.   A leading RESPA treatise recently observed: "HUD concluded (and there is no reason to think the CFPB does not agree) that captive mortgage reinsurance arrangements are permissible under RESPA if the payments to the reinsurer:  (1) are for reinsurance services actually furnished or for services performed and (2) are bona fide compensation that does not exceed the value of such services."  James H. Pannabecker & David Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* § 8.04[6][a] (2013) (citation omitted).  Courts have relied on HUD's two-part test to determine the legality of affiliated-reinsurance arrangements under RESPA. *See*, *e.g.*, *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1010–14 (9th Cir. 2002); *Munoz v. PHH Corp.*, No. 08-cv-759, 2013 WL 2146925, at *5 (E.D. Cal. May 15, 2013); *Reyes v. Premier Home Funding, Inc.*, 640 F. Supp. 2d 1147, 1159 (N.D. Cal. 2009); *Pedraza v. United Guar. Corp.*, No. 99-239, Dkt. 172, ¶¶ 2, 7 (S.D. Ga. June 25, 2001).

Indeed, *in this very proceeding*, both the ALJ and Enforcement Counsel understood HUD's interpretation of RESPA as providing the controlling legal standard. As the ALJ explained, the HUD Letter's "'guidance is a straightforward application of [Regulation X] to captive reinsurance,'" and it "has been 'relied upon by mortgage insurers, lender-owned reinsurers and courts alike to evaluate a captive arrangement's compliance with Section 8.'" Dkt. 205, at 41 (citation omitted) (JA147); *see also* Dkt. 1, ¶ 96 (alleging that premiums "were not for services furnished or performed," or "grossly exceeded the value of any such services") (JA57). Indeed, Enforcement Counsel's own expert witness relied on the HUD Letter. *See* Expert Report of Mark Crawshaw, Ph.D., Dkt. 55, at 34 (JA79) ("Another guideline for assessing risk transfer is described in a 1997 letter from Nicholas Retsinas of [HUD].").

*b.* Upending this well-settled interpretation of Section 8(c), the Director concluded that affiliated reinsurance violates Section 8(a) even when the reinsurance coverage was provided at a "commensurate price." Dec. 20 (JA20). The Decision thus punishes the precise activity that HUD at the time was telling regulated entities (including Petitioners) was legal.

The Director dismissed the HUD Letter as not "binding." Dec. 17 (JA17). As an initial matter, that position ignores the CFPB's own regulations, which contain the *same* two-part test as the HUD Letter and expressly "permit"

28

qualifying payments.  *See* 12 C.F.R. § 1024.14(g)(2).  And it disregards the voluminous *other* published guidance from HUD adopting the *same* interpretation of Section 8, and the agreement of other agencies and courts.  *See supra* at 6–10.

But even if the HUD Letter had been the *only* source of the relevant test, that letter reflected HUD's official legal interpretation, and the Director cannot brush it aside.  HUD plainly intended its letter ruling to provide guidance to regulated entities and to govern RESPA's application to them.  It "detail[ed]" "how [HUD] will scrutinize these arrangements to determine whether any specific captive reinsurance program is permissible under RESPA," and concluded by reassuring Countrywide that "this guidance will assist you to conduct your business in accordance with RESPA."  HUD Letter at 1, 8 (JA251, 258).  HUD later reiterated that its "1997 guidance" would be "useful" in "evaluat[ing]" the "legality of captive mortgage reinsurance agreements under RESPA."  Confirmation Letter (JA259).  And on its first day of existence, the CFPB confirmed that all "official commentary, guidance, and policy statements" from HUD would continue to control "pending further CFPB action."  Identification of Enforceable Rules and Orders, 76 Fed. Reg. at 43,570.  Until the Director issued his Decision, the CFPB took no administrative action suggesting otherwise.

The consistent interpretation of RESPA by HUD, other federal regulators, courts, commentators, and regulated entities alike makes clear that Petitioners

lacked "fair notice" of the Director's contrary interpretation at the time that they engaged in the relevant conduct. Indeed, even the ALJ and Enforcement Counsel (as well as its expert) believed that the HUD Letter provided the proper framework for decision under Section 8: the *entire hearing*—including PHH's evidentiary submissions—was conducted on that basis.

Under these circumstances, how could Petitioners have predicted that, years after they closed the mortgages at issue and stopped receiving premiums, the Director would jettison HUD's well-settled interpretation of RESPA and impose a retroactive, punitive *per se* bar on affiliated-mortgage reinsurance programs, *after* Atrium paid out millions in claims under those arrangements? Even *silent agency acquiescence* can preclude fair notice. *See Christopher*, 132 S. Ct. at 2168 (involving "lengthy period of conspicuous inaction"). This case is even worse: what the CFPB now says was forbidden was affirmatively *permitted* by the "regulations and other public statements issued by the agency," *Gen. Elec.*, 53 F.3d at 1329. Regulated entities were assured they could "conduct [their] business," HUD Letter at 8, in ways the CFPB now says were illegal. The Director's attempt to manufacture retroactive liability against those who took the government at its word violates the bedrock requirements of fair notice.

2.     **The Director's New Interpretation Of Section 8(a) Contradicts The Previously Settled Interpretation Of That Provision.**

Petitioners also never received fair notice of the Director's new interpretation of Section 8(a) as creating a violation every time a mortgage-reinsurance premium is received, rather than when the relevant loan closed.

The Director's interpretation was literally unprecedented. As the ALJ acknowledged, Dkt. 152, at 11 (JA91), courts have consistently found that a RESPA violation occurs (if at all) when the loan closes. *See Snow v. First American Title Ins. Co.*, 332 F.3d 356, 359–60 (5th Cir. 2003); *see also*, *e.g.*, *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 325 (M.D.N.C. 2002). As further explained below, *see infra* Section I.B, these courts have rested their conclusion on the plain language of the statute of limitations, which runs from a *singular* point: "*the* date of *the* occurrence of *the* violation." 12 U.S.C. § 2614 (emphases added). No court has disagreed. *See* Dkt. 152, at 11 (JA91). As the ALJ correctly recognized, "the *Snow* doctrine is authoritative." *Id.* at 12 (JA92).

The Director brazenly "reject[ed]" this long-established and widely accepted interpretation of RESPA. Dec. 17 (JA17). Fair-notice principles prevent the Director from punishing Petitioners for receiving payments that were not previously considered independently actionable under RESPA.

\*     \*     \*

31

The Director's retroactive reinterpretations of Sections 8(c)(2) and 8(a) violate the most basic of constitutional guarantees:  fair notice.  An agency cannot "punish a member of the regulated class for reasonably interpreting [its precedent]. Otherwise the practice of administrative law would come to resemble 'Russian Roulette.'"  *Satellite Broad. Co.*, 824 F.2d at 4.  The Director may wish to rewrite RESPA, but he cannot rewrite history: HUD, industry, other federal agencies, courts, commentators, the ALJ, and Enforcement Counsel *all* read Section 8 to make lawful what the Director now seeks to punish.  Due process does not permit that outcome.

### B.     The Director's New Interpretations Of RESPA Are Contrary To Law.

The clear violation of Petitioners' fundamental right to fair notice is sufficient in itself to warrant setting the Director's action aside.  But the Director's new interpretations of RESPA are independently impermissible.  They contravene the statute's plain language and Congress's obvious intent to carve out certain referrals from liability under Section 8.

In concluding that Section 8(c)(2) is irrelevant where a referral agreement exists, and that a Section 8(a) violation occurs each time a payment is received, the Director shrugged off the clear text of RESPA in favor of sweeping reinterpretations that effectively nullify critical parts of the statute.  The Director compounded these errors by interpreting RESPA not to include *any* statute of

32

limitations for administrative enforcement proceedings, sweeping within the CFPB's dragnet even *more* conduct that was lawful when undertaken.

Even if Sections 8(a) or 8(c)(2) were ambiguous, they must be interpreted in Petitioners' favor. Where a statute carries both criminal and civil penalties, as here, the rule of lenity governs its interpretation in both contexts and requires any ambiguities to be construed against the government. *See Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004); *see also Carter*, 736 F.3d at 727 (applying rule of lenity to Section 8). Moreover, the Director's cavalier dismissal of the "serious reliance interests," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015), induced by the government's prior, repeated constructions of these provisions is arbitrary and capricious.

### 1. The Director's New Interpretation Of Section 8(c)(2) Contravenes The Plain Statutory Text And Guts Its Purpose.

Section 8(c) is written with particular clarity: "*Nothing in this section shall be construed as prohibiting* . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2) (emphasis added). The provision uses the absolute term "nothing," and contains no restrictions. It unambiguously permits the payment of any "bona fide salary or compensation or other payment" made related to "services actually performed," regardless of

Section 8(a)'s otherwise-applicable prohibition.  Congress plainly never intended to outlaw all referrals; rather, it prohibited paying for referrals by charging more than the value of the services provided.  *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038 (D.C. Cir. 1986) (RESPA enacted to address "unnecessarily high settlement charges caused by *certain* abusive practices") (emphasis added) (internal quotation marks omitted); *supra* at 9 (quoting Conf. Rep.).

Consistent with Section 8(c)(2)'s plain text, and as explained above, HUD repeatedly interpreted the provision to impose a two-part test that expressly *exempted* certain payments from liability under RESPA:  Payments are permissible if they "(1) are for reinsurance services 'actually furnished or for services performed' and (2) are <u>bona fide</u> compensation that does not exceed the value of such services."  HUD Letter at 3 (JA253); *see also* 24 C.F.R. § 3500.14(g)(1) (2011) (listing types of payments that "Section 8 of RESPA permits"); 12 C.F.R. § 1024.14(g) (same); *supra* at 6–10 (collecting examples).

The Director, however, read an unwritten limitation into Section 8(c)(2), claiming that "[S]ection 8(c)(2) only becomes relevant if there is a question as to whether the parties actually did enter into an agreement to refer settlement service business."  Dec. 17 (JA17).  There is no textual basis for that reading.  Section 8(c)(2) does not draw distinctions among referral agreements, or even mention such agreements at all; rather, it states that legitimate payments are not prohibited.

34

The Director's reading directly contravenes the unqualified nature of Section 8(c)(2) and effectively reads that provision out of existence.

The Director asserted that Section 8(c) merely "clarifies section 8(a), providing direction as to how that section should be interpreted, but does not provide a substantive exemption from section 8(a)."  Dec. 16 (JA16) (emphasis omitted).  But that's not what the statute says, and indeed Regulation X says exactly the opposite.  Moreover, courts,[3] HUD, and the CFPB itself[4] have correctly found that Section 8(c) operates as an exemption from liability.  Yet whether couched as a clarification, exemption, defense, qualification, safe harbor, or "interpretive gloss," Section 8(c)(2)'s effect is obvious:  It expressly *permits*

---

[3]  *See*, *e.g.*, *Geraci v. Homestead Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (Section 8(c) "provides a safe harbor"); *Glover*, 283 F.3d at 965 (Section 8(c) "specifically excludes [payments for services actually furnished or performed] from the Section 8(a) proscription"); *Price v. Landsafe Credit, Inc*., No. CIV.A.CV205-156, 2006 WL 3791391, at *3 (S.D. Ga. Dec. 22, 2006) (Section 8(c) "creates a safe harbor from liability"), *aff'd*, 514 F.3d 1153 (11th Cir. 2008).

[4]  *See*, *e.g.*, Consent Order ¶ 9, *In re Lighthouse Title, Inc*., No. 2014-CFPB-0015 (Sept. 30, 2014) (Section 8(c)(2) "provides an exemption"); Consent Order ¶ 9, *In re Fidelity Mortg. Corp.*, No. 2014-CFPB-0001 (Jan. 16, 2014) (Section 8(c) "lists exemptions to the prohibitions [of Section 8(a)]"); *see also* Brief for the United States as Amicus Curiae at 22, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) (No. 10-1042) (Section 8(c) "provid[es] a safe harbor").

certain conduct that would otherwise be proscribed by removing that conduct from the scope of Section 8(a) and (b).[5]

The Director also contended that "permit[ing] compensated referrals . . . would distort the market in ways that the statute as a whole plainly sought to prevent."  Dec. 16 (JA16).  But Congress thought otherwise, and for good reason: the market for real estate settlement services is not distorted—and no "unnecessar[y]" settlement costs incurred, *Hardin*, 797 F.2d at 1038 (quoting 12 U.S.C. § 2601)—when mortgage insurers pay no more than the commensurate price for the reinsurance services they actually receive.  Congress deliberately excluded such payments from liability, and the Director was not free to disregard Congress's clear textual command based on his skewed view of Congress's "intent."

The Director attempted to conclude in the alternative that Petitioners' arrangements did not comply with Section 8(c) even as correctly (and long) interpreted, but was able to arrive at this conclusion only by shifting the burden of

---

[5]    The Director relied in part on the Eleventh Circuit's statement in *Culpepper v. Irwin Mortgage Corp.* that, "[i]f [Section] 8(c) is only a gloss on [Section] 8(a), making clear what [Section] 8(a) allows in certain contexts, we should avoid reading [Section] 8(c) to bless conduct that [Section] 8(a) plainly outlaws."  253 F.3d 1324, 1330 (11th Cir. 2001).  The Eleventh Circuit, however, later *rejected* this interpretation in light of HUD's two-part test.  *See Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1263 (11th Cir. 2002).

proof from the government to Petitioners and assuming that evidentiary *silence* equaled liability. *See* Dec. 20 (JA20). That was fundamental legal error; rather than defend the conclusion, the CFPB has already abandoned it in this Court. Stay Opp. 14 n.5. Rightly so. Section 8(c) does not set forth an affirmative defense, but rather elements of the offense that the government must prove. *See*, *e.g.*, *Franks v. Bowman Transp., Co.*, 424 U.S. 747, 758 (1976). The government—not the defendant—therefore bears the burden of proving that the conduct at issue does not fall within Section 8(c). *See*, *e.g.*, *Capell v. Pulte Mortg. L.L.C.*, Civ. A. No. 07-1901, 2007 WL 3342389, at *6 (E.D. Pa. Nov. 7, 2007).

### 2. The Director's New Interpretation Of Section 8(a) Contravenes The Plain Statutory Text And Structure.

The Director similarly ignored the plain text of RESPA in concluding that a statutory violation occurs under Section 8(a) each time a payment is made by the mortgage insurer to the reinsurer. *See* Dec. 22 (JA22).

Although RESPA prohibits "giv[ing]" or "accept[ing]" things of value pursuant to a fee-for-referral agreement, 12 U.S.C. § 2607(a), RESPA's statute of limitations provision is triggered by "*the* date of *the* occurrence of the violation," *id.* § 2614 (emphases added). Accordingly, courts have long concluded that a RESPA violation occurs at the date that the loan closes, rather than every subsequent date when a payment related to the loan may be received. *See*, *e.g.*, *Snow*, 332 F.3d at 359–60 (5th Cir. 2003); *Menichino v. Citibank, N.A.*, No. 12-

37

0058, 2013 WL 3802451, at *12 (W.D. Pa. July 19, 2013); *Palmer v. Homecomings Fin., LLC*, 677 F. Supp. 2d 233, 237 (D.D.C. 2010); *Mullinax*, 199 F. Supp. 2d at 325.

At closing, the referral has already occurred, and the lender and the affiliated reinsurer have received the "thing of value"—that is, the contractual right of the reinsurer to receive payments from the mortgage insurer over time, in exchange for the promise to reinsure the risk. The fact that the "thing of value" is later exchanged for its equivalent—that is, the payments themselves—is immaterial. In *Snow*, the plaintiff alleged that title agents violated Section 8(a) by receiving payments for certain insurance referrals long after the relevant loans closed. The Fifth Circuit rejected that contention, holding that "[t]he phrase 'the date of the occurrence of the violation' refers to the closing, i.e., when the plaintiffs paid for the insurance, because that is when the agents earned the allegedly prohibited 'thing of value.'" 332 F.3d at 359. Moreover, "extending indefinitely the limitations period for private plaintiffs suing under [Section] 2607 . . . would creat[e] a limitations period that is longer than Congress could have contemplated," thereby "negat[ing] Congress' decision to impose three different limitations periods in [Section] 2614." *Id.* (citation omitted).

In *Mullinax*, the district court similarly considered and rejected the kind of continuing-violations theory that the Director embraced. The court emphasized

that RESPA "focus[es] on the settlement transaction itself," and that, if the continuing-violations theory were adopted, it would create "disparate results" among the limitations periods applicable to different borrowers, "who apparently can elect either to pay for their insurance in one lump sum or through multiple payments." 199 F. Supp. 2d at 325.

The Director's contrary reading is also unworkable, because a private plaintiff's cause of action would arise not on an objective date the borrower knows (the closing) but on dates determined by the happenstance of payments between providers, and nonsensically implies that a new decision to refer settlement service business is made every time a premium cedes (here, monthly). Finally, it would create a shocking multiplier effect on the statutory penalties, *see* 12 U.S.C. § 2607(d)—and in this case, it operated to increase *by a multiple of 18* the disgorgement amount (assuming that is a valid remedy) from $6 million to $109 million. Especially when the Director's continuing-violations theory is combined with his conclusion that there are *no* time limits on administrative enforcement actions, *see infra* Section I.B.4, the potential for staggering and unconstitutional fines, *see*, *e.g.*, *United States v. Bajakajian*, 524 U.S. 321 (1998), further militates against the Director's construction of Section 8(a).

### 3. Even If Sections 8(a) Or 8(c)(2) Were Ambiguous, Those Provisions Must Be Interpreted In Petitioners' Favor.

Even if Sections 8(a) and 8(c)(2) were ambiguous, deference is not appropriate under the rule of lenity, and the Director's dismissal of Petitioners' reliance interests as "not particularly germane," Dec. 19 (JA19), further compels rejection of his interpretations.

*a.* Because Section 8 has both civil and criminal applications, the rule of lenity governs its construction. Any possible ambiguities therefore must be resolved in favor of Petitioners. *See Leocal*, 543 U.S. at 12 n.8; *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) ("[T]he rule of lenity can apply when a statute with criminal sanctions is applied in a noncriminal context."); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality opinion).

Courts "must interpret [Section 8] consistently, whether [they] encounter its application in a criminal or noncriminal context." *Leocal*, 543 U.S. at 11 n.8. To permit otherwise would allow courts (or, worse, agencies) to "'give the same statutory text different meanings in different cases.'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez*, 543 U.S. 371, 386 (2005)). That will not do: a "statute is not a chameleon. Its meaning does not change from case to case." *Carter*, 736 F.3d at 730 (Sutton, J., concurring).

40

Moreover, because the rule of lenity resolves any possible ambiguity in Section 8, *Chevron* deference could not apply in any circumstances. A court should defer to the agency's interpretation of a statute only if ambiguity remains *after* deploying all the "normal 'tools of statutory construction.'" *See*, *e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 321 n.45 (2001) (quoting *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). The rule of lenity, as a "rule of statutory construction," *Thompson/Ctr. Arms Co.*, 504 U.S. at 519 n.10, is therefore applicable before the question of deference even arises. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 985 (2005) (deferring to agency because lower court, in refusing to give deference, "invoked no . . . rule of construction (such as the rule of lenity) requiring it to conclude that the statute was unambiguous"). Thus, "*Chevron* accommodates rather than trumps the lenity principle." *Carter*, 736 F.3d at 732 (Sutton, J., concurring). That is as it should be, because the power to "define criminal activity" rests exclusively with Congress, *United States v. Bass*, 404 U.S. 336, 348 (1971), not executive agencies—and especially not *unaccountable* agencies. *See Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., respecting the denial of certiorari) ("[T]he Government's pretensions to deference . . . collide with the norm that legislatures, not executive officers, define crimes.").

Thus, it is the Director who must show that the statute unambiguously favors *his* construction, as the rule of lenity resolves any ambiguity in Petitioners' favor. He cannot carry that burden, because Petitioners' interpretations are at a minimum reasonable; under the rule of lenity, the Director's harsher interpretations must give way. *See Carter*, 736 F.3d at 727. Any contrary holding would "turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring).

   ***b.***      It is undisputed that "[t]he [HUD] Letter has been relied upon by mortgage insurers [and] lender-owned reinsurers [*i.e.*, affiliated reinsurers] . . . to evaluate a captive reinsurance arrangement's compliance with Section 8." *Munoz*, 2013 WL 2146925, at *5. For that reason, the Director's decision to throw that guidance overboard is subject to heightened scrutiny. *See Perez*, 135 S. Ct. at 1209 (agencies must "provide more substantial justification" when they change a policy that "has engendered serious reliance interests") (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

   The Director barely acknowledged Petitioners' reliance interests in the existing HUD interpretation, much less offered a "substantial justification" for reversing course. Instead, he spurned those interests as "not particularly germane." Dec. 19 (JA19). Yet Petitioners (and, indeed, the entire industry) were lulled into a

false sense of security that their affiliated-mortgage-reinsurance programs were permissible so long as they satisfied the two-part test that HUD articulated, emphasized, and reaffirmed, and that the CFPB adopted. "It [was] arbitrary or capricious to ignore such matters." *Fox*, 556 U.S. at 515.

### 4. The Director Erred In Concluding That Administrative Enforcement Actions Under RESPA Are Not Subject To Any Limitations Period.

The Director's sweeping constructions of Section 8 were expanded even further by his conclusion that the CFPB is not restrained by *any* limitations period for administrative enforcement actions under RESPA. This position, which would permit the CFPB to have initiated this proceeding even a century from now, is as illogical as it is unsupported by the statute. RESPA provides that actions such as this one are subject to a three-year statute of limitations, and, accordingly, all of the CFPB's claims involving loans closed before January 25, 2009 are time-barred.

Section 16 of RESPA provides that "[a]ny action" by the CFPB "may be brought within 3 years from the date of the occurrence of the violation." 12 U.S.C. § 2614. Relying on *BP America Production Co. v. Burton*, 549 U.S. 84 (2006), the Director stated that "action" refers exclusively to lawsuits in court, not to administrative enforcement proceedings, *see* Dec. 10 (JA10). That is incorrect.

The issue in *BP America* was whether the six-year statute of limitations generally applicable to "every [contract] action for money damages brought by the

United States," 28 U.S.C. § 2415(a), applies to administrative payment orders issued by the Department of the Interior. In deciding that it does not, the Supreme Court reasoned that "[Section] 2415(a) applies when the Government commences any 'action for money damages' by filing a 'complaint' to enforce a contract, and the statute runs from the point when 'the right of action accrues.'" 549 U.S. at 91 (quoting 28 U.S.C. § 2415(a)). The Court emphasized that the "key terms in this provision—'action' and 'complaint'—are ordinarily used in connection with judicial, not administrative, proceedings." *Ibid.* Moreover, "[t]he phrase 'action for money damages' reinforces this reading because the term 'damages' is generally used to mean 'pecuniary compensation or indemnity, which may be recovered *in the courts*.'" *Id.* at 91–92 (citation omitted) (emphasis added).

The Supreme Court's holding that an administrative payment order does not fall within the definition of an "action for money damages" initiated by a "complaint," and which runs from the accrual of the "right of action," has little bearing here. Although both Section 16 and Section 2415(a) use the term "action," the remaining textual clues that the Supreme Court used to inform its understanding of that term in Section 2415(a)—"complaint" and "money damages"—are absent from Section 16. And while "action" can, as the Court noted, be used to refer to judicial proceedings, the Court relied on the more

specific language of Section 2415(a)—that is, "right of action"—in interpreting the statute. *See BP Am.*, 549 U.S. at 91.

The relevant textual clues in *this* case point in the opposite direction. Most notably, the very authority invoked by the CFPB to pursue equitable relief in this enforcement proceeding—12 U.S.C. § 2607(d)(4)—states that the CFPB "may bring an action to enjoin violations" of Section 8. The CFPB's administrative-tribunal statute, in contrast, refers only to "ensur[ing] or enforc[ing] compliance with" consumer laws such as RESPA. *Id.* § 5563(a). Unless Section 2607(d)(4)'s reference to "action" is interpreted to include administrative enforcement proceedings, as the CFPB must believe to have instituted this proceeding, then the injunctive relief ordered would have been impermissible. If the CFPB wants to rely on the phrase "an action to enjoin," it must accept the consequence: That "action" is subject to a three-year limitations period under Section 2614(a).

## C. The CFPB Violates The Constitutional Separation Of Powers.

The Director's blatant disregard for fair notice, statutory text, and industry's reliance interests is a symptom of larger constitutional problems. The CFPA places sweeping legislative, executive, and judicial power all "in the same hands" of a *single person* who is entirely unaccountable to the democratic process—what James Madison called "the very definition of tyranny." *The Federalist No. 47*, at 301 (Clinton Rossiter ed., 1961).

45

The Director is not answerable to the President, as he is removable only for cause. *See* 12 U.S.C. § 5491(c)(3). Nor is Congress able to rein in the Director using its power over the purse, as he has the sole power to fund his agency from the Federal Reserve System's operating expenses, *id.* § 5497(a)(1), and Congress is *prohibited* from reviewing the Director's budget determinations, *id.* § 5497(a)(2)(C). The Director is not checked by the deliberative decision-making process of a multi-member commission structure, nor is he checked by a short tenure, as he serves a fixed five-year term. *Id.* § 5491(c)(1). And far from a limited scope of power, the Director wields vast authority under eighteen statutes previously enforced by seven different agencies. Mark P. Goodman & Daniel J. Fetterman, *Defending Corporations and Individuals in Government Investigations* § 9:4 (2014).

Never before has so much power been accumulated in the hands of one individual so thoroughly shielded from democratic accountability. The combination of these unprecedented structural features violates the separation of powers. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010). The CFPB is an unconstitutional body, and its action against PHH thus is void. *See*, *e.g.*, *Noel Canning v. NLRB*, 705 F.3d 490, 499, 514 (D.C. Cir. 2013), *aff'd on other grounds*, 134 S. Ct. 2550 (2014).

**1.** The Constitution vests the Executive power in the President, who must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," *Free Enter. Fund*, 561 U.S. at 484, and thus the President "must have the power to remove [executive officers] without delay," *Myers v. United States*, 272 U.S. 52, 134 (1926).  Restrictions on the President's removal power are presumptively unconstitutional, and the Supreme Court has recognized only two exceptions:  Congress may limit the President's ability to remove (1) a multi-member "body of experts," *see Humphrey's Ex'r v. United States*, 295 U.S. 602, 624 (1935),[6] and (2) inferior officers with limited tenure and a narrow scope of powers, *see Morrison v. Olson*, 487 U.S. 654, 671–73, 695–97 (1988).

When a court is asked "to consider a new situation not yet encountered by the [Supreme] Court," there must be special "circumstances" to justify "restrict[ing] the President] in his ability to remove" an officer.  *Free Enter. Fund*, 561 U.S. at

---

[6]     The continued viability of *Humphrey's Executor* after *Free Enterprise Fund* has been questioned.  *See*, *e.g.*, *In re Aiken Cnty.*, 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("The [*Free Enterprise Fund*] Court's rhetoric and reasoning are notably in tension with *Humphrey's Executor*.").  In light of *Free Enterprise Fund*, *Humphrey's Executor* should be read narrowly and not extended.  Further, Petitioners respectfully preserve the argument that the Supreme Court should revisit *Humphrey's Executor*.

483–84.  The CFPB is precisely such a "new situation."  Unlike the Federal Trade Commission, the Director is not meant to be "non-partisan" or to "act with entire impartiality," nor is he "called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Humphrey's Ex'r*, 295 U.S. at 624 (citation omitted).  Further, the CFPB is headed not by a multi-member commission that contains its own internal checks, but by a single unchecked Director.  And unlike the "independent counsel," the Director does not have "limited jurisdiction and tenure" or "lac[k] policymaking or significant administrative authority."  *Morrison*, 487 U.S. at 691.  To the contrary, he has lengthy tenure, Hydra-headed authority, and sweeping enforcement powers.

Moreover, Congress eliminated other important checks on the Director by abdicating its *own* core responsibilities over the CFPB.  The Director has sole authority to set the CFPB's budget and to demand up to 12% of the Federal Reserve System's operating expenses, totaling over half a billion dollars,[7] *see* 12 U.S.C. § 5497(a)(2)(A)—a demand *exempt* from "review by the Committees on Appropriations of the House of Representatives and the Senate," *id.*

---

[7]     $618.7 million for the fiscal year 2015, and $631.7 million for the fiscal year 2016.  Consumer Financial Protection Bureau, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* 11 (2015), *available at* http://files.consumerfinance.gov/f/201502_cfpb_report_ strategic-plan-budget-and-performance-plan_FY2014-2016.pdf.

§ 5497(a)(2)(C).  Under the Constitution, however, Congress has exclusive control over the power of the purse.  *See* U.S. Const. art. I, § 7, cl. 1 (Origination Clause), § 8, cl. 1 (Taxing and Spending Clause), § 9, cl. 7 (Appropriations Clause).  "'This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people[.]'"  *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting *The Federalist No. 58*, at 359 (James Madison) (Clinton Rossiter ed., 1961)).  The Director's funding decisions thus are shielded from any congressional accountability—an essential constitutional aim.  *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (Appropriations Clause has "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents").

There are, accordingly, no special "circumstances," *Free Enter. Fund*, 561 U.S. at 483–84, here that could justify encroaching on the President's removal power.  Quite the opposite, the CFPB combines vast authority for the Director with unprecedented insulation.  *See id.* at 498 (striking down removal limitations because "the public c[ould not] 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall'")

49

(quoting *The Federalist No. 70*, at 428 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

**2.**    It would be erroneous to examine each of the CFPB's anomalous structural features separately, finding a precedential justification for each one in isolation, as some courts have done.  *See*, *e.g.*, *CFPB v. Morgan Drexen, Inc*., 60 F. Supp. 3d 1082, 1086–92 (C.D. Cal. 2014).  Rather, the constitutionality of agency "independence" must be examined holistically, and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001); *see also Morrison*, 487 U.S. at 671–73, 695–97 (finding fewer protections necessary where scope of delegated power is narrow).

"[J]ust because two [or more] structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute."  *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp*., 721 F.3d 666, 673 (D.C. Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1225 (2015).  While the Supreme Court has "previously upheld limited restrictions" on particular checks and balances, the combined elements of the CFPB's "novel structure does not merely add to the [agency's] independence, but transforms it."  *Free Enter. Fund*, 561 U.S. at 495, 496.  Indeed, the CFPB's unconstitutionality lies in its unprecedented level of insulation from *all* democratic checks and accountability.    Thus,

"[p]erhaps the most telling indication of the severe constitutional problem" with the CFPB's structure "is the lack of historical precedent for this entity." *Id*. at 505 (internal quotation marks omitted).

Aggravating the constitutional problems in this case is the fact that the ALJ who presided over the hearing, despite being an "inferior Office[r]," was not appointed by the President, a court, or a "Hea[d] of Departmen[t]." U.S. Const. art. II, § 2, cl. 2. Pursuant to an Interagency Agreement between the CFPB and the SEC, this enforcement action was assigned to the ALJ by the SEC's Chief ALJ. *Order Assigning ALJ* (JA75). Neither the CFPB Director, *see* 12 U.S.C. § 5491(a), nor the SEC's Chief ALJ, is among the "Heads of Departments." Moreover, ALJs are inferior officers because, even though they cannot enter final orders, "[t]hey take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881–82 (1991).[8]

---

[8]    *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125 (D.C. Cir. 2000), held that ALJs who cannot issue final orders are not "officers." Three courts have recently disagreed. *See Duka v. SEC*, No. 15-CIV-357, 2015 WL 4940083, at *2 (S.D.N.Y. Aug. 12, 2015); *Gray Fin. Grp. v. SEC*, 15-CV-492, Dkt. 56, at 33, 35 (N.D. Ga. Aug. 4, 2015); *Hill v. SEC*, No. 1:15-CV-1801, 2015 WL 4307088, at *16–19 (N.D. Ga. June 8, 2015); *see also Landry*, 204 F.3d at 1140–43 (Randolph, J., concurring in part and concurring in the judgment). Petitioners respectfully preserve this argument for review by the *en banc* Court or the Supreme Court.

All of these unique and unprecedented features, taken as a whole, render the CFPB unconstitutional and this enforcement action void.

## II.   The Order's Sanctions Are Unlawful.

The Director's liability determinations should be set aside, in which case there is no legal basis for the imposition of any sanctions against Petitioners. But those sanctions are themselves invalid. The Order's staggeringly broad injunctions cover activities far beyond the conduct addressed in the Notice of Charges and are otherwise unlawful. As for the Order's disgorgement mandate, the CFPB possesses no statutory authority to issue any such remedy in the first place; there is, in any event, a grievous disconnect between the total amount of disgorgement required by the Director and the evidence actually before the ALJ. The sanctions cannot survive judicial review

### A.   The Injunctive Provisions Exceed The CFPB's Statutory Authority And Are Otherwise Invalid.

Under the "[s]pecial rules for cease-and-desist proceedings," when "the [CFPB] finds that *any violation specified in the notice of charges* has been established, the [CFPB] may issue and serve upon the covered person or service provider an order to cease and desist from *the violation or practice*." 12 U.S.C. § 5563(b)(1)(D) (emphases added). Moreover, the injunctive provisions in the Order are subject to Rule 65, *see Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995) ("Long ago . . . the Supreme Court held that Rule 65(d) simply

restates a norm of federal equity practice and therefore is equally germane to orders enforcing decisions of administrative agencies."), which requires "specific[ity]" and "reasonable detail," Fed. R. Civ. P. 65(d)(1); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 444 (1974) ("[T]hose against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.").  None of the injunctive provisions in the Order adheres to these requirements.

**1.**     Provision I of the Order requires Petitioners "in connection with the referral of any borrower to a provider of mortgage insurance, [to] CEASE AND DESIST from violating section 8 of the Real Estate Settlement Procedures Act, 12 USC § 2607(a)."  Order at 1 (JA39).  This "obey-the-law" injunction is patently invalid.

Provision I is not tied in any way to the Notice of Charges at issue here.  It also fails to describe in any kind of detail, let alone "reasonable detail," the actions to be prohibited.  *See*, *e.g.*, *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 433 (1941) (rejecting "a blanket order restraining the employer from committing any act in violation of the statute, however unrelated it may be to those charged and found"); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (rejecting an injunction that "might subject defendants to contempt for activities having no

resemblance to the activities that led to the injunction, thereby being overly broad in its reach").

And because Provision I refers generically to Section 8, without explanation, it does not provide Petitioners with fair notice of the *particular* acts enjoined, thus violating "the most fundamental postulates of our legal order forbid[ding] the imposition of a penalty for disobeying a command that defies comprehension." *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

**2.**    Provision III requires Petitioners to "CEASE AND DESIST, for a period of 15 years, from referring any borrower to any provider of a real estate settlement service if that provider has agreed to purchase or pay for any service from any of the [Petitioners], and the provider's purchase of or payment for that service is triggered by those referrals." Order at 2 (JA40).

The reference to any "real estate settlement service" ensures that Provision III reaches far beyond the conduct described in the Notice of Charges to services *completely unrelated* to mortgage reinsurance. Indeed, the CFPB has admitted as much, conceding in this Court that "this provision applies to referrals that do not involve mortgage insurance." Stay Opp. at 16. But the Notice of Charges in this proceeding concerned *only* mortgage reinsurance. *Contra* 12 U.S.C. § 5563(b)(1)(D); *see also Express Publ'g Co.*, 312 U.S. at 435–36 ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a

statute does not justify an injunction" that would "subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."). Indeed, the reference to any "real estate settlement service" means that the provision would prohibit conduct expressly *allowed* under the CFPB's own regulations. *See* 12 C.F.R. § 1024.14(g)(1).

Provision III also fails to define the term "triggered," which appears nowhere in RESPA or its implementing regulations. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (per curiam) ("[W]e have held injunctions to be too vague . . . when they include, as a necessary descriptor of the forbidden conduct, an undefined term that the circumstances of the case do not clarify.").

**3.**    Provision II requires Petitioners to "CEASE AND DESIST, for a period of 15 years, from entering into *any* captive reinsurance agreement." Order at 1 (JA39) (emphasis added). The provision thus purports to limit Petitioners' participation in numerous reinsurance areas, such as life and property insurance, wholly outside of the mortgage realm. Again, the Notice of Charges concerned only mortgage reinsurance. And by enjoining conduct not covered by RESPA and perhaps even outside the CFPB's authority entirely, the provision goes too far under Rule 65. *See SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1318–19 (D.C. Cir.

55

1981) (rejecting part of injunction that "could embrace nearly any sort of violation of the securities laws, and possibly reach out even beyond the securities area").

    **4.**    Provision IV requires Petitioners to "maintain records of all things of value that any [Petitioner] receives or has received from any real estate settlement service provider to which any [Petitioner] has referred borrowers since July 21, 2008, and for the next 15 years." Order at 2 (JA40). The breadth of this provision is jaw-dropping: It applies to *anything* of value that *any* Petitioner received within two years of a referral from any real estate settlement service provider to which *any* (and potentially a different) Petitioner referred borrowers—for a period of 22 years. *Ibid.*

    This vast information-collecting and record-keeping obligation would impose massive burdens on Petitioners for years to come, and would require them immediately to determine whether any of their more than 10,700 current and former employees ever received a relevant "thing of value" during the past seven years. And, like the other injunctive provisions, it does not adhere to the relevant statutory or other legal requirements: It is not tied to the Notice of Charges, does not provide Petitioners with fair notice of the specific prohibited conduct, and reaches conduct not covered by RESPA because it is unrelated to payments made "pursuant to" an "agreement or understanding" that business would be "referred." 12 U.S.C. § 2607(a).

**B.    The Disgorgement Order Exceeds The CFPB's Statutory Authority And Is Otherwise Invalid.**

Provision V of the Order requires Petitioners to disgorge $109,188,618. But that equitable remedy is categorically unavailable under RESPA and suffers from numerous other legal flaws.

**1.**    RESPA's statutory provisions specifically and clearly address the penalties that violators may face, and disgorgement is not among them. *See* 12 U.S.C. § 2607(d)(4). To be sure, RESPA provides the CFPB with the ability to obtain equitable remedies through the *courts*, and, where injunctive relief is authorized by statute, "a *court* may award the full range of equitable relief, including disgorgement." Dec. 12 (emphasis added) (JA12). But that is irrelevant in this *administrative* proceeding: Agencies, unlike courts, have no inherent equitable authority. *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 708 (D.C. Cir. 2005).

Moreover, while the CFPB may seek disgorgement in an administrative action brought pursuant to the CFPA, *see* 12 U.S.C. § 5565(a)(2)(D), this action is controlled by the particular remedial provisions of RESPA. "'Where there is no clear intention otherwise,'" the Supreme Court has noted, "'a specific statute will not be controlled or nullified by a general one.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (citation omitted); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). There is no suggestion—let alone a

57

"clear" indication—that, in transferring authority from HUD to the CFPB, Congress intended to radically alter RESPA's remedial scheme. To the contrary, the CFPA provides that the CFPB "shall have all powers and duties that were vested in the Secretary of the Department of Housing and Urban Development relating to the Real Estate Settlement Procedures Act of 1974." 12 U.S.C. § 5581(b)(7)(B). The "powers and duties" exercised by HUD did *not* include disgorgement, and thus neither do the "powers and duties" now exercised by the CFPB.

Even assuming that the CFPA's remedial provisions applied here, they cannot be applied retroactively to penalize conduct that occurred *before* the CFPB itself was granted enforcement authority on July 21, 2011. That is so because HUD was statutorily authorized only to "bring an *action to enjoin* violations" of Section 8. *See* 12 U.S.C. § 2607(d)(4) (2006) (emphasis added); *see also* Mar. 5 Tr. 38 (JA261) ("[T]o the extent that the [CFPA] creates additional remedies . . . that HUD did not possess, [Enforcement Counsel] agree that those can only apply to conduct that occurred after the effective date of the statute."). If the CFPB wanted to seek disgorgement from PHH for conduct before July 21, 2011, it should have brought suit in court, which was all that HUD could have done. 12 U.S.C. § 2607(d)(4).

**2.**     The total amount of disgorgement also lacks any evidentiary foundation.   The $109 million sum is based on the Director's liability determination with respect to book years that were literally never evaluated by the ALJ.

In ruling on Petitioners' pre-trial motions, the ALJ held that "no claims arising from loans closed before July 21, 2008, are actionable."  Dkt. 152, at 14 (JA94) (citing 12 U.S.C. § 2614).  As a result, the ALJ analyzed only book years that included loans that closed on or after July 21, 2008:  UGI 2009, Genworth 2008-B, Radian 2008, and CMG 2008.  But when the Director adopted his new construction of Section 8(a) and found that the receipt of individual premiums violated the statute, regardless of when the underlying mortgage was settled, he effectively reached back in time to earlier book years.

Thus, of the $109 million in disgorgement ordered by the Director, approximately $102.6 million is based on reinsurance premiums received on loans originated *before* July 21, 2008—*i.e.*, on books of reinsurance business that the ALJ specifically *excluded* from consideration during the hearing.  Dec. 34–37 (JA34–37).  There was no relevant evidence on these books at the hearing, much less any findings of fact as to whether Petitioners performed actual reinsurance services and received bona fide compensation for those services.

**3.**    Disgorgement is meant to deprive violators of "ill-gotten gains," thus restoring the *status quo ante*. *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Although a disgorgement order may be based on a "reasonable approximation of profits causally connected to the violation," *SEC v. Whittemore*, 659 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks omitted), the relevant metric is "*profits*," *id.* (emphasis added), not gross receipts, *see United States v. Masters*, 924 F.2d 1362, 1369–70 (7th Cir. 1991) (disgorgement refers to "net, not gross revenues—profits, not sales, for only the former are gains").

The Director, however, calculated disgorgement based on the total *premiums* received from the mortgage reinsurers, which do not reflect the "profits" earned by Petitioners but total receipts. The Director's disgorgement calculation was flawed because it failed to discount reinsurance claims and commutation payments, which is necessary for deriving the alleged "profit." *Compare* Admin. Hr. Tr. 1905–07, 2307 (JA292–94, 307) (showing no profit expectation from Genworth 2008-B, and expected losses for UGI 2009 Book), *with* Dec. 34–35 (JA34–35) (basing yearly disgorgement calculation only on total gross premiums of $10,996,782 and $21,148,628). When a disgorgement award is based entirely on what an entity received, without accounting for costs, the disgorgement is not equitable but punitive. *See SEC v. Teo*, 746 F.3d 90, 106 n.29 (3d Cir. 2014) ("[R]evenue disgorgement (gross benefit) is generally understood as outside the traditional

60

realm of equity."). And Congress did not authorize HUD to seek punitive disgorgement, because, as the Director noted, HUD could have called upon only the equitable powers of courts. Dec. 12 (JA12). The Director's disgorgement order is therefore arbitrary, capricious, and contrary to law.

The Order further directs Petitioners to pay $2,104,108 as a result of reinsurance premiums paid by Radian and CMG, without acknowledging that Petitioners never received those premiums, which were held in trust accounts. Dec. 34, 36 (JA34, 36); Dkt. 205, at 30–31, 89 (JA136–37, 195). Nor does the Order acknowledge that, pursuant to the commutations of the Genworth and UGI agreements, more than $85 million of premiums was returned to those insurers. Statement of Undisputed Facts in Support of Motion for Summary Disposition, Dkt. 19, at 3 (JA68). Disgorgement notwithstanding, the commutations of those agreements would result in Petitioners paying twice—a result that is arbitrary by *any* measure. *See, e.g., Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (duplicative disgorgement order "not reasonable").

## III.    The Decision And Order Should Be Vacated.

The appropriate remedy for the Director's multiple legal errors is vacatur. *See* 5 U.S.C. § 706(2); *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). There is no doubt about the grave nature of these violations: The Decision and Order constitute unprecedented agency action that

ignores fundamental constitutional principles and the limits of the CFPB's statutory authority, all in order to punish a regulated entity with shocking monetary liability and vast injunctions for conduct undertaken years ago in reliance on well-established federal guidance. *See Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("The agency's errors could not be more serious insofar as it acted unlawfully, which is more than sufficient reason to vacate the rules.").

In addition, vacatur would not produce any disruptive consequences. Implementation of the Decision and Order was stayed pending the outcome of this appeal. By setting aside that action, this Court would simply maintain the status quo. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014).

## CONCLUSION

For the foregoing reasons, the Decision and Order should be vacated.

Dated:  December 11, 2015                    Respectfully submitted,

                                             /s/ Theodore B. Olson
Mitchel H. Kider                            Theodore B. Olson
David M. Souders                               *Counsel of Record*
Sandra B. Vipond                            Helgi C. Walker
Michael S. Trabon                           Scott P. Martin
WEINER BRODSKY KIDER PC                      GIBSON, DUNN & CRUTCHER LLP
1300 19th Street, N.W., Fifth Floor         1050 Connecticut Avenue, N.W.
Washington, D.C.  20036                     Washington, D.C.  20036
(202) 628-2000                              (202) 955-8500

Thomas M. Hefferon
William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000

*Counsel for Petitioners*

63

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 13,914 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that, on December 11, 2015, an electronic copy of the foregoing Brief for Petitioners was filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon the following counsel for respondent Consumer Financial Protection Bureau, who is a registered CM/ECF user:

Larry DeMille-Wagman
  *Enforcement Attorney*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street, N.W.
Washington, D.C.  20552

  /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500